## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO.

JOSE BASULTO, an individual, and
BROTHERS TO THE RESCUE, INC. a
Florida not-for-profit corporation,

      Plaintiffs,

v.

NETFLIX, INC., a Delaware corporation,
ORANGE STUDIOS, S.A., a French anonymous
society,  OLIVIER ASSAYAS, an individual,
NOSTROMO PICTURES, SL, a Spanish
corporation, US ONE COMERCIO
E SERVICIOS DE CRIACAO E PRODUCAO
DE OBRAS COM DIREITOS AUTORAIS, LTD, a
Brazilian limited company, CG CINEMA, SASU,
a French simplified joint stock company, RODRIGO
TEIXEIRA, an individual, CHARLES GILLIBERT,
an individual, and LOURENCO SANT'ANNA, an
individual,

      Defendants.

_____/

### **COMPLAINT**

Plaintiffs, JOSE BASULTO ("Mr. Basulto") and BROTHERS TO THE RESCUE, INC.

("Brothers to the Rescue") (Mr. Basulto and Brothers to the Rescue are hereafter collectively

referred to as, "Plaintiffs"), by and through undersigned counsel, hereby files their Complaint

against Defendants, NETFLIX, INC. ("Netflix"), ORANGE STUDIOS, S.A. ("Orange

Studios") OLIVIER ASSAYAS ("Assayas"), NOSTROMO PICTURES, SL ("Nostromo"), US

ONE COMERCIO E SERVICIOS DE CRIACAO E PRODUCAO DE OBRAS COM DIREITOS

AUTORAIS, LTD ("Comercio"), CG CINEMA, SASU ("CG Cinema"), RODRIGO TEIXEIRA

("Teixeira"),  CHARLES  GILLIBERT  ("Gillibert")  and  LOURENCO  SANT'ANNA

("Sant'Anna") (Netflix, Orange Studios, Assayas, Nostromo, Comercio, CG Cinema, Teixeira,

*Martinez v. Netflix, et al.*

Gillibert and Sant'Anna are hereafter collectively referred to as, "Defendants") and Plaintiffs allege as follows:

### **Nature of Action**

1)      This defamation action arises from Defendant Netflix, Inc.'s ("Netflix") release of the film *The Wasp Network* (the "Film") to its worldwide streaming service on June 19, 2020. Since then, the Film has been accessed by, and remains accessible to, more than 192 million Netflix subscribers and viewers.[1]   As elucidated below, Netflix has gone to great lengths to market and promote the Film as a "true story." In reality, the Film is not a true story because it is filled with egregious lies and false portrayals of Plaintiffs as terrorists and criminals.

2)      The Film falsely portrays Plaintiffs Brothers to the Rescue and its leader, Mr. Basulto, as terrorists who engaged in criminal, terrorist attacks and other terrorist activity, criminal drug trafficking activity, and other criminal activity. These false portrayals have absolutely no basis in fact, and Defendants have always known that the false portrayals of Plaintiffs in the Film have no basis in fact.

3)      The Film romanticizes, or glorifies, the criminal activity conducted by spies of Cuba's Ministry of the Interior, *i.e.*, the "Cuban Five," whose espionage work was responsible for the death of four Americans in 1996, as being based on "True Events."

4)      The Cuban Five were a group of Cuban intelligence officers dispatched to Miami in the early 1990s to spy on and sabotage Cuban exile organizations and U.S. Military Facilities. The Film is an obvious attempt to rewrite and whitewash history in favor of the communist Cuban regime and is factually inaccurate. The Film portrays the Cuban Five as courageous heroes who were simply defending their homeland. In reality, the Cuban Five

---

[1]      https://www.netflixinvestor.com/financials/sec-filings/default.aspx

*Martinez v. Netflix, et al.*

were a spy network that produced actionable intelligence enabling the Cuban government to commit extrajudicial killings.

5)      In addition, the Film falsely portrays the Cuban exile organizations, who were driven from their home country because of atrocities committed by the communist Cuban regime, as terrorists. Plaintiff Brothers to the Rescue, at times referenced in the film as "*Hermanos al Rescate,*" is one such Cuban exile organization. Plaintiff Mr. Basulto is the leader of Brothers to the Rescue.

6)      The economic and social crisis in Cuba resulted in the plight of thousands of Cubans trying to escape to the United States on makeshift rafts. Hundreds of Cubans died and were attacked by sharks. Brothers to the Rescue was dedicated to the search and rescue of Cuban rafters stranded in the Atlantic Ocean by flying planes to spot the rafters and dropping food and water from the planes for the rafters. Shockingly, and in violation of International Law, on February 24, 1996, Cuba shot down two Brothers to the Rescue planes with missiles while the planes were engaging in a humanitarian mission to search for and aid Cuban refugees fleeing on rafts in the Straits of Florida. The Brothers to the Rescue planes were defenseless and the four occupants of the planes died. It was the intelligence of the Cuban Five that enabled the Cuban regime to carry out the killings of these four Cuban Americans. Incredibly, in an attempt to justify the espionage of the Cuban Five and Cuba's action of shooting down the Brothers to the Rescue planes, the Film falsely represents that Brothers to the Rescue is a terrorist organization which engaged in terroristic activities against Cuba. Defendants have always known that the representations in the Film that Brothers to the Rescue is a terrorist organization are false.

7)      The Castro regime's statements that Brothers to the Rescue was engaged in covert operations, bombing campaigns, and commando operations in Cuba have no basis in fact.

*Martinez v. Netflix, et al.*

8)    The Film is straight out of the Cuban regime's 'playbook' and is now playing and being promoted under the guise of being "Based on True Events" or "based on a true story."

9)    However, the Film is not based on any non-fiction literature or any other work purporting to depict "true events," instead it was scripted from Brazilian author Fernando Morais' spy-thriller novel, *The Last Soldiers of the Cold War*. A review of the book states "Morais makes no effort to hide his sympathy for the 12 men and 2 women who were dispatched from Cuba…".[2] Another book by Morias was *La Isla (The Island)*, a story about the journey Morais made to Cuba and his personal encounters with Fidel Castro. A different book review states "The Island, a book that became the icon of the Left and quickly hit the best seller list. Of course, the book never mentioned Castro's assassinations, torture, dictatorship of the thousands of political prisoners."[3] These types of material omissions are no surprise because Morais was good friends with Castro and the Cuban regime since he interviewed Castro for the book in 1976. Defendants were aware of Morais' relationship with Castro and still did not hesitate to use his book as if it was a history textbook on the subject.[4] In addition Morais' *Last Soldiers of the Cold War* falsely states that Mr. Basulto was interviewed for the book, this interview never took place.[5] Put simply, Morais is not a traditional journalist in search of the truth, but rather another instrument to distribute the propaganda of the communist Cuban government.

10)    Further, the Film was filmed in large part in Cuba with the permission and oversight of the totalitarian and content censoring Cuban Communist Party. In order to film

---

[2]        https://www.startribune.com/review-the-last-soldiers-of-the-cold-war-by-fernando-morais-players-in-a-dangerous-game/308435931/
[3]        https://www.brazzil.com/13777-brazil-and-cuba-more-than-good-friends/
[4]        Producer of the film states that the writer of *The Last Soldiers of the Cold War*, Fernando Morais, was a "good friend of Fidel Castro" and that Fidel "always respected him" (Morias) after he wrote his first book about Fidel and Cuba, *The Island*.
https://www.youtube.com/watch?v=lHAuFC73GHM&t=849s - 00:08:31 – 00:08:51
[5]        The Last Soldiers of the Cold Ware – Page 270.

*Martinez v. Netflix, et al.*

in Cuba, you must be approved for a permit. According to the Film Commission of Cuba's website, there are some general requirements before obtaining a permit to film. Specifically, The Film Commission of Cuba requires: 1) A letter of intent with company information, **along with a script, storyboard or synopsis of the project**; 2) An estimated time period for production in Cuba; 3) Estimated budget and indication to the amount to be spent in Cuba; and 4) **Permits will not be granted if the script content is detrimental to the image of the country and people of Cuba**.[6] These requirements are particularly important when it comes to a defamation suit, as Cuba's content censoring communist party requires the "script, storyboard or synopsis of the project" to be submitted and expressly states that any project that paints Cuba in a negative light will be denied a permit. Thus, filming the true and accurate story was never even a possibility.

11) A significant portion of the Film portrays Mr. Basulto, played by actor Leonardo Sbaraglia, in a false and defamatory manner. The Film's portrayal of Mr. Basulto cannot be justified as the mere use of artistic license or dramatization. In the Film, which Defendants have marketed and promoted as being based on "True Events", Defendants depict Mr. Basulto, under his own name. The Film falsely describes Mr. Basulto as a terrorist trained by the United States government[7]. Mr. Basulto is falsely portrayed as the leader and recruiter of a terrorist organization who actively participates and coordinates drug trafficking and terrorist activities. The Film does not disclose the fact that Mr. Basulto was a humanitarian hero and leader of the non-violent, strictly humanitarian organization, Plaintiff Brothers to the Rescue.

12) Defendants acted with actual malice when publishing the Film because they knew that the portrayals of Plaintiffs Brothers to the Rescue and Mr. Basulto in the Film, and

---

[6]     Filmcommissioncuba.org – Permits and Regulations
[7]     Wasp Network 00:09:48 – 00:09:56

statements and conduct attributed to Plaintiffs Brothers to the Rescue and Mr. Basulto, were false.  At a minimum, Defendants exercised a reckless disregard for the manner in which Plaintiffs Brothers to the Rescue and Mr. Basulto were depicted in the Film by failing to conduct appropriate diligence of publicly available information with respect to the actual and accurate historical facts and instead opting to use a staggering amount of false information to develop a more exciting and persuasive movie, which was entirely fabricated with no basis in fact. Additionally, Plaintiffs Brothers to the Rescue and Mr. Basulto did not have any involvement with the production of the Film and were never consulted with respect to the events depicted therein. Also, Mr. Basulto wrote a book titled *Seagull One - The Amazing True Story of Brothers to the Rescue*. The facts contained in this book are completely ignored and clearly were never referenced when determining the accuracy of any scene. The Film's untruthful depiction of Brothers to the Rescue as "a terrorist cell" of Cuban Exiles and of Mr. Basulto as being the leader and organizer of the "terrorist cell" has caused irreparable harm to Brothers to the Rescue and Mr. Basulto and their previously celebrated reputation.[8]

13)   Not only does the Film depict Plaintiff Brothers to the Rescue and Mr. Basulto in a false and defamatory manner, but while doing so, the Film maligns the Cuban exile community in general.[9]  Many of these exiled individuals were driven from Cuba, largely due to their own government's repression.  By way of further example, the writer and director of the Film, Assayas, allowed his characters to refer to legitimate political dissidents with the official label of "*gusanos*" (a derogatory Spanish word used by the totalitarian communist

---

[8]     https://babalublog.com/2018/01/11/city-of-south-miami-names-street-after-jose-basulto-leader-of-the-brothers-to-the-rescue/

[9]     "It might be surprising to find a movie on Netflix that presents Cuban agents as self-sacrificing idealists and Miami exiles as right-wing terrorists" - https://www.jacobinmag.com/2020/08/wasp-network-five-cuban-revolution

*Martinez v. Netflix, et al.*

Cuban regime to describe those who did not agree with Castro's policies and were essentially considered "traitors" of the revolution).

14)   Defendants led the public to believe that the Film is a true and accurate account of what occurred, and all marketing and promotion of the Film conducted by Defendants further reinforce the "truth" of the account presented in the Film.

15)   Several Cuban Websites published articles to opine their thoughts on the accuracy of the Film. In general, the articles are in agreement that the Film is factually inaccurate [10] and serves to further the agenda of the Cuban government.

16)   Given the sheer volume of facts in the public record that directly contradict the manner in which Plaintiffs Brothers to the Rescue and Mr. Basulto are portrayed in the Film, Netflix's marketing and promotion of the Film as a truthful account of what occurred is both knowingly false and defamatory, as well as unconscionable. For example, the Film disregards the factual record established in various judicial and legislative proceedings, including, without limitation: *Alejandre v. Republic of Cuba*, 996 F. Supp. 1239 (S.D. Fla. 1997);  US Congressional findings encoded at 22 U.S. Code § 6046, titled "Condemnation of Cuban attack on American aircraft"; Jose J. Basulto v. The Republic of Cuba (S.D. Fla. 2003) and *United States v. Hernandez, et al.*, 124 F.Supp.2d 698 (S.D. Fla. 2000). Additionally, Netflix has previously been urged by the Assembly of the Cuban Resistance to correct the untruthful and defamatory portrayals of the Cuban exiles in the Film that were untruthfully touted as being "Based on True Events."

17)   Netflix has expressly sought to mislead its viewers to believe that the Film's false portrayal of Plaintiffs Brothers to the Rescue as a terrorist organization and the Film's false

---

[10]      https://www.cubacenter.org/archives/2020/6/24/cubabrief-the-wasp-network-that-killed-americans-and-plotted-a-terror-attack-on-us-soil-were-not-the-castro-regimes-last-soldiers-of-the-cold-war

*Martinez v. Netflix, et al.*

portrayal of Mr. Basulto as a member and leader of a Cuban terrorist community are accurate in form and substance.  In reality, the Film's portrayals of Brothers to the Rescue and Mr. Basulto in the Film are completely fabricated.  When marketing and promoting the Film as "Based on True Events," Netflix and its agents knew that the portrayals of Brothers to the Rescue and of Mr. Basulto were false and defamatory, and at a minimum, Netflix acted with reckless disregard in wrongfully assailing Mr. Basulto and Brothers to the Rescue.

