UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO. 22-21796-CIV-MORENO/GOODMAN

JOSE BASULTO, and BROTHERS TO
THE RESCUE, INC.,

      Plaintiffs,

v.

NETFLIX, INC., a Delaware corporation,
et al,

      Defendants.
_____/

**ORDER ON NETFLIX'S PURPORTED PRIVILEGE TO NOT PROVIDE
DISCOVERY ABOUT THE FACTS UNDERLYING ITS AFFIRMATIVE
<u>DEFENSES DURING A RULE 30(B)(6) DEPOSITION</u>**

*"The framing of a problem is often more essential than its solution."*

      -  Albert Einstein (1879 – 1955)

*"If you can properly define the problem, then you've already defined the solution as well."*

      -  Chip Kidd (American book cover graphic designer, born 1964)

Plaintiffs are embroiled in a dispute over efforts to obtain discovery about the facts

underlying some of Defendant Netflix, Inc.'s ("Netflix") affirmative defenses in this

defamation lawsuit arising from the release of the film *The Wasp Network* (the "Film").

The Complaint alleges that the Film falsely portrays Plaintiffs Brothers to the Rescue, Inc.

and its leader, Jose Basulto, as terrorists and criminals. It claims that the film romanticizes,

or glorifies, the criminal activity conducted by spies of Cuba's Ministry of the Interior, i.e., the "Cuban Five," whose espionage work was responsible for the death of four Americans in 1996, as being based on "True Events."

More specifically, the Complaint alleges that the Cuban Five were a group of Cuban intelligence officers dispatched to Miami in the early 1990s to spy on and sabotage Cuban exile organizations and U.S. Military Facilities. The Film, Plaintiffs contend, is an obvious attempt to rewrite and whitewash history in favor of the communist Cuban regime and is factually inaccurate. Plaintiffs say the Film portrays the Cuban Five as courageous heroes who were simply defending their homeland. In reality, Plaintiffs allege, the Cuban Five were a spy network that produced actionable intelligence enabling the Cuban government to commit extrajudicial killings.

The Complaint names Netflix and other defendants involved in the writing, directing, production and distribution of the film. It asserts eight counts for defamation, two counts for conspiracy to defame and a count for intentional infliction of emotional distress.

Given this background, Netflix asserted several affirmative defenses. [ECF No. 51]. The ones relevant to this Order are the Second (Plaintiffs are public figures and therefore must plead and prove that Netflix acted with actual malice), the Fifth (waiver and estoppel because the allegedly false facts were previously made publicly available by

other sources and Plaintiffs never complained that they were defamatory), and the Sixth (the film and the statements made in it are true or substantially true).

Plaintiffs' counsel took the Rule 30(b)(6) deposition of Netflix, but its designee was unable to answer some questions about the facts underlying Netflix's affirmative defenses or Netflix's post-demand investigation (if any) into the accuracy of the Film's portrayal of Plaintiffs. At a discovery hearing scheduled to address this development, Netflix argued that: (1) the facts concerning the affirmative defenses were gathered by its counsel; (2) its designee was not prepared to testify about the facts because she did not know the information due to Netflix's counsel's failure to prepare her to provide answers; and (3) the work product doctrine justified its position because the designee would otherwise have to provide factual answers provided by Netflix's attorneys.

The Undersigned directed the parties to submit post-hearing memoranda on the following questions:

(1) In a 30(b)(6) deposition, is a plaintiff in a defamation lawsuit entitled to learn in discovery the facts supporting the defendant's affirmative defense, regardless of whether the defendant learned about those facts or acquired documents only through the efforts of its attorney(s)?;

(2) Phrased differently, is Netflix permitted to prevent Plaintiffs from obtaining discovery concerning the facts and documents supporting Netflix's affirmative defenses by saying that the lawyers for Netflix are the ones who learned the facts and obtained the documents through the lawyers' post-claim factual investigation?;

(3) What legal consequences, if any, arise from Netflix's distinction between publicly available information and other types of information vis-à-vis Netflix's position on whether Plaintiffs are entitled to ask Netflix's 30(b)(6)

witness questions about the facts and documents supporting the affirmative defenses?;

(4) Are questions concerning the factual grounds for affirmative defenses questions which concern legal conclusions or do the questions concern evidence supporting or undermining the affirmative defenses?;

(5) Assuming that a follow-up 30(b)(6) deposition of Netflix is permitted, will Plaintiffs be permitted to ask questions about the investigation which Netflix's counsel conducted after receiving a demand letter from Plaintiffs' counsel because, under Plaintiffs' theory, the questions concern Netflix's state of mind?

[ECF No. 138].

For the reasons outlined in greater detail below, the Undersigned largely agrees with Plaintiffs and will permit them to resume the 30(b)(6) deposition of Netflix in order to learn the facts on which the affirmative defenses are based. But, before providing a more-detailed background and analysis, the Undersigned notes that Netflix has tried to obtain the result it seeks (i.e., no more 30(b)(6) testimony) by altering the focus of the relevant issues.

Instead of acknowledging that Plaintiffs are seeking to learn the *facts* underlying the affirmative defenses at issue, Netflix **recasts the issue** as one where Plaintiffs "wish to continue Netflix's Rule 30(b)(6) deposition for one purpose only: to ask Netflix to explain what its counsel researched, and what its counsel *thinks*, about the strength of Netflix's affirmative defenses." [ECF No. 142, pp. 1-2 (emphasis added)]. But, as explained below, Netflix cannot immunize itself from discovery about the factual grounds for its affirmative defenses by merely reframing the issues through a prism

which incorrectly and unfairly makes it seem as though attorney opinion work product is at risk of being disclosed in response to all questions seeking the facts about affirmative defenses.

Netflix has asserted affirmative defenses, and, as we will soon discuss, Plaintiffs are entitled to discovery about the **facts** which supposedly support them, either through interrogatories, a 30(b)(6) deposition, or both. Of course, if Netflix were to abandon the affirmative defenses, then Plaintiffs would have no need to obtain discovery about them. And if Plaintiffs were to seek discovery about *legal conclusions* reached by its attorneys or the *communications* the designee had with Netflix's attorneys, then that would encroach into attorney work product or information covered by the attorney-client privilege.

But that is not what this battle is about. The challenged discovery largely concerns the **facts** about affirmative defenses and whether a post-demand letter investigation was done – and the mere fact that Netflix's designee would have to learn those facts *from* the company's attorneys does not mean that Netflix can keep those facts hidden in discovery.

Indeed, if Netflix's view of privilege and discovery about relevant facts were to be approved by the courts, then a large swath of discovery, including basic interrogatories seeking the identities of fact witnesses, would be foreclosed. In fact, given that interrogatories seeking the names of fact witnesses and a summary of their knowledge are frequently used and long-approved, and given that attorneys usually help gather the information needed to provide interrogatory answers signed by a party or a party's

representative, Netflix's perspective would necessarily mean that parties could no longer

obtain factual information about fact witnesses through this basic discovery tool.

After all, Netflix would have to take the position that these often-used

interrogatories are improper and off-limits because the only way the signer obtained all

the information about witnesses is from her *lawyers* – and that scenario, Netflix would be

obliged to say, would implicate both the attorney-client privilege and the work product

doctrine.

But that is not how discovery and privilege are interpreted. A discussion of why

this interpretation is flawed is outlined below, following the factual background.

<u>Additional Factual Background</u>

Plaintiffs propounded a topic list for the Rule 30(b)(6) deposition of Netflix. [ECF

No. 143-5]. The following topics are relevant to this dispute:

> 1.      Your Answer and Affirmative Defenses, including all facts related to the assertions in Your Affirmative Defenses that "Plaintiffs are public figures" and that "the allegedly false portrayals of Plaintiffs are supported as accurate, including by publicly available sources, such as court records, newspaper articles and Plaintiff Basulto's own words.

> \*\*\*

> 10.      Any information in Netflix's possession, custody, or control concerning the accuracy of events depicted in the Film.

> 11.      Any information in Netflix's possession, custody, or control concerning the accuracy and fairness of the portrayal of Plaintiffs in the Film.

12.     Any due diligence undertaken by Netflix to verify the accuracy of the film and documents and communications in Netflix's possession[,] custody, or control reflecting due diligence efforts by others to verify the accuracy of the Film.

*Id.*

The 30(b)(6) Deposition

Netflix produced Kimberly Rocque[1] as its designee for the 30(b)(6) deposition. [ECF No. 143-6]. Although she confirmed her understanding that she was there as Netflix's corporate representative and that her answers would be binding on Netflix, she testified that she had never seen the relevant corporate representative deposition notice or the list of topics for which she would be testifying about. The only preparation she did for the 30(b)(6) deposition was to meet with Netflix's counsel (i.e., an in-house attorney with Netflix's "litigation team" and outside litigation counsel).

The Undersigned will quote relevant highlights from the deposition:

Q. Does Netflix believe that the content of the film is accurate?

Mr. Charron [outside defense counsel]: Objection to form.

---

[1]     The deposition excerpts submitted by both parties do not reveal Ms. Rocque's position with the company. However, a Google search for Ms. Rocque generated a LinkedIn page identifying her as a Los Angeles-based "Director, Business and Legal Affairs, Original Features at Netflix." *Kim Rocque,* LinkedIn, available at https://www.linkedin.com/in/krocque (last visited May 1, 2023). It also lists her as a "California and New York licensed attorney with 10+ years entertainment industry experience. Skilled in the development, production, and acquisition of feature film, with special knowledge of independent film finance, production and distribution." *Id.* The LinkedIn information states that Ms. Rocque has been in her current position since December 2019 and was "Counsel, Business and Legal Affairs, Original Features," from April 2015 to December 2019. *Id.*

**A. Netflix does not have to take a stand on the accuracy of the films that it acquires.**

Q. Why do you believe that?

Mr. Charron: Objection: Asked and answered.

A. Because Netflix is acquiring a completed picture, it is relying on its partner and the licensor to have fulfilled their responsibilities, and we therefore require them to represent and warrant to that effect.

[ECF No. 143-6, pp. 40-41 (emphasis added)].

Q. So going back for a moment, back to the acquisition process, and I understand your responses about the reps and warranties in the contract, but my question is, did Netflix ever form a belief as to whether the content of the film was actually true or false?

Mr. Charron: Objection to the form.

**A. Netflix does not form beliefs as to the truth or falsity of pictures.**

Q. And with respect to this particular film, did Netflix ever form any beliefs as to whether the film's content was accurate before acquiring the film?

A. No.

*Id.* at 53-54 (emphasis added).

Q. Did Netflix conduct any investigation as to the allegations made in the pre-suit demand letter sent by the Boone & Davis law firm?

Mr. Charron: Objection to form because I believe that the way the question is worded, Leon, would implicate attorney work product **potentially.**

Q. You can answer.

A. **Not that I have direct knowledge of.**

Q. How would you figure that out?

8

A. To the extent any investigations were done, that would have been handled by the litigation team.

Q. Have you spoken to anybody in the litigation team in preparation for your deposition today?

A. Yes.

Q. Who did you speak with?

A. Linda Burrow.

Q. And sitting here today, you are not aware of, one way or the other, if Netflix conducted any investigation into the allegations of the pre-suit demand letter?

A. **I am not.**

Q. Did you do anything to prepare for today's deposition on that issue?

A. **Not on this issue**.

Q. Following receipt of the pre-suit demand letter from the Boone & Davis law firm, has Netflix done any investigation at all regarding the accuracy of the film's content?

Mr. Charron: I will note again the objection that the question is calling for information about attorney work product that's privileged, and this witness had not been – is not in a position to answer those questions, nor would we permit her to.

Mr. Hirzel [Plaintiffs' counsel]: Are you instructing the witness not to answer?

Mr. Charron: I will permit the witness to answer with respect to nonlawyers, but I believe she has already answered that question. But – so if you – do you understand? Okay.

A. Not that I am aware of.

9

Mr. Hirzel: And so that I am clear, you instructed, Bill, the witness not to answer the question with respect to an event whether or not any investigation has been done by a lawyer into . . . .

*Id.* at 62-63 (emphasis added).

Q. My next question for the witness is really the same thing, but just to clarify, I am **not asking about the content of the investigation** or the results of the investigation or any of the details of the investigation. My question is simply about whether or not an investigation has been conducted.

And what I am asking you is, is there anything that prevented you from gaining the knowledge in order to testify today as to whether or not an investigation ever even occurred?

A. What prevented me is that it was **not in the scope of what I was expected to be asked about.**

Mr. Charron: Can we take a one-minute break since the question is asked and answered?

Mr. Hirzel: Excuse me?

Mr. Charron: I want to take a one-minute break since she just answered your question before you ask your next question. I just want to take a one-minute break.

Mr. Hirzel: Is it necessary? I would like to finish this line of questioning before we take a break.

Mr. Charron: I believe it would be helpful, yes.

Mr. Hirzel: I am concerned that you are going to discuss with the witness this line of questioning, but –

Mr. Charron: Go ahead.

Mr. Hirzel: I'd ask that you do not do that, please.

Mr. Charron: We are going to go off the record for one minute.

Mr. Hirzel: Sure.

Mr. Charron: I will ask everybody to just stand by.

(Thereupon, a recess was taken)

Mr. Charron: We can come back on the record. Are we on the record?

Oh. We just lost Leon.

Mr. Hirzel: Yes, back on the record.

Mr. Charron: Okay. The witness would like to further respond to your question based upon information she has been provided to enable her to answer your question. So go ahead.

A. Yes, some degree of investigation was performed by the litigation team.

Q. Is that something you just learned during this one-minute break?

A. Yes.

Q. **Who did you learn that from?**

A. **From counsel.**

Q. The gentleman sitting next to you?

A. No. From Netflix litigation counsel, Linda Burrow.

Q. Bill, who is sitting to your right, or Linda Burrow, who's in the room, or somebody else?

A. Linda Burrow, who is sitting in the room.

Q. **So during the break, she educated you as to that fact?**

A. **Yes.**

Q. So an investigation was, in fact, conducted by Netflix following its receipt of the pre-suit demand letter from the Boone & Davis law firm?

Mr. Charron: Objects [sic] to form. Vague. And also she said "some degree of investigation." I don't know if you want to amplify what you mean by "investigation," but I believe she has answered your question.

Q. What do you mean by "some form of investigation?"

Mr. Charron: Not "some form."

Q. I will ask my prior question again for the witness.

Q. Ms. Rocque, is it now your testimony that an investigation was performed by Netflix as to the accuracy of the film's content following Netflix's receipt of the pre-suit demand letter from the Boone & Davis law firm?

A. Yes.

Q. What investigation was conducted?

Mr. Charron: Objection. Direct not to answer.

Mr. Hirzel: On what basis?

Mr. Charron: Attorney work product.

Mr. Hirzel: Any other basis?

Mr. Charron: Attorney-client communications.

Q. Ms. Rocque, do you know who conducted this investigation?

A. The litigation team.

Q. Do you know who?

A. I do not know exactly who on the litigation team.

Q. **Do you know anything else other than the fact that an investigation was conducted as was just told to you during the break about the investigation?**

A. **No.**

Q. You don't know how long the investigation lasted for?

A. I do not.

Q. You don't know what the results of the investigation were?

A. I do not.

Q. You don't know what was done to investigate?

A. I do not.

Q. You don't know what materials were referred to as part of the investigation?

A. I do not.

Q. Do you know who would know the answers to these questions?

A. The litigation team.

Q. Well, you are part of the litigation team, right?

A. I'm not part of the litigation team.

Q. Who is on the litigation team?

A. It's a large team. I could not name all of its members.

Q. How large?

A. I am not entirely certain exactly how many members there are, but I could not name them all.

Q. Is it more than five people?

A. Yes.

Q. Is it more than 10 people?

A. Yes. We are a global company.

Q. More than 100 lawyers in the litigation team?

A. I am not certain between 10 and 100 where we land.

Q. Are you aware of whether Netflix conducted any subsequent investigations to the one that was conducted following Netflix's receipt of the pre-suit demand letter from the Boon and Davis firm?

Mr. Charron: Objection to form.

**A. I do not.**

Q. Do you know whether Netflix communicated with any third parties concerning the investigation that it . . .

*Id.* at 68-73 (emphasis added).

Q. In the sixth affirmative defense, Netflix asserts that "the film and the statements made therein are true or substantially true." My question to you, ma'am, is what is the basis for which Netflix states in its sixth affirmative defense that the statements made in the film are true or substantially true?

Mr. Charron: Objection. Vague. Overbroad. Calls for a legal conclusion.

A. Reading the document now, it looks like the second sentence is the basis on which the first was made.

Mr. Charron: This is the problem. You are asking this witness to testify about legal language drafted by outside counsel regarding legal conclusions. Again, I thought we had an understanding that this is not what you were going to do.

14

Mr. Hirzel: Bill, I don't want to engage with you and interrupt my deposition. I don't agree with you, but I'm not going to engage you at this point in time. You can make your objection and the witness can answer. So, ma'am, my question is, in the sixth affirmative defense[,] where it states "the film and the statements made therein are true or substantially true," what does Netflix base that belief or understanding on?

Mr. Charron: Objection. Asked and answered.

A. As I answered, reading this document for the first time, having not prepared this document, it looks like the conclusion in the first sentence is based on the second.

Q. Anything else?

A. **Not that I am aware of[,] as I did not prepare this document.**

Mr. Hirzel: Ms. Savoy, can you read the last answer back?

(Thereupon, the referred-to answer was read back[,] as recorded above.)

Q. But did you prepare to testify today as to Netflix's position as to whether or not the statement[s] in the film are true or false?

Mr. Charron: This witness was appropriately prepared based upon the topics, excluding **privileged information and excluding legal conclusions** that I spoke to you about in advance.

Mr. Hirzel: Bill, my questions are directed to the witness, not to you.

Mr. Charron: But they are unfair questions to direct to the witness.

Mr. Hirzel: I am asking the witness – and this is not directed to you, Bill, this is a question to the witness – did you prepare to testify as to Netflix's position as to whether the film and the statements made in the film are true or substantially true?

Mr. Charron: Same objections.

**A. I did not prepare to testify as to legal conclusions.**

Mr. Hirzel: That is not my question. My question is, did you prepare to testify as to Netflix's position as to whether the film and the statements made in the film are true or substantially true?

Mr. Charron: Same objections.

A. As we discussed earlier today, Netflix has not – **did not take a position on that prior to this document.** As I have testified, the producers are responsible for any kind of diligence necessary for any project that is sold to Netflix, and in our agreements, we require them to represent and warrant to that effect.

Q. Your answer is nonresponsive. My question is about your preparation as to whether or not or as to the topic of Netflix's position as to whether or not the film and the statements made therein are accurate.

A. Yes. And I answered previously that Netflix did not take a position on the truth or falsity of the film when it acquired the film because Netflix did not produce this film.

Q. So when Netflix states that in its sixth affirmative defense that the film and the statements made therein are true or substantially true, what does it base that statement on?

Mr. Charron: Objection. Asked and answered. Same objections as previously stated.

A. The language here in the sixth affirmative defense is happening at a very different moment in time in response to a complaint.

Q. That's not my question.

A. I have answered that question as well that the first conclusion drawn in the first sentence is based on the second, that the film was inspired by a nonfiction book.

Q. The sixth affirmative defense reads further down, quote, "Furthermore, the allegedly false portrayals of plaintiffs are supported as accurate,

including by publicly available sources such as court records, newspaper articles, and Plaintiff Basulto's own words." Are you prepared to answer questions concerning this statement in the sixth affirmative defense?

A. To what extent?

Q. As to the basis of Netflix's statement.

A. I think the sentence states clearly on which the conclusion – the basis on which the conclusion is based; that there are publicly available sources, court records, newspaper articles, and Plaintiff Basulto's own words.

Q. And are you aware of any of the publicly available sources, the court records, the newspaper articles, or Mr. Basulto's own words?

A. **I have not personally reviewed those documents.**

Q. And do you know what words are being referred to in the sixth affirmative defense where it states "Plaintiff Basulto's own words"?

A. **I do not.**

A. Do you know what newspaper articles are referred to in the sixth affirmative defense?

A. **I do not.**

Q. Do you know what court records are referred to in the sixth affirmative defense?

A. **I do not.**

Q. Do you know what publicly available sources are referred to in the sixth affirmative defense?

A. **I do not.**

Q. Other than what you are reading here, do you have any independent knowledge as to **the basis** for which Netflix is taking the position that the portrayals of the plaintiff in the film are accurate?

A. **I do not.**

*Id.* at 77- 82 (emphasis added).

Q. Do you know what in particular was investigated?

A. **I do not.**

Q. And what about outside of the investigation, do you know whether or not Netflix has any information about Mr. Basulto or Brothers to the Rescue?

A. **I do not.**

*Id.* at 143-44 (emphasis added).

Q. Netflix does dispute the congressional finding that Brothers to the Rescue is a Miami-based humanitarian organization engaged in searching for and aiding Cuban refugees in the straits of Florida and that it was engaged in such a mission on Saturday, February 24, 1996?

A. **I cannot speak to that**.

Q. Why not?

A. I cannot speak to the substance of the investigation.

Q. I understand that, but Netflix is not disputing the congressional finding, correct? Was there an answer?

A. I can't speak to that that.

Q. You can or cannot?

A. Not.

Q. Any reason why not?

A. **I do not know**.

Q. Does Netflix dispute whether or not Brothers to the Rescue is a Miami-based humanitarian organization?

A. **I do not know.**

Q. Does Netflix dispute whether or not Brothers to the Rescue was engaged in covert operations, bombing campaigns, and commando operations against the government of Cuba?

A. I don't know.

*Id.* at 154-55 (emphasis added).

Q. After paragraph 2, Netflix denies [in its Answer] the allegations in paragraph 2 of the complaint. So I am trying to understand, and I will ask the question once again, what **information** does Netflix have about Brothers to the Rescue or Mr. Basulto --

Mr. Charron: Objection to form. Asked and answered. Lacks foundation. Mischaracterizes the record.

Q. -- other than what is in the film?

A. The response in a section 2 refers the court to the film.

Q. Can you answer the question.

A. **That is my answer.**

Q. That is not responsive to my question. My question is what information does Netflix have about Mr. Basulto or Brothers to the Rescue other than what is in the film?

Mr. Charron: Objection. Asked and answered.

A. As established earlier, I **cannot speak to the substance of any investigation** done by Netflix. Referring to the answer, the response in section 2 **refers the court back to the film.**

19

*Id.* at 161-62 (emphasis added).

> Q. Does Netflix have any information that would support a finding that Brothers to the Rescue was ever engaged in any criminal activity.
> Mr. Charron: Objection to the form.
>
> **A. I cannot speak to the substance of the investigation.**
>
> Q. Jumping up to page 10, earlier in the film, Basulto says, "We are not just a humanitarian organization, we are also a militant organization." Does Netflix have any information as to whether or not Brothers to the Rescue was actually a militant organization?
>
> A. **I cannot speak to our investigation.**
>
> Q. Even outside of the investigation, do you know whether or not Netflix has any such information?
>
> A. Outside of the investigation, we would have just relied on the producers to have done whatever was necessary.

*Id.* at 171 (emphasis added).

> Q. And although you don't know about the substance or what happened in that investigation or what that investigation revealed, do you know what Netflix's ultimate position is on whether or not it is **accurate** when the film depicts Brothers to the Rescue as being a militant organization?
>
> Mr. Charron: Objection. Calls for a **legal conclusion**. Asked and answered.
>
> Mr. Hirzel: It's a factual statement.
>
> Mr. Charron: Sorry, what?
>
> Mr. Hirzel: "Militant organization" is a **factual statement**, and that's all I am asking for, ma'am, not any legal conclusions.
>
> Mr. Charron: You are asking for **legal conclusions**.
>
> Mr. Hirzel: I am asking for Netflix's position on a fact.

Mr. Charron: You are asking –

Mr. Hirzel: Netflix's position on the **fact. Is it true or it is false?** Very easy.

Mr. Charron: You are asking for – you are basically disguising a legal argument through a 30(b)(6) deposition throughout this entire day. You are constantly making legal conclusion arguments in matters of interpretation that are matters of law.

Mr. Hirzel; I have no idea what you are talking about, but please don't explain it in front of the witness. We can talk about it later. I would ask the witness to answer.

A. With respect to Netflix as a distributor of this film, outside of the context of whatever has been replied in the answer, Netflix does not take a position on whether or not Brothers to the Rescue is a militant organization.

Q. And post pre-suit demand notice, what has Netflix's position been with respect to that fact?

Mr. Charron: Objection. The record speaks for itself. Calls for a legal conclusion.

A. As I mentioned, this would be **set forth in the answer**.

*Id.* at 175-76 (emphasis added).

Mr. Hirzel: Now it may be more appropriate because there seems to be a big misunderstanding, and of course the record will reflect it. But my understanding is that there is no preparation done about the investigation that was conducted.

Mr. Charron: The investigation that – you have used this term "investigation." You have not clarified what you meant by it, but we have worked within it to the best of the witness's understanding. What has been made very clear on the record is that any post-demand, air quotes, "investigation," was **done by counsel** and is **privileged** and, for that reason, we are **not waiving the privilege and we would not allow this**

**witness to testify to it**. So it is **not the subject of her testimony today**. I think that has been made clear.

Q. Okay. Ma'am, so let me just ask you again, and perhaps the record is clear, but sitting here right now, I just want to make certain, did you or did you not prepare to testify as to the details or the results of the investigation that Netflix conducted as to the accuracy of the content of the film with respect to the plaintiffs?

A. I **did not prepare** with respect to the **results** of the investigation.

*Id.* at 183-84 (emphasis added).

As reflected by the 30(b)(6) deposition excerpts quoted above, Netflix's designee was not prepared to testify about facts underlying positions taken by Netflix (such as affirmative defenses or denials (in Netflix's Answer)) if they were obtained in an investigation. Netflix's counsel contended that the witness was not prepared on those topics because, had that happened, her testimony would reveal privileged information (as the source of her knowledge would be the attorneys).

Nevertheless, despite this position, Netflix arranged for one of its attorneys to provide its 30(b)(6) witness with factual information during a deposition break and permitted her to disclose that very factual information on the record.

Moreover, the excerpts also reveal that Mr. Charron sometimes *claimed* that questions called for a legal conclusion[2] when they actually were seeking facts. If a

---

[2] Before the deposition, Plaintiffs' counsel agreed that the 30(b)(6) topics would not include questions about legal conclusions. Nevertheless, his understanding of the "agreement" was that he would be permitted to ask questions of which facts supported Netflix's affirmative defenses and the accuracy of the portrayal of Plaintiffs in the film.

question asks about facts and Netflix learned of the facts through its attorney's investigation, the facts still exist as facts, regardless of whether Netflix learned of those facts through counsel or through an employee or through a non-party witness. This point will be amplified below, in the Applicable Legal Standards and Analysis Section.

<u>The Ambiguous Agreement</u>

Counsel for both sides had dramatically different understandings about which types of questions would be permitted at the Rule 30(b)(6) deposition. As explained in the footnote, the deposition was "a mess" because the parties "had not adequately agreed on what was going to be permitted and what was going to be prohibited." [ECF No. 152-1, p. 59]. The Undersigned noted at the hearing that the "so-called agreement is packed with ambiguity." The purported agreement was first reached during a telephone call and was followed up by an email which counsel now concede did not fully and clearly make clear their positions.[3] I also noted then that both sides were acting in good faith and took positions which each lawyer believed was legitimate.

---

[ECF No. 152-1, pp. 55-56]. But Netflix's counsel had a different understanding of the agreement before the deposition. Netflix's counsel thought that Plaintiffs' counsel would be able to ask questions of the 30(b)(6) witness about facts if Netflix itself had, without counsel, learned of the facts through the company's own investigation. But he thought related questions would be off-limits if they concerned facts acquired post-claim by Netflix's attorneys, through their investigation. *Id*. at 47-54.

[3]    At the hearing, Mr. Charron, who did not draft the supposedly-confirmatory email, explained that it was "not worded as precisely as what was discussed on the call." He said he was "surprised" at Plaintiffs' counsel's questions at the deposition. [ECF No. 152-1, pp. 54-55]. But Mr. Hirzel emphasized that he "would never have agreed that the

<u>Post-Hearing Developments</u>

In its Court-ordered, post-hearing memorandum, Netflix submitted a memorandum (filed in redacted fashion, because the deposition excerpts are deemed confidential for a preliminary period) explaining, in substance, that both Plaintiffs essentially admitted certain facts which reflect the truth and substantial truth of the film's depictions of them and also confirm another affirmative defense. Therefore, Netflix says, there is no "legitimate point to asking Netflix to explain what publicly available information Netflix's counsel believes establishes Netflix's 'substantial truth' defense – Plaintiffs and their counsel have now seen that publicly available information for themselves, and they have testified about them." [ECF No. 142, p. 2].[4]

Netflix contends that Plaintiffs' admission during their recent, post-hearing depositions are "devastating to their case" and urge the Court to reject Plaintiffs' application to continue the 30(b)(6) deposition of Netflix. [Because the memoranda were simultaneously filed on the same day, Plaintiffs have not had the opportunity to respond to this argument.].

<u>Applicable Legal Standards and Analysis</u>

---

witness shouldn't have to answer questions about" the facts underlying the affirmative defenses and the truth or accuracy of the portrayal of Plaintiffs in the film. *Id.* at 56.

[4]     Netflix filed an unredacted version of its memorandum and the deposition transcripts of Plaintiffs under seal. [ECF No. 147].

The primary issue is whether Plaintiffs are entitled to learn the factual grounds supporting Netflix's affirmative defenses and its denials of certain allegations in the Complaint when the facts were obtained by Netflix's counsel in an investigation conducted after receipt of a pre-lawsuit demand letter. The answer hinges on an analysis of Federal Rule of Civil Procedure 30(b)(6), the attorney-client privilege, the work product doctrine, and the practical realities of litigation (i.e., the involvement of counsel in preparing answers to interrogatories and developing facts to support a lawsuit or the defense of a lawsuit).

The Undersigned finds *Protective Nat'l Ins. Co. of Omaha v. Commonwealth Ins. Co.*, 137 F.R.D. 267 (D. Neb. 1989) to be particularly helpful, as it is a persuasive and comprehensive summary of the principles which inform the analysis. I will, therefore, discuss the case[5] in depth.

*Protective Nat'l* involved a lawsuit between two insurance companies concerning reinsurance of certain risks originally written by the plaintiff's agent and the defendant carrier's counterclaim (which essentially alleged that it would not have participated in the reinsurance if it knew of the plaintiff insurance company's mishandling of claims by its agent). The defendant, Commonwealth, selected a designee to be its Rule 30(b)(6) witness. She was a chartered accountant who was an assistant vice president for

---

[5]     Many courts have cited *Protective Nat'l,* including Courts in our district. *See, e.g., Palmisano v. Paragon 28, Inc.,* No. 21-60447, 2021 WL 1686948 (S.D. Fla. Apr. 7, 2021); *Garayoa v. Miami-Dade Cnty.*, No. 16-20213, 2017 WL 3115753 (S.D. Fla., July 20, 2017).

Commonwealth who had the responsibility of completing the reinsurance book of business.

The deposition unfolded poorly, with the designee admitting that she had never reviewed any of the pleadings. Substantial colloquy between counsel ensued, and it soon became clear that what the designee knew about the case arose out of communications she had received from Commonwealth's attorneys. The deposition "really began to unravel" at that point. *Id*. at 273. The plaintiff's counsel wanted to determine the factual basis for specific paragraphs in Commonwealth's answer and counterclaim. Commonwealth's counsel did not permit her to provide facts she knew which were communicated to Commonwealth by its attorneys.

The *Protective Nat'l* Court noted that Rule 30(b)(6) provides that the corporation's deposition designee(s) must be prepared to "testify as to matters known or reasonably available to the organization." *Id*. at 278 (citing Fed R. Civ. P. 30(b)(6)) (emphasis removed). The Court pointed out that the 30(b)(6) notice at issue was specific about the matters on which the designee would be required to testify.

Highlights of the Court's relevant observations, holdings, and explanations are summarized below:

1.      The "plain language" of the Rule unequivocally provides that "'[t]he persons so designated shall testify as to matters known or *reasonably available to the organization*.'" *Id*. at 278 (quoting Fed. R. Civ. P. 30(b)(6)) (emphasis added by the Court).

If the rule is to promote effective discovery regarding corporations, then "the **spokesperson must be informed**." *Id.* (emphasis added). This means that: "[The corporation] must make a conscientious good-faith endeavor to designate the persons having knowledge of the matters sought by [the interrogator] and to prepare those persons in order that they can answer fully, completely, unevasively, the questions posed by [the interrogator] as to the relevant subject matters." *Id*. (quoting *Mitsui & Co. v. Puerto Rico Water Res. Auth.*, 93 F.R.D. 62, 67 (D.P.R. 1981) (requiring a corporation to designate a 30(b)(6) spokesperson and imposing fees and sanctions for the failure to do so)) (alterations in original).

2.      Commonwealth's counsel was "plainly wrong" when he took the position that the designee could not testify as to facts which had been communicated to her by Commonwealth's lawyers because the communications were supposedly protected by the attorney-client privilege. *Id.*

3.      Citing to *Sedco Intern., S.A. v. Cory*, 683 F.2d 1201, 1205 (8th Cir.), *cert denied,* 459 U.S. 1017 (1982), the Court emphasized that "[n]o contention can be made that the attorney-client privilege precludes disclosure of factual information. The privilege does not protect facts communicated to an attorney. *Upjohn Co. v. United States*, 449 U.S. 383, 395–96, 101 S.Ct. 677, 685–86, 66 L.Ed.2d 584 (1981). **Clients cannot refuse to disclose facts which their attorneys conveyed to them and which the attorneys obtained from independent sources.** *Hickman v. Taylor*, 329 U.S. 495, 508, 67 S.Ct. 385, 392, 91 L.Ed. 451

(1947); 8 J. Wigmore, Wigmore on Evidence § 2317 (McNaughton rev. 1961) (emphasis added).

4.      "It is clear that Protective was not seeking *communications* between client and lawyer, but rather, Protective was seeking the *facts* supporting the allegations contained in the answer and counterclaim. This essential distinction renders the claim of attorney-client privilege **improper**." *Id*. at 279 (emphasis added).

5.      Concerning the work product doctrine, "[i]t is important to distinguish between facts learned by a lawyer, a memorandum or document containing those facts prepared by the lawyer, and the lawyer's mental impressions of the facts. The facts are discoverable[,] if relevant. The document prepared by the lawyer stating the facts is not discoverable absent a showing required by Federal Rule of Civil Procedure 26(b)(3). Mental impressions of the lawyer regarding the facts enjoy nearly absolute immunity." *Id.* at 279 n.1 (citing *In re Murphy*, 560 F.2d 326, 336 (8th Cir. 1977)).

6.      "Commonwealth misunderstands the work product doctrine; where a document may be insulated from discovery because of the work product doctrine, the **facts** contained therein **must be disclosed** in response to a **properly worded interrogatory or deposition question**." *Id*. at 280-81 (emphasis supplied).

7.      The Court relied upon a law review article by Professor Michael E. Wilson: Wolfson, *Opinion Work Product—Solving the Dilemma of Compelled Disclosure*, 64 Neb. L.

Rev. 248, 256–57 (1985). The article provided an illustration which applies to the argument asserted by Netflix:

> The first issue, which seems to bother lawyers more than it should, relates to whether or not the work product doctrine precludes the discovery of relevant facts gathered by the lawyer during his or her efforts on the client's behalf. For example, during the interview of witness A, the lawyer learns of the existence of witness B. Can the lawyer then, in response to an interrogatory requesting the names and addresses of all known witnesses, decline to reveal the existence of witness B based upon the protections of the work product doctrine? The answer to this question was clearly provided by the Supreme Court in *Hickman*. The Court pointed out that where relevant and non-privileged facts were contained in an attorney's file, and where discovery was essential to preparation of the opposing party's case, **such facts were clearly discoverable** or the "liberal ideals of the deposition-discovery portions of the Federal Rules of Civil Procedure **would be stripped of much of their meaning**."

*Id.* at 280 (emphasis added).

8.     The *Protective Nat'l* Court continued to quote from the article, and the Undersigned includes these excerpts here because they demonstrate the flaws in Netflix's argument:

> More recently, the Supreme Court addressed this same problem in the context of the attorney-client privilege. The Court noted that the privilege protected against disclosure of communications between a client and his attorney, but did not protect against disclosure of the underlying facts known by those who communicate with an attorney. Similarly, while witness A's written statement may be protected from discovery as ordinary work product and an interview summary prepared by the lawyer protected from discovery as opinion work product, the **basic facts** provided by witness A, as long as they are relevant and not protected from disclosure by another evidentiary privilege, are **discoverable** by the opposing party. Where a document may be insulated from a Request for Production, the **facts** contained therein **must be disclosed in response to a properly worded interrogatory or deposition question.**

*Id*. at 281 (emphasis added).

9.      The Court relied further on the article, apparently because it discussed the

practical ramifications of a contrary approach (i.e., the one urged by Netflix):

> Attorneys often refuse to disclose during discovery those *facts* that they
> have acquired *through their investigative efforts* and assert, as the basis for
> their refusal, the protections of the work product doctrine. Where such facts
> are concerned, as opposed to the documents containing them or the
> impressions and conclusions drawn from them, they *must be disclosed* to the
> opposing party in response to a proper request for discovery. *Otherwise*,
> discovery would be a *meaningless tool* and we would be back to the era
> before the advent of the Federal Rules of Civil Procedure when "mutual
> knowledge of all the relevant facts gathered by both parties" was far from
> the guiding principle of the federal litigation process.

*Id.* (emphasis added).

10.      There is "simply nothing wrong" with asking a deponent about facts even

though they "may have been communicated to the deponent by the deponent's counsel."

However, depending upon how the questions are framed, deposition questions may tend

to elicit the impressions of counsel about the importance of certain facts. For this type of

question, opposing counsel is not entitled to his adversaries' thought processes. Instead,

the effort then "must be to protect against indirect disclosure of an attorney's mental

impressions or theories of the case." *Id.*

11.      The Court reasoned that "the problem in this type of situation" is

determining the degree to which a specific deposition question "elicits the mental

impressions of the attorney who communicated a fact to the deponent." The practical

reality, of course, is that, "[i]n a sense, *any* fact that a witness learns from his or her attorney presumably reveals in *some* degree the attorney's mental impressions of the case, or, presuming rationality, the attorney would not have communicated the fact to the client." *Id.* (emphasis added).

12.     Nonetheless,

it is **clearly not the law that a fact is not discoverable because a lawyer communicated the fact to the client**. Indeed:

> The courts have consistently held that the work product concept furnishes no shield against discovery, by interrogatories or by deposition, of the **facts that the adverse party's lawyer has learned**, or the person from whom he has learned such facts, or the existence or nonexistence of documents, **even though the documents themselves may not be subject to discovery.** 8 C. Wright & A. Miller, [Fed. Prac. & Proc. Civ.] § 2023, at 194 (1970) (footnote omitted).[6]

*Id.* at 281 (footnote and emphasis added).

13.     Therefore, the Court reasoned, the "essential question" is whether the questions asked to the 30(b)(6) witness about the facts supporting an allegation in the answer and counterclaim "improperly tended to elicit the mental impressions" of the lawyers. The Court concluded that they did not. *Id.*

14.     The Court noted that "undoubtedly, there is some danger that the mental impressions of Commonwealth's lawyers will be disclosed by answers" to certain

---

[6]     The current version of the well-known and often-quoted treatise on civil procedure contains the same point. *See* § 2023 The Work–Product Rule—The 1970 Amendment, 8 Fed. Prac. & Proc. Civ. § 2023 (3d ed.).

questions, but it then pointed out that "this is always the case." Similar to the comments made by Plaintiffs' counsel in the instant case against Netflix, the Court noted that counsel made it clear that he did not want counsel's opinions; he sought only the facts. *Id.*

15.     After noting that the 30(b)(6) witness was not well prepared, the *Protective Nat'l* Court held that the questions at issue did not improperly threaten to disclose the mental impressions of Commonwealth's lawyers, the Court concluded that "there is nothing purely legal" about the allegations which were the subject of the questions. As a result, the Court granted the motion to compel and required Commonwealth to produce the designee for another 30(b)(6) deposition. *Id*. at 283.

16.     In doing so, however, the Court issued three rulings designed to address the concerns of both sides: (1) the designee has an obligation to be prepared as a 30(b)(6) spokesperson; (2) to the extent she is able, the spokesperson must provide the facts upon which Commonwealth relied to support the allegations of its answer and counterclaim which are *not purely legal*, even *though those facts may have been provided to her or her employer by Commonwealth's lawyers*; and (3) the plaintiff must avoid asking questions which are *intended* to elicit Commonwealth's *counsel's advice*. *Id.* (emphasis added).

The teachings of *Protective Nat'l* have been followed by courts throughout the country, including those in Florida district courts and district courts in the Southern District of Florida. *See generally Palmisano v. Paragon 28, Inc*., No. 21-60447-CIV, 2021 WL

1686948, at *6 (S.D. Fla. Apr. 7, 2021), reconsideration denied, No. 21-60447-CIV, 2021 WL

1686928 (S.D. Fla. Apr. 23, 2021) ("The attorney-client privilege only extends to

communications; it does not extend to the underlying facts. *Upjohn Co. v. United States*,

449 U.S. 383, 396 (1981). Thus, while the privilege applies when a questioner directly asks

a deponent about discussions with counsel, the 'attorney-client privilege simply does not

extend to facts known to a party that are central to that party's claims, even if such facts

came to be known through communications with counsel who had obtained knowledge

of those facts through an investigation into the underlying dispute.'")[7]; *B.C.F. Oil Ref., Inc.*

*v. Consol. Edison Co.*, 168 F.R.D. 161, 165 (S.D.N.Y. 1996); *Wiand v. Wells Fargo Bank, N.A.*,

No. 8:12-CV-557-T-27EAJ, 2013 WL 6170616, at *1 (M.D. Fla. Nov. 22, 2013) (compelling

disclosure over deponent's objection that he had no independent knowledge of the

underlying facts outside of those learned through counsel); *Hernandez v. Motorola*

*Mobility, Inc.*, No. 12-60930-CIV, 2013 WL 4773263, at *3 (S.D. Fla. Sept. 4, 2013) ("A party's

knowledge of facts, from whatever source, is not privileged."); *Kansas Wastewater, Inc. v.*

---

[7]    In *Palmisano,* the Court explained that Paragon sought Palmisano's personal knowledge about the basis for statements in the Complaint. It held that, to the extent that Paragon seeks his knowledge about the basis for specific factual allegations, the information is not privileged, regardless of how Palmisano learned the facts. *See also Thomasson v. GC Servs. Ltd. P'ship*, No. 05CV0940-LAB (CAB), 2006 WL 8451615, at *3 (S.D. Cal. Oct. 11, 2006) (compelling disclosure over objection that any information was received from counsel and stating that if the "plaintiff's counsel told him any facts supporting the allegation, [then] [he] should have disclosed them"); *Alliant*, 217 F.R.D. at 528, 532 n.3 (compelling disclosure of factual basis for claims over objection that it would necessarily reveal communications with counsel).

*Alliant Techsystems, Inc.*, 217 F.R.D. 525, 528, 532 n.3 (D. Kan. 2003) ("It is well established that a party may not withhold relevant facts from disclosure simply because they were communicated to, or learned from, the party's attorney.").

Netflix urges the view that questions about the facts on which the affirmative defenses and denials require the disclosure of attorney mental impressions (to the extent the facts were gathered by counsel during their investigation of Plaintiffs' claims). But this view is "incorrect as a matter of law." *Davis v. Daytona Int'l Speedway, LLC*, No. 615CV1872ORL31KRS, 2016 WL 8917273, at *3 (M.D. Fla. Nov. 17, 2016) ("Daytona's argument that work-product protects it from revealing the requested facts on which it relies to support its defense of negligence or carelessness by [the] [p]laintiff is incorrect as a matter of law."). The *Davis* Court noted that "[t]he work product doctrine does not protect factual information from disclosure" and permitted the plaintiff to "seek discovery of facts underlying Daytona's defense" but stated that "Daytona need not disclose documents and tangible materials that contain such facts if they are protected work product." *See also Stern v. O'Quinn*, 253 F.R.D. 663, 687 (S.D. Fla. 2008)[8] ("The work-

---

[8]    Eleventh Circuit Court of Appeals Judge Robin Rosenbaum decided *Stern v. O'Quinn* when she was a U.S. Magistrate Judge. The rules it adopted continue to be followed in this district and throughout the country. *See Palmisano*, 2021 WL 1686948; *Garayoa v. Miami-Dade Cnty.*, No. 16-CIV-20213, 2017 WL 3115753, at *4 (S.D. Fla. July 20, 2017) ("Courts have consistently held that "[f]acts enjoy far less protection under the work product doctrine regardless of when they were discovered." (quoting *Schreib v. Am. Family Mut. Ins. Co.*, 304 F.R.D. 282, 287 (W.D. Wash. 2014))); *Pastrana v. Local 9509, Commc'ns Workers of Am.*, AFL–CIO, W AJB, 2007 WL 2900477, at *5 (S.D. Cal. Sept. 28, 2007) ("[C]ourts have consistently held that the work product doctrine furnishes **no**

product doctrine does not protect factual information from disclosure. Rather, it protects a party only from disclosing particular documents containing the information. To accommodate these principles, a party **may propound interrogatories and take depositions to obtain the sought-after factual information**." (emphasis added)); *See* Fed. R. Civ. P. 26(b)(3) Advisory Comm. Note (1970) ("No change is made in the existing doctrine, noted in the *Hickman* case, that one party may discover relevant facts known or available to the other party, even though such facts are contained in a document which is not itself discoverable.").

At times, Netflix has adopted inconsistent legal positions. It purposefully failed to prepare its spokesperson witness to discuss facts when they were obtained by counsel, and it did not communicate those facts to her; yet it arranged for one of its attorneys to orally advise the designee of a fact during a deposition break and then allowed the 30(b)(6) witness to answer a question with that very information even though it came directly from an attorney.

---

shield against discovery, **by interrogatories or by deposition, of the facts that the adverse party's lawyer has learned**, or the person from whom he has learned such facts, or the existence or nonexistence of documents, even though the documents themselves may not be subject to discovery." (citing *Protective Nat'l. Ins. Co. of Omaha*, 137 F.R.D. at 281; 8 C. Wright & A. Miller, Fed. Prac. & Proc. Civ. § 2023, at 194 (1970) (footnote omitted) (emphasis added)). Expanding on this principle, the *Garayoa* Court held that it was "improper for defense counsel to shield [a defendant] from answering a question about the factual underpinnings of an affirmative defense." 2017 WL 3115753 at *4.

Moreover, as flagged at the start of this Order, Netflix has tried to avoid applicable legal authority by strategically changing the issue into one it framed for a tactical advantage. To be sure, discovery aimed at learning "what its counsel *thinks* about the strength of Netflix's affirmative defenses" is inappropriate and would improperly seek privileged information. Framed that way, the issue would result in a ruling in Netflix's favor. But that is not what most of the unanswered 30(b)(6) questions were about. They were about **facts.** And the caselaw and other authority discussed above make it clear that fact-oriented discovery is permitted even if the witness learned about the facts from her attorneys.

From an overarching perspective, Netflix's legal position would handcuff lawyers in discovery and prevent the acquisition of basic facts about a case, undermining the policies informing our discovery rules. A prime illustration concerns one of the most-used discovery tools – an interrogatory seeking the names of fact witnesses and a summary of their knowledge of, and involvement in, the case. Not only is this type of discovery common, but it is in the Form Interrogatories included with the Florida Rules of Civil Procedure.

Specifically, Fla. R. Civ. P. Form 1 (General Personal Injury Negligence – Interrogatories to Plaintiff), which the Florida Supreme Court approved, authorizes defense counsel to propound the following interrogatory (interrogatory 17) to a plaintiff: "List the names and addresses of all person who are believed or known by you, your

agents, or **your attorneys** to have any knowledge concerning any of the issues in this lawsuit; and specific the subject matter about which the witness has knowledge." (emphasis added). Form 2 concerns interrogatories to a defendant, and Number 10 is the same as Number 1 to the plaintiff (i.e., it also approves an interrogatory asking for witnesses known by, among others, the party's **attorneys**). But this Court-approved set of interrogatories to defendants also contains an additional interrogatory: "State the facts upon which you rely for each **affirmative defense** in your answer." (emphasis added).[9]

In complex lawsuits, there could be 50 or more fact witnesses. As a practical matter, the corporate representative (or individual party) usually does not personally know about all 50 witnesses. Instead, the attorneys prepare the list of witnesses, often as a result of their own post-lawsuit investigation. But under Netflix's version of discovery,

---

[9]     In Administrative Order 96-36 (entered June 27, 1996), the Southern District of Florida adopted a Discovery Practices Handbook, which was published as an appendix to the Local General Rules. The practices in the Handbook did not have the force of law but the Court explained that they "may be looked to by practitioners for guidance in conducting discovery in this District." The Administrative Order explained that the Federal Courts Committee of the Dade County Bar Association prepared the Handbook. Section IV(A)(2) of the Handbook noted that "[i]nterrogatories initially are restricted to those seeking names of witnesses with knowledge or information relevant to the subject matter of the action, the nature and substance of such knowledge," and other subjects. Notably, the Handbook did not contain an exception for witnesses whose identities and knowledge were acquired as a result of counsel's post-trial investigation. The Court rescinded the Handbook in 2014. *See* In Re: Amendments to the Local Rules Notice of Proposed Amendments, of Opportunity for Public Comments, and of Hearing to Receive Comments, S.D. Fla. Admin. Order 2014-95 (amending the Local Rules to "to include a statement regarding professional practice retained from the Southern District of Florida Discovery Practices Handbook, which has been eliminated").

a defendant might list only 14 of the 50 witnesses it knows about because, after all, the defendant *itself* knows of only 14 fact witnesses and the remaining 36 witnesses were found by its counsel. But that result would turn discovery on its head and significantly restrict fundamental discovery.

Not surprisingly, Netflix has not cited any authority to support that extreme and unduly-narrow view of permissible discovery. But this illogical and unworkable result is the logical consequence of Netflix's argument. Netflix has not explained why its view of attorney-client privilege and work product would *prevent* Plaintiffs from obtaining discovery about facts from a 30(b)(6) witness if the facts were collected in an attorney investigation but *permit* it to learn facts (such as the existence of fact witnesses and a summary of their knowledge) in an interrogatory answer prepared in large part by attorneys, based on their "investigation." But there is no legally sound reason for such a distinction, which strongly suggests that there *is* no distinction -- because **both types of discovery are permissible.**

Applying this philosophy to the 30(b)(6) deposition of Ms. Rocque, Plaintiffs are entitled to learn the facts (as opposed to legal conclusion of Netflix's attorneys) supporting affirmative defenses and denials in Netflix's Answer. Netflix's counsel prevented that from happening because they did not prepare Ms. Rocque to answer questions on those topics. They should have. The mere fact that the preparation of the

corporate spokesperson comes, in part, from counsel does not prevent Plaintiffs from learning the facts in a resumed 30(b)(6) deposition.

So (assuming that Senior United States District Judge Federico A. Moreno permits another 30(b)(6) deposition after expiration of the discovery deadline), Plaintiffs will be permitted to resume the 30(b)(6) deposition of Netflix's designee. Netflix can designate Ms. Rocque again, or it can designate one or more other persons to provide testimony to bind the corporation.[10]

However, Plaintiffs' counsel must take steps to make sure that the questions concern facts, not legal analysis or attorneys' opinions. The distinction between a permissible question and an impermissible one will, of course, hinge on the wording of the questions. Questions concerning communications between Netflix's counsel and its spokesperson are not permitted, as they seek confidential information. On the other hand,

---

[10] But Netflix will not be able to avoid providing 30(b)(6) testimony about facts merely because the information is in the public domain. Discovery is routinely permitted over objections that the requested information is in the public domain and that the propounding party can simply access the materials itself. *See, e.g., Pepperwood of Naples Condo. Ass'n, Inc. v. Nationwide Mut. Fire Ins. Co.,* No. 2:10–cv–753–FtM–36SPC, 2011 WL 3841557, at *4 (M.D. Fla. Aug. 29, 2011) (rejecting discovery objection that the requested information was publicly available and noting that "[c]ourts have unambiguously stated that this exact objection is insufficient to resist a discovery request" (quotation omitted*)); Ochoa v. Empresas ICA, S.A.B. de C.V.,* No. 11-23898-CIV, 2012 WL 3260324, at *5 (S.D. Fla. Aug. 8, 2012) ("Whether the documents are available to Plaintiffs through due diligence does not control whether [Defendant] should be compelled to produce them."); *Phillips v. Hanover Ins. Co.,* No. CIV–14–871–R, 2015 WL 1781873, at *2 n.1 (W.D. Okla. Apr. 20, 2015) ("Courts consistently hold that parties have an obligation to produce even publicly available information." (collecting cases)).

questions about the facts (which might be embedded in a communication from counsel in a deposition-preparation session) are allowable.

Concerning the investigation itself, unless the factual results of the investigation are needed to answer Plaintiffs' deposition questions about the affirmative defenses and the denials in Netflix's answer, the results of the lawyers' investigation will *not* be permitted at the continued 30(b)(6) deposition.[11]

Assuming that both Plaintiffs are public figures, Plaintiffs cannot meet their threshold burden without establishing that Netflix acted with actual malice, which relates

---

[11]    Plaintiffs contend that they are entitled to learn about the steps undertaken in Netflix's attorney-led investigation because they relate to the actual malice standard needed to establish liability in public figure defamation cases. Plaintiffs note that the film is still available on Netflix and therefore is still being published (and was being published, after receipt of the pre-suit demand letter). But Florida has adopted the single publication rule, which provides that a defamation claim accrues "at the time of the first publication or exhibition or utterance" in the state. Fla. Stat. § 770.07 ("The cause of action for damages founded upon a single publication or exhibition or utterance, as described in s. 770.05, shall be deemed to have accrued at the time of the first publication or exhibition or utterance thereof in this state."); *see also Pippen v. NBCUniversal Media, LLC*, 734 F.3d 610, 614 (7th Cir. 2013) (noting irrelevance of subsequently discovered facts to defamation claim in light of Illinois' single publication rule, which operated to make defamation complete upon initial publication); *Shoen v. Shoen*, 48 F.3d 412, 417 (9th Cir. 1995).

As explained in *Pippen*, the single publication rule "provides that a claim for relief for defamation is complete at the time of first publication; later circulation of the original publication does not trigger fresh claims. The [Uniform Single Publication] Act protects speakers and writers from repeated litigation arising from a single, but mass-produced defamatory publication. 734 F.3d at 614. Plaintiffs have not submitted any legal authority to suggest that the single publication rule is inapplicable to a streaming service where the movie is, in a sense, always available and viewed on an ongoing basis. *Cf. Stern v. O'Quinn*, 253 F.R.D. at 686 (noting the actual malice inquiry applies at the time the statement at issue is published, and denying disclosure of post-statement work product).

to a defendant's state of mind at the time of publication of the allegedly defamatory evidence. *See, e.g., Long v. Arcell*, 618 F.2d 1145, 1147-48 (5th Cir. 1980) ("[T]he [actual malice] inquiry focuses on the defendant's state of mind at the time of publication."); *Fairfax v. CBS Corp.*, 2 F.4th 286, 295 (4th Cir. 2021) (alleged refusal to issue correction or retraction after post-statement revelation insufficient to show actual malice, which requires that "the defendant had a particular, subjective state of mind at the time the statements were made[]" (emphasis added) (quoting *Horne v. WTVR, LLC*, 893 F.3d 201, 211 (4th Cir. 2018)); *Pippen*, 734 F.3d at 614 (7th Cir. 2013) ("[T]he fact that [the plaintiff] alerted the defendants by email *after* publication that he had not entered bankruptcy does not help him establish actual malice at the time of publication." (emphasis in original)); *see also Klayman v. City Pages*, 5:13-CV-143-OC-22PRL, 2015 WL 1546173, at *15 (M.D. Fla. Apr. 3, 2015) ("While there is no dispute that [the] [d]efendants have yet to issue any corrections, the Supreme Court has explicitly rejected [the] [p]laintiff's argument and stated that actual malice cannot be inferred from a publisher's failure to retract a statement once it learns it to be false.") (citing *New York Times v. Sullivan*, 376 U.S. 254, 286 (1964) ("Failure to retract upon respondent's demand . . . [is] not adequate evidence of malice for constitutional purposes.")), aff'd, 650 F. App'x 744 (11th Cir. 2016).

Conclusion

The Undersigned grants Plaintiffs' implicit motion to compel a further 30(b)(6) deposition, which will last no more than two hours (assuming that Judge Moreno

authorizes it).[12] The Undersigned is not awarding attorney's fees to Plaintiffs, the prevailing parties, because the dispute arose from confusion over the permissible scope of 30(b)(6) deposition questions. The confusion was triggered by an ambiguous and vague purported agreement reached during a telephone call, and the differing interpretations reveal that what the lawyers believed was an agreement was actually not one at all. *See generally* "Cool Hand Luke" (a 1967 classic movie in which actor Strother Martin, playing the role of The Captain, uttered the classic line, "[w]hat we've got here is failure to communicate").

**DONE AND ORDERED**, in Chambers, in Miami, Florida, on May 2, 2023.

Jonathan Goodman
UNITED STATES MAGISTRATE JUDGE

---

[12]    Netflix argues that Plaintiffs no longer have a need to obtain 30(b)(6) discovery about its truth or substantial truth affirmative defense because they both, in recent depositions, were shown exhibits reflecting the substantial truth supporting the Film's depictions of them. But the mere fact that Netflix may have made some exhibits available does not mean that Plaintiffs are forbidden from seeking discovery on the topics at issue in the exhibits. Netflix proclaims that it will soon demonstrate in a summary judgment motion that Plaintiffs' so-called admissions are "devasting" to their case. That may well be, and Netflix is surely free to timely file a summary judgment motion based, at least in part, on Plaintiffs' deposition testimony. But, for now, for discovery purposes, the mere fact that Plaintiffs provided deposition testimony does not immunize Netflix from providing 30(b)(6) testimony about the facts supporting the substantial truth affirmative defense. Presumably, Netflix's designee will mention Plaintiffs' deposition testimony as some of the facts supporting its substantial truth affirmative defense. But Plaintiffs are entitled to probe further and learn what *other* facts, if any, support the defense.

**<u>Copies furnished to:</u>**

The Honorable Federico A. Moreno
All counsel of record