**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO: 1:22-cv-21796-Moreno/Goodman**

JOSE BASULTO, an individual, and
BROTHERS TO THE RESCUE, INC., a
Florida not-for-profit corporation,

                     Plaintiffs,

v.

NETFLIX, INC., a Delaware corporation,
ORANGE STUDIOS, S.A., a French anonymous society,
OLIVIER ASSAYAS, an individual, NOSTROMO
PICTURES, SL, a Spanish corporation, US ONE
COMERCIO E SERVICIOS DE CRIACAO E
PRODUCAO DE OBRAS COM DIREITOS
AUTORAIS, LTD, a Brazilian limited company,
CG CINEMA, SASU, a French simplified
joint stock company, RODRIGO TEXIEIRA,
an individual, CHARLES GILLIBERT, an individual,
and LOURENÇO SANT'ANNA, an individual,

                     Defendants.

_____/

**DEFENDANT NETFLIX, INC.'S MOTION FOR SUMMARY JUDGMENT**

Pursuant to Federal Rule of Civil Procedure 56 and Local Rule 56.1, Defendant Netflix, Inc. ("Netflix") respectfully submits this Motion for Summary Judgment against Plaintiffs Jose Basulto and Brothers to the Rescue, Inc. (collectively, "Plaintiffs").

## INTRODUCTION

Prior to their depositions last month, Plaintiffs, who are public figures known for their opposition to the government and regime of Fidel Castro in Cuba, had never seen the 241-paragraph Complaint filed in their names identifying 15 scenes in the film *Wasp Network* (the "Film") that allegedly defame them. Plaintiffs did not select these 15 allegedly defamatory scenes. Plaintiffs had never been asked by their lawyers to confirm that the Complaint's allegations are accurate, and, as discussed below, Plaintiffs' deposition admissions and the readily available public record reveal they are not. Plaintiffs had never been asked whether they can support their claim for *$30 million* in so-called "compensatory damages," and indeed admitted during their depositions that they cannot. Plaintiffs' testimony and the public record thoroughly undermine the Complaint's allegations, leaving no genuine issues to be tried.

*Wasp Network* is a docudrama "based on a true story" about a Cuban spy ring, known as the "Wasp Network," which infiltrated the Miami Cuban exile community in the 1990s. Plaintiff Jose Basulto ("Basulto"), a CIA-trained participant in the 1961 Bay of Pigs invasion as well as other acts against the Cuban government, is a well-known public figure. Plaintiff Brothers to the Rescue ("BTR") is a similarly well-known aviation organization founded by Basulto in 1991 with the stated purpose of rescuing Cuban rafters fleeing Cuba for Miami. It is an established fact that Basulto also used BTR planes to fly over Cuba for the purpose of dropping printed propaganda, to inspire dissent by the Cuban people and to antagonize the Cuban regime.

The Film, which is inspired by a non-fiction book published in 2015 entitled *The Last Soldiers of the Cold War* ("*Soldiers*") by the acclaimed Brazilian journalist Fernando Morais ("Morais"), dramatically depicts how Cuban spies insinuated themselves into the Miami exile community in the 1990s, including by joining BTR as well as other Cuban exile groups. The Film also depicts significant events concerning aggressive acts taken and attempted against and by the Cuban regime in the 1990s, which are described in *Soldiers* and are also matters of public record.

Plaintiffs are unhappy because they believe the Film generally "romanticizes" the Cuban spies and their work for the Cuban regime. (D.E. 1 ¶ 3.) Basulto admits he views this case as a "political statement" by Plaintiffs brought in the name of the greater Cuban exile community.

(Def.'s Rule 56.1 Statement of Material Facts ("SMF") ¶ 121.)  But as another court in this district explained in a companion case brought by the same counsel representing Plaintiffs, *Martinez v. Netflix*, No. 20-CV-24328-MGC-WPD (S.D. Fla.), a defamation claim cannot be based upon generalities, or on the Film as a whole, or on perceived offense to some larger group.  A defamation plaintiff must allege specific defamatory content, and must do so regarding the plaintiff him/itself.  Group libel is not a valid claim.  And Plaintiffs cannot show that they suffered any individual harm.

Following the Court's ruling in *Martinez*, Plaintiffs filed this lawsuit, alleging that 15 specific scenes in the Film defame them.  (D.E. 1 ¶¶ 107(a)-(o).)  As discussed below, it is Plaintiffs' burden to prove that each of these scenes is materially false.  Plaintiffs cannot meet this burden. Plaintiffs admitted during their depositions that each scene depicts true or substantially true events. The easily-searchable public record confirms the same.

Even if Plaintiffs could show material falsity, they cannot establish, by the requisite clear and convincing evidence, that Netflix first published the scenes in 2020 with "actual malice," which is the standard to be applied in view of Plaintiffs' admitted "public figure" status.  It is undisputed that Netflix did no more than license rights to the Film under representations and warranties by the Film's licensor, including that the Film does not include defamatory content.

Finally, even if Plaintiffs could somehow establish that they are not public figures, their claims would still fail as a matter of law because they concede that they have *no* evidence of *any* damages (let alone their lawyers' fanciful assertion of $30 million).  Plaintiffs also admit they cannot ascribe any damage amount to any particular allegedly defamatory scene.  Because Netflix is a media defendant, even if Plaintiffs did not need to show actual malice, they would be required to prove *some* quantifiable damages amount to sustain a claim for defamation.  Plaintiffs' admissions that they have no evidence of damages is a further basis to grant summary judgment.

Plaintiffs' claims for negligence and intentional infliction of emotional distress should also be dismissed.  Plaintiffs may not end-run the "actual malice" standard through their negligence claim.  And Basulto admitted he has no evidence to support his emotional distress claim, including admitting he has not offered any evidence of the manifestation of emotional distress supposedly caused by the Film.  Nor can Basulto show the necessary "outrageous conduct" by Netflix.

"[I]in [defamation] cases, there is a powerful interest in ensuring that free speech is not unduly burdened by the necessity of defending against expensive yet groundless litigation." *Michel v. NYP Holdings*, 816 F.3d 686, 702 (11th Cir. 2016).  This case is groundless.  Summary

judgment for Netflix should be granted.

**MATERIAL, UNDISPUTED FACTS**

**A.**     **Plaintiff Jose Basulto Is A Public Figure With A History Of Terrorist Actions**

Basulto is a historical figure.  He is a CIA-trained intelligence officer who "received training in just about everything having to do with warfare," including combat and the use of explosives.  (SMF ¶ 1.)  Basulto was identified and selected by the CIA to be part of the Bay of Pigs invasion in 1961.  (*Id*. ¶ 2.)  Basulto has publicly described himself as having been "trained by the CIA as a terrorist," and he acknowledges that he has been, and continues to be, publicly identified by others as a "terrorist."  (*Id*. ¶¶ 3-4.)[1]

In 1962, Basulto led a flotilla and "fired a cannon [his term for a .22-caliber rifle] against Hotel Rosita de Hornedo, Havana, Cuba."  (*Id*. ¶ 5.)  Basulto admits his objective was "to shoot Russians" believed to be staying at the hotel, and to "scare the hell out of [people]."  (*Id*. ¶ 6.)  The people firing from Basulto's flotilla, including Basulto himself, were not snipers; they acted with reckless disregard for the lives of innocent bystanders.  (*Id*. ¶ 7.)  Basulto is "proud" of his past violent activities – he even lists them on his personal resume, which he uses "in promotion of [his] activities."  (*Id*. ¶¶ 8-9.)  Basulto continues to this day to promote the overthrow of the Communist regime in Cuba.  (*Id*. ¶ 10.)  To the extent other exile groups share that objective, Basulto does not criticize the means they employ, including the use of violence.  (*Id*. ¶ 11.)

Basulto proudly admits he is a "public figure."  (*Id*. ¶ 12.)  Basulto "coordinated press coverage [for BTR] and acted as spokesman for the organization on a local, national, and international level."  (*Id*. ¶ 14.)  He also "had enumerable [sic] press conferences … [p]ersonally …."  (*Id*. ¶ 13.)  Basulto is a credited contributor to the book *Seagull One: The Amazing True Story of Brothers to the Rescue*, published in 2010, which recounts significant moments in his life.  (*Id*. ¶ 15.)  Basulto approved the contents of *Seagull One* and agrees they are accurate.  (*Id*. ¶ 16.)

**B.**     **Plaintiff BTR Is A Public Figure With A Militant History**

Basulto founded BTR in 1991, with the stated purpose of rescuing rafters fleeing from Cuba to the United States.  (*Id*. ¶ 17.)  BTR expressly admits (through its Rule 30(b)(6) deponent,

---

[1] A court may take judicial notice of publicly available documents such as newspaper articles and prior judicial proceedings.  *Lil' Joe Wein Music, Inc. v. Jackson*, 245 F. App'x 873, 879 (11th Cir. 2007); *Davis v. McKenzie*, No. 16-62499-CIV, 2017 WL 8809359, at *5 (S.D. Fla. Nov. 3, 2017), *report and recommendation adopted*, No. 16-62499-CIV, 2018 WL 1813897 (S.D. Fla. Jan. 19, 2018).

Rita Basulto, who is Jose Basulto's wife and a board member of BTR) that its activities in the 1990s were also "militant." (*Id.* ¶ 18.) In particular, BTR concedes that it repeatedly engaged in "aggressive" of acts of aerial civil disobedience, misrepresenting flight plans to the U.S. Federal Aviation Association ("FAA") and violating Cuba's airspace, for the purpose of dropping leaflets and other pro-democratic propaganda over Havana to incite the Cuban people, promote the overthrow of the government, and antagonize the Cuban regime. (*Id.* ¶ 19.)

BTR largely used volunteer pilots, who knew about BTR because of its public prominence. (*Id.* ¶ 20.) BTR "never … advertised [or] paid for advertisements or stuff like that." (*Id.* ¶ 21.) BTR received ample free publicity through "all the tv programs, radio programs that [Basulto] was invited to" participate in. (*Id.* ¶ 22.) BTR was the subject of numerous nationally published news articles. (*Id.* ¶ 25.) Press reporters regularly accompanied BTR pilots on their flights as well. (*Id.* ¶ 26.) BTR is also the subject of *Seagull One*. (*Id.* ¶ 23.) Basulto's aircraft (the "Seagull One") was sold in or about 2009 to a collector who exhibits it in a museum. (*Id.* ¶ 24.)

BTR was the subject of national and international news and attention in February 1996, when the Cuban air force shot down two BTR planes flying in international air space. (*Id.* ¶ 25.) The U.S. National Transportation and Safety Board ("NTSB") found that a third BTR plane, piloted by Basulto, had unlawfully crossed Cuba's air space during that same mission. (*Id.* ¶ 27.) Basulto pilot's license was suspended as a result of that serious infraction. (*Id.* ¶ 28.)

BTR still exists nominally, but it has not been operational since 2009. (*Id.* ¶ 29.)

## C.   The Film Is A Docudrama Based On Morais's Nonfiction Book, *Soldiers*

The Film is a docudrama inspired by Morais's non-fiction book, *Soldiers*. (*Id.* ¶¶ 30, 32.) Morais is an acclaimed Brazilian journalist and author. (*Id.* ¶ 31.) The Film opens with a line that it is "based on a true story" from the years 1991-1996, as told in *Soldiers*. (*Id.* ¶ 33.)[2]

The Film primarily unfolds through the perspectives of two Cuban spies and their wives: Rene Gonzalez ("Gonzalez") and his wife, Olga, and Juan Pablo Roque ("Roque") and his wife, Ana Martinez. (*Id.* ¶ 34.) Gonzalez and Roque both appear to defect from Cuba to the U.S., and both fly for BTR for periods of time. (*Id.* ¶ 35.) Other anti-Castro exile organizations, including "CANF," "PUND" and "Movimiento Democracia" are also portrayed in the Film. (*Id.* ¶ 36.)

Approximately halfway through the Film, the inception of the "Wasp Network" four years

---

[2] A docudrama is a dramatized movie based on real events. *Martinez*, 2023 WL 2630337, at *4.

earlier is described, revealing Gonzalez and Roque as spies.  (*Id*. ¶ 37.)  In a brief segment, the Film's narrator explains through montage and voiceover how the Wasp Network functioned through the early-1990s.  (*Id*. ¶ 38 (Ex. 10 at 01:00:07-01:03:30).)  The narrator identifies a number of specific exile groups and persons whom the spies were sent to infiltrate and monitor, including an organization known as "Alpha 66" (described as "the most aggressive terrorist group") and an individual named Luis Posada Carriles.  (*Id*. ¶ 39.)  Neither BTR nor Basulto is mentioned during that narration.  (*Id*. ¶ 40.)  The last time that BTR and Basulto are depicted in the Film is at the 77-minute mark, more than 49 minutes before the Film's conclusion.  (*Id*. ¶ 41.)

**D.    Netflix Licensed The Film Subject To Licensor Representations And Warranties, Including A Warranty Of No Defamatory Content**

Netflix is an entertainment content online streaming service.  (*Id*. ¶ 42.)  Netflix produces certain of its own content and also licenses completed content produced by others, including documentaries, which depict actual historical events and "maintain[] strict fidelity to fact," and docudramas, which dramatically extrapolate from real world events to tell fictionalized versions of events that actually occurred.  (*Id*. ¶¶ 43-45.)  *Martinez v. Netflix*, No. 20-v-24328-WPD, 2023 WL 2630337, at *4 (S.D. Fla. Feb. 23, 2023).

Netflix does not vet the fully completed films it licenses for accuracy.  (SMF ¶ 47.)  Netflix could not practicably do so for the hundreds of films offered each year within the competitive online entertainment streaming market. (*Id*. ¶¶ 46, 48.)  Netflix instead relies on representations and warranties from its licensors that their completed works contain no defamatory content.  (*Id*. ¶ 49.)

Netflix licensed the Film, as a completed docudrama, from Orange Studio S.A. ("Orange") in December 2019 pursuant to a license agreement (the "License").  (*Id*. ¶ 50.)  Orange is a well-known, established licensor with which Netflix has previously done business, without any issues. (*Id*. ¶¶ 52-53.)  The License includes a representation by Orange that Netflix's distribution of the Film "shall not violate or infringe any rights of any third party … or defame … such third party and shall not violate any applicable law, rule or regulation."  (*Id*. ¶ 54.)

The Film was first published on Netflix's streaming platform on June 19, 2020.  (*Id*. ¶ 55.)  The record is uncontroverted that Netflix had no knowledge of any possibly defamatory content within the Film, as respecting Plaintiffs or anyone else, at the time of the Film's first publication. (*Id*. ¶ 56.)  The first time that Netflix was aware of any claim of defamatory content concerning

Plaintiffs was when counsel for Basulto sent his initial pre-suit notice letter on October 23, 2020. (*Id*. ¶ 57.)  As discussed herein, Plaintiffs' allegations that the Film defames them are baseless.

**E.      Plaintiffs Did Not Review Or Confirm The Basis Of Their Complaint**

Prior to their depositions in April 2023, neither Plaintiff had ever seen the Complaint filed in their names.  (*Id*. ¶ 58.)  Nor had Plaintiffs ever reviewed, or been asked to review, the Complaint for accuracy.  (*Id*. ¶ 59.)

The bulk of the 60-page Complaint does not focus on Plaintiffs, but is a so-called "historical background" of the Cuban Revolution.  (D.E. 1 ¶¶ 41-99.)  The Complaint also includes allegations criticizing the Film as generally offending the Cuban exile community as a whole by depicting Gonzalez and Roque "sympathetically," and as "romanticizing" the Cuban spies.  (SMF ¶ 121.)  As discussed below, these allegations are non-actionable surplusage.

The Complaint includes one paragraph, divided into 15 subparts, identifying 15 scenes that allegedly defame Plaintiffs.  (*Id*. ¶ 60; D.E. 1 ¶¶ 107(a)-(o).)  Plaintiffs did not identify or select these scenes for inclusion in the Complaint.  (SMF at ¶ 60.)  Plaintiffs were unfamiliar with the allegations in paragraph 107 of the Complaint until their depositions.  (*Id.* ¶ 61.)

As discussed below, Plaintiffs' deposition admissions, along with information from the readily-available public record, thoroughly belie the allegations that the 15 scenes are defamatory.

**F.      The Scenes Identified In Paragraph 107 Of The Complaint Are Not Defamatory**

None of the scenes identified in paragraphs 107(a)-(o) of the Complaint is defamatory.

•      **Paragraph 107(a)** alleges that the Film's depiction of Gonzalez describing Basulto as the "arch enemy of the Cuban Revolution" is defamatory.  (*Id*. ¶ 62 (Ex. 10 at 00:08:33-00:08:39).)  Basulto testified not only that this description is *true*, but that he is "proud" of it.  (*Id*. ¶¶ 63-64.)

•      **Paragraph 107(b)** alleges that the Film's depiction of Basulto "describ[ing] himself as a man who was 'Trained by the U.S. as a terrorist'" is defamatory.  (*Id*. ¶ 65 (Ex. 10 at 00:09:44-00:09:51).)  But Basulto confirmed that he was, in fact, trained by the CIA as a terrorist and, moreover, that he has, in fact, described himself that way publicly.  (*Id*. ¶¶ 66-67.)  Indeed, more than one national publication *quotes* Basulto as saying, "I was trained as a terrorist by the United States in the use of violence to obtain goals."  (*Id*. ¶ 67.)[3]

---

[3] In multiple publications, this quote continues:  "When I was young, my Hollywood hero was John Wayne.  Now I'm like Luke Skywalker, I believe the Force is with us."  (*Id*. ¶ 67.)  These lines are also used virtually verbatim in this scene.  (*Id.* ¶ 68 (Ex. 10 at 00:09:44-00:10:07).)

- **Paragraph 107(c)** alleges that several constituent scenes "combined paint the picture that Brothers to the Rescue and Mr. Basulto were funded by the criminal activities [of] Jorge Mas Canosa and CANF, and that Brothers to the Rescue are 'terrorists' who assist in 'operations carried on by mercenaries recruited in Central America.'" (*Id.* ¶ 69.)  To create the appearance of an alleged link in the Film between BTR and "terrorism," however, Plaintiffs rely on a scene where a "*representative for Cuba*" states at a White House meeting that "'the CANF is financing terrorists and that the operations are carried on by mercenaries recruited in Central America.'" (*Id.* ¶ 70 (Ex. 10 at 01:41:22-01:41:48).)  Plaintiffs testified that (a) they have no evidence that such a meeting did not actually occur, and (b) the Film's depiction of *Cuba* labeling CANF (or anyone) as a "terrorist" is not defamatory.  (*Id.* ¶¶ 71-72 ("Q. Is it your position that the movie's depiction of a representative of Cuba describing CANF as affiliated with terrorists, *is it your position that that scene somehow defames you? A. No, no, absolutely not...*"); ("Cuba views everybody that's against it, the government, as terrorists.") (emphasis supplied).)  Nor does this scene ever refer to Plaintiffs. (*Id.* ¶ 73.)  Furthermore, Basulto testified that Jorge Mas Canosa, the president of CANF, was also a *legitimate* businessman, which is confirmed by the public record.  (*Id.* ¶ 74.)  Indeed, the court in *Martinez* found that the same counsel representing Plaintiffs had "mischaracteriz[ed] . . . [the portrayal] of Mas Canosa.  Mas Canosa is portrayed in the Film as a prominent, influential leader of the Cuban exile community and, in particular, the Cuban American National Foundation."  2023 WL 2630337, at *4 n.2.  Plaintiffs also admit that CANF donated money to BTR.  (SMF ¶ 75.)  The Film's depiction of Mas Canosa donating to BTR and money being "no object" for him does not defame Plaintiffs.

- **Paragraph 107(d)** alleges that the Film's depiction of Basulto saying, "'[w]e [*i.e.*, BTR] are not just a humanitarian organization … [w]e're a militant organization," is defamatory.  (*Id.* ¶ 76 (Ex. 10 at 00:13:04-00:13:10).)  But both Plaintiffs testified and agreed that BTR *was* a "militant" organization that encouraged "confrontation" between the Cuban government and its people.  (*Id.* ¶ 18.)  The scene's context further shows that Basulto was referring to BTR unlawfully entering Cuban airspace in the past to drop pro-democracy propaganda.  (*Id.* ¶ 77 (Ex. 10 at 00:12:52-00:14:47).)  As discussed below, it is undisputed that BTR repeatedly did just that.  (*Id.* ¶ 19.)

- **Paragraph 107(e)** alleges that the Film's depiction of Basulto saying "[w]e don't respect safety rules or the laws of aeronautics," and laughing that such conduct is "illegal," is defamatory.

(*Id*. ¶ 78 (Ex. 10 at 00:24:04-00:24:40).)  But Basulto testified, proudly, that BTR did violate U.S. and Cuban aviation laws and engaged in "extremely dangerous" flying conduct.  (*Id*. ¶ 19, 79.)

• **Paragraph 107(f)** alleges that the Film defamatorily depicts "Brothers to the Rescue … as a lookout for terrorists" and as "aiding and abetting an illegal weapon smuggling mission" on a particular occasion.  (*Id*. ¶ 80 (Ex. 10 at 00:25:01-00:26:03).)  But Plaintiffs confirmed they have no evidence that a BTR pilot did not engage in such conduct, whether or not sanctioned by BTR. Plaintiffs confirmed they have no flight logs, cockpit recordings or other evidence that a BTR pilot did not perform such an act, and BTR further testified that it did not supervise its pilots.  (*Id*. ¶¶ 81-82.)  Plaintiffs thus cannot show that this scene is false.  On the contrary, the public record includes a formal letter from the Cuban government to the United Nations dated November 6, 2001, describing *the very events* depicted in the Film that are the subject of paragraph 107(f), which are also recounted in *Soldiers* (which Plaintiffs never claimed is defamatory).  (*Id*. ¶¶ 83-85.)[4]

• **Paragraph 107(g)** alleges that the Film defamatorily depicts Olga – *while living in Cuba and believing that her husband had betrayed the Castro regime to which she was loyal* – telling her brother-in-law that she does not want her daughter to "live close to a terrorist, like Jose Basulto." (*Id*. ¶ 86 (Ex. 10 at 00:30:02-00:30:28).)  But Basulto testified that the Cuban regime did, in fact, view him as a "terrorist" and an "enemy," and he could not explain why a scene portraying a Cuban citizen, in Cuba and under possible Cuban surveillance, espousing Cuban propaganda and expressing her *opinion* about another character, is defamatory.  (*Id*. ¶¶ 87-89.)

• **Paragraph 107(h)** alleges that the Film defamatorily depicts BTR as involved in drug smuggling because Gonzalez is shown flying a plane on behalf of PUND and being directed by the head of PUND to divert from the filed flight plan to pick up drugs.  (*Id*. ¶ 90 (Ex. 10 at 00:30:49-00:32:10).)  The scene is clear, however, that Gonzalez had left BTR and joined PUND, and was flying a PUND plane at the time, *not* a BTR plane.  (*See id*. ¶¶ 91-92 (Ex. 10 at 00:30:28-00:32:10) ("I heard Rene left Basulto and joined the PUND.  Better pay supposedly.  With them, you never know where the fight for a free Cuba ends and drug smuggling begins.")).  BTR admitted that this

---

[4] The Film depicts a combination of events described in the November 6, 2001 letter from the Cuban government to the United Nations as having occurred on "4 July 1992" and "July 1992." This is precisely the kind of artistic license regularly taken by docudramas.  *See, e.g., Lovingood v. Discovery Commc'ns, Inc.*, 800 F. App'x 840, 847 (11th Cir. 2020), *cert. denied*, 140 S. Ct. 2808 (2020) ("reasonable viewer[s]" understand that docudramas "portray historical events with some amount of artistic license").

scene does *not* depict a BTR plane.  (*Id.* ¶ 92.)  Basulto also admitted that the Film's depiction of Gonzalez stating that he did not always "follow the flight plan" when he was with BTR is substantially true because BTR pilots did, in fact, file false flight plans indicating missions to rescue rafters when, actually, the pilots intended to drop propaganda over Cuba.  (*Id.* ¶ 19.)  Nor does the Film's depiction of Gonzalez stating that he did not always follow BTR's flight plans suggest that he was smuggling drugs for BTR.  (*Id.* ¶ 93.)

•    **Paragraph 107(i)** alleges that the Film defamatorily depicts "Brothers to the Rescue aiding a successful terrorist attack in Cuba," and Basulto "approving of the terrorist attack and as the leader and orchestrator of the terrorist attacks against Cuba."  (*Id.* ¶ 94 (Ex. 10 at 00:40:57-00:43:50).)  But BTR again admitted that the scene does *not* depict a BTR plane.  (*Id.* ¶ 95)  The allegation in paragraph 107(i) that "Rene [Gonzalez] is seen flying a Brother [sic] to the Rescue plane as cover and as a lookout for a speedboat transporting men holding machine guns" is a *false* allegation, as BTR admitted during its deposition.  (*Id.* ¶ 96.)  Rather, the Film plainly depicts the attack as having been led and orchestrated by another anti-Castro organization, Movimiento Democracia, not by Basulto, who is depicted as *asking* Gonzalez what happened.  (*Id.* ¶ 97 (Ex. 10 at 00:34:57-00:35:44) (Gonzalez: "The money's good, but it's too risky for me." PUND pilot: "Got any other offers?" Gonzalez: "Ramón Saul Sánchez reaching out to me. *Movimiento Democracia* needs good pilots."), (*id.* at 00:42:02-07) (Basulto: "Back from a mission?" Gonzalez: "Don't you have your own sources?"), (*id.* at 00:42:20-22) (Gonzalez: "The *Movimiento* may be proud, not me.").)  Moreover, Basulto testified that BTR supported Movimiento operations; and that he (Basulto), with his own past history of violence, did not judge whether the means used by any other exile group to effect regime change were appropriate or not.  (SMF ¶¶ 98-99.)[5]

•    **Paragraph 107(j)** alleges that the Film's depiction of Mas Canosa referring to Basulto as his "friend" during a wedding scene is defamatory because it implies that Basulto is "the ringleader and mastermind of criminal Cuban Exile groups" as well as "a pawn of CANF" who "actively

---

[5] Plaintiffs allege in paragraph 107(i) that Basulto is portrayed as considering the terrorist attack a success, that his character finds the lack of casualties disappointing, and that he is pleased with the damage caused.  The Basulto character states in this scene:  "They say the operation was a success. No casualties but damage."  Consistent with this depiction, Basulto testified, and has repeatedly claimed, that he considered his 1962 flotilla attack on a hotel in Havana a success because he caused damage to the hotel and scared people without actually causing any casualties.  (*Id.* ¶ 100.)

plans and coordinates terrorist attacks." (*Id.* ¶ 101 (Ex. 10 at 00:46:04-00:46:44).) (Plaintiffs fail to explain how Basulto can *both* be "the ringleader and mastermind" and a mere "pawn.") This is idiosyncratic misinterpretation and confirmation bias. As discussed in connection with paragraph 107(c), the Film's depiction of Mas Canosa is not defamatory as a matter of law. *See Martinez*, 2023 WL 2630337, at *4 n.2. Nor is the Film's depiction of Mas Canosa and Basulto as having been friends defamatory because Basulto testified that he *was* "a friend" of Mas Canosa, whom Basulto further described as "a Cuban patriot." (*Id.* ¶ 102.) Basulto also acknowledged that he was at social events with Mas Canosa, and that he attended Mas Canosa's funeral in 1997. (*Id.* ¶¶ 102-103.)

- **Paragraph 107(k)** alleges that the Film defamatorily depicts Basulto as "endangering the pilots" who were shot down in 1992, and as further portraying the downed planes as "violating Cuban air space when they were shot down" when, in fact, they were "in international airspace…." (*Id.* ¶ 104 (Ex. 10 at 01:13:37-00:16:50).) But both Plaintiffs admitted that the Film does *not* depict the downed planes as having been in Cuban airspace at the time. (*Id.* ¶ 105.) Basulto also admitted that the plane he piloted that day *did* cross into Cuban airspace (which is also an NTSB-adjudicated fact), thereby endangering the lives of him, his crew, and the other pilots and planes flying on the same mission. (*Id.* ¶ 106.)

- **Paragraph 107(l)** alleges that the Film defamatorily depicts BTR and Basulto as "flying over the city of Havana and dropping leaflets from the window," and further alleges that such depiction of BTR and Basulto "illegally flying in Cuban airspace" is defamatory because it portrays "another justification for Cuba's shootdown of the planes." (*Id.* ¶ 107 (Ex. 10 at 00:13:11-:00:14:48).) But, as discussed above, Basulto *did* illegally fly into Cuban airspace on the day of the shootdown. (*Id.* ¶ 106.) Both Plaintiffs further admitted that Basulto had illegally flown into Cuban airspace on multiple occasions in the past to drop pro-democracy leaflets, bumper stickers and medallions, which had incited the Cuban government. (*Id.* ¶ 19, 108.)

- **Paragraph 107(m)** alleges that Plaintiffs are defamatorily depicted in the Film "as being part of the criminal enterprise composed of Cuban Exile groups" because of a scene where Roque gives an interview criticizing BTR and Basulto as "organizing terrorist actions in Cuba while pretending to give humanitarian aid." (*Id.* ¶ 109 (Ex. 10 at 01:18:40-01:19:40).) But as BTR itself admitted, Roque did, in fact, give such an interview on CNN. (*Id.* ¶ 110.)

- **Paragraph 107(n)** vaguely alleges that "some narration throughout the Film" somehow defames Plaintiffs because "[o]ne portion of the narration" refers to the Wasp Network thwarting 20 terrorist attacks.  (*Id.* ¶ 111 (Ex. 10 at 01:00:07-01:03:30).)  The cited portion of the Film, while expressly mentioning *other* anti-Castro groups, does *not* refer to BTR.  (*Id.* ¶ 112.)  Unsurprisingly, when asked about this allegation in their depositions, neither Plaintiff could explain what is meant by this paragraph or why the cited scene is supposedly defamatory to them.  (*Id.* ¶ 113.)

- **Paragraph 107(o)** alleges that the Film's wedding scene presents "a defamatory image of Mr. Basulto being involved in a mafioso-like lifestyle paid for by cocaine and terrorist activities," because the scene portrays a nice wedding with a luxury bridal car, well-dressed guests, and the presence of press (notwithstanding that Basulto concedes he is now and was then a public figure).  (*Id.* ¶ 114 (Ex. 10 at 00:43:51-00:48:34).)   This allegation is more confirmation bias and non-actionable misinterpretation.  *See Martinez*, 2023 WL 2630337, at *4 (rejecting as misinterpretation the claim that this scene depicts "a lavish lifestyle funded by criminal activity").

G.   **Plaintiffs Concede They Have *No* Evidence Of Any Damages**

Shortly before Plaintiffs depositions were conducted, Plaintiffs stipulated through their counsel that they have no evidence of any damages suffered by either of them in any liquidated amount(s) with respect to any of their claims.  (SMF ¶ 115.)  Basulto likewise admitted that he has no evidence of any manifestations of damages from his alleged emotional distress.  (*Id.* ¶ 120.)

During Plaintiffs' depositions, they also stipulated they have no evidence that any of the 15 allegedly defamatory scenes caused any specific damages to them.  (*Id.* ¶¶ 116, 119.)  Basulto further admitted that he has no evidence to disprove that pre-existing publications about him, not the 15 allegedly defamatory scenes in the Film, may have caused any alleged harm.  (*Id.* ¶ 117.)[6]

In a candid moment, Basulto admitted that this case is a "political statement" by Plaintiffs, and an effort by them to shut down speech that Basulto and his family apparently view as overly-sympathetic to the Cuban government.  (*Id.* ¶ 121.)  *See Martinez*, 2023 WL 2630337, at *4 ("While the Film may have an attitude of favorability to the Castro regime that the Cuban exile community disagrees with, that does not make the Film[] … defamatory[.]").

**STANDARD OF REVIEW**

Summary judgment is proper when "there is no genuine dispute as to any material fact and

---

[6] Plaintiffs all but admitted that the $30 million damages figure being sought in their names is arbitrary, is not the product of *any* input from them, and is devoid of any support.  (*Id.* ¶ 118.)

the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *accord Rubinstein v. Ourian*, No. 20-21948-CIV, 2021 WL 4134753, at *2 (S.D. Fla. Sept. 10, 2021) (Moreno, J.) (citation omitted). "The party moving for summary judgment 'bears the initial responsibility of informing the district court of the basis for its motion.'" *Josendis v. Wall to Wall Residence Repairs, Inc.*, 662 F.3d 1292, 1314 (11th Cir. 2011) (citation omitted). The burden then shifts to the non-moving party to rebut that showing with admissible evidence to demonstrate a "*genuine* issue of *material* fact." *Id.* at 1315; *Rubinstein*, 2021 WL 4134753, at *2 (citations omitted).

In defamation cases, "because of the importance of free speech, ***summary judgment is the rule, not the exception***." *Larreal v. Telemundo of Fla., LLC*, 489 F. Supp. 3d 1309, 1317-18 (S.D. Fla. 2020) (adopting report and recommendation of Goodman, J.). First Amendment protections indisputably apply to films. *Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495, 501 (1952).

## ARGUMENT

## I.   PLAINTIFFS' DEFAMATION CLAIMS SHOULD BE DISMISSED

To state a claim for defamation under Florida law, a plaintiff must allege:  (1) publication; (2) falsity; (3) knowledge or reckless disregard of falsity on a matter concerning a public figure, or negligence on a matter concerning a private person; (4) actual damages; and (5) that the statement is defamatory. *E.g.*, *Mennella v. Am. Airlines, Inc.*, 824 F. App'x 696, 701 (11th Cir. 2020) (citing *Jews for Jesus, Inc. v. Rapp*, 997 So. 2d 1098, 1106 (Fla. 2008)). To be defamatory, a statement must be "of and concerning" the plaintiff and must also "'expose [the] plaintiff to hatred, ridicule, or contempt or injure[] his business or reputation or occupation.'" *Parekh v. CBS Corp.*, 820 F. App'x 827, 833 (11th Cir. 2020) (quoting *Jews for Jesus, Inc.*, 997 So. 2d at 1108-09).

"True statements, statements that are not readily capable of being proven false, and statements of pure opinion are protected from defamation actions ...." *Turner v. Wells*, 879 F.3d 1254, 1262 (11th Cir. 2018). "Under the substantial truth doctrine, a statement does not have to be perfectly accurate if the 'gist' or 'sting' of the statement is true." *Wentz v. Project Veritas*, No. 6:17-cv-1164-Orl-18GJK, 2019 WL 1716024, at *4 (M.D. Fla. Apr. 16, 2019). "Whether [a] statement is one of fact or opinion and whether a statement of fact is susceptible to defamatory interpretation are questions of law for the court." *Turner*, 879 F.3d at 1262-63.

There is no genuine dispute that Plaintiffs cannot satisfy any of the elements of a claim for defamation other than the first element that there has been a "publication."

### A. Plaintiffs Must Identify Specific False Content Within The Film, And May Not Recover Based Upon Their Allegations That The Film Generally And As A Whole Defames Them

Under Florida law, a party must specifically "identify and describe allegedly defamatory statements in a larger work." *Martinez*, No. 20-CV-24328-MGC-WPD, Order on Motions to Dismiss, D.E. 95 ("*Martinez I*"), at 11 (S.D. Fla. Feb. 1, 2022); *Michel*, 816 F.3d at 705-06 (limiting plaintiff to the allegedly false statements specifically enumerated in the complaint).

The plaintiff's complaint in the companion *Martinez* case was initially dismissed without prejudice because she failed to identify specific allegedly defamatory scenes in the Film, instead making only general allegations that the Film as a whole defamed her. *Martinez I*, D.E. 95, at 11 ("[T]his district routinely requires parties raising defamation claims to identify and describe allegedly defamatory statements within a larger work."). The *Martinez* court subsequently dismissed the amended complaint with prejudice after finding that none of the specifically identified scenes was defamatory as a matter of law. *Martinez v. Netflix*, No. 20-CV-24328-MGC-WPD, 2023 WL 2630337, at *7 (S.D. Fla. Feb. 23, 2023) ("*Martinez II*").

In this action, which followed *Martinez I*'s dismissal without prejudice ruling, Plaintiffs (through the same counsel as in *Martinez*) pleaded paragraphs 107(a)-(o) in their Complaint, vainly attempting to identify specific scenes in the Film that allegedly defame them. Plaintiffs' catch-all allegation that the scenes alleged in paragraphs 107(a)-(o) are mere "examples" is not legally meaningful or a basis for Plaintiffs to avoid summary judgment. *See Martinez I*, D.E. 95, at 11.

Plaintiffs' allegations that the Film (as a whole) "maligns the Cuban exile community in general" are also not legally meaningful. (D.E. 1 ¶¶ 5, 13, 100, 104, 105, 110.) When, as here, "a group is large, that is, composed of twenty-five or more members, courts consistently hold that plaintiffs cannot show the statements were 'of and concerning' them." *Thomas v. Jacksonville Television, Inc.*, 699 So. 2d 800, 805 (Fla. Dist. Ct. App. 1997); *accord Diaz v. NBC Universal, Inc.*, 536 F. Supp. 2d 337, 343 (S.D.N.Y. 2008), *aff'd*, 337 F. App'x 94 (2d Cir. 2009); *Adams v. WFTV, Inc.*, 691 So. 2d 557, 557 (Fla. Dist. Ct. App. 1997). It is indisputable that the Cuban exile community consists of more than 25 members.

### B. Plaintiffs Cannot Prove That Any Of The 15 Allegedly Defamatory Scenes Is False

Plaintiffs bear the initial burden of proving that each of the 15 allegedly defamatory scenes described in paragraphs 107(a)-(o) of their Complaint is false. *E.g.*, *Turner*, 879 F.3d at 1267;

*Ludwin v. Proman*, No. 20-CV-81755-RS, 2023 WL 2401774, at *5 (S.D. Fla. Jan. 24, 2023) (rejecting the plaintiffs' attempt to shift the burden of proof to the defendant to prove that its statements were truthful and holding that "in defamation cases … plaintiffs carry the burden of proving the merits of their claims"); *Montgomery v. Risen*, No. 15-20782-CIV, 2015 WL 5167628, at *2 (S.D. Fla. Sept. 3, 2015) (Goodman, J.) (observing that it is "Plaintiff's burden to prove falsity" in a libel case).

Plaintiffs also must overcome the fact that, as Judge Dimitrouleas found in *Martinez II*, "the Film is clearly a docudrama." 2023 WL 2630337, at *4. The Film, therefore, is a dramatized version of real events "that may vary from historical fact" without being "false." *Id.* ("Docudramas utilize simulated dialogue, composite characters, and a telescoping of events occurring over a period into a composite scene or scenes.") (citations omitted); *Partington v. Bugliosi*, 56 F.3d 1147, 1155 (9th Cir. 1995) (observing that audiences of docudramas understand that they are not watching "assertions of verifiable facts").

As discussed above, none of the 15 dramatized scenes at issue is false. Basulto *was* the enemy of the Cuban regime. (SMF ¶¶ 62-64.) Basulto *was* trained by the CIA as a terrorist – he has said so himself. (*Id.* ¶¶ 3, 65-67.) Basulto *was* (and still is) referred to as a "terrorist" by Cuban government sympathizers (and, in any event, whether Basulto is a "terrorist" is a matter of opinion). (*Id.* ¶¶ 4, 86.) *See, e.g.*, *Turner*, 879 F.3d at 1262-69 (description of plaintiff as "homophobic" was "opinion"). By his own admissions and official findings, Basulto *did* violate Cuban airspace multiple times to inspire revolution and antagonize the Cuban government, putting himself and his companions in danger. (SMF ¶¶ 19, 104-108.) Basulto is proud of these facts, and he continues to support regime change in Cuba, without judgment as to the means used to effect such change, including violence. (*Id.* ¶¶ 10, 11, 62, 94.) *See Turner*, 879 F.3d at 1267 ("The challenged statements are true, and Turner's defamation claim falls short on this basis alone.").

Nor is there any falsity in the Film's depiction of Plaintiffs' operations. BTR's missions to promote the overthrow of the Cuban government *were* militant, and BTR pilots *did* repeatedly antagonize the Cuban government, violate flight plans and engage in "extremely dangerous" conduct. (SMF ¶¶ 19, 76-79.) Roque *did* give an interview accusing Plaintiffs of "organizing terrorist actions in Cuba while pretending to give humanitarian aid." (*Id.* ¶¶ 109-110.) The Cuban government *did* file a formal complaint with the United Nations accusing a BTR pilot of assisting an attempted attack in 1992. (*Id.* ¶¶ 80, 83.) *See, e.g.*, *Dunn v. Air Line Pilots Ass'n*, 193 F.3d

1185, 1193-94 (11th Cir. 1999) (granting summary judgment where description of pilots as "scabs" was not false where pilots admitted to crossing union picket lines and working during strike).

None of these dramatized scenes is defamatory. Even if one were to assume, *arguendo*, that Plaintiffs had shown some degree of falsity, there is no genuine dispute that each scene is nonetheless "substantially true." *See, e.g.*, *Wentz*, 2019 WL 1716024, at *5 (finding "the alleged defamatory content in this case is true, substantially true, or at least not provable as false" where "many of the alleged defamatory statements made by [defendants] … are recitations of Wentz's own admitted actions and statements," and "although the Wentz Video includes a rap song implying Wentz is a liar, Wentz admitted to lying to Sandini during Wentz's deposition"); *Marder v. TEGNA Inc.*, No. 19-81283-CIV-SMITH, 2020 WL 3496447, at *5 (S.D. Fla. June 29, 2020) (dismissing defamation claim concerning statement that plaintiff had been charged with crimes where plaintiff had, in fact, committed crimes for which he would later be charged); *Davis v. McKenzie*, No. 16-62499-CIV-COHN/SELTZER, 2017 WL 8809359, at *12-14, *17-18 (S.D. Fla. Nov. 3, 2017), *report and recommendation adopted*, 2018 WL 1813897 (S.D. Fla. Jan. 19, 2018) (finding that PBS news reports about plaintiff's crimes were substantially true and that any falsehoods could have done only incremental damage to plaintiff's reputation).

Plaintiffs objectively misrepresent other Film scenes. BTR planes are *not* depicted smuggling drugs, as Plaintiffs claim. (SMF ¶¶ 90-93.) BTR planes are *not* depicted "as a lookout for a speedboat transporting men holding machine guns," and Basulto is *not* depicted "as the leader and orchestrator" of that attack. (*Id.* ¶¶ 94-97.) The two downed BTR planes are *not* depicted as "violating Cuban air space when they were shot down," (*id.* ¶¶ 104-105), and it has been adjudicated that Basulto *did* "illegally fly[] in Cuban airspace" on the day of the shootdown. (*Id.* ¶ 106.) Furthermore, even if the narration scene stating that the Wasp Network thwarted 20 terrorist attacks could be viewed somehow as defamatory, (*id.* ¶ 111), that scene does *not* mention BTR. (*Id.* ¶ 112.) *See, e.g.*, *Sullivan*, 376 U.S. at 288-89 (finding statements not defamatory because they were not "of and concerning" plaintiff where "[t]here was no reference to respondent in the advertisement, either by name or official position"); *Mac Isaac v. Twitter, Inc.*, 557 F. Supp. 3d 1251, 1259 (S.D. Fla. 2021) (same); *R.W. v. Charter Schs. USA, Inc.*, No. 18-14405-CIV-MARRA, 2019 WL 13216131, at *8 (S.D. Fla. May 23, 2019) (same).

Nor does the Film's depiction of Mas Canosa attending a wedding and referring to Basulto as his "friend" (Basulto admitted he and Mas Canosa were friends) depict Plaintiffs as being part

of a "criminal enterprise."  (SMF ¶¶ 69, 101, 114.)  *See Martinez II*, 2023 WL 2630337, at *4 & n.2 (finding allegations "were a mischaracterization of Mas Canosa," and dismissing complaint as a whole because it "significantly mischaracterize[d] the portrayal of [the plaintiff] in the Film as a whole, as well as in the selected scenes"); *Turner*, 879 F.3d at 1267 (rejecting defamation claim where plaintiff "cherry pick[ed] statements in the [challenged] Report out of context.").

Because Plaintiffs cannot show that the 15 allegedly defamatory scenes are false, and cannot rebut the indisputable facts confirming that the challenged scenes are substantially true, the Court should grant Netflix summary judgment.

### C.     Plaintiffs Cannot Show That Netflix Acted With Actual Malice

Even assuming, purely for the sake of argument, that Plaintiffs could demonstrate falsity, the record is uncontroverted that Netflix had no awareness or suspicion of such supposed falsity. Because Plaintiffs are public figures, they must demonstrate by clear and convincing evidence that Netflix acted with actual malice. *E.g.*, *Klayman v. City Pages*, 650 F. App'x 744, 750 (11th Cir. 2016) ("[A] public figure must prove actual malice by clear and convincing evidence" at summary judgment); *Berisha v. Lawson*, 973 F.3d 1304, 1310 (11th Cir. 2020), *cert. denied*, 141 S. Ct. 2424 (2021) (same).  Plaintiffs cannot meet this high burden.

#### 1.     Plaintiffs Are Public Figures

Public figure status is a question of law for the Court.  *E.g.*, *Turner*, 879 F.3d at 1271 (citations omitted); *Michel*, 816 F.3d at 702.  "An individual may qualify as a public figure either generally . . . or for only 'limited' purposes, where the individual has thrust himself into a particular public controversy and thus must prove actual malice in regard to certain issues."  *Berisha*, 973 F.3d at 1310.  An entity may likewise qualify as a public figure.  *E.g.*, *Silvester v. Am. Broadcasting Cos.*, 650 F. Supp. 766, 777 (S.D. Fla. 1986) ("[F]or purposes of applying First Amendment to defamation claims, corporations can be public figures."), *aff'd*, 839 F.2d 1491 (11th Cir. 1988) (citation omitted); *Hindu Am. Found. v. Viswanath*, No. 21-CV-01268 (APM), 2022 WL 17820331, at *10-11 (D.D.C. Dec. 20, 2022) (applying standard to non-profit organization).

The Eleventh Circuit has identified "two 'fundamental criteria'" that distinguish public and private figures: "(1) 'public figures usually have greater access to the media which gives them a more realistic opportunity to counteract false statements than private individuals normally enjoy'; and, more importantly, (2) public figures typically 'voluntarily expose themselves to increased risk of injury from defamatory falsehoods.'"  *Berisha*, 973 F.3d at 1310 (citation omitted).

There is no genuine dispute that Basulto and BTR are both public figures.  Basulto *admits* he is a public figure whom many people "love," and he readily fits the definition of a public figure. (SMF at ¶¶ 12-15, 119.)  Nor can BTR dispute its public figure status.  BTR admits it easily attracted volunteers without needing any advertising because of its press coverage and prominence. (*Id.* at ¶¶ 20-22, 26.)  BTR was also the subject of significant public attention following the shootdown of its planes by the Cuban air force.  (*Id.* at ¶ 25.)  *See, e.g.*, *Michel*, 816 F.3d at 702 (finding "acclaimed philanthropist" to be public figure); *Turner*, 879 F.3d at 1272 (finding professional football coach to be public figure due to his media access); *see also Berisha*, 973 F.3d at 1310 (finding plaintiff to be limited public figure where his role in scheme at issue was "covered by news media").

### 2. Plaintiffs Cannot Show Actual Malice By Netflix

Because Plaintiffs are public figures, they must show, by clear and convincing evidence, that Netflix "*in fact* entertained serious doubts as to the truth of [its] publication."  *Berisha*, 973 F.3d at 1312.  Plaintiffs have no such evidence.

The record is uncontroverted that Netflix did no independent research into the Film's contents prior to its initial publication in June 2020, relying instead, as it does in the normal course of its business, on the representation and warranty of the Film's licensor, Orange, that the Film contained no defamatory content.  (SMF ¶¶ 47-49, 51-53, 56.)  Plaintiffs cannot establish actual malice under such facts.  *See Sullivan*, 376 U.S. at 287 (finding no actual malice where media defendant performed no independent investigation into truth of advertisement at issue, instead relying upon "their knowledge of the good reputation" of its sponsors); *Lovingood*, 800 F. App'x at 850 (finding that media defendant did not act with actual malice because plaintiff identified no evidence "showing that anyone at Discovery had actual doubts about the scene or real awareness that the scene might be problematic"); *Dunn*, 193 F.3d at 1197 (granting summary judgment to defendant where there was no record evidence to support a jury finding by clear and convincing evidence that defendants knew – or were reckless in not questioning whether – the statements at issue were false).

Nor was Netflix's reliance on Orange's representation and warranty malicious.  *E.g.*, *Lovingood*, 800 F. App'x at 850 ("[F]ailure to investigate before publishing, even when a reasonably prudent person would have done so, is not sufficient to establish reckless disregard.") (citation omitted); *Klayman*, 650 F. App'x at 750-51 ("[D]efendants' failure to investigate and

poor journalistic standards are insufficient to establish actual malice.").[7]

Because Plaintiffs are public figures, their negligence claims also fail as a matter of law. (D.E. 1 ¶¶ 137-154, 175-194.) *E.g.*, *Meisler v. Gannett Co.*, 12 F.3d 1026, 1030 (11th Cir. 1994), *cert. denied*, 512 U.S. 1222 (1994) (granting summary judgment where "[a]t best, the defendants' actions were negligent; negligence is not the appropriate standard for proving actual malice"); *Don King Prods., Inc. v. Walt Disney Co.*, 40 So. 3d 40, 43, 46 (Fla. Dist. Ct. App. 2010) (granting summary judgment for defendant and noting that "[a] public figure bringing a defamation action must prove more than mere negligence on the part of the publisher; he must prove that the publisher acted with actual malice").

### D.  Plaintiffs Have No Evidence Of Damages

"Florida law applies the Supreme Court's ruling from the well-known First Amendment defamation case of *Gertz v. Robert Welch Inc.*, 418 U.S. 323, 94 S. Ct. 2997, 41 L.Ed.2d 789 (1974), which eliminates presumed damages for defamation *per se* actions against media defendants." *Corsi v. Newsmax Media, Inc.*, 519 F. Supp. 3d 1110, 1119 (S.D. Fla. 2021), *appeal dismissed in part*, No. 21-10480, 2022 WL 3353776 (11th Cir. July 1, 2022), *and appeal dismissed in part*, No. 21-10480, 2022 WL 3350519 (11th Cir. July 7, 2022); *Rubinson v. Rubinson*, 474 F. Supp. 3d 1270, 1274 (S.D. Fla. 2020) ("[A]fter *Gertz*, in libel cases involving media defendants, fault and proof of damages must always be established …. Libel *per se* otherwise still exists in Florida.") (citation omitted); *Edelstein v. WFTV, Inc.*, 798 So. 2d 797, 798 (Fla. DCA 4th Dist. 2001) (dismissing defamation claim against media defendant for failure to allege actual injury).

Netflix is unquestionably a media defendant. *See Street v. Nat'l Broad. Co.*, 512 F. Supp. 398, 406 n.6 (E.D. Tenn. 1977), *aff'd*, 645 F.2d 1227 (6th Cir. 1981) (applying *Gertz*'s actual damages requirement to acquirer and distributor of television docudrama about the Scottsboro trial

---

[7] Plaintiffs have elsewhere contended that they may establish actual malice based on Netflix's counsel's investigation conducted after receipt of Plaintiffs' pre-suit notice letters. As this Court stated in its May 2, 2023 Order [D.E. 156], Plaintiffs' position fails in light of Florida's single publication rule. *Id*. at 40 (citing Fla. Stat. § 770.07; *Pippen v. NBCUniversal Media, LLC*, 734 F.3d 610, 614 (7th Cir. 2013), *cert. denied*, 573 U.S. 917 (2014) (noting irrelevance of subsequently discovered facts to defamation claim in light of Illinois' single publication rule, which operated to make defamation complete upon initial publication)); *see also Klayman*, 650 F. App'x at 751 (rejecting claim that media defendant's "lack of editorial or verification processes and the authors' failure to contact [plaintiff] for comment before publication," reliance on allegedly incredible source, and refusal to correct the statements after receiving plaintiff's demand letter constituted actual malice).

and noting that "[t]elevision entertainment … is under the blanket of First Amendment protection");

*see also Gertz,* 418 U.S. at 349 (explaining that "the doctrine of presumed damages invites juries to punish unpopular opinion rather than to compensate individuals for injury sustained by the publication of a false fact," and "award[ing] "[substantial] damages where there is no actual loss . . . is antithetical to and inhibits the vigorous exercise of First Amendment freedoms"); *Nichols v. Moore*, 477 F.3d 396, 400 (6th Cir. 2007) (analyzing filmmaker as "media defendant" for purposes of constitutional limitations imposed by First Amendment on defamation claims).

Thus, even if, *arguendo*, Plaintiffs were not public figures and did not need to prove liability according to the "actual malice" standard (which, as discussed above, they cannot prove), they would nevertheless be required to prove actual damages to support their defamation claims, including defamation *per se*. Plaintiffs, however, have stipulated that they have *no* evidence of actual damages (let alone evidence to support the assertion of having suffered "$30 million" in "compensatory damages"). (SMF at ¶¶ 115-119.)

Plaintiffs also cannot sustain a claim for defamation *per quod*, which requires a showing of actual economic injury – which, once again, Plaintiffs stipulate they cannot show. *E.g.*, *Carey v. Kirk*, No. 21-20408-CIV, 2022 WL 17996027, at *12 (S.D. Fla. Sept. 2, 2022), *motion to certify appeal denied*, No. 21-20408-CIV, 2022 WL 4217892 (S.D. Fla. Sept. 13, 2022); *Anderson v. Smith*, No. 3:19-cv-222-J-20JRK, 2020 WL 10058207, at *3 (M.D. Fla. Mar. 24, 2020). For this alternative reason as well, summary judgment should be granted to Netflix.[8]

## II.   BASULTO'S CLAIM FOR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS ("IIED") SHOULD BE DISMISSED

### A.   Basulto Cannot Prove "Outrageous Conduct" By Netflix

To state an IIED claim, a plaintiff must allege conduct "so outrageous in character, and so extreme in degree," that it is considered "atrocious and utterly intolerable in a civilized community." *Paylan v. Devage*, No. 8:15-CV-1366-T-36AEP, 2019 WL 9667696, at *9-11 (M.D. Fla. Mar. 12, 2019), *aff'd sub nom. Paylan v. Dirks*, 847 F. App'x 595 (11th Cir. 2021). "Whether a claim pleads conduct sufficiently outrageous to support a claim of IIED is a question of law … and is

---

[8] Because Plaintiffs' have no claim for defamation, their "Conspiracy to Defame" claims should also be dismissed. *E.g.*, *Thomas v. Patton*, No. 162005CA003777XXXXMA, 2005 WL 3048033, at *4 (Fla. Cir. Ct. Oct. 21, 2005), *aff'd and remanded*, 939 So. 2d 139 (Fla. DCA 1st Dist. 2006) ("Without a defamation, there can be no conspiracy to defame."); *Pierson v. Orlando Reg'l Healthcare Sys., Inc.*, No. 6:08-CV-466-Orl-28GJK, 2010 WL 1408391, at *24 (M.D. Fla. Apr. 6, 2010), *aff'd*, 451 F. App'x 862 (11th Cir. 2012) (same).

measured by an objective standard; the subjective response of the person who allegedly suffered emotional distress does not control." *Piccolo v. Piccolo*, No. 15-CV-62463, 2016 WL 9526494, at *3 (S.D. Fla. May 6, 2016).

"A plaintiff cannot transform a defamation action into a claim for intentional infliction of emotional distress simply by characterizing the alleged defamatory statements as 'outrageous.'" *Rubinson*, 474 F. Supp. 3d at 1278. Basulto must instead offer evidence that Netflix engaged in "atrocious and utterly intolerable" and uncivilized conduct. Basulto has no such evidence; Netflix's reliance on the representation and warranty from Orange was not atrocious and utterly intolerable. (SMF ¶ 56.)

Moreover, where the Film's scenes are based upon *Soldiers* – which Basulto never complained about – and where, as shown above, the content in the Film is abundantly supported by information in the public record, Basulto cannot establish that Netflix engaged in outrageous conduct. *See Martinez*, 2023 WL 2630337, at *4 (dismissing IIED claim based on the Film because it "fail[ed] to meet the difficult showing of outrageous conduct by Defendants").

**B.   Basulto Has No Evidence Of Damages**

Basulto's IIED claim should be dismissed for the separate reason that he admits he has no evidence showing any manifestation of harm based upon the Film. (SMF ¶ 120.) Basulto admits he has never seen a doctor for any ailment, physical or emotional, because of the Film. (*Id.* ¶ 121.) Nor has Basulto offered any other cognizable evidence of IIED harm. *See, e.g.*, *Greer v. Ivey*, 767 F. App'x 706, 713 (11th Cir. 2019) (affirming dismissal of IIED claim on summary judgment where plaintiff "failed to produce any evidence beyond bare allegations of his 'severe' emotional distress"); *Saint-Vil v. City of Miami Beach*, No. 19-24640-CIV, 2022 WL 1591492, at *12 (S.D. Fla. May 19, 2022) (dismissing IIED claim on summary judgment where plaintiff had not "sought any mental health treatment to remediate his purported distress"); *Triana v. Diaz*, No. 12-21309-CIV-KING, 2014 WL 5319800, at *7 (S.D. Fla. Oct. 16, 2014) (same).

## CONCLUSION

For the foregoing reasons, Netflix respectfully requests that the Court grant it summary judgment dismissing all of Plaintiffs' claims with prejudice, and awarding Netflix such other and further relief as deemed just and proper.

## REQUEST FOR HEARING

Pursuant to Local Rule 7.1(b)(2), Netflix respectfully requests an oral argument on this

motion, which it anticipates will necessitate thirty (30) minutes.  Oral argument may assist the Court in streamlining the issues for determination on this motion.

Dated:  May 12, 2023                    Respectfully submitted,

                                        **PRYOR CASHMAN LLP**
                                        255 Alhambra Circle, 8th Floor
                                        Miami, Florida 33134
                                        Telephone: (786) 582-3010
                                        Facsimile:  (786) 582-3004


                                        *s/ James G. Sammataro*
                                        William L. Charron (admitted *pro hac vice*)
                                        Tom J. Ferber (admitted *pro hac vice*)
                                        James G. Sammataro
                                        Florida Bar No. 520292
                                        Felicity S. Kohn (admitted *pro hac vice*)
                                        tferber@pryorcashman.com
                                        wcharron@pryorcashman.com
                                        jsammataro@pryorcashman.com
                                        fkohn@pryorcashman.com

                                        *Attorneys for Defendant Netflix, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

**I HEREBY CERTIFY** that on May 12, 2023, I electronically filed the foregoing

document with the Clerk of the Court using the CM/ECF system, which will send Notices of

Electronic Filing to all counsel of record.

*s/ James G. Sammataro*
James G. Sammataro