18)  As a result of Netflix's publication of the Film, which continues to stream on its platform, and its representations that the Film is "Based on a True Story" (despite the fact that the source material for the Film is not non-fiction literature, but rather fictional drama, written by Fernando Morais, who was personal friends with the Cuban regime and Fidel Castro[11] ), Netflix has defamed Mr. Basulto and Brothers to the Rescue and caused harm to their name and reputation.

19)  Defendants' defamatory accusations have caused and continue to cause Brothers to the Rescue and Mr. Basulto irreparable harm.

20)  Mr. Basulto and Brothers to the Rescue now file this defamation action to set the record straight, to vindicate their rights under civil law, and to recover actual damages, punitive damages, and injunctive relief against Defendants.

## <u>PARTIES</u>

21)  Plaintiff, JOSE BASULTO, is a natural person and a resident of Miami-Dade County, Florida for decades.

22)  Plaintiff, BROTHERS TO THE RESCUE, INC., is a Florida not-for-profit corporation.

---

[11]     Producer of the film states that the writer of *The Last Soldiers of the Cold War*, Fernando Morais, was a "good friend of Fidel Castro" and that Fidel "always respected him" (Morias) after he wrote his first book about Fidel and Cuba, *The Island*.
https://www.youtube.com/watch?v=lHAuFC73GHM&t=849s - 00:08:31 – 00:08:51

*Martinez v. Netflix, et al.*

23)   Defendant, NETFLIX, INC., is a public corporation incorporated under the laws of the State of Delaware, and its principal place of business located at 100 Winchester Circle, Los Gatos, California 95023. Netflix is registered to do business in Florida. According to Netflix's 10-Q for the period ended June 30, 2020, they are "… the world's leading subscription streaming entertainment service with over 192 million paid streaming memberships in over 190 countries enjoying TV series, documentaries and feature films across a wide variety of genres and languages."[12]   In that quarter, Netflix provided its subscription based streaming service to 72.9 million U.S. subscribers, including many who are in the State of Florida.[13]

24)   Defendant, ORANGE STUDIOS, S.A. is a French anonymous society headquartered in France. Orange Studios, S.A. is a producer of *The Wasp Network.*

25)   Defendant, OLIVIER ASSAYAS,  is a filmmaker presently residing in France. Assayas is the writer and director of *The Wasp Network.*

26)   Defendant NOSTROMO PICTURES, SL, is a Spanish corporation headquartered in Spain and a producer of *The Wasp Network.*

27)   US ONE COMERCIO E SERVICIOS DE CRIACAO E PRODUCAO DE OBRAS COM DIREITOS AUTORAIS, LTD, a Brazilian limited company headquartered in Brazil and a producer of *The Wasp Network.*

28)   CG CINEMA, SASU, a French simplified joint stock company and a producer of *The Wasp Network.*

29)   Defendant RODGRIGO TEIXEIRA is an individual presently residing in Brazil and a producer of *The Wasp Network.*

---

[12]        https://www.netflixinvestor.com/financials/sec-filings/default.aspx
[13]        https://www.statista.com/statistics/250937/quarterly-number-of-netflix-streaming-subscribers-in-the-us/

30)   Defendant CHARLES GILLIBERT is an individual presently residing in France and a producer of *The Wasp Network*.

31)   Defendant LOURENCO SANT'ANNA is an individual presently residing in California and a producer of *The Wasp Network*.

<u>**JURISDICTION AND VENUE**</u>

32)   This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000, exclusive of interest and costs; and the parties are of diverse citizenship.

33)   The Court has personal jurisdiction over Netflix:

a)      pursuant to Section 48.193(1)(a)(1), Florida Statutes, because the causes of action arise from Netflix "operating, conducting, engaging in, or carrying on a business venture in this state."

b)      because Netflix continuously and systematically does business in Florida by streaming its content to subscribers residing in Florida, offering subscriptions to Florida residents via its website, engaging in film production activities in Florida, and premiering its original content in Florida.

c)      pursuant to Section 48.193(1)(a)(2), Florida Statutes, because the causes of action arise from Netflix "committing a tortious act within this state" by releasing *The Wasp Network* for viewing on its website, which contains false and defamatory statements about Mr. Basulto, and was, and continues to be, accessed by Netflix's Florida subscribers.

d)      pursuant to Section 48.193(1)(a)(6), Florida Statutes, because the causes of action arise from Netflix "causing injury to persons...within this state arising out of an act or omission by [Netflix] outside this state" and "at or about the time of the injury" Netflix was "engaged in solicitation or service activities within the

*Martinez v. Netflix, et al.*

state," and "products...processed, serviced, or manufactured anywhere" by Netflix "were used or consumed within this state in the ordinary course of commerce, trade, or use."

e)      pursuant to Section 48.193(2), Florida Statutes, because Netflix is engaged in substantial and not isolated activity within Florida, and therefore, Netflix is subject to the jurisdiction of the court of this state.

34)   The Court has personal jurisdiction over Defendants Orange Studios, Assayas, Nostromo, Comercio, CG Cinema, Teixeira, Gillibert and Sant'Anna because the causes of action alleged against them arise from their commission of a tortious act within Florida by participating in, facilitating and causing the publication of defamatory content on Netflix's website, namely *The Wasp Network*, for which Orange Studios, Nostromo, Comercio, CG Cinema, Teixeira, Gillibert and Sant'Anna served as the producers and Mr. Assayas served as writer and director, and which contains false and defamatory statements about Brothers to the Rescue and Mr. Basulto and was, and continues to be, accessed in Florida by Netflix subscribers. *See* Section 48.193 (1)(a)(2), Florida Statutes. *See* Section 48.193 (1)(a)(2), Florida Statutes. Further the causes of action arise from Defendants Netflix, Orange Studios, Assayas, Nostromo, Comercio, CG Cinema, Teixeira, Gillibert and Sant'Anna conspiring to portray Brothers to the Rescue and Mr. Basulto in a false and defamatory manner in *The Wasp Network. See Execu-Tech Business Sys., Inc. v. New Oji Paper Co., Ltd.*, 752 So. 2d 582 (Fla. 2000); *Wilcox v. Stout*, 637 So. 2d 335 (Fla. 2d DCA 1994). Indeed, Defendants Netflix, Orange Studios, Assayas, Nostromo, Comercio, CG Cinema, Teixeira, Gillibert and Sant'Anna agreed for Netflix to publish the Film in Florida.

35)   Netflix intended to and did publish the Film in Florida. Indeed, Netflix published and broadcast the Film nationally in the United States, including in Florida, on its website, platform and video streaming service.

*Martinez v. Netflix, et al.*

36)    Defendant Assayas wrote the script of the Film, directed the Film and intended for the Film to be published and broadcast nationally in the United States, including in Florida. Defendant Assayas intended and agreed with Defendants Netflix, Orange Studios, Nostromo, Comercio, CG Cinema, Teixeira, Gillibert and Sant'Anna for the Film to be published and broadcast by Netflix nationally in the United States, including in Florida.

37)    Defendants Orange Studios, Assayas, Nostromo, Comercio, CG Cinema, Teixeira, Gillibert and Sant'Anna produced the Film, including but not limited to producing the video content of the Film, financing the production of the Film, hiring and directing the actors and other participants involved in the creation of the Film (such video camera operators), creating the production schedule for the Film, and overseeing and coordinating the production of the Film. Defendants Netflix, Orange Studios, Assayas, Nostromo, Comercio, CG Cinema, Teixeira, Gillibert and Sant'Anna intended for the Film to be published and broadcast nationally in the United States, including in Florida. Defendants Netflix, Orange Studios, Assayas, Nostromo, Comercio, CG Cinema, Teixeira, Gillibert and Sant'Anna intended and agreed for the Film to be published and broadcast by Netflix nationally in the United States, including in Florida.

38)    The Film was accessed and viewed in Florida by Florida residents, including members of Plaintiffs' community.

39)    Venue is proper in this District pursuant to 28 U.S.C. § 1391 because this is the judicial district where a substantial part of the events or omissions that gave rise to the claims occurred.

40)    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the instant claim occurred in the Southern District of Florida where Mr. Basulto resides and where a substantial number of readers and potential readers who know and associate with Mr. Basulto are located who have

*Martinez v. Netflix, et al.*

viewed *The Wasp Network*, or seen attendant press coverage or social media posts about the same. Venue pursuant to 28 U.S.C. § 1391(b)(2) is also proper because this Court has personal jurisdiction over Defendants.

FACTS RELEVANT TO ALL CLAIMS

I.   HISTORICAL BACKGROUND

      a.  THE CUBAN REVOLUTION AND THE CUBAN FREEDOM FIGHTERS

41)  On the early morning of January 1, 1959, Cuban dictator Fulgencio Batista escaped to the Dominican Republic.

42)  The next day Castro occupied Santiago de Cuba.  By January 5th, his rebel army was in control of the military bases in Cuba.  By January 8th, Castro entered Havana as the leader of the Cuban Revolution.

43)  Within 30 days of victory, most officers and soldiers of the defeated army were discharged, exiled, incarcerated, subjected to cruel and inhumane treatment and killed via firing squad campaigns.  In some cases, by grotesque, circus-like televised trials and executions.  On January 13th, five days after he had marched into Havana, Castro's Council of Ministers approved into law the death penalty, and Cuba's Ministry of the Interior was founded on June 6, 1961 as a deadly and brutal force that suppressed all in opposition of Castro with shocking levels of violence.

44)  On March 3, 1959, a group of 43 pilots and mechanics of Batista's air force were accused of war crimes.  Presiding over the tribunal was a hero of the revolution Comandante Felix Pena, who fought against Batista in Santiago and later in the Sierra Cristal.

45)  The Court found that the evidence presented by the prosecution was inadequate and they were acquitted.  Castro was outraged by the tribunal's verdict and immediately went on TV to accuse the Revolutionary Court of being mistaken.  He ordered a retrial.  He claimed that when a verdict was unjust, the revolution had the right to appeal.

*Martinez v. Netflix, et al.*

46)   A new tribunal was immediately appointed.  Swiftly, the airmen were found guilty and sentenced to 30 years in prison and ten years of forced labor.  Felix Pena was found shot to death.  Castro was direct and to the point.  He stated that "[r]evolutionary justice is based not on legal precepts but on moral convictions" – a most tragic travesty for the judicial process in Cuba.

47)   In November 1959, ten months after taking power, Castro instructed a young Marxist, Hector Rodriguez Lompart, his Undersecretary of Commerce, to establish a direct link with Anastas Mikoyan, the first Deputy Chairman of the Soviet Union.   Rodriguez Lompart met with Mikoyan and arranged for a visit by the cunning Bolshevik to Havana.

48)   On February 5, 1960, Mikoyan arrived in Havana and met with Castro.  They reached a crucial economic and political agreement.   In 1960, the Soviet Union was to purchase 425,000 tons of sugar at the world price and one million tons of sugar each year for the following four years.  The era of Castro's close economic and military links with the communist Russia was dawning.

49)   On May 17, 1960, the three large oil refineries in Cuba – Standard Oil, Texaco, Royal Dutch (Shell) – were ordered by Castro to process Russian oil.  The refineries refused.  On June 29, 1960, Castro confiscated the three refineries.

50)   On August 6, 1960, Castro confiscated several U.S. owned corporations, including electrical and telephone companies and 36 sugar mills.

51)   By October, the revolution confiscated Cuban owned corporations, including Bacardi, financial institutions, sugar mills, cattle ranches, mining operations, theaters, and hotels.  It took Castro a quick 22 months to bury individual freedom and private ownership of property in Cuba.

52)   On October 18, 1960, President Dwight Eisenhower recalled the U.S. ambassadors and the next day imposed an embargo on all export from the United States to Cuba.

*Martinez v. Netflix, et al.*

53)   The Eisenhower administration was now ready to listen to the Central Intelligence Agency's ("CIA") recommendation that military assistance be provided to the Cuban exiles in Miami and the Cuban underground.  Greatly concerned with the Soviet Union's presence in Cuba, President Eisenhower issued a warning that "[t]his nation cannot and will not tolerate the establishment of a Soviet satellite ninety miles from our shores." *See* Graystone Lynch, DECISION FOR DISASTER, Washington: Brassey's, 2000.

54)   On March 17, 1960 ("March 17 meeting"), President Eisenhower authorized the CIA to develop a plan to overthrow the Castro regime.

55)   At the March 17 meeting at the White House, the President gave the green light for the CIA to create a Cuban exile military force to be trained for the deployment in Cuba.

56)   On August 18, 1960, the Eisenhower administration approved a $13 million dollar budget for covert operations in Cuba.  The Cuban freedom fighters inside the island did create a large and effective clandestine network.

57)   As the clandestine operation grew, the need to set up supply bases in the Florida Keys became clear as well as to provide extensive training to a hand-picked group of men in the complex skill of covert operations.  The Florida Keys became the main operational base of the maritime crews and the teams.  As the Union of Soviet Socialist Republics ("Soviet Union") began to increase their supply of weapons to Cuba, the Eisenhower administration decided to go for a powerful knockout punch with a well-trained and equipped assault brigade that would establish and hold a beachhead for further operations (the genesis of the Bay of Pigs).

58)   In response to the failed Bay of Pigs invasion of 1961, the Soviet Union agreed to Cuba's request to place nuclear missiles on the island pointed at the United States.

59)   From 1960 to 1972, hundreds of CIA-sponsored clandestine operations were carried on by Cuban exiles from Miami and the Florida Keys.

60)   In October 1971, one of the CIA's last maritime operations was directed at "Boca de Sama" inlet near the city of Banes in the Northern coast of Oriente.

61)   By 1972, the CIA's Cuban maritime and infiltration teams were placed in a reserve status.

62)   In 1976, they were permanently retired, and active clandestine operations were cancelled by the CIA.[14]

b.  BROTHERS TO THE RESCUE

63)   Brothers to the Rescue (in Spanish, "Hermanos al Rescate") is a Florida not-for-profit corporation that was formed in 1991 by Mr. Basulto, a Bay of Pigs veteran who has served as its President.

64)   Brothers to the Rescue is a pro-democracy, humanitarian organization. Its stated mission "is to promote and support the efforts of the Cuban people to free themselves from dictatorship through the use of active nonviolence."

65)   An integral part of the Brothers to the Rescue effort is to save the lives of refugees escaping the island of Cuba and to assist the families of political prisoners.

66)   Brothers to the Rescue conducted extensive humanitarian missions searching for rafters in the Florida Straits, through the efforts of a group of pilots, observers and volunteers from numerous countries.

67)   Brothers to the Rescue engaged in humanitarian work that conducted over 2,400 aerial search missions, resulting in the rescue of more than 4,200 Cuban rafters consisting

---

[14]      In 1976, all of the CIA operational facilities were dismantled.  The clandestine operations of the Cuban Freedom Fighters in Miami and the Florida Keys became abruptly illegal. As a result, the totalitarian regime in Cuba deployed a terrorist offensive to turn Central America into the principal battleground. It is obvious that Cuban spies in South Florida (1990 – 1998) were at the wrong place and wrong time.

*Martinez v. Netflix, et al.*

of men, women and children ranging from a five-day old infant to an elderly man of 79 years of age.

68)   It has been estimated that Brothers to the Rescue pilots have saved one life for every two hours of flight time.  This is considered a record rate among professional search and rescue organizations, such as the Civil Air Patrol and the United States Air Force.[15]

       c.   J<small>UAN</small> P<small>ABLO</small> R<small>OQUE</small>

69)   In February 1992, the government of Cuba sent its agent, Juan Pablo Roque ("Roque"), a Soviet-trained spy and MiG pilot and Major in the Cuban Air Force, to the shores of Guantanamo, where he falsely claimed to be a high-ranking defector from Cuba.

70)   Roque swam to the U.S. Military base in Guantanamo, Cuba, claiming to be a high-ranking military defector from Cuba.

71)   During 1994, Roque joined the Brothers to the Rescue organization in Miami.  As a former MiG fighter pilot with the rank of Major in the Cuban Air Force, Roque joined Brothers to the Rescue as one of its pilots.  He flew on many scouting missions with the Brothers.

       d.   T<small>HE</small> 1996 A<small>SSASSINATION OF</small> 4 B<small>ROTHERS TO THE</small> R<small>ESCUE</small> P<small>ILOTS</small>

72)   On Saturday, February 24, 1995, three civilian Brothers to the Rescue planes flew a humanitarian mission, searching for Cuban refugees in the Straits of Florida.

73)   The members of Brothers to the Rescue were flying unarmed and defenseless planes in a mission identical to hundreds they had flown since 1991 and posed no threat to the Cuban government, military, or people.

---

[15]      Additionally, there have been flights to drop food and water supplies to stranded rafters in deserted Bahamian Islands, as well as weekly deliveries of emergency food, medicine and clothing to a Cuban refugee detention camp in Nassau, Bahamas.  The organization has also conducted search missions for survivors of shipwrecks of U.S. citizens, Bahamians, Haitians and missing divers.

74)  Statements by the Cuban Government that Brothers to the Rescue had engaged in covert operations, bombing campaigns, and commando operations against the Government of Cuba have no basis in fact.

75)  The Brothers to the Rescue aircraft notified air traffic controllers as to their flight plans, which would take them north of the 24th parallel and close to Cuban airspace.

76)  International law provides a nation with airspace over the 12-mile territorial sea.

77)  The Castro regime's response to that Saturday afternoon's rescue mission flight was to scramble two fighter jets from a Havana airfield.

78)  At approximately 3:24 p.m., the pilot of one of the Cuban MiGs received permission and proceeded to shoot down one Brothers to the Rescue airplane more than 6 miles north of the Cuban exclusion zone, or 18 miles from the Cuban coast.

79)  Approximately 7 minutes later, the pilot of the Cuban fighter jet received permission and proceeded to shoot down the second Brothers to the Rescue airplane almost 18.5 miles north of the Cuban exclusion zone, or 30.5 miles from the Cuban coast.

80)  The Cuban dictatorship, if it truly felt threatened by the flight of these unarmed aircraft, could have and should have pursued other peaceful options as required by international law.

81)  However, that was not the case because on February 23, MININT officials met with Eugene Carroll, then rear admiral in the United States Navy, and insinuated that Cuba was capable and would shoot down Brothers to the Rescue planes—a warning Mr. Carroll took as a threat and took this information back to the U.S. government.[16]

---

[16]     The Queen of Cuba, Revisionist History, Malcolm Gladwell (2016) (also available through iTunes).

82)   Further, Castro admitted in a Time Magazine interview with Reginald K. Brack, Jr., the chairman of Time, Inc., that he ordered the downing of the planes and discussed the decision with his brother, Raul Castro.[17]

83)   It is clear that Castro and Cuban intelligence had been deliberately planning and premeditating the shoot-down of the planes for quite some time.

84)   The response chosen by the Castro regime—the use of lethal force—was completely inappropriate and disproportionate to the situation presented to the Cuban Government, making such actions a blatant and barbaric violation of international law and tantamount to cold-blooded murder.

85)   There were no survivors of the attack on these aircraft, and the crew of a third aircraft managed to escape this criminal attack by the Cuban Air Force.

86)   The crew members of the annihilated unarmed civilian airplanes—Pablo Morales, Carlos Costa, Mario de la Pena, and Armando Alejandre Jr.—were Miami-based U.S. citizens[18] flying on a voluntary basis with Brothers to the Rescue.

87)   This premeditated act took place after a week-long wave of repression by the Cuban government against Concilio Cubano, a Cuban-based umbrella organization of human rights activists, dissidents, independent economists, and independent journalists, among others.

88)   The wave of repression against Concilio Cubano, whose membership was committed to peaceful democratic change in Cuba, included arrests, strip searches, house arrests, and, in some cases, jail sentences lasting for a year or longer.

---

[17]     *Shoot-Down of the Brothers to the Rescue Planes, Hearing on H.R. 1999 Before the Subcomm. on Crime of the Comm. on the Judiciary*, 106th Cong. 63-608 (1999) (statement of George Fowler, General Counsel, Cuban American Nat'l Foundation).

[18]     With the exception of Pablo Morales who became a permanent US resident after being rescued at sea by the Brothers to the Rescue.

*Martinez v. Netflix, et al.*

e.  INTERNATIONAL CONDEMNATION OF THE 1996 ASSASSINATION

89)   There was an international condemnation of the 1996 criminal intentional

downing of the Brothers to the Rescue aircraft.

90)   On February 25, 1996, the Inter-American Commission on Human Rights ("the

Commission" or "the Inter-American Commission") issued a report stating the following:

> [The Commission] received several complaints brought against Cuba according
> to which a MIG-29 military aircraft belonging to the Cuban Air Force ("CAF")
> downed two unarmed civilian light airplanes belonging to the organization
> "Brothers to the Rescue."  According to the report issued by the International
> Civil Aviation Organization ("ICAO"), the incidents occurred on February 24,
> 1996 at 3:21 p.m. and 3:27 p.m., respectively, in international airspace.  The
> air-to-air missiles fired by the MiG-29 destroyed the civilian aircraft,
> immediately killing Armando Alejandre Jr. (45 years old), Carlos Alberto Costa
> (29), Mario Manuel de la Pena (24), and Pablo Morales (29).  The complaint
> concludes with the Commission being requested to begin proceedings in
> accordance with Articles 32 *et seq.* of its Regulations and to declare Cuba
> responsible for failing to comply with its international obligations contained in
> the American Declaration of the Rights and Duties of Man ("the Declaration"
> or "the American Declaration") for violating the right to life and the right to a
> fair trial as set forth in Articles I and XVIII of said international instrument.
>
> After showing that the first element causing the international responsibility of
> the Cuban State—the actions that violated the American Declaration of the
> Rights and Duties of Man—was present in the case at hand, the Commission
> also believes it has been clearly proven that those illicit actions were
> attributable to the State, in that the responsible agents were officers of the
> Cuban Air Force and were thus acting in performance of official functions.  This
> is confirmed by the eye-witnesses' reports, the International Civil Aviation
> Organization's investigation, and the transcript of the radio exchanges
> between the Havana control tower and the aircraft pilots who perpetrated the
> actions.  Consequently, the events of February 24, 1996 are attributable to the
> Cuban State.
>
> Cuba is responsible for violating the right to life (Article I of the American
> Declaration of the Rights and Duties of Man) to the detriment of Carlos Costa,
> Pablo Morales, Mario de la Pena, and Armando Alejandre, who died as a result
> of the direct actions of its agents on the afternoon of February 24, 1996 while
> flying through international airspace.

91)   The United Nations Security Council issued a press release stating that:

… [T]he unlawful downing of two civil aircraft on February 24 by the Cuban Airforce violated the principle that States must refrain from using weapons against airborne civil aircraft, the Security Council this afternoon condemned such use as being incompatible with the rules of customary international law contained in article 3 bis and annexes of the 1994 Chicago Convention on International Civil Aviation and with elementary consideration of humanity.

By the terms of the United States-sponsored resolution 1067 (1996), adopted by a  vote of 13 in favour to none against, with 2 abstentions (China, Russia Federation), the Council called upon Cuba to join other States in complying with their obligations to those provisions.  It urged all States that have not done so to ratify the Protocol adding article 3 to the Convention as soon as possible and comply with all of its provisions, pending the Protocol's entry into force.

Article 3 provides that every State must refrain from the use of weapons against civil aircraft in flight.  In case of interception, the lives of those aboard and the safety of the aircraft must not be endangered.

92)   Then-President Bill Clinton made a public statement condemning the attack.

93)   The Cuban Liberty and Democratic Solidarity (LIBERTAD) Act of 1996 was passed.

f.   THE CUBAN SPIES STAND TRIAL

94)   The Cuban Five (Gerardo Hernández, Antonio Guerrero, Ramón Labañino, Fernando González, and René González) were arrested in September 1998 and ultimately convicted in Miami of conspiracy to commit espionage, conspiracy to commit murder, acting as unregistered agents of a foreign government, and other illegal activities in the United States.

95)   All five were arrested in Miami on September 12, 1998 and were indicted by the U.S. government on 25 counts, including charges of false identification and conspiracy to commit espionage. Seven months later, Gerardo Hernández was indicted for conspiracy to commit murder in connection with the shoot-down of the Brothers to the Rescue aircraft

*Martinez v. Netflix, et al.*

96)   Because he was called back to Cuba immediately before the downing of the Brothers to the Rescue planes, Roque was not part of the trial.  However, a federal indictment charged Roque in 1999 with failing to register as a foreign agent and conspiring to defraud the United States.

97)   The trial began in November 2000 in the U.S. District Court for the Southern District of Florida and lasted seven months.  At the time, it was the largest and most complex case in the history of the Southern District of Florida.

98)   At the close of the evidence and closing arguments, jury deliberations lasted only a few hours.  In June 2001, the jury returned verdicts of guilty on all counts, including the charge of first-degree murder against Hernández for the murder of Pablo Morales, Carlos Costa, Mario de la Pena, and Armando Alejandre Jr., who had been shot down in international waters while flying a humanitarian rescue mission.

99)    In December 2001, the members of the group were sentenced to prison terms: two life terms for Hernández, to be served consecutively; life for Guerrero and Labañino; 19 years for Fernando González; and 15 years for René González.

## II.   *THE WASP NETWORK* FILM: THE FALSE AND DEFAMATORY PORTRAYALS OF MR. BASULTO AND BROTHERS TO THE RESCUE

100)  In the Film, which is presented as being "based on a true story," Defendants Netflix, Orange Studios, Assayas, Nostromo, Comercio, CG Cinema, Teixeira, Gillibert and Sant'Anna deliver a deceptive narrative that attempts to justify the crimes committed by the "Cuban Five," by describing them as courageous heroes who were defending their homeland, and further vilifies and falsely disparages Mr. Basulto, Brothers to the Rescue and the Cuban exiles as terrorists and being a community comprised of terrorists and drug traffickers.  *See*

*Martinez v. Netflix, et al.*

Scene 1 (00:01:30); *see also infra* at Section III.[19] To further demonstrate this point, Netflix's description of the film states "Based on a **true** and gripping story: Cuban spies **infiltrate exile groups in the 1990's to stop terrorism** against the island, but at a high personal cost".

101) This portrayal of Brothers to the Rescue and Mr. Basulto is inaccurate. Quite simply, there is no connection whatsoever among Mr. Basulto or Brothers to the Rescue organization to any terrorist attacks against Cuba or drug trafficking activity. The Film also fails to show why certain members of the Cuban diaspora chose to establish such civic-society groups abroad, *i.e.*, the Film generally ignores the fact that thousands of Cubans were robbed, imprisoned, beaten, and executed without trial under Castro's dictatorship. Yet, despite the foregoing inhumane and unlawful conduct, Defendants Netflix, Orange Studios, Assayas, Nostromo, Comercio, CG Cinema, Teixeira, Gillibert and Sant'Anna show no qualms in allowing the characters in the Film to refer to legitimate political dissidents with the official label of "worm" in Spanish (which translates to "traitor").

102) This portrayal of Mr. Basulto, Brothers to the Rescue and the Cuban exile community was deliberately calculated to create two clear and unmistakable villains for the Film to falsely portray as criminals and terrorists against Cuba and that is, Mr. Basulto and Brothers to the Rescue.

103) By doing so, the Film downplays the level and reach of the Wasp Network's espionage, by attempting to rewrite history in a dishonest and irresponsible way, romanticizing, sympathizing, and showing favoritism to the Cuban regime over the Cuban diaspora and exiled Cuban community.

---

[19]     Portions of the Film are identified herein using the "Scene" number from the Film's script and/or by a timecode that shows the approximate hours, minutes, and seconds (hh:mm:ss) of the relevant portion of the Film.

*Martinez v. Netflix, et al.*

104)  It is against this backdrop, where Cuban exiles are being portrayed in a false and negative light, that the Film venerates the espionage work of the "Cuban Five".

105) While maligning the Cuban exile community, in general, the Film also portrays Plaintiffs Brothers to the Rescue and Mr. Basulto in a false and defamatory manner in nearly every scene of the Film in which they appear.  The Film's portrayal of Brothers to the Rescue and Basulto cannot be justified as the mere use of artistic license or dramatization.

106) In the Film, which Defendants have repeatedly marketed, promoted, and categorically labelled as "based on true events", Defendants depict Brothers to the Rescue as a terrorist organization and Defendants depict Mr. Basulto, using his true name, as a criminal and terrorist leader, who is involved with drug trafficking and terrorist activities.

107) Specific examples of the defamatory scenes that appear throughout the Film, which contain false portrayals of Plaintiffs, include:

a)      Expectedly, The Film wastes no time to defame Mr. Basulto, the "Arch enemy of the Cuban Revolution" 00:08:40 – 00:08:43.

b)      Within the first ten minutes of the Film, Mr. Basulto, using his true name, falsely describes himself as a man who was "Trained by the U.S. as a terrorist." 00:09:48 – 00:09:56.

c)      While describing the Brothers to the Rescue job opportunity to Rene, Rene asked who pays the pilots, Basulto responds "Jorge Mas Canosa, money is not a problem for him." 00:10:40-00:10:50. Later in the Film,during the wedding scene, Mr. Basulto introduces Jorge Mas Canosa to Roque as the president of CANF. 00:46:04 - 00:46:27. In reality, Jorge Mas Canosa , did not attend the wedding. Then at a meeting in the White House, the representative for Cuba states "then you know that the CANF is financing terrorists and that the operations are carried on by mercenaries recruited in Central America." 01:41:40 – 01:42:00. These scenes combined paint the picture that Brothers to the Rescue and Mr.

*Martinez v. Netflix, et al.*

Basulto were funded by the criminal activities Jorge Mas Canosa and CANF, and that Brothers to the Rescue are "terrorists" who assist in "operations carried on by mercenaries recruited in Central America."

d)      While flying a Brothers to the Rescue plane with Rene, Basulto  is depicted saying "We are not just a humanitarian organization. We're a militant organization." 00:13:09 – 00:13:15. Mr. Basulto is referring to Brothers to the Rescue and this scene leaves no doubt that Mr. Basulto and Brothers to the Rescue are a "militant organization."

e)      While speaking with Roque to recruit Roque to fly with Brothers to the Rescue, Mr. Basulto explains to Roque that "We don't respect safety rules or the laws of aeronautics." When Roque responds to Mr. Basulto and tells him "My friend, that's illegal" Mr. Basulto "laughs" (as described by Netflix's Audio Description Subtitles) and says "Illegal…"  00:24:10 – 00:24:43

f)      The Film contains scenes which depict Brothers to the Rescue planes aiding and abetting an attempted terrorist attack against Cuba, and which undeniably paint the picture that Mr. Basulto is the recruiter and organizer for a terrorist group disguised as humanitarians. Immediately following the last scene where Mr. Basulto is recruiting Roque as a pilot for Brothers to the Rescue, Roque "flies one of Jose's planes over the open ocean" (Netflix's Audio Description Subtitles). The plane has the Brothers to the Rescue emblem on its side. While flying, Roque looks down at a Cuban Coast Guard boat and starts speaking over the radio. "November 58, Bravo-Bravo to base. **Cuban Coastguard spotted** at 23-80 by 81-77 heading north/north-west. 00:25:06-00:25:19. The Film then cuts to a boat captain at the helm with a man holding a machine gun standing over his shoulder, both listening to Roque's radio call which identified a Cuban Coast Guard ship and specified its coordinates and direction. The man holding the machine gun next to the captain then says "Cuban Coast Guard ahead, change course. South-Southeast Varadero." The captain nods his head in

*Martinez v. Netflix, et al.*

agreement. Then the Film depicts the boat turning in the ocean and shows three men in street clothes leaning against the back of the boat. Netflix's Audio Description Subtitles describe that scene by saying "Helmsman turns the wheel and the boat changes course, men hefting machine guns lean against the transom" 00:25:19 – 00:25:34. As such, the Film depicts Brothers to the Rescue serving as a lookout for terrorists planning to carry out an attack on Cuba. Brothers to the Rescue successfully warns the terrorists that the Cuban Coast Guard is nearby, and the terrorists change course. As described below, in a subsequent scene, Brothers to the Rescue serves as a lookout for terrorists, informs the terrorists that the Cuban Coast Guard is not nearby, and the terrorists proceed to carry out a terrorist attack. At a minimum, the foregoing scene (wherein Brothers to the Rescue warns the machinegun wielding men about the proximity of the Cuban Coast Guard) depicts Brothers to the Rescue aiding and abetting an illegal weapon smuggling mission. Directly after, Roque is seen landing the Brothers to the Rescue plane at the airport. Roque is wearing a Brothers to the Rescue shirt and walks over to meet Rene who is at the airport bar. 00:25:35 -00:25:45. Roque, referring to the terrorist and weapons smuggling mission he was just serving as the look-out for while flying for Brothers to Rescue, asks Rene "how did it go? Rene responds, "things went wrong". Roque then follows up with "nabbed by the Cubans?" Rene says "They changed course. Their engine broke down off Varadero. **U.S. Customs found. Seized their weapons.**" Roque then says "Shit!", "Hope they don't talk", "No one must know we guided them." 00:25:45- 00:26:06. These scenes leave viewers with no doubt that Mr. Basulto and Brothers to the Rescue participated in illegal terrorist and weapons smuggling activity that was thwarted by U.S. Customs.

      g)     When Olga is speaking about why she won't take her daughter and  join Rene to live in the United States, Olga mentions Mr. Basulto particularly. Stating that her

daughter will not "...live close to a terrorist, like Jose Basulto". 00:30:26-00:30:32. Thus, the Film once again expressly categorizes Mr. Basulto as a "terrorist."

h)        The next portion is particularly confusing and misleading. There is one line that is supposed to differentiate that Rene is no longer flying for Mr. Basulto and Brothers to the Rescue. Roberto says "I heard Rene left Basulto and joined the PUND, better pay supposedly, with them you never know where the fight for a free Cuba ends and drug smuggling begins". 00:30:44. The next scene, shows Rene flying a plane with Viamonte as his passenger. Viamonte directs him to continue south and when Rene questions him and says "its not our flight plan?", Viamonte asks "did you follow the flight plan when you were for the Hermanos?" And Rene responded with "not really" 00:31:00-00:31:06. Then Rene lands a plane to offload smuggled drugs.00:31:09-00:32:15. Rene infers that he committed illegal activities for the Brothers to the Rescue by admitting he didn't always follow the flight path. In addition, there is no second recruitment meeting with someone besides Mr. Basulto, and no visual depiction of Rene making a switch to work for a different origination. Thus, a regular viewer watching this scene would logically believe that Rene was depicted smuggling drugs for Brothers to the Rescue.

i)The Film contains additional scenes depicting Brothers to the Rescue aiding a successful terrorist attack in Cuba. The scenes display Mr. Basulto as approving of the terrorist attack and as the leader and orchestrator of the terrorist attacks against Cuba. These scenes leave no doubt that the Film is defamatory. 00:41:22 – 00:44:00:

(1)        Rene is seen flying a Brother to the Rescue plane as cover and as a lookout for a speedboat transporting men holding machine guns. Rene radios down to the boat to tell them the "sea is clear," informing the men with machine guns that there are no Cuban authorities to stop the terrorist attack the men plan to carry out. The man on the boat announces to the group of men holding machine guns "no coast guard, lets go!", and the

*Martinez v. Netflix, et al.*

men with the machine guns then run onto the beach and start shooting rounds in the air, while people are running for their lives and screaming. The screen then fades to black. Next, Mr. Basulto is pictured, sitting at the airport bar as Rene approaches. Mr. Basulto asks Rene "back from a mission?" and Rene responds by saying "Don't you have your sources" to which Mr. Basulto confirms by smiling and saying "they say the operation was a success. No casualties, but damage". Accordingly, the Film represents that Mr. Basulto has inside knowledge of the "operation" – *i.e.* the terrorist attack, the Film states that Mr. Basulto considers the terrorist attack a "success," and the Film states that Mr. Basulto considers the lack of casualties disappointing and is pleased with "damage" that was caused by the terrorist attack. These false depictions of Mr. Basulto approving of the terrorist attack and as connected to and coordinating the terrorist attack are extremely defamatory.

(2)     Rene then asks if the "damage" done was "bad," to which Mr. Basulto responds (while still smiling), "Bad enough. The Cubans won't shout it from the rooftops as you can imagine." Thus, the Film reinforces the false portrayal of Mr. Basulto being the organizer of the terrorist attack, being connected with the terrorist attack, approving of the terrorist attack, and having inside knowledge of the terrorist attack.

(3)     Rene then expressed his disgust with the mission he had just completed and says, "The Movimiento may be proud. Not me." Mr. Basulto responds by saying, "Why, if it's indiscreet?" Thus, the Film depicts Mr. Basulto as expressing that Rene should be proud of Rene's and Brothers to the Rescue's involvement in the terrorist attack. After Mr. Basulto expresses that Rene should be proud of the terrorist attack, Rene expresses further disgust and states "I didn't join the resistance to abet terrorists, just to save rafters" 00:42:23 – 00:42:37.  So, the film expressly uses the word "terrorist," leaving no doubt in the viewers' mind that Brothers to the Rescue and Mr. Basulto are terrorists and/or are abetting

*Martinez v. Netflix, et al.*

terrorists and that Mr. Basulto and Brothers to the Rescue are deeply involved and intertwined with terrorist activities.

j)      The Film continues to paint Mr. Basulto as the ringleader and mastermind of criminal Cuban Exile groups at the wedding scene. During the wedding, Mr. Basulto pulls Ana and Roque aside to come meet someone. That someone is Jorge Mas Canosa, President of the CANF. In fact, upon meeting Roque, Jorge Mas Canosa says "my friend Basulto, says your our best pilot". This introduction scene coupled with Jorge Mas Canosa referring to Mr. Basulto as his "friend" leaves no doubt that Mr. Basulto is involved with Jorge Mas Canosa and the purported terrorist activities and smuggling activities of CANF. 00:46:04 - 00:46:39. As stated earlier, the Cuban representative tells a White House representative that "…CANF is financing terrorists.." 01:41:40 - 01:42:00.  In addition, another scene depicts two weapons smugglers who were caught burying explosives and guns in Cuba, and " both confessed to taking orders from CANF." 01:03:12-01:13:19. These scenes provide the audience with the belief that Mr. Basulto is a pawn of CANF and actively plans and coordinates terrorist activities.

k)      The Film continues to defame Mr. Basulto in the tragic murder scene of the brave Brothers to the Rescue members. In this scene, the Film portrays the Brothers to the Rescue planes violating Cuban Air space when they were shot down, but in reality, the planes were shot down in international airspace, causing public outcry and condemnation of the Cuban regime internationally. 01:14:15 – 00:16:52. This representation is fabricated to shift blame away from the murderous Cuban government onto Plaintiffs Brothers to the Rescue and Mr. Basulto for "knowingly" endangering the pilots by having them fly in Cuban airspace, which is against the law. The false representation in the Film that the Brothers to the Rescue planes violated Cuban Air space is defamatory with respect to Brothers to the Rescue and Mr. Basulto.

*Martinez v. Netflix, et al.*

l)      To further blame Brothers to the Rescue and Mr. Basulto for the shootdown of the planes, the film added another false scene wherein Mr. Basulto is depicted flying over the city of Havana and dropping leaflets from the window. This scene is false and inaccurate. Mr. Basulto and Brothers to the Rescue studied the wind in the area and expertly dropped leaflets from international airspace, not Cuban airspace, and leaflets traveled by wind into Havana.[20] The Film falsely portrays Mr. Basulto and Brothers to the Rescue as illegally flying in Cuban airspace as another justification for Cuba's shootdown of the planes.

m)      Throughout the Film, Brothers to the Rescue and Mr. Basulto are depicted as being a part of the criminal enterprise composed of Cuban Exile groups. The film makes no effort to clear Mr. Basulto or Brothers to the Rescue's good name and instead purposely confuses and lumps the groups and Plaintffs Brothers to the Rescue and Mr. Basulto into the same criminal web. For example, (Roque on the news after returning to Cuba), states that "I was deceived by militants, claiming to be patriots but who were in fact organizing terrorist actions in Cuba while pretending to give humanitarian aid. They were told many times not to violate Cuban airspace. And I said it to Jose Basulto, you can ask him". Thus, the Film, once again, expressly refers to Plaintiffs Brothers to the Rescue and Basulto as "militants" who were "organizing terrorist actions." 01:18:50 – 01:19:43.

n)      There is also some narration throughout the film. One portion of the narration says ("During the period, the Wasp Network was able to thwart 20 terrorist attacks, and seize a large quantity of explosives, weapons, and cash"). 01:02:33 – 01:02:43.

o)      In Scene 65 of the Film, Ms. Martinez and Roque's Wedding, the Film shows an extravagant Rolls Royce arriving; a large cheering crowd outside the church; many rich "bigwigs" wearing flashy signet rings, guayaberas, sunglasses and smoking cigars; and

---

[20] https://www.youtube.com/watch?v=ePcIHwo1Jfc

*Martinez v. Netflix, et al.*

a lavish press presence. *See Scene* 65 (00:44:00-.00:48:20). All of the foregoing elements of the Film are entirely false and present a defamatory image of Mr. Basulto being involved in a mafioso-like lifestyle paid for by cocaine and terrorist activities. *Id.*

108) The "information" that was used to develop Plaintiffs Brothers to the Rescue and Mr. Basulto's character in the Film was fabricated. Based on the sheer volume of facts available in the public record which directly contradict the portrayal of Plaintiffs Brothers to the Rescue and Mr. Basulto in the Film, Defendants' marketing and promotion of the Film as a truthful account of what transpired between the Cuban spies and the Cuban exiles is unconscionable, defamatory and actionable.

109) Notably, the Defendants completely disregarded the undisputable factual record established in various judicial and legislative proceedings, including without limitation: *Martinez v. Republic of Cuba*, Eleventh Judicial Circuit Court in and for Miami-Dade County, Case No. 99-18208-CA-20; US Congressional findings encoded at 22 U.S. Code § 6046, titled "Condemnation of Cuban attach on American aircraft"; and *United States v. Hernandez, et al.*, 124 F.Supp.2d 698 (S.D. Fla. 2000).

110) Defendants have expressly sought to mislead its viewers to believe that the Film's false portrayal of Plaintiffs Brothers to the Rescue as a terrorist organization and of the Film's false portrayal of Mr. Basulto as a terrorist leader and leader of the Cuban criminal exile community, is accurate in form or substance, when in fact, the Defendants' portrayal of Plaintiffs Brothers to the Rescue and of Mr. Basulto was fabricated and false.

111) When marketing and promoting the Film as being based on "true" events, Defendants knew that the portrayal of Plaintiffs Brothers to the Rescue and of Mr. Basulto was false and defamatory.

*Martinez v. Netflix, et al.*

112) As a result of the publication of the Film, which continues to stream on Netflix's platform, Defendants have defamed Plaintiffs Brothers to the Rescue and Mr. Basulto and have caused Plaintiffs severe emotional distress.

### III.   DEFENDANTS' ASSERTIONS THAT *THE WASP NETWORK* IS A TRUE STORY

113) Netflix continuously advertises *The Wasp Network* as "Based on a true and gripping story" within the film's main description.

114) In fact, Netflix describes the Film on its platform as "Based on a true and gripping story: Cuban spies infiltrate exile groups in the 1990's to stop terrorism against the island, but at a high personal cost". Netflix's also represents the Film as: "Spy Movies, Movies based on real life".

115) Wasp Network's Credits and More Information page lists genres. The genres for this Film include "Movies based on real life" and "Movies based on books". As a result, when a customer specifically searches for titles "Based on real life", Wasp Network appears as a result.

116) The phrase "Based on a True Story" is boldly displayed within the Film's official movie trailer.

117) In the very first scene of the movie, seconds after the first character appears on screen, *The Wasp Network* displays, in large font, the phrase "**this is based on a true story**."



*Martinez v. Netflix, et al.*

118) It is apparent that the Defendants actively wanted viewers to believe that the film was factually accurate and authentic in every respect.

119) The Defendants gathered for a press conference in Toronto.[21] In the press conference, Assayas states "this is not a spy-thriller…its modern history…a movie based on fact". 00:09:15-00:09:30. Assays goes on to say "…when you're dealing with modern politics, you have to get your facts right … its vital because otherwise you get into partisan territory…" 00:09:34-00:09:46.

120)  Later, Assayas and some of the actors regathered to discuss the Film in another press conference.[22] In this press conference, Assayas said he researched it, checked it, and rechecked again, referring to accuracy of the film. 00:02:01- 00:02:08. Assayas also says "I write a scene based on fact" 00:02:30 – 00:02:42. Also, unsurprisingly, based on the Film Commission of Cuba's general requirements, Defendants ran into some legal issues filming in Cuba, that "never left the island" and Defendants thought they were going to be sued. 00:07:01 – 00:07:21. Assayas apparently "faced a lot of difficulties (from Cuban government) at the beginning but then was left the space to work.00:07:28-00:07:37. Also, the crew and producer said they were actively being "spied on" during the filming of the Film. 00:07:57-00:08:06. To further back up a point made earlier regarding Morias and the accuracy of his book, the producer of the film states that the writer of *The Last Soldiers of the Cold War*, Fernando Morais, was a "good friend of Fidel Castro" and that Fidel always respected him (Morias) after he wrote his first book about Fidel and Cuba, *The Island*. 00:08:31 – 00:08:51. Thus, Morias was given access to work in Cuba. Lastly, Assayas says when he was editing the Film, he was obsessed with being as fair as possible, and to give facts to be as precise as possible. 00:09:39-00:09:52. In direct contradiction to the directors statements in these press

---

[21]     https://www.youtube.com/watch?v=lHAuFC73GHM&t=849s
[22]     https://www.youtube.com/watch?v=cor23oys90o&t=889s

*Martinez v. Netflix, et al.*

conferences, Netflix's response to Plaintiff's notice letter stated "..modern day audiences of docudramas understand that they are watching dramatizations, not exacting recreations of events." Thus, anyone who heard these press conferences would be left with no question that this film was an accurate representation of the events that took place. Assayas makes no mention of artistic or dramatic emphasis and continued to double down on the idea that facts and accuracy were his main concern.

121) This has clearly had the intended impact on viewers and critics.[23] Specifically, numerous publications and viewer reviews have specifically noted that the film is a "true story." As a result, the viewing public has indeed been fooled into believing that *The Wasp Network* is a true account of real events that accurately depicts the characters therein, including Mr. Basulto.

### IV.   DEFENDANTS ARE PLACED ON NOTICE REGARDING DEFAMATION

122) The Assembly of the Cuban Resistance has urged Netflix to correct the untruthful and defamatory portrayals of the Cuban exiles in *The Wasp Network* that were untruthfully touted as being "Based on True Events." Correspondence dated July 30, 2020, addressed to Netflix's Chief Executive Officer, Wilmot Reed Hastings, informed Netflix that *The Wasp Network* is promoting the Castro regime's untruthful propaganda. The correspondence further informed Netflix that the film depicts "internationally recognized actors uttering the mantras (of communist propaganda); the embargo (not the regime) blamed for Cuba's condition, downplaying the level and reach of the Cuban government's espionage and murder conspiracy, the blanket labeling and portrayal of Cuban exiles as terrorists; attempted justification for crimes proven in a court of law and total disregard for the real victims." The

---

[23]   "It might be surprising to find a movie on Netflix that presents Cuban agents as self-sacrificing idealists and Miami exiles as right-wing terrorists" - https://www.jacobinmag.com/2020/08/wasp-network-five-cuban-revolution

*Martinez v. Netflix, et al.*

correspondence lamented that *The Wasp Network* is straight out of the Cuban regime's playbook and it is 'now playing' under the false and slanderous pretense of being "Based on True Events." Netflix did not respond to this letter.

123) On October 23, 2020, Plaintiffs, by and through counsel, delivered a Pre-Suit Notice Letter to Defendant Netflix, pursuant to Sections 770.01 and 770.02, Florida Statutes, specifying the harm caused by Defendants conduct, and providing written demands to remedy Defendant's actions.[24] In addition, on June 1, 2022, Plaintiffs sent a Pre-Suit Notice Letter to Defendants Netflix, Assayas and Orange Studios.[25] In the Notice Letters, Plaintiffs notified Netflix, Assayas and Orange Studios that the Film defames Plaintiffs, that Plaintiffs intended to file suit against Netflix, Assays and Orange Studios and Plaintiffs specified the defamatory statements and portrayals of Plaintiffs contained in the Film. Indeed, Plaintiffs elucidated in the Notice Letters, *inter alia*, how the Film falsely portrays Brothers to the Rescue as a terrorist organization and a drug and weapon trafficking organization, how the Film falsely portrays Mr. Basulto as the leader and member of a violent terrorist and criminal trafficking organization, how the Film falsely portrays Mr. Basulto as a recruiter for a terrorist and criminal organization looking to find pilots to carry out illegal activities, how the Film falsely portrays Plaintiffs participating in criminal activities, and how the Film falsely portrays Plaintiffs as having been associated with a criminal enterprise.

124) To be clear, Netflix and all other Defendants are not entitled to the Notice Letters or any pre-suit notice under Sections 770.01 and 770.02, Florida Statutes. The Notice Letters were only sent out of an abundance of caution and in an effort to obtain certain corrections and retractions. Plaintiffs Brothers to the Rescue and Mr. Basulto expressly reserve all legal

---

[24] The October 23, 2020 Notice Letter is attached hereto as Exhibit "A."

[25] The June 1, 2022 Notice Letters to Netflix, Assayas and Orange Studios are attached hereto as Exhibits "B," "C," and "D," respectively.

rights in this regard, including the right to maintain that Netflix (and all Defendants) is not a "media defendant" and is not entitled to pre-suit notice under Sections 770.01 and 770.02, Florida Statutes. Indeed, Netflix is not engaged in the dissemination of news and information through the news and broadcast media, the Film does not pertain to the dissemination of news, and the defamatory and false portrayals of Brothers to the Rescue and Mr. Basulto in the Film do not involve the dissemination of news.

125) In the Notice Letters, Plaintiffs Brothers to the Rescue and Mr. Basulto demanded that Netflix issue a "full and fair correction, apology, or retraction," outlined in the following terms: (i) Netflix must issue a public statement correcting the false and defamatory scenes concerning Plaintiffs Brothers to the Rescue and Mr. Basulto that appear in *The Wasp Network* as detailed herein above, (ii) Netflix must place a prominent and clearly visible disclaimer at the beginning of the film, which states that the film is a dramatization, is not a true story, and that the characters identified by their actual names in the film are not truthfully or accurately depicted therein, (iii) Netflix must categorize *The Wasp Network* as a fictional drama on all streaming services and marketing campaigns, and (iv) Netflix must remove all posts on its social media and any other print references which refer to *The Wasp Network* as a true, real, or fact-based story.

126) To the date of this Complaint, Netflix has failed to make any such retractions, apologies, or otherwise comply with Plaintiffs Brothers to the Rescue and Mr. Basulto's demands.

127) At all times, Netflix, Orange Studios, Assayas, Nostromo, Comercio, CG Cinema, Teixeira, Gillibert and Sant'Anna knew that the defamatory portrayals in the Film of Plaintiffs' Brothers to the Rescue and Mr. Basulto are false. Defendants knew that the portrayals in the Film of Plaintiffs' Brothers to the Rescue and Mr. Basulto as terrorists,

*Martinez v. Netflix, et al.*

approving of terrorism, aiding and abetting terrorists and as connected to and participating in criminal and drug trafficking activity are false.

128) In the alternative, Defendants Netflix, Orange Studios, Assayas, Nostromo, Comercio, CG Cinema, Teixeira, Gillibert and Sant'Anna created and published the Film with reckless disregard as to whether the portrayals in the Film of Plaintiffs Brothers to the Recue and Mr. Basulto are false or true.  Defendants Netflix, Orange Studios, Assayas, Nostromo, Comercio, CG Cinema, Teixeira, Gillibert and Sant'Anna created and published the Film with reckless disregard as to whether the portrayals in the Film of Plaintiffs Brothers to the Recue and Mr. Basulto as terrorists, approving of terrorism, aiding and abetting terrorists and as connected to and participating in criminal and drug trafficking activity are false or true.

129) As a minimum, Defendants acted negligently, and Defendants failed to exercise reasonable care in accurately portraying Plaintiffs' Brothers to the Rescue and Mr. Basulto in the Film. Defendants Netflix, Orange Studios, Assayas, Nostromo, Comercio, CG Cinema, Teixeira, Gillibert and Sant'Anna failed to exercise reasonable care as to whether the portrayals in the Film of Plaintiffs Brothers to the Recue and Mr. Basulto as terrorists, approving of terrorism, aiding and abetting terrorists and as connected to and participating in criminal and drug trafficking activity are false or true.

130) The Film harms Plaintiffs' Brothers to the Rescue and Mr. Basulto's reputation, deters third persons from associating and dealing with Plaintiffs and causes Plaintiffs humiliation, mental anguish and suffering.

131) In addition, Plaintiff Mr. Basulto has written books about his life, including books that contain factual content regarding Brothers to the Rescue as a humanitarian, nonviolent organization. Mr. Basulto's book sales are negatively impacted by the Film. Indeed, in falsely

*Martinez v. Netflix, et al.*

portraying Mr. Basulto and Brothers to the Rescue as terrorists, among other things, the Film falsely indicates that the content of Mr. Basulto's books are false.

132) Further, Brothers to the Rescue is a pro-democracy, humanitarian organization. Its mission is to promote and support the efforts of the Cuban people to free themselves from dictatorship through the use of active nonviolence. Rather than portraying Brothers to the Rescue as a humanitarian organization, the Film portrays Brothers to the Rescue as a terrorist organization. The Film also portrays Brothers to the Rescue as an organization that is affiliated with crime and drug trafficking. As a result, the Film has a detrimental impact on Brothers to the Rescue's ability to carry out its humanitarian goals, to fulfill its mission, to obtain monetary and non-monetary donations, to find people willing to work with and for Brothers to the Rescue, and to engage in its lawful business.

133) Defendants Netflix, Orange Studios, Assayas, Nostromo, Comercio, CG Cinema, Teixeira, Gillibert and Sant'Anna are not engaged in the dissemination of news.

134) The defamatory and false portrayals of Plaintiffs' Brothers to the Rescue and Mr. Basulto in the Film do not involve the dissemination of news.

<u>**CONDITIONS PRECEDENT**</u>

135) All conditions precedent to the institution of this action have been waived, performed, or have occurred.

<u>**ATTORNEYS' FEES AND COSTS**</u>

136) Plaintiff has retained the undersigned counsel to represent him in this action and is obligated to pay counsel a reasonable fee for their services. Plaintiff seeks to recover his reasonable attorney's fees and costs from Defendants pursuant to applicable law.

*Martinez v. Netflix, et al.*

### CAUSES OF ACTION

#### COUNT I - DEFAMATION *PER SE* (NEGLIGENCE)

(By Plaintiff Jose Basulto and against Defendants Netflix, Orange Studios, Assayas,
Nostromo, Comercio, CG Cinema, Teixeira, Gillibert and Sant'Anna)

137) Plaintiff Mr. Basulto incorporates by reference, re-alleges, and adopts paragraphs 1 through 136 of this Complaint as though fully stated herein.

138) This cause of action is for negligent defamation *per se* by Plaintiff Jose Basulto against the Defendants Netflix, Orange Studios, Assayas, Nostromo, Comercio, CG Cinema, Teixeira, Gillibert and Sant'Anna.

139) Defendants' publications of the false, defamatory statements are defamatory *per se*. The Film portrays Plaintiff Mr. Basulto as engaging in the commission of criminal offenses amounting to felonies and of having characteristics incompatible with the proper exercise of Mr. Basulto's lawful business and profession. The Film portrays Plaintiff Mr. Basulto in such a manner as to subject Mr. Basulto to hatred, distrust, ridicule, contempt and disgrace. Indeed, the Film falsely portrays Mr. Basulto as a terrorist, approving of terrorism, aiding and abetting terrorists and as connected to and participating in criminal and drug trafficking activity.

140) The falsehoods portrayed in *The Wasp Network* tend to degrade Plaintiff Mr. Basulto, bring Plaintiff Mr. Basulto into ill repute, and destroy confidence in Plaintiff Mr. Basulto's integrity.  Such falsehoods suggests that Mr. Basulto has committed corrupt and illegal actions.

141) The Film causes harm to Mr. Basulto's reputation and causes Mr. Basulto mental anguish and personal humiliation

*Martinez v. Netflix, et al.*

142) *The Wasp Network* therefore harms the reputation of Plaintiff Mr. Basulto. The Film lowers his reputation in the estimation of his community, and deters third persons from associating and dealing with Mr. Basulto.

143) Defendants have acted, at a minimum, negligently as to the falsity in publishing the false and defamatory material in *The Wasp Network*. Indeed, Defendants failed to exercise reasonable care as to whether the portrayals in the Film of Mr. Basulto are false or true.

144) Defendants' conduct causes Plaintiff Mr. Basulto damages.

145) Netflix is a major corporation and punitive damages are warranted in an amount sufficient to punish it and to deter it and others from such wrongful conduct.

**WHEREFORE**, Mr. Basulto prays for judgment against Defendants and an award of:

1. Damages in an amount to be determined at trial;

2. Punitive damages;

3. The entry of a permanent injunction prohibiting Netflix from making *The Wasp Network* in its current form available for streaming or in any other method of transmission or format; alternatively, the entry of a permanent mandatory injunction requiring Netflix to edit so as to delete the defamatory and false references to the Film being "Based on True Events" from any version made available for streaming or in any other method of transmission or format; and

4. For such other and further relief as the Court deems just and equitable.

### COUNT II – DEFAMATION *PER SE* (NEGLIGENCE)

(By Plaintiff Brothers to the Rescue, Inc. and against Defendants Netflix, Orange Studios, Assayas, Nostromo, Comercio, CG Cinema, Teixeira, Gillibert and Sant'Anna)

146) Plaintiff Brothers to the Rescue incorporates by reference, re-alleges, and adopts paragraphs 1 through 136 of this Complaint as though fully stated herein.

*Martinez v. Netflix, et al.*

147) This cause of action is for negligent defamation *per se* by Plaintiff Brothers to the Rescue against Defendants Netflix, Orange Studios, Assayas, Nostromo, Comercio, CG Cinema, Teixeira, Gillibert and Sant'Anna.

148) Defendants' publications of the false, defamatory statements are defamatory *per se*. The Film portrays Plaintiff Brothers to the Rescue as engaging in the commission of criminal offenses amounting to felonies and of having characteristics incompatible with the proper exercise of Brothers to the Rescue's lawful business and profession. The Film portrays Plaintiff Brothers to the Rescue in such a manner as to subject Brothers to the Rescue to hatred, distrust, ridicule, contempt and disgrace. Indeed, the Film falsely portrays Brothers to the Rescue as a terrorist organization, approving of terrorism, aiding and abetting terrorists and as connected to and participating in criminal and drug trafficking activity.

149) The falsehoods portrayed in *The Wasp Network* tend to degrade Plaintiff Brothers to the Rescue, bring Plaintiff Brothers to the Rescue into ill repute, and destroy confidence in Plaintiff Brothers to the Rescue's integrity. Such falsehoods suggests that Brothers to the Rescue has committed corrupt and illegal actions.

150) The Film causes harm to Plaintiff Brothers to the Rescue's reputation and causes Brothers to the Rescue mental anguish and humiliation

151) *The Wasp Network* therefore harms the reputation of Plaintiff Brothers to the Rescue. The Film lowers Brothers to the Rescue's reputation in the estimation of its community, and deters third persons from associating and dealing with Brothers to the Rescue.

152) Defendants have acted, at a minimum, negligently as to the falsity in publishing the false and defamatory material in *The Wasp Network*. Indeed, Defendants failed to exercise reasonable care as to whether the portrayals in the Film of Brothers to the Rescue are false or true.

*Martinez v. Netflix, et al.*

153) Defendants' conduct caused Plaintiff Brothers to the Rescue damages.

154) Netflix is a major corporation and punitive damages are warranted in an amount sufficient to punish it and to deter it and others from such wrongful conduct.

**WHEREFORE**, Brothers to the Rescue, Inc. prays for judgment against Defendants and an award of:

1.  Damages in an amount to be determined at trial;

2.  Punitive damages;

3.  The entry of a permanent injunction prohibiting Netflix from making *The Wasp Network* in its current form available for streaming or in any other method of transmission or format; alternatively, the entry of a permanent mandatory injunction requiring Netflix to edit so as to delete the defamatory and false references to the Film being "Based on True Events" from any version made available for streaming or in any other method of transmission or format; and

4.  For such other and further relief as the Court deems just and equitable.

**COUNT III - DEFAMATION *PER SE* (KNOWING OR RECKLESS DISREGARD)**

(By Plaintiff Jose Basulto and against Defendants Netflix, Orange Studios, Assayas, Nostromo, Comercio, CG Cinema, Teixeira, Gillibert and Sant'Anna)

155) Plaintiff Jose Basulto incorporates by reference, re-alleges, and adopts paragraphs 1 through 136 of this Complaint as though fully stated herein.

156) In the alternative to Count I, which alleges <u>negligent</u> defamation *per se*, Mr. Basulto brings this cause of action against Defendants Netflix, Orange Studios, Assayas, Nostromo, Comercio, CG Cinema, Teixeira, Gillibert and Sant'Anna for <u>knowing or reckless</u> defamation *per se* and alleges that Defendants acted with knowing or reckless disregard as to the truth in publishing the false and defamatory material in *The Wasp Network*.

*Martinez v. Netflix, et al.*

157) At all times, Defendants Netflix, Orange Studios, Assayas, Nostromo, Comercio, CG Cinema, Teixeira, Gillibert and Sant'Anna knew that the defamatory portrayals in the Film of Plaintiff Jose Basulto are false. Defendants knew that the portrayals in the Film of Plaintiff Mr. Basulto as a terrorist, approving of terrorism, aiding and abetting terrorists and as connected to and participating in criminal and drug trafficking activity are false.

158) In the alternative, Defendants Netflix, Orange Studios, Assayas, Nostromo, Comercio, CG Cinema, Teixeira, Gillibert and Sant'Anna created and published the Film with reckless disregard as to whether the portrayals in the Film of Plaintiff Mr. Basulto are false or true. Defendants Netflix, Orange Studios, Assayas, Nostromo, Comercio, CG Cinema, Teixeira, Gillibert and Sant'Anna created and published the Film with reckless disregard as to whether the portrayals in the Film of Plaintiff Mr. Basulto as a terrorist, approving of terrorism, aiding and abetting terrorists and as connected to and participating in criminal and drug trafficking activity are false or true.

159) Defendants' publications of the false, defamatory statements are defamatory *per se*. The Film portrays Plaintiff Mr. Basulto as engaging in the commission of criminal offenses amounting to felonies and of having characteristics incompatible with the proper exercise of Mr. Basulto's lawful business and profession. The Film portrays Plaintiff Mr. Basulto in such a manner as to subject Mr. Basulto to hatred, distrust, ridicule, contempt and disgrace. Indeed, the Film falsely portrays Mr. Basulto as a terrorist, approving of terrorism, aiding and abetting terrorists and as connected to and participating in criminal and drug trafficking activity.

160) The falsehoods portrayed in *The Wasp Network* tend to degrade Mr. Basulto, bring Mr. Basulto into ill repute, and destroy confidence in Mr. Basulto's integrity. Such falsehoods suggests that Mr. Basulto has committed dishonest and illegal actions.

*Martinez v. Netflix, et al.*

161) The Film causes harm to Mr. Basulto's reputation and causes Mr. Basulto mental anguish and personal humiliation

162) *The Wasp Network* therefore harms the reputation of Mr. Basulto, as to lower him in the estimation of the community, or to deter third persons from associating or dealing with Mr. Basulto.

163) Defendants' conduct caused Mr. Basulto damages.

164) Netflix is a major corporation and punitive damages are warranted in an amount sufficient to punish it and to deter it and others from such wrongful conduct.

**WHEREFORE**, Mr. Basulto prays for judgment against Defendants and an award of:

1. Damages in an amount to be determined at trial;

2. Punitive damages;

3. The entry of a permanent injunction prohibiting Netflix from making *The Wasp Network* in its current form available for streaming or in any other method of transmission or format; alternatively, the entry of a permanent mandatory injunction requiring Netflix to edit so as to delete the defamatory and false references to the Film being "Based on True Events" from any version made available for streaming or in any other method of transmission or format; and

4. For such other and further relief as the Court deems just and equitable.

**COUNT IV - DEFAMATION *PER SE* (KNOWING OR RECKLESS DISREGARD)**

(By Plaintiff Brothers to the Rescue and against Defendants Netflix, Orange Studios, Assayas, Nostromo, Comercio, CG Cinema, Teixeira, Gillibert and Sant'Anna)

165) Plaintiff Brothers to the Rescue, Inc. incorporates by reference, re-alleges, and adopts paragraphs 1 through 136 of this Complaint as though fully stated herein.

166) In the alternative to Count II, which alleges <u>negligent</u> defamation *per se*, Plaintiff Brothers to the Rescue brings this cause of action against Defendants Netflix, Orange

*Martinez v. Netflix, et al.*

Studios, Assayas, Nostromo, Comercio, CG Cinema, Teixeira, Gillibert and Sant'Anna for

<u>knowing or reckless</u> defamation *per se* and alleges that Defendants acted with knowing or

reckless disregard as to the truth in publishing the false and defamatory material in *The*

*Wasp Network*.

167) At all times, Defendants Netflix, Orange Studios, Assayas, Nostromo, Comercio,

CG Cinema, Teixeira, Gillibert and Sant'Anna knew that the defamatory portrayals in the

Film of Plaintiff Brothers to the Rescue are false. Defendants knew that the portrayals in the

Film of Plaintiff Brothers to the Rescue as a terrorist organization, approving of terrorism,

aiding and abetting terrorists and as connected to and participating in criminal and drug

trafficking activity are false.

168) In the alternative, Defendants Netflix, Orange Studios, Assayas, Nostromo,

Comercio, CG Cinema, Teixeira, Gillibert and Sant'Anna created and published the Film

with reckless disregard as to whether the portrayals in the Film of Plaintiff Brothers to the

Rescue are false or true.  Defendants Netflix, Orange Studios, Assayas, Nostromo, Comercio,

CG Cinema, Teixeira, Gillibert and Sant'Anna created and published the Film with reckless

disregard as to whether the portrayals in the Film of Plaintiff Brothers to the Rescue as a

terrorist organization, approving of terrorism, aiding and abetting terrorists and as

connected to and participating in criminal and drug trafficking activity are false or true.

169) Defendants' publications of the false, defamatory statements are defamatory *per*

*se*. The Film portrays Plaintiff Brothers to the Rescue as engaging in the commission of

criminal offenses amounting to felonies and of having characteristics incompatible with the

proper exercise of Brothers to the Rescue's lawful business and profession. The Film portrays

Plaintiff Brothers to the Rescue in such a manner as to subject Brothers to the Rescue to

hatred, distrust, ridicule, contempt and disgrace. Indeed, the Film falsely portrays Brothers

*Martinez v. Netflix, et al.*

to the Rescue as a terrorist organization, approving of terrorism, aiding and abetting terrorists and as connected to and participating in criminal and drug trafficking activity.

170) The falsehoods portrayed in *The Wasp Network* tend to degrade Brothers to the Rescue, bring Mr. Basulto into ill repute, and destroy confidence in Brothers to the Rescue's integrity.  Such falsehoods suggests that Brothers to the Rescue has committed dishonest and illegal actions.

171) The Film causes harm to Brothers to the Rescue's reputation and causes Brothers to the Rescue mental anguish and humiliation

172) *The Wasp Network* therefore harms the reputation of Brothers to the Rescue, as to lower it in the estimation of its community, or to deter third persons from associating or dealing with Brothers to the Rescue.

173) Defendants' conduct caused Brothers to the Rescue damages.

174) Netflix is a major corporation and punitive damages are warranted in an amount sufficient to punish it and to deter it and others from such wrongful conduct.

**WHEREFORE**, Brothers to the Rescue prays for judgment against Defendants and an award of:

1.   Damages in an amount to be determined at trial;

2.   Punitive damages;

3.   The entry of a permanent injunction prohibiting Netflix from making *The Wasp Network* in its current form available for streaming or in any other method of transmission or format; alternatively, the entry of a permanent mandatory injunction requiring Netflix to edit so as to delete the defamatory and false references to the Film being "Based on True Events" from any version made available for streaming or in any other method of transmission or format; and

4.   For such other and further relief as the Court deems just and equitable.

*Martinez v. Netflix, et al.*

### COUNT V- DEFAMATION *PER QUOD* (NEGLIGENCE)

(By Plaintiff Jose Basulto and against Defendants Netflix, Orange Studios, Assayas, Nostromo, Comercio, CG Cinema, Teixeira, Gillibert and Sant'Anna)

175) Plaintiff Jose Basulto incorporates by reference, re-alleges, and adopts paragraphs 1 through 136 of this Complaint as though fully stated herein.

176) This cause of action is brought by Plaintiff Jose Basulto and against the Defendants Netflix, Orange Studios, Assayas, Nostromo, Comercio, CG Cinema, Teixeira, Gillibert and Sant'Anna for Negligent Defamation *Per Quod*.

177) Defendants' publications of the false, defamatory statements are defamatory *per quod* because they portray or imply a want of integrity in Mr. Basulto's professional life, particularly their depiction of Mr. Basulto's actions and his ties to "terrorist cells" and purported drug traffickers.

178) The Film portrays Plaintiff Mr. Basulto as engaging in the commission of criminal offenses amounting to felonies and of having characteristics incompatible with the proper exercise of Mr. Basulto's lawful business and profession. The Film portrays Plaintiff Mr. Basulto in such a manner as to subject Mr. Basulto to hatred, distrust, ridicule, contempt and disgrace. Indeed, the Film falsely portrays Mr. Basulto as a terrorist, approving of terrorism, aiding and abetting terrorists and as connected to and participating in criminal and drug trafficking activity.

179) The falsehoods portrayed or implied in *The Wasp Network* tend to degrade Mr. Basulto, bring Mr. Basulto into ill repute, and destroy confidence in Mr. Basulto's integrity. Such falsehoods suggest and impute that Mr. Basulto has committed corrupt and illegal actions.

180) The Film causes harm to Mr. Basulto's reputation and causes Mr. Basulto mental anguish and personal humiliation

*Martinez v. Netflix, et al.*

181) *The Wasp Network* harms the reputation of Mr. Basulto, as to lower him in the estimation of the community, or to deter third persons from associating or dealing with Mr. Basulto.

182) Defendants have acted, at a minimum, negligently as to the falsity in publishing the false and defamatory material in *The Wasp Network*. Indeed, Defendants failed to exercise reasonable care as to whether the portrayals in the Film of Mr. Basulto are false or true.

183) Defendants' conduct caused Mr. Basulto damages, including but not limited to actual damages and/or special damages.

184) Netflix is a major corporation and punitive damages are warranted in an amount sufficient to punish it and to deter it and others from such wrongful conduct.

**WHEREFORE**, Mr. Basulto prays for judgment against Defendants and an award of:

1. Damages in an amount to be determined at trial;

2. Punitive damages;

3. The entry of a permanent injunction prohibiting Netflix from making *The Wasp Network* in its current form available for streaming or in any other method of transmission or format; alternatively, the entry of a permanent mandatory injunction requiring Netflix to edit so as to delete the defamatory and false references to the Film being "Based on True Events" from any version made available for streaming or in any other method of transmission or format; and

4. For such other and further relief as the Court deems just and equitable.

### COUNT VI - DEFAMATION *PER QUOD* (NEGLIGENCE)

(By Plaintiff Brothers to the Rescue and against Defendants Netflix, Orange Studios, Assayas, Nostromo, Comercio, CG Cinema, Teixeira, Gillibert and Sant'Anna)

*Martinez v. Netflix, et al.*

185) Plaintiff Brothers to the Rescue incorporates by reference, re-alleges, and adopts paragraphs 1 through 136 of this Complaint as though fully stated herein.

186) This cause of action is brought by Plaintiff Brothers to the Rescue and against the Defendants Netflix, Orange Studios, Assayas, Nostromo, Comercio, CG Cinema, Teixeira, Gillibert and Sant'Anna for Negligent Defamation *Per Quod*.

187) Defendants' publications of the false, defamatory statements are defamatory *per quod* because they portray or imply a want of integrity in Brothers to the Rescue professional and business, particularly their depiction of Brothers to the Rescue's actions and ties to "terrorist cells" and purported drug traffickers.

188) The Film portrays Plaintiff Brothers to the Rescue as engaging in the commission of criminal offenses amounting to felonies and of having characteristics incompatible with the proper exercise of Brothers to the Rescue's lawful business and profession. The Film portrays Plaintiff Brothers to the Rescue in such a manner as to subject Brothers to the Rescue to hatred, distrust, ridicule, contempt and disgrace. Indeed, the Film falsely portrays Brothers to the Rescue as a terrorist, approving of terrorism, aiding and abetting terrorists and as connected to and participating in criminal and drug trafficking activity.

189) The falsehoods portrayed or implied in *The Wasp Network* tend to degrade Brothers to the Rescue, bring Brothers to the Rescue into ill repute, and destroy confidence in Mr. Basulto's integrity. Such falsehoods suggest and impute that Brothers to the Rescue has committed corrupt and illegal actions.

190) The Film causes harm to Brothers to the Rescue's reputation and causes Brothers to the Rescue mental anguish and humiliation

191) *The Wasp Network* harms the reputation of Brothers to the Rescue, as to lower it in the estimation of the community and to deter third persons from associating or dealing with Brothers to the Rescue.

*Martinez v. Netflix, et al.*

192) Defendants have acted, at a minimum, negligently as to the falsity in publishing the false and defamatory material in *The Wasp Network*. Indeed, Defendants failed to exercise reasonable care as to whether the portrayals in the Film of Brothers to the Rescue are false or true.

193) Defendants' conduct caused Brothers to the Rescue damages, including but not limited to actual damages and/or special damages.

194) Netflix is a major corporation and punitive damages are warranted in an amount sufficient to punish it and to deter it and others from such wrongful conduct.

**WHEREFORE**, Brothers to the Rescue prays for judgment against Defendants and an award of:

1. Damages in an amount to be determined at trial;

2. Punitive damages;

3. The entry of a permanent injunction prohibiting Netflix from making *The Wasp Network* in its current form available for streaming or in any other method of transmission or format; alternatively, the entry of a permanent mandatory injunction requiring Netflix to edit so as to delete the defamatory and false references to the Film being "Based on True Events" from any version made available for streaming or in any other method of transmission or format; and

4. For such other and further relief as the Court deems just and equitable.

**COUNT VII - DEFAMATION *PER QUOD* (KNOWING OR RECKLESS DISREGARD)**

(By Plaintiff Jose Basulto and against Defendants Netflix, Orange Studios, Assayas, Nostromo, Comercio, CG Cinema, Teixeira, Gillibert and Sant'Anna)

195) Plaintiff Jose Basulto incorporates by reference, re-alleges, and adopts paragraphs 1 through 136 of this Complaint as though fully stated herein.

*Martinez v. Netflix, et al.*

196) In the alternative to Count V, which alleges <u>negligent</u> defamation *per quod*, Mr. Basulto brings this cause of action against Defendants Netflix, Orange Studios, Assayas, Nostromo, Comercio, CG Cinema, Teixeira, Gillibert and Sant'Anna for <u>knowing or reckless</u> defamation *per quod* and alleges that Defendants acted with knowing or reckless disregard as to the truth in publishing the false and defamatory material in *The Wasp Network*.

197) At all times, Defendants Netflix, Orange Studios, Assayas, Nostromo, Comercio, CG Cinema, Teixeira, Gillibert and Sant'Anna knew that the defamatory portrayals in the Film of Plaintiff Jose Basulto are false. Defendants knew that the portrayals in the Film of Plaintiff Mr. Basulto as a terrorist, approving of terrorism, aiding and abetting terrorists and as connected to and participating in criminal and drug trafficking activity are false.

198) In the alternative, Defendants Netflix, Orange Studios, Assayas, Nostromo, Comercio, CG Cinema, Teixeira, Gillibert and Sant'Anna created and published the Film with reckless disregard as to whether the portrayals in the Film of Plaintiff Mr. Basulto are false or true.  Defendants Netflix, Orange Studios, Assayas, Nostromo, Comercio, CG Cinema, Teixeira, Gillibert and Sant'Anna created and published the Film with reckless disregard as to whether the portrayals in the Film of Plaintiff Mr. Basulto as a terrorist, approving of terrorism, aiding and abetting terrorists and as connected to and participating in criminal and drug trafficking activity are false or true.

199) Defendants' publications of the false, defamatory statements are defamatory *per quod* because they portray or imply a want of integrity in Mr. Basulto professional life, particularly their depiction of Mr. Basulto's actions and his ties to "terrorist cells" and purported drug traffickers.

200) The Film portrays Plaintiff Mr. Basulto as engaging in the commission of criminal offenses amounting to felonies and of having characteristics incompatible with the proper exercise of Mr. Basulto's lawful business and profession. The Film portrays Plaintiff Mr.

Basulto in such a manner as to subject Mr. Basulto to hatred, distrust, ridicule, contempt and disgrace. Indeed, the Film falsely portrays Mr. Basulto as a terrorist, approving of terrorism, aiding and abetting terrorists and as connected to and participating in criminal and drug trafficking activity.

201) The falsehoods portrayed or implied in *The Wasp Network* tend to degrade Mr. Basulto, bring Mr. Basulto into ill repute, and destroy confidence in Mr. Basulto's integrity. Such falsehoods suggest and impute that Mr. Basulto has committed dishonest and illegal actions.

202) The Film causes harm to Mr. Basulto's reputation and causes Mr. Basulto mental anguish and personal humiliation

203) *The Wasp Network* harms the reputation of Mr. Basulto, as to lower him in the estimation of the community, or to deter third persons from associating or dealing with Mr. Basulto.

204) Defendants have acted, at a minimum, negligently as to the falsity in publishing the false and defamatory material in *The Wasp Network*.

205) Defendants' conduct caused Mr. Basulto damages, including but not limited to actual damages and/or special damages.

206) Netflix is a major corporation and punitive damages are warranted in an amount sufficient to punish it and to deter it and others from such wrongful conduct.

**WHEREFORE**, Mr. Basulto prays for judgment against Defendants and an award of:

1. Damages in an amount to be determined at trial;

2. Punitive damages;

3. The entry of a permanent injunction prohibiting Netflix from making *The Wasp Network* in its current form available for streaming or in any other method of transmission or format; alternatively, the entry of a permanent mandatory injunction

*Martinez v. Netflix, et al.*

requiring Netflix to edit so as to delete the defamatory and false references to the Film being "Based on True Events" from any version made available for streaming or in any other method of transmission or format; and

       4.   For such other and further relief as the Court deems just and equitable.

### COUNT VIII - DEFAMATION *PER QUOD* (KNOWING OR RECKLESS DISREGARD)

(By Plaintiff Brothers to the Rescue and against Defendants Netflix, Orange Studios, Assayas, Nostromo, Comercio, CG Cinema, Teixeira, Gillibert and Sant'Anna)

207) Plaintiff Brothers to the Rescue incorporates by reference, re-alleges, and adopts paragraphs 1 through 136 of this Complaint as though fully stated herein.

208) In the alternative to Count VI, which alleges <u>negligent</u> defamation *per quod*, Brothers to the Rescue brings this cause of action against Defendants Netflix, Orange Studios, Assayas, Nostromo, Comercio, CG Cinema, Teixeira, Gillibert and Sant'Anna for <u>knowing or reckless</u> defamation *per quod* and alleges that Defendants acted with knowing or reckless disregard as to the truth in publishing the false and defamatory material in *The Wasp Network*.

209) At all times, Defendants Netflix, Orange Studios, Assayas, Nostromo, Comercio, CG Cinema, Teixeira, Gillibert and Sant'Anna knew that the defamatory portrayals in the Film of Plaintiff Brothers to the Rescue are false. Defendants knew that the portrayals in the Film of Plaintiff Brothers to the Rescue as a terrorist organization, approving of terrorism, aiding and abetting terrorists and as connected to and participating in criminal and drug trafficking activity are false.

210) In the alternative, Defendants Netflix, Orange Studios, Assayas, Nostromo, Comercio, CG Cinema, Teixeira, Gillibert and Sant'Anna created and published the Film with reckless disregard as to whether the portrayals in the Film of Plaintiff Brothers to the Rescue are false or true.  Defendants Netflix, Orange Studios, Assayas, Nostromo, Comercio,

*Martinez v. Netflix, et al.*

CG Cinema, Teixeira, Gillibert and Sant'Anna created and published the Film with reckless disregard as to whether the portrayals in the Film of Plaintiff Brothers to the Rescue as a terrorist, approving of terrorism, aiding and abetting terrorists and as connected to and participating in criminal and drug trafficking activity are false or true.

211) Defendants' publications of the false, defamatory statements are defamatory *per quod* because they portray or imply a want of integrity in Brothers to the Rescue's business and profession, particularly their depiction of Brothers to the Rescue's actions and ties to "terrorist cells" and purported drug traffickers.

212) The Film portrays Plaintiff Brothers to the Rescue as engaging in the commission of criminal offenses amounting to felonies and of having characteristics incompatible with the proper exercise of Brothers to the Rescue's lawful business and profession. The Film portrays Plaintiff Brothers to the Rescue in such a manner as to subject Brothers to the Rescue to hatred, distrust, ridicule, contempt and disgrace. Indeed, the Film falsely portrays Brothers to the Rescue as a terrorist organization, approving of terrorism, aiding and abetting terrorists and as connected to and participating in criminal and drug trafficking activity.

213) The falsehoods portrayed or implied in *The Wasp Network* tend to degrade Brothers to the Rescue, bring Brothers to the Rescue into ill repute, and destroy confidence in Brothers to the Rescue's integrity.  Such falsehoods suggest and impute that Brothers to the Rescue has committed dishonest and illegal actions.

214) The Film causes harm to Brothers to the Rescue's reputation and causes Brothers to the Rescue mental anguish and personal humiliation

215) *The Wasp Network* harms the reputation of Brothers to the Rescue, as to lower it in the estimation of the community and to deter third persons from associating or dealing with Brothers to the Rescue.

*Martinez v. Netflix, et al.*

216) Defendants have acted, at a minimum, negligently as to the falsity in publishing the false and defamatory material in *The Wasp Network*.

217) Defendants' conduct caused Brothers to the Rescue actual damages and/or special damages.

218) Netflix is a major corporation and punitive damages are warranted in an amount sufficient to punish it and to deter it and others from such wrongful conduct.

**WHEREFORE**, Brothers to the Rescue prays for judgment against Defendants and an award of:

1. Damages in an amount to be determined at trial;

2. Punitive damages;

3. The entry of a permanent injunction prohibiting Netflix from making *The Wasp Network* in its current form available for streaming or in any other method of transmission or format; alternatively, the entry of a permanent mandatory injunction requiring Netflix to edit so as to delete the defamatory and false references to the Film being "Based on True Events" from any version made available for streaming or in any other method of transmission or format; and

4. For such other and further relief as the Court deems just and equitable.

**COUNT IX - CONSPIRACY TO DEFAME**

(By Plaintiff Jose Basulto and against Defendants Netflix, Orange Studios, Assayas, Nostromo, Comercio, CG Cinema, Teixeira, Gillibert and Sant'Anna)

219) Plaintiff Jose Basulto incorporates by reference, re-alleges, and adopts paragraphs 1 through 136 of this Complaint as though fully stated herein.

220) This is an action by Plaintiff Jose Basulto and against Defendants Netflix, Orange Studios, Assayas, Nostromo, Comercio, CG Cinema, Teixeira, Gillibert and Sant'Anna for Conspiracy to Defame Mr. Basulto.

*Martinez v. Netflix, et al.*

221) Defendants conspired together to publish *The Wasp Network* which portrays Mr. Basulto in a false and defamatory manner.

222) Defendants further conspired and agreed to purposefully market and aggressively promote *The Wasp Network* as a "true" story, despite it containing so many fabrications and falsehoods about Mr. Basulto.

223) Each of the Defendants committed overt acts in furtherance of the conspiracy.

224) As a result of the conspiracy, Mr. Basulto has suffered, and continues to suffer, damages in an amount to be determined at trial, but in excess of $75,000, including economic losses, lost career opportunities, reputational harm, and emotional distress.

225) These damages were proximately caused by Defendants' conspiracy to defame Mr. Basulto.

**WHEREFORE**, Mr. Basulto prays for judgment against Defendants and an award of:

1. Damages in an amount to be determined at trial;

2. Punitive damages;

3. The entry of a permanent injunction prohibiting Netflix from making *The Wasp Network* in its current form available for streaming or in any other method of transmission or format; alternatively, the entry of a permanent mandatory injunction requiring Netflix to edit so as to delete the defamatory and false references to the Film being "Based on True Events" from any version made available for streaming or in any other method of transmission or format; and

4. For such other and further relief as the Court deems just and equitable.

### COUNT X - CONSPIRACY TO DEFAME

(By Plaintiff Brothers to the Rescue and against Defendants Netflix, Orange Studios, Assayas, Nostromo, Comercio, CG Cinema, Teixeira, Gillibert and Sant'Anna)

*Martinez v. Netflix, et al.*

226) Plaintiff Brothers to the Rescue incorporates by reference, re-alleges, and adopts paragraphs 1 through 136 of this Complaint as though fully stated herein.

227) This is an action by Plaintiff Brothers to the Rescue and against Defendants Netflix, Orange Studios, Assayas, Nostromo, Comercio, CG Cinema, Teixeira, Gillibert and Sant'Anna for Conspiracy to Defame Brothers to the Rescue.

228) Defendants conspired together to publish *The Wasp Network* which portrays Brothers to the Rescue in a false and defamatory manner.

229) Defendants further conspired and agreed to purposefully market and aggressively promote *The Wasp Network* as a "true" story, despite it containing so many fabrications and falsehoods about Brothers to the Rescue.

230) Each of the Defendants committed overt acts in furtherance of the conspiracy.

231) As a result of the conspiracy, Brothers to the Rescue has suffered, and continues to suffer, damages in an amount to be determined at trial, but in excess of $75,000, including economic losses, lost career opportunities, reputational harm, and emotional distress.

232) These damages were proximately caused by Defendants' conspiracy to defame Brothers to the Rescue.

**WHEREFORE**, Brothers to the Rescue prays for judgment against Defendants and an award of:

1. Damages in an amount to be determined at trial;

2. Punitive damages;

3. The entry of a permanent injunction prohibiting Netflix from making *The Wasp Network* in its current form available for streaming or in any other method of transmission or format; alternatively, the entry of a permanent mandatory injunction requiring Netflix to edit so as to delete the defamatory and false references to the Film being

*Martinez v. Netflix, et al.*

"Based on True Events" from any version made available for streaming or in any other method of transmission or format; and

    4.   For such other and further relief as the Court deems just and equitable.

### COUNT XI - INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

(By Plaintiff Jose Basulto and against Defendants Netflix, Orange Studios, Assayas, Nostromo, Comercio, CG Cinema, Teixeira, Gillibert and Sant'Anna)

233) Plaintiff Jose Basulto incorporates by reference, re-alleges, and adopts paragraphs 1 through 136 of this Complaint as though fully stated herein.

234) This is an action by Plaintiff Jose Basulto against Defendants Netflix, Orange Studios, Assayas, Nostromo, Comercio, CG Cinema, Teixeira, Gillibert and Sant'Anna for Intentional Infliction of Emotional Distress.

235) Defendants intentionally or recklessly inflicted emotional distress upon Mr. Basulto when they knew or should have known that emotional distress would result.

236) This is particularly true because Defendants were well aware that Mr. Basulto had already endured extreme psychological and emotional distress as a result of the 1996 Shooting of Brother to the Rescue planes and Roque's comments thereafter.

237) In fact, in 2005, Mr. Basulto was awarded $1.75 million judgment for emotional trauma suffered after the 1996 shoot-down. U.S. District Judge Kenneth A. Marra stated "This continued fear has affected his daily life activities and ability to enjoy life".[26] Mr. Basulto stated "I have a MIG on my tail for the rest of my life".

238) The Film portrays Roque and the other Cuban spies in a falsely favorable light (i.e. falsely showing him as a heroic defender of the Cuban people against purported

---

[26] *Seagull One – The Amazing True Story of Brothers to the Rescue* – Page 273

*Martinez v. Netflix, et al.*

terrorists), as opposed to the reality of Roque being a Machiavellian agent of the Castro regime.

239) The false and defamatory contents of *The Wasp Network* are outrageous and beyond all bounds of decency.

240) Mr. Basulto has suffered, and continues to suffer, severe emotional distress.

241) There exists a causal connection between the aforementioned conduct and the injury and damages suffered by Mr. Basulto.

**WHEREFORE**, Mr. Basulto prays for judgment against Defendants and an award of:

1. Damages in an amount to be determined at trial;

2. Punitive damages;

3. The entry of a permanent injunction prohibiting Netflix from making *The Wasp Network* in its current form available for streaming or in any other method of transmission or format; alternatively, the entry of a permanent mandatory injunction requiring Netflix to edit so as to delete the defamatory and false references to the Film being "Based on True Events" from any version made available for streaming or in any other method of transmission or format; and

4. For such other and further relief as the Court deems just and equitable.

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs Jose Basulto and Brothers to the Rescue, Inc. respectfully request that this Honorable Court enter a judgment in their favor and against Defendants, NETFLIX, INC., ORANGE STUDIOS, S.A., OLIVIER ASSAYAS, NOSTROMO PICTURES, SL, US ONE COMERCIO E SERVICIOS DE CRIACAO E PRODUCAO DE OBRAS COM DIREITOS AUTORAIS, LTD, CHARLES GILLIBERT CG CINEMA, SASU, RODRIGO TEIXEIRA, CHARLES GILLIBERT and LOURENCO SANT'ANNA for:

*Martinez v. Netflix, et al.*

A)      all recoverable compensatory, statutory, and other damages sustained by Plaintiffs;

B)      both pre-judgment and post-judgment interest on any amounts awarded;

C)      attorneys' fees, costs, and expenses;

D)      treble and/or punitive damages as may be allowable under applicable law;

E)      equitable relief; and

F)      such other relief as the Court may deem be just and proper.

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiffs Jose Basulto and Brothers to the Rescue, Inc. demand a jury trial on all issues so triable, and a trial pursuant to Rule 39(c), Federal Rules of Civil Procedure, as to all matters not triable as of right by a jury to the extent permitted by law.

*Martinez v. Netflix, et al.*

Dated:  June 10, 2022                        *Respectfully submitted,*
Miami, FL

                                             **Boone & Davis, P.A.**
                                             *Counsel for Plaintiffs*
                                             2311 North Andrews Ave
                                             Fort Lauderdale, Florida 33311
                                             Telephone: (954) 566-9919
                                             Facsimile:  (954) 566-2680

                                             */s/ Michael Davis*
                                             M‌ICHAEL D‌AVIS
                                             Florida Bar No.: 330094
                                             Email: mdavis@boonedavis.com
                                             Email: kristen@boonedavis.com
                                             A‌LEX D‌AVIS
                                             Florida Bar No.: 1010692
                                             Email: alex@boonedavis.com

                *and*

                                             **HIRZEL DREYFUSS & DEMPSEY, PLLC**
                                             *Counsel for Plaintiffs*
                                             2333 Brickell Avenue, Suite A-1
                                             Miami, Florida 33129
                                             Telephone: (305) 615-1617

                                             By: */s/    Andre L. Dreyfuss*
                                                 **LEON F. HIRZEL**
                                                 Florida Bar No. 085966
                                                 hirzel@hddlawfirm.com
                                                 **ANDRE L. DREYFUSS**
                                                 Florida Bar No. 0094868
                                                 dreyfuss@hddlawfirm.com