# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
### MIAMI DIVISION

### CASE NO. 22-21796-CIV-MORENO/GOODMAN

JOSE BASULTO, and BROTHERS TO
THE RESCUE, INC.,

       Plaintiffs,

v.

NETFLIX, INC., a Delaware corporation,
ORANGE STUDIOS, S.A., a French anonymous
society, OLIVIER ASSAYAS, an individual,
NOSTROMO PICTURES, SL, a Spanish
corporation, US ONE COMERCIO
E SERVICIOS DE CRIACAO E PRODUCAO
DE OBRAS COM DIREITOS AUTORAIS, LTD, a
Brazilian limited company, CG CINEMA, SASU,
a French simplified joint stock company, RODRIGO
TEIXEIRA, an individual, CHARLES GILLIBERT,
an individual, and LOURENCO SANT'ANNA, an
individual,

       Defendants.

_____/

### REPORT AND RECOMMENDATIONS ON THE FOREIGN DEFENDANTS'
### MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION

       In this defamation lawsuit against Defendant Netflix, Inc. and other Defendants,

certain Defendants known as "the Foreign Defendants"[1] filed a Motion to Dismiss for

---

[1]       The "Foreign Defendants" are Orange Studio, S.A. ("Orange"), Charles Gillibert
("Gillibert"), CG Cinema International (incorrectly identified as CG Cinema SASU)
("CGI"), Rodrigo Teixeira ("Teixeira"), Lourenço Sant'Anna ("Sant'Anna"), and US One

Lack of Jurisdiction. [ECF No. 33]. In support of their motion, the Foreign Defendants submitted declarations from Gillibert [ECF No. 34], Orange [ECF No. 35], RT Features and Teixeira [ECF No. 36], Sant' Anna [ECF No. 37], and Nostromo [ECF No. 127].

Plaintiffs filed an opposition response [ECF No. 52], a supplemental response based on jurisdictional discovery from RT Features, Teixeira, Sant'Anna, Orange, CG Cinema, and Gillibert [ECF No. 115], and a second supplemental response based on jurisdictional discovery from Nostromo [ECF No. 165]. The Foreign Defendants filed replies to each of Plaintiffs' responses. [ECF Nos. 59; 121; 169]. Senior United States District Court Judge Federico A. Moreno referred all pretrial matters to the Undersigned. [ECF No. 68].

As explained below, the Undersigned is recommending that the District Court **grant** the Foreign Defendants' Motion. However, before turning to the specific legal principles which will inform this recommendation, the Undersigned offers the following introductory remarks about a theme articulated in a business management book:

"Confront the Brutal Facts" and its companion concept, "The Stockdale Paradox," developed in business management consultant Jim Collins' book *Good to Great*, tout the following principle: a successful person must maintain unwavering faith that he will

---

Comércio e Serviços de Criação e Produção de Obras com Direitos Autorais LTD ("RT Features"). After Nostromo Pictures, SL ("Nostromo") was served, it filed a Notice of Joinder, advising that it was joining and adopting the motion to dismiss. [ECF No. 126]. The Court now considers Nostromo to be a "Foreign Defendant."

prevail in the end, regardless of the difficulties, while also having the discipline to simultaneously confront the most brutal facts of the current reality, whatever they might be.

Collins' perspective comes to mind in connection with the motion to dismiss the Undersigned will analyze here. Plaintiffs Jose Basulto and Brothers to the Rescue, Inc. seem to have unbridled confidence in their ability to prevail on the motion and to obtain personal jurisdiction over these Defendants. But, as this ruling will soon explain, Plaintiffs' enthusiastic optimism is not enough to overcome the harsh facts (including a lack of facts) undermining their legal position. In many instances, Plaintiffs either ignore the negative facts, describe them incompletely, omit troublesome aspects, fail to address omitted facts and/or exaggerate the significance of other facts.

For example, Plaintiffs proudly state, in support of their effort to obtain personal jurisdiction, that the Foreign Defendants used the services of a plane rental company based in Opa Locka. Yet they neglect to mention that the flight at issue originated in Italy and never entered Florida airspace, and that no payments for the service were made to a United States bank account. In another instance, Plaintiffs claim that a specific Defendant had knowledge that Plaintiffs reside in Florida, but the deposition testimony does not support the assertion. Similarly, Plaintiffs -- as purported proof of publication -- argue that Orange "**participated** in publishing the Film at the Venice and Toronto film

festivals," (emphasis added) but the cited testimony states only that Orange was "*present*" at the film festivals when the Film was published.

These embellishments and incomplete factual recitations cannot win the day. For Plaintiffs, the brutal fact about the jurisdictional facts is that they have precious few facts in their favor on the due process portion of the analysis. None of the Foreign Defendants is domiciled in Florida, but Plaintiffs need to establish that they are covered by Florida's long-arm statute and that such coverage is constitutionally permissible and does not violate due process.

Certainly, their upbeat position may be admirable in the abstract, but attitude alone cannot cure the deficiencies in Plaintiffs' jurisdictional approach. Optimists sometimes do not fare well when they gloss over problematic facts. Indeed, Admiral Jim Stockdale, the highest-ranking United States military officer in the "Hanoi Hilton" prisoner-of-war camp during the height of the Vietnam War, explained to author Collins that the optimists were the one most likely to *not* make it out and survive because they ignored the horrific facts of their confinement and incorrectly and repeatedly said they would be released by a certain date, such as Christmas or Easter, but were devasted when their predictions turned out to be wrong.[2]

---

[2]      Jim Collins, *The Stockdale Paradox* (last visited May 24, 2023), https://www.jimcollins.com/concepts/Stockdale-Concept.html.

Although Plaintiffs' argument is more complex than summarized in this sentence, the mere fact that the Foreign Defendants may have known that the purportedly defamatory Film in question might be broadcast in Florida is inadequate to compensate for the fact that they did not themselves broadcast the movie in Florida. Moreover, Plaintiffs' conclusory allegations that the Foreign Defendants somehow "conspired" to publish the Film in Florida is too conclusory and detail-free to propel Plaintiffs over the due process goal line of a personal jurisdiction battle.

## I.     Factual Background[3]

Basulto is the leader of Brothers to the Rescue, a Cuban exile organization that was formed in 1991. [ECF No. 1, ¶¶ 5, 63]. According to the Complaint, Brothers to the Rescue is a pro-democracy, humanitarian organization, whose mission is to promote and support the efforts of the Cuban people to free themselves from dictatorship through the use of active nonviolence. *Id.* at ¶ 64. Basulto is a Florida resident and Brothers to the Rescue is a Florida not-for-profit corporation. *Id.* at ¶¶ 21-22.

On June 19, 2020, Defendant Netflix published on its streaming platform the Film, *The Wasp Network*. *Id.* at ¶ 1. Netflix advertises and promotes the Film as being "Based on True Events" or "based on a true story." *Id.* at ¶ 8. According to the Complaint, *The Wasp Network* falsely portrays Plaintiffs Brothers to the Rescue and its leader, Mr. Basulto, as

---

[3]     The facts are derived from the Complaint and from the declarations submitted by the Foreign Defendants.

terrorists who engaged in criminal, terrorist attacks and other terrorist activity, criminal

drug trafficking activity, and other criminal activity. *Id.* at ¶ 2.

Orange is a French anonymous society headquartered in France. *Id.* at ¶ 24.

Gillibert is a French resident. *Id.* at ¶ 30. CGI is a French simplified joint stock company.

*Id.* at ¶ 28. Teixeira is a Brazilian resident. *Id.* at ¶ 29. Sant'Anna is a Californian resident.

*Id.* at ¶ 31. RT Features is a Brazilian limited company headquartered in Brazil. *Id.* at ¶

27. And, Nostromo is a Spanish corporation headquartered in Spain. *Id.* at ¶ 26. The

Foreign Defendants are producers of *The Wasp Network*. *Id.* at ¶¶ 24, 26-31.

None of the Foreign Defendants wrote or directed the Film. [ECF Nos. 34-37; 127].

Other than a few shots of the Miami skyline, the entirety of the filming took place in

locations outside of Florida. Other than layovers, none of the Foreign Defendants spent

any meaningful time in Florida. *Id.*

Once the Film was completed and ready for publication, it was marketed or

published at film festivals, in print media, and online. None of these activities took place

in Florida. These marketing efforts were made with the intent of finding a distributor for

the Film. Orange, acting on behalf of RT Features -- who controlled the United States

distribution rights to the Film -- negotiated a licensing deal with Netflix. [ECF No. 35].

Other than a provision prohibiting Netflix from publishing the Film before a

certain date, the licensing agreement provided Netflix with unfettered discretion on

when it could publish the Film, where in the United States it could publish the Film, and

whether it would choose to publish the Film at all. [ECF No. 115-3].

## II.    Legal Standard

"A court must dismiss an action against a defendant over which it has no personal

jurisdiction." *S.O.S. Res. Servs., Inc. v. Bowers*, No. 14-22789-Civ, 2015 WL 2415332, at \*2

(S.D. Fla. May 21, 2015) (quoting *Verizon Trademark Servs., LLC v. Producers, Inc.*, 810 F.

Supp. 2d 1321, 1323–24 (M.D. Fla. 2011)).

To determine whether personal jurisdiction exists, a federal court sitting in

diversity must engage in a two-step analysis. *Waite v. All Acquisition Corp.*, 901 F.3d 1307,

1312 (11th Cir. 2018). "First, the exercise of jurisdiction must be appropriate under the

forum state's long-arm statute, which delimits the exercise of personal jurisdiction under

state law." *Id.* "Second, the exercise of jurisdiction must comport with the Due Process

Clause of the Fourteenth Amendment." *Id.*

As explained by the Eleventh Circuit, Florida's long-arm statute subjects a

defendant to Florida's personal jurisdiction in one of two ways:

> First, a defendant is subject to 'specific personal jurisdiction—that is,
> jurisdiction over suits that arise out of or relate to a defendant's contacts
> with Florida'—for conduct specifically enumerated in the statute. Second,
> a defendant is subject to 'general personal jurisdiction—that is, jurisdiction
> over any claims against a defendant, whether or not they involve the
> defendant's activities in Florida—if the defendant engages in 'substantial
> and not isolated activity' in Florida.'

*Id.*; *see also* Fla. Stat. § 48.193(1)(a) and (2).

7

Relevant here, Florida's long-arm statute subjects a defendant to the court's specific jurisdiction "for any cause of action arising from . . . [c]omitting a tortious act within [Florida]. Fla. Stat. § 48.193(1)(a)2.

If the exercise of jurisdiction comports with the state's long-arm statute, then the Court must next consider whether the exercise of jurisdiction violates the Due Process Clause of the Fourteenth Amendment to the United States Constitution. *Waite*, 901 F.3d at 1312. In determining whether an exercise of specific jurisdiction comports with due process, the Eleventh Circuit employs a three part test: (1) the court "consider[s] whether the plaintiffs have established that their claims 'arise out of or relate to' at least one of the defendant's contacts with the forum"; (2) "whether the plaintiffs have demonstrated that the defendant 'purposefully availed' itself of the privilege of conducting activities within the forum state"; and (3) if the first two prongs are met, then "whether the defendant has 'ma[de] a compelling case that the exercise of jurisdiction would violate traditional notions of fair play and substantial justice.'" *Id.* at 1313 (quoting *Louis Vuitton Malletier, S.A. v. Mosseri*, 736 F.3d 1339, 1355 (11th Cir. 2013)).

### III.   Analysis

#### a.   Florida's Long-Arm Statute

Plaintiffs' response memorandum makes clear that they believe personal jurisdiction over the Foreign Defendants is found under the Florida long-arm statute's conferral of specific personal jurisdiction over individuals who have committed a tortious

act within the state. [ECF No. 52]. Plaintiffs say that personal jurisdiction exists because: "(i) the Foreign Defendants defamed Plaintiffs by creating the Film which was published in Florida; (ii) the Foreign Defendants conspired with Netflix for Netflix to publish the Film in Florida; and (iii) the Foreign Defendants created a defamatory Film which intentionally inflicted emotional distress upon Plaintiff Basulto." *Id.*

i.  <u>Defamation</u>

The elements of defamation under Florida law are: (1) publication; (2) falsity; (3) that the publisher acted with knowledge or reckless disregard as to the falsity on a matter concerning a public figure, or at least negligently on a matter concerning a private person; (4) actual damages; and (5) that the statement is defamatory. *Parekh v. CBS Corp.*, 820 F. App'x 827, 833 (11th Cir. 2020) (citing *Jews for Jesus, Inc. v. Rapp*, 997 So. 2d 1098, 1105 (Fla. 2008)).

The Foreign Defendants argue that Plaintiffs cannot satisfy Florida's long-arm statute's conferral of jurisdiction over individuals who have committed a tortious act (i.e., defamation) in the state because the Foreign Defendants did not publish the allegedly defamatory statements about Plaintiffs within the state of Florida. [ECF No. 33]. The Foreign Defendants contend that they are mere producers, and that Netflix is the only Defendant which published the purportedly defamatory Film in Florida. Plaintiffs aver, however, that it is sufficient that the Foreign Defendants created the defamatory material which was eventually published in Florida by a third party.

9

In summary, the parties disagree on whether an individual defendant must be the *actual publisher* of alleged defamatory material to be subject to personal jurisdiction under Florida's long-arm statute. The parties rely on the same four cases and disagree over each case's meaning or persuasiveness. The Undersigned will discuss each case in turn:

1. *Internet Sols. Corp. v. Marshall*, 39 So. 3d 1201, 1202 (Fla. 2010)

In *Marshall*, the Florida Supreme Court answered in the affirmative the following, modified certified question:

> DOES A NONRESIDENT COMMIT A TORTIOUS ACT WITHIN FLORIDA FOR PURPOSES OF SECTION 48.193(1)(b) WHEN HE OR SHE MAKES ALLEGEDLY DEFAMATORY STATEMENTS ABOUT A COMPANY WITH ITS PRINCIPAL PLACE OF BUSINESS IN FLORIDA BY POSTING THOSE STATEMENTS ON A WEBSITE, WHERE THE WEBSITE POSTS CONTAINING THE STATEMENTS ARE ACCESSIBLE AND ACCESSED IN FLORIDA?

The facts of the case required the Florida Supreme Court to confront whether Florida's long-arm statute permitted jurisdiction over an individual who lived in Washington and posted on a noncommercial website (that she owned and operated) statements about a Florida company which were accessed by individuals in Florida. Ultimately, the Court

> conclude[d] that allegedly defamatory material about a Florida resident placed on the Web and accessible in Florida constitutes an "electronic communication into Florida" when the material is accessed (or "published") in Florida. In the context of the World Wide Web, given its pervasiveness, an alleged tortfeasor who posts allegedly defamatory material on a website has intentionally made the material almost instantly available everywhere the material is accessible. By posting allegedly

> defamatory material on the Web about a Florida resident, the poster has directed the communication about a Florida resident to readers worldwide, including potential readers within Florida. When the posting is then accessed by a third party in Florida, the material has been "published" in Florida and the poster has communicated the material "into" Florida, thereby committing the tortious act of defamation within Florida. This interpretation is consistent with the approach taken regarding other forms of communication.

*Internet Sols. Corp.*, 39 So. 3d at 1215.

In reaching this decision, the Florida Supreme Court noted that "the tort of defamation is committed in the place where the defamatory material is published." *Id.* at 1214 (citing *Casita, L.P. v. Maplewood Equity Partners, L.P.*, 960 So. 2d 854, 857 (Fla. 3d DCA 2007) ("A telephonic, electronic, or written communication is deemed 'published' in Florida, subjecting the publisher to long-arm jurisdiction under section 48.193(1)(b) of the Florida Statutes if the communication was made into this state by a person outside the state, even if that person has no other contacts with the state.").

2.   *Madara v. Hall*, 916 F.2d 1510, 1513 (11th Cir. 1990)

In *Madara*, the defendant was sued in Florida for libel based on a telephone interview that the defendant gave from New York to a reporter in California about a California resident. The interview was published in a magazine, Music Connection, which was sold in Florida. The plaintiff, based on statute of limitation concerns, elected to bring suit in Florida.

In assessing whether the defendant's conduct subjected him to specific personal jurisdiction under Florida's long-arm statute, the Eleventh Circuit began by stating that

"[t]he tort of libel is generally held to occur wherever the offending material is circulated." *Madara*, 916 F.2d at 1515. For purposes of assessing personal jurisdiction under Florida's long-arm statute, the Court was unconcerned by the fact that the defendant was not the publisher of the material, stating that "[t]he rule is unchanged by the fact that the defendant here is an individual **and not the publisher** of the alleged libel. *Id.* at 1515 (emphasis added) (citing *Stepanian v. Addis*, 782 F.2d 902 (11th Cir. 1986) (in defamation action against attorney who made allegedly libelous statements to reporter in Washington, D.C., where statements were eventually published in newspapers distributed in Florida, the court stated, "where a person informs a news reporter, the tort of slander and libel can occur [in Florida,] where the allegedly false material is circulated[]")).

The Court acknowledged that there were no Florida cases which directly addressed this issue and the Court's ruling was based on how it believed Florida courts would rule. *Id.* at 1515 n.6 ("We find no Florida cases that directly confront this question. However, we believe our interpretation is consistent with the way in which Florida courts would decide the issue if presented with it.").

3. *Geller v. von Hagens*, No. 08:10-CV-01688-EAK, 2011 WL 2193329 (M.D. Fla. June 6, 2011)

In *Geller*, an agent of the defendant made purportedly defamatory statements to an investigative journalist for ABC, "well aware that that the 20/20 broadcast would be aired on U.S. television, including within the State of Florida." *Geller*, 2011 WL 2193329,

at *3. When ABC aired the segment in Florida, the plaintiffs sued the defendants for defamation. *Id.* at *1.

The Court cited to *Marshall* and *Madara* and held that personal jurisdiction under Florida's long-arm statute existed based on the simple fact that the program was aired nationally, and the defendant knew and "intended that it be broadcast nationally." *Id.* at *4.

> 4. *Sifonte v. Fonseca*, No. 1:21-CV-20543, 2022 WL 4110705, at *1 (S.D. Fla. Aug. 12, 2022), report and recommendation adopted, No. 21-20543-CIV, 2022 WL 4111199 (S.D. Fla. Sept. 8, 2022)

The defendant in *Sifonte* was the producer for two television shows. Another entity would film the shows, the defendant would then edit the raw footage, and then the other entity would broadcast the shows in its full discretion. The plaintiff argued that there was specific personal jurisdiction over the defendant under Florida's long-arm statute because of the defendant's involvement in the production of the shows and its knowledge that the show's content "[would] be available for broadcast, online streaming on the NBCUniversal Media's Telemundo Puerto Rico smartphone application, in addition to their websites, social media pages, or elsewhere, including different social media platforms such as YouTube, which is accessible to Florida residents." *Sifonte*, 2022 WL 4110705, at *10.

The Court rejected this argument and said that the plaintiff was attempting to impugn the actions of the shows' publishers onto the defendant. *Id.* at *10 (citing *La Tele*

*Prods., Inc. v. TV Azteca*, No. 16-25347-CIV, 2018 WL 4623532, at *4 (S.D. Fla. Sept. 25, 2018) (Moreno, J.) (noting that Florida's long-arm statute "surely does not contemplate impugning the alleged tortious acts of wholly unrelated entities" onto codefendant entity seeking dismissal for lack of personal jurisdiction); *Verizon Trademark Servs.*, 810 F. Supp. 2d at 1331 ("This Court will not consider the actions of other defendants in this case as the actions of the IMG Defendants for the purposes of conducting a jurisdictional analysis."). *Cf. Sovereign Offshore Servs., LLC v. Shames*, No. 17-cv-80172, 2017 WL 7798664, at *4 (S.D. Fla. Aug. 3, 2017) (Middlebrooks, J.) ("[The] [d]efendant's awareness that his blog posts would be accessible in Florida, by virtue of the nature of the world-wide web, and [the plaintiff]'s physical location in Florida are insufficient to establish that [the] [d]efendant has minimum contacts with Florida.")).

Thus, the *Sifonte* Court reasoned that because the defendant did not publish the offending shows, there was insufficient evidence to demonstrate that the defendant committed the tort of defamation in Florida. The Court found it insufficient for purposes of personal jurisdiction based on the tort of defamation that the defendant "created or produced two of the television shows that contained allegedly defamatory statements about [the] [p]laintiffs which were subsequently broadcast and published by [the] [d]efendants Telemundo of Puerto Rico and Telemundo Network Group on their website and through their mobile application for access anywhere in the world." *Id.* at *10.

5.  The Parties' Positions

14

Plaintiffs argue that the Court should follow the reasoning found in *Madara* and *Geller*. In Plaintiffs' view, although *Sifonte* is factually similar to the instant case, it conflicts with the Eleventh Circuit's decision in *Madara* and, therefore, should not be followed.

The Foreign Defendants contend that *Madara* is "outdated" and that the Florida Supreme Court's decision in *Marshall* "addressed the reach of the long-arm statute with regard to speech made available on the internet and held that the poster of a defamatory statement is subject to the long-arm statute if that statement is accessed in Florida." [ECF No. 59 (emphasis removed)]. The Foreign Defendants argue that "[a]t most, *Geller* and *Madara* stand for the proposition that one who makes a defamatory statement to a reporter may be subject to the Florida long-arm statute, which is inapplicable to the facts here." *Id.*

The Undersigned is unpersuaded by the Foreign Defendants' attempt to expand the Florida Supreme Court's holding in *Marshall* or to suggest that its holding means that *Madara* is no longer valid law in our Circuit. The modified certified question before the Florida Supreme Court was a narrow one and focused on whether an individual from another state who posts something on a website that was accessed in Florida can be subject to Florida's long-arm statute. To the extent that the Florida Supreme Court expressed an opinion on whether a defamation-plaintiff must be the publisher of the

material -- an issue not encompassed by the certified question -- that specific opinion is *dicta*.[4]

Therefore, as noted by Plaintiffs, *Madara* remains binding in the Eleventh Circuit. In *Madara*, the Eleventh Circuit necessarily determined that a defamation defendant was not required to be the actual publisher to be subject to personal jurisdiction under Florida's long-arm statute. Because the Foreign Defendants' defamation-focused argument challenges only whether a defamation plaintiff must show that the defendant actually published the defamatory material in Florida (a requirement which the Undersigned rejects under *Madara*), the Undersigned finds that Plaintiffs have sufficiently alleged the commission of a tortious act for purposes of Florida's long-arm statute.

Therefore, the Undersigned **respectfully recommends** that the District Court find that the Foreign Defendants are subject to specific personal jurisdiction under Florida's

---

[4]     "Dicta includes statements in an opinion not raised by the facts, not related to the certified questions, and not the subject of analysis or discussion." *Thourtman v. Junior*, 275 So. 3d 726, 737–38 (Fla. 3d DCA 2019), opinion approved of, 338 So. 3d 207 (Fla. 2022) (footnotes removed); *Miccosukee Tribe of Indians v. Lewis Tein*, P.L., 227 So. 3d 656, 661 (Fla. 3d DCA 2017) ("One of the basic principles of appellate law is that the holding of a decision cannot extend beyond the facts of the case."); *Cirelli v. Ent*, 885 So. 2d 423, 427 (Fla. 5th DCA 2004) (deciding that the Supreme Court's inclusion of statutory ways of necessity in its holding was dicta because "the certified question concerned only common law ways of necessity" and "the facts and legal analysis discussed in the opinion concerned only common law ways of necessity"); *Rey v. Philip Morris, Inc.*, 75 So. 3d 378, 381 (Fla. 3d DCA 2011) ("No Florida appellate decision is authority on any question not raised and considered[.]" (internal quotation marks and citation omitted)).

long-arm statute.[5] This conclusion, of course, does not mean that the Court can permissibly exercise personal jurisdiction over them, as Plaintiffs still need to establish that personal jurisdiction does not violate due process.

> ii. Personal Jurisdiction over Gillibert, Teixeira, and Sant'Anna ("Individual Defendants")

The Foreign Defendants argue for the first time in their reply that personal jurisdiction over the Individual Defendants cannot exist because "they acted only on behalf of CGI and RT Features, respectively." [ECF No. 59]. "It is well settled in the Eleventh Circuit that arguments raised for the first time in a reply brief are not properly raised before the reviewing court." *In re W. Caribbean* [sic] *Crew Members*, No. 07-22015-CIV, 2008 WL 11331917, at *1 (S.D. Fla. Oct. 1, 2008) (citing *United States v. Oakley*, 744 F.2d 1553, 1556 (11th Cir. 1984)).

Therefore, because the Foreign Defendants did not properly raise this argument in their initial motion, the Undersigned **respectfully recommends** that the District Court **deny** the Individual Defendants' motion to dismiss and reject the new argument that they were acting exclusively in the scope of their employment.

> b. *Due Process*

---

[5] Because the Undersigned is recommending that the District Court find that the defamation claims are sufficient to establish specific personal jurisdiction under Florida's long-arm statute, I decline to address whether Plaintiffs' conspiracy to defame and intentional infliction of emotional distress claims would serve as a separate basis for personal jurisdiction.

As noted, the Eleventh Circuit applies a three part test to determine whether an exercise of specific jurisdiction affords due process: (1) the court "consider[s] whether the plaintiffs have established that their claims 'arise out of or relate to' at least one of the defendant's contacts with the forum"; (2) "whether the plaintiffs have demonstrated that the defendant 'purposefully availed' itself of the privilege of conducting activities within the forum state"; and (3) if the first two prongs are met, then "whether the defendant has 'ma[de] a compelling case that the exercise of jurisdiction would violate traditional notions of fair play and substantial justice.'" *Waite*, 901 F.3d at 1313 (quoting *Mosseri*, 736 F.3d at 1355).

Before turning to the three-part test, the Undersigned writes to address Plaintiffs' theory that "due process is **easily** established under the co-conspirator theory." [ECF No. 52 (emphasis added)]. In support of this position, Plaintiffs cite *Amersham Enters., Inc. v. Hakim-Daccach*, which states:

> Under a well-developed body of precedent, "each conspirator is liable for and bound by the act and declaration of each and all of the conspirators done or made in furtherance of the conspiracy even if not present at the time." *Wilcox v. Stout*, 637 So. 2d 335, 337 (Fla. 2d DCA 1994). It follows that "acts of a conspirator in furtherance of a conspiracy may be attributed to the other members of the conspiracy and that personal jurisdiction over a nonresident coconspirator may be exercised even absent sufficient personal minimum contacts with the forum if those contacts are supplied by another." 21 C.J.S. Courts § 63 (2021). Accordingly, "the conspiracy theory of personal jurisdiction is viewed as consistent with the requirements of due process." *Id.*

333 So. 3d 289, 296 (Fla. 3d DCA 2022), reh'g denied (Mar. 2, 2022), review denied,

No. SC22-409, 2022 WL 4099930 (Fla. Sept. 8, 2022).

However, a closer review of authority from throughout the country reveals that the viewpoint that proper personal jurisdiction over one purported co-conspirator necessarily satisfies due process as to every other co-conspirator is *not* well-settled. Indeed, the secondary source upon which Florida's Third District Court of Appeal relies acknowledges this conflict. 21 C.J.S. Courts § 63 ("In contrast, some authorities emphasize that due process requirements remain applicable to coconspirators, as to any other defendants, and the absence of sufficient contacts with the forum by a nonresident coconspirator will defeat personal jurisdiction allegedly predicated on the defendant's participation in a conspiracy with forum residents." (footnotes removed)).[6]

In recent years, the United States Supreme Court has advanced a more-restrictive approach in determining whether the exercise of personal jurisdiction would comport with due process. For example, in *Walden v. Fiore*, 571 U.S. 277, 284–85, 134 S. Ct. 1115,

---

[6]     While some courts have rejected the conspiracy theory of jurisdiction, concluding that it is inconsistent with due process, *see, e.g.*, *Brown v. Kerkhoff*, 504 F. Supp. 2d 464 (S.D. Iowa 2007); *Paolino v. Argyll Equities, L.L.C.*, 401 F. Supp. 2d 712 (W.D. Tex. 2005); *Silver Valley Partners, LLC v. De Motte*, 400 F. Supp. 2d 1262 (W.D. Wash. 2005); *In re New Motor Vehicles Canadian Exp. Antitrust Litig.*, 307 F. Supp. 2d 145 (D. Me. 2004); *Steinke v. Safeco Ins. Co. of Am.*, 270 F. Supp. 2d 1196 (D. Mont. 2003), other courts have adopted some variant of the theory, *see, e.g.*, *Kentucky Speedway, LLC v. Nat'l Ass'n of Stock Car Auto Racing, Inc.*, 410 F. Supp. 2d 592 (E.D. Ky. 2006); *Remmes v. Int'l Flavors & Fragrances, Inc.*, 389 F. Supp. 2d 1080 (N.D. Iowa 2005); *In re Vitamins Antitrust Litig.*, 270 F. Supp. 2d 15 (D.D.C. 2003); *Kohler Co. v. Kohler Int'l, Ltd.*, 196 F. Supp. 2d 690 (N.D. Ill. 2002).

1122, 188 L. Ed. 2d 12 (2014), the Court reversed the lower court's denial of a defendant's

motion to dismiss based on lack of personal jurisdiction, emphasizing the minimum

contacts which are necessary for a court to exercise jurisdiction over a non-resident:

> First, the relationship must arise out of contacts that the "defendant *himself*"
> creates with the forum State. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462,
> 475, 105 S. Ct. 2174, 85 L.Ed.2d 528 (1985). Due process limits on the State's
> adjudicative authority principally protect the liberty of the nonresident
> defendant—not the convenience of plaintiffs or third parties. *See World–
> Wide Volkswagen Corp., supra*, at 291–292, 100 S. Ct. 559. We have consistently
> rejected attempts to satisfy the defendant-focused "minimum contacts"
> inquiry by demonstrating contacts between the plaintiff (or third parties)
> and the forum State. *See Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466
> U.S. 408, 417, 104 S. Ct. 1868, 80 L.Ed.2d 404 (1984) ("[The] **unilateral
> activity of another party or a third person is not an appropriate
> consideration when determining whether a defendant has sufficient
> contacts with a forum State to justify an assertion of jurisdiction").**

*Id.* (italics emphasis in original; bold emphasis added)).

Using a similar rationale, United States District Court Judge K. Michael Moore

rejected the plaintiff's theory that personal jurisdiction over one co-conspirator

automatically satisfied due process for other co-conspirators. *Oueiss v. Saud*, No. 1:20-CV-

25022-KMM, 2022 WL 1311114, at *18 (S.D. Fla. Mar. 29, 2022) ("Even assuming [the]

[p]laintiff's [a]mended [c]omplaint adequately pleaded the inclusion of Van Rider and

Jundi in the [c]onspiracy, [the] [p]laintiff would, in any event, not be able to establish that

conspiracy-based personal jurisdiction over the Crown Prince satisfies the requirements

of Due Process."); *see also Walden*, 571 U.S. at 286 ("Due process requires that a defendant

be haled into court in a forum State based on his own affiliation with the State, not based

on the 'random, fortuitous, or attenuated' contacts he makes by interacting with other persons affiliated with the State.").

At bottom, including a conspiracy claim does not operate as a jurisdictional net which captures all defendants in its embrace. Rather, the Court must examine whether due process permits the exercise of personal jurisdiction over *each* individual defendant based on the actions of *that* defendant.

i.   Arise Out of or Relate to

To analyze this factor, the court must look to the "'affiliation between the forum and the underlying controversy,' focusing on any 'activity or ... occurrence that [took] place in the forum State.'" *Waite*, 901 F.3d at 1314 (quoting *Bristol-Myers Squibb Co. v. Superior Court*, ––– U.S. ––––, 137 S. Ct. 1773, 1780, 198 L.Ed.2d 395 (2017)) (alteration in original). The Eleventh Circuit has held that "a tort 'arise[s] out of or relate[s] to' the defendant's activity in a state only if the activity is a 'but-for' cause of the tort. *Id.* (quoting *Oldfield v. Pueblo De Bahia Lora, S.A.*, 558 F.3d 1210, 1222-23 (11th Cir. 2009)).

The Foreign Defendants argue that this factor falls in their favor because "none of the Foreign Defendants published the Film in Florida, nor did any of them have any role, control, or decision-making authority over its publication in Florida." [ECF No. 33]. Plaintiffs say that this element is met based on their allegation that "the Foreign Defendants 'intended and agreed for the [F]ilm to be published and broadcast nationally in the United States, including in Florida.'" [ECF No. 52 (quoting [ECF No. 1])].

The analysis of this factor properly focuses on a defendant's relationship with the subject forum. The Eleventh Circuit has noted that the Supreme Court has "rejected attempts to establish personal jurisdiction based solely on a plaintiff's injury in the forum." *Waite*, 901 F.3d at 1315. In other words, the "analysis must focus on those contacts the '*defendant* [itself] creates with the forum State,'" not the plaintiffs' contacts with the forum or even the defendant's contacts with the plaintiffs." *Id.* at 1316 (quoting *Walden*, 571 U.S. at 284) (emphasis added).

In their supplemental memorandum, Plaintiffs make an argument -- untethered to any specific factor -- that "[t]he Foreign Defendants are subject to personal jurisdiction for publishing the Film to Netflix who then published it in Florida, just as the defendants in *Madera* [sic] and *Geller* published defamatory statements to reporters who subsequently published the statements in Florida." [ECF No. 115]. *Geller* (which the Undersigned discussed more thoroughly, *supra*) perfunctorily noted that because the broadcast was nationwide, the defendant must have intended to reach Florida where the plaintiffs suffered damages. 2011 WL 2193329, at *4. *Geller's* analysis is extremely limited, and is therefore unhelpful.

Further, *Madara* cuts against Plaintiffs' due process arguments. In *Madara*, the Eleventh Circuit held that exercising personal jurisdiction over Hall -- the author of the supposed defamatory statements -- *would* offend due process because, even if he was aware that copies of the magazine might be published in Florida, he did not "appoint

copies of the magazine as his agent for service of process wherever a third party, the publisher, might choose to send those magazines." *Madara*, 916 F.2d at 1519.

Plaintiffs attempt to distinguish *Madara's* due process conclusion by claiming that the Court reached its decision because the plaintiff was not a Florida resident. In Plaintiffs' view, because Basulto is a Florida resident, *Madara* is inapplicable and the Court should follow *Geller*. This argument, however, oversimplifies *Madara's* reasoning and overemphasizes the importance of this isolated factual difference. The *Madara* plaintiff's lack of connection to Florida was only a single consideration. Relevant here, the Eleventh Circuit also considered the defendant's lack of control over the publication of the magazine, the defendant's lack of contact with Florida, the burden the defendant would face defending the suit in Florida, the plaintiff's lack of ability to seek redress in other forums, as well as Florida's interest in resolving the dispute.

On this issue, United States District Court Judge Robert N. Scola's discussion in *USA Mgmt. Grp., LLC v. Fitness Publ'ns, Inc.*, No. 14-22477-CIV, 2015 WL 11233075, at *3 (S.D. Fla. Mar. 4, 2015) is instructive. *Fitness Publ'ns, Inc.* involved an allegation of trademark infringement. The plaintiff argued that due process supported personal jurisdiction over the defendant -- the producer of a purportedly infringing fitness supplement -- because a licensee sold units of the purportedly infringing product in Florida. Judge Scola properly noted that a plaintiff must show that "the *defendant* had *some* contact with the forum state and that the contact was a but-for cause of the alleged

tort. *Id.* at *3 (citing *Fraser v. Smith*, 594 F.3d 842, 850 (11th Cir. 2010)). Thus, the Court determined that the plaintiff's claims did not arise out of the defendant's contacts with Florida because there is no precedent to support a finding that "sale of a licensed product by a licensee constitutes use in commerce on the part of the licensor, even absent any actual sales by the licensor."

The jurisdictional discovery obtained by Plaintiffs does not assist them on this factor. At most, it establishes that the Foreign Defendants wanted the Film published and took efforts to find a publisher who would buy the rights from them. However, none of *their* actions took place in Florida.

Plaintiffs rely on the following non-Florida based contacts to argue that personal jurisdiction in *Florida* comports with due process:

(1) Teixeira and RT Features published the Film at film festivals in Toronto, Venice, Sao Paulo, and New York;

(2) Teixeira promoted the Film at press conferences which have been published on the internet;

(3) Sant'Anna participated in publishing the Film at the Venice and Toronto film festivals;

(4) Orange participated in publishing the Film at the Venice and Toronto film festivals;

(5) Gillibert and CG Cinema participated in publishing the Film at the Venice and Toronto film festivals;

(6) "[A] very few simple exterior" shots of the Miami skyline were filmed in Florida;

(7) Nostromo admits that it paid GoFly Tours, which is based in Opa Locka, Florida, for a plane used in the Film.[7]

[ECF Nos. 115; 165].

These actions are either entirely unrelated to Florida or constitute only a *de minimis* relation to Florida. As the Foreign Defendants' declarations make clear, none of the Foreign Defendants exercised any control over Defendant Netflix's decision on whether to publish the Film, nor do they have any personal connections with Florida (either related to or unrelated to the Film). [ECF Nos. 34-37].

This lack of connection to Florida is made evident by Plaintiffs' attempt to magnify the import of the GoFly Tours relationship. In its supplemental response, Plaintiffs state:

> In its Interrogatory Responses, Nostromo admitted that the planes used in the Film were provided by GoFly Tours, which is "based in Opa Locka, Florida[.]" Nostromo admits that it paid GoFly Tours for a plane used in the Film. As such, Nostromo has had contact with Florida in connection with the making of the Film. Nostromo's contacts with GoFly Tours in Florida is sufficient to establish minimum contacts with Florida such that this Court may exercise personal jurisdiction over Nostromo. Indeed,

---

[7]   Initially, Plaintiffs argued that the "planes were obtained from U.S. resources" and because "Florida is the closest U.S. resource for planes . . ., the planes were likely obtained from Florida resources." [ECF No. 115]. Plaintiffs were able to amend this argument based on Nostromo's answers to Plaintiffs' jurisdictional discovery.

> Nostromo's contacts are "related" to Plaintiffs' claims, Nostromo
> "purposefully availed" itself of Florida, and Nostromo's contacts with
> Florida are such that it could "reasonably anticipate being haled [sic] into
> court" in Florida.

[ECF No. 165].

In Nostromo's reply, it notes the following additional relevant facts: (1) the plane originated in Italy and was flown from Italy to Spain for use in the Film; and (2) Nostromo made payments for the plane to a bank account located in France and a bank account located in Italy held by Mungo Fly, ASD, which Nostromo understands to be an Italian company. Although Plaintiffs devote an entire section of their response to GoFly Tours, they never address these facts or attempt to argue why they are not relevant. Instead, similar to the optimists at the Hanoi Hilton, they pretend the facts don't exist.

This type of isolated and minimal business relationship is insufficient to demonstrate that any of the purportedly tortious actions arise out of any events which took place in Florida.[8] *See Future Tech. Today, Inc. v. OSF Healthcare Sys.*, 218 F.3d 1247, 1251 (11th Cir. 2000) (holding that the defendant's one-time business transaction with a Florida entity insufficient to satisfy due process); *Alan Richard Textiles, Ltd. v. Vertilux, Inc.*, 627 So. 2d 529, 530 (Fla. 3d DCA 1993) ("The fact that Alan Richard ordered goods from

---

[8]     It is unclear to the Undersigned which factor Plaintiffs believe the GoFly Tours relationship should fall under. In the Undersigned's view, the argument could pertain to either the "arise out of or relate to" factor or to the "purposeful availment" factor. Although the Undersigned has analyzed the argument in relation to only the "arise out of or relate to" factor, the Undersigned also finds that it is insufficient to satisfy any of the other due process factors.

a Florida corporation is not sufficient to establish minimum contacts with Florida so as to allow Alan Richard to be sued in Florida.").

Plaintiffs attempt to absolve themselves of being required to connect the Foreign Defendants to Florida by focusing on a purported conspiracy. However, the mere fact that Plaintiffs allege that a conspiracy exists does not render meaningless the requirement that each Defendant have contacts with the subject forum. Given the complete lack of forum contacts by the Foreign Defendants, Plaintiffs cannot meet their burden to show "a direct causal relationship between the defendant, the forum, and the litigation." *Louis Vuitton Malletier, S.A. v. Mosseri*, 736 F.3d 1339, 1355–56 (11th Cir. 2013).

### ii.  Purposeful Availment

There are two different tests which the Court can apply to determine whether a defendant has purposely availed himself of the privilege of conducting activities in the jurisdiction:

First, "[u]nder the 'effects test,' a nonresident defendant's single tortious act can establish purposeful availment, without regard to whether the defendant had any other contacts with the forum state."[9] *Louis Vuitton Malletier, S.A. v. Mosseri*, 736 F.3d 1339, 1356 (11th Cir. 2013). "This occurs when the tort: '(1) [was] intentional; (2) [was] aimed at the

---

[9]      As mentioned earlier, although the Undersigned has determined that the alleged tortious act of defamation is sufficient to satisfy Florida's long-arm statute, as *Madara* makes clear, this does not mean that the due process requirement is also satisfied. 916 F.2d at 1518.

forum state; and (3) caused harm that the defendant should have anticipated would be suffered in the forum state.'" *Id.* (quoting *Lovelady*, 544 F.3d at 1285-86, 1287-88).

Second, using the traditional purposeful availment analysis, the court will "assess the nonresident defendant's contacts with the forum state and ask whether those contacts: (1) are related to the plaintiff's cause of action; (2) involve some act by which the defendant purposefully availed himself of the privileges of doing business within the forum; and (3) are such that the defendant should reasonably anticipate being hailed into court in the forum." *Id.* at 1357.

In the Foreign Defendants' motion, they address only the "traditional" test. They argue that exercising personal jurisdiction would violate due process because the Foreign Defendants do not "own[] any property in Florida," do not "conduct[] any business in Florida," and their involvement in the Film occurred "almost entirely in France and Brazil, where the Foreign Defendants reside, or in Spain and Cuba, where the Film was shot." [ECF No. 33]. Plaintiffs do not argue in response that the traditional test is satisfied; instead, they contend that purposeful availment is satisfied under the effects test.

As support for their position, Plaintiffs rely on *Walden v. Fiore*, 571 U.S. 277, 277, 134 S. Ct. 1115, 1117, 188 L. Ed. 2d 12 (2014), where the Court analyzed *Calder v. Jones*, 465 U.S. 783, 104 S. Ct. 1482, 79 L.Ed.2d 804 (1984). The *Walden* Court explained that, in *Calder*,

> a California actress brought a libel suit in California state court against a reporter and an editor, both of whom worked for the National Enquirer at its headquarters in Florida. The plaintiff's libel claims were based on an article written and edited by the defendants in Florida for publication in the

28

National Enquirer, a national weekly newspaper with a California circulation of roughly 600,000.

*Id.* at 286-87.

In *Calder*, the Supreme Court considered the following factors in determining that personal jurisdiction was appropriate: (1) the defendants relied on phone calls to California sources; (2) the defendants wrote a story about the plaintiff's activities in California; (3) the allegedly libelous article was widely circulated in California; (4) the "brunt" of that injury was suffered by the plaintiff in that State; and (5) the defendants "expressly aimed" "their intentional, and allegedly tortious, actions" at California because they knew the National Enquirer "ha[d] its largest circulation" in California, and that the article would "have a potentially devastating impact" there. *Id.* at 288 n.7.

Plaintiffs say that this case is similar because they reside in Florida, the Film is based on events which purportedly occurred in Florida, and the Florida public has viewed the Film.[10]

---

[10]     Plaintiffs also appear to argue in their supplemental memorandum that some form of intent exists by "not[ing] that Teixeira knows that Plaintiffs reside in Florida." This, however, is a misrepresentation. Although Plaintiffs contend that Teixeira knows that Plaintiffs reside in Florida, their record citation falls well short of supporting this unequivocal statement:

> **Q You are aware that the plaintiffs in this case, Jose Basulto and Brothers to the Rescue reside in Florida?**
> **A No.**
> Q But the [F]ilm based on a true story then and the [F]ilm portrays them as being -- residing in Florida, right?
> A The [F]ilm, yes.

In their reply, the Foreign Defendants say that many of the factors which were necessary in *Calder* are not present here. The Foreign Defendants note that the Supreme Court has clarified that *Calder* made "clear that mere injury to a forum resident is not a sufficient connection to the forum. *Id.* at 290. In the Foreign Defendants' view, Plaintiffs' residence and the fact that part of the Film is based on Florida are the only factors which the instant case shares with *Calder*.

In rejecting the plaintiff's due process argument, *Madara* held that "mere awareness that [a] product[ ] [will] eventually enter the forum state [i]s not enough to support the exercise of personal jurisdiction." 916 F.2d at 1518. Unlike *Calder*, Plaintiffs here have put forward no evidence that the Foreign Defendants intended to purposely exploit the Florida market. At most, Plaintiffs established that the Foreign Defendants had a general desire that the Film be published in the United States (which would include Florida -- along with 49 other states).

---

Q So based on that, wouldn't you say that RT Features knew that [ ] [P]laintiffs lived in Florida?
A I don't know even if Jose Basulto is alive now.
Q Okay. But you knew at least at the time period that the [F]ilm was set in that they lived in Florida, right?
A Yes, it was on the book, yes.
Q And do you have any reason to believe or did you get any knowledge that they moved out of Florida or that they died?
A No.

[ECF No. 115-4 (emphasis added)].

The Foreign Defendants also note that Netflix had the exclusive discretion on when/where to publish the Film in the United States. Plaintiffs contend that this is false and claim that "[t]he License Agreement does not provide Netflix discretion to publish." [ECF No. 115]. Plaintiffs misread the agreement. [ECF No. 115-2]. The License Agreement does not contain a provision which *requires* Netflix to publish the Film. The limitations on Netflix were only that it could not publish the Film before a certain date. Thus, the Foreign Defendants would have had no recourse if Netflix opted to not publish the Film on its platform or decided that it wanted to wait a few years before publishing the Film.

At bottom, Plaintiffs offer very little to support their contention that the Foreign Defendants purposefully availed themselves of the privilege of conducting activities in Florida. When the attorney rhetoric is removed, it becomes clear that the Foreign Defendants' only connection to Florida is that they produced a film which a Florida resident claims was defamatory. This attenuated connection is insufficient to establish purposeful availment. *Sovereign Offshore Servs., LLC v. Shames*, No. 17-CV-80172, 2017 WL 7798664, at *4 (S.D. Fla. Aug. 3, 2017) ("[The] [d]efendant's awareness that his blog posts would be accessible in Florida, by virtue of the nature of the world-wide web, and [the plaintiff's] physical location in Florida are insufficient to establish that [the] [d]efendant has minimum contacts with Florida.").

iii.   Fair Play and Substantial Justice

31

If a plaintiff is able to establish that a non-resident defendant's actions satisfy the first two elements, then the burden shifts to the defendant to make a compelling case that being hailed into the forum court would violate traditional notions of fair play and substantial justice. *Waite*, 901 F.3d at 1313. Although Plaintiffs have not met their initial burden of establishing other aspects of the due process requirement, the Undersigned will, nonetheless, address this element.

There are four factors which the Court considers in determining whether hailing a non-resident defendant into court runs afoul of fair play and substantial justice: (1) "the burden on the defendant"; (2) "the forum's interest in adjudicating the dispute"; (3) "the plaintiff's interest in obtaining convenient and effective relief"; and (4) "the judicial system's interest in resolving the dispute." *Louis Vuitton Malletier, S.A. v. Mosseri*, 736 F.3d 1339, 1358 (11th Cir. 2013) (quoting *Lovelady*, 544 F.3d at 1288).

Neither side offers any more than conclusory arguments on this element. The Foreign Defendants aver that "because [they] had no contacts with Florida, they had no expectation of being hailed into court there." [ECF No. 33]. Plaintiffs, in turn, contend that "asserting jurisdiction over the Foreign Defendants comports with traditional notions of fair play and substantial justice because Plaintiffs suffered injury in Florida." [ECF No. 52].

The Foreign Defendants have put forward no argument nor facts which explain the burden they would face if forced to litigate in Florida. Nor have they offered anything

32

more than a conclusory allegation that they could not have expected to be sued in Florida. Although the Court need not address this element (because Plaintiffs have not met their burden on the other two elements), if the District Court disagrees with the Undersigned's findings on the other two elements, then the Undersigned would respectfully recommend that the District Court determine that the Foreign Defendants have not met their burden on this element

### iv.  Conclusion

Plaintiffs have failed to establish that exercising personal jurisdiction over the Foreign Defendants would comport with due process. The most that can be said is that the Foreign Defendants produced and/or marketed the Film (in places outside of Florida) with hopes that an entity would purchase the distribution rights to the Film. They were successful in their goal, and Defendant Netflix obtained the exclusive -- and discretionary -- rights to publish the Film in the United States.

The cases Plaintiffs cite do not support their sweeping viewpoint that anyone who financed the production or advertising of a purportedly defamatory film can be haled into any jurisdiction in which a third party publishes the film. If this were true, then any film producer, interviewee, or financer could be haled into any United States Courthouse whenever the defamatory material was published by another entity on a national scale, even if publication was only through internet accessibility.

**IV. Conclusion**

Although the Foreign Defendants are subject to the jurisdiction of Florida's long-arm statute, an exercise of personal jurisdiction over them here would not comport with constitutional due process. Therefore, the Undersigned **respectfully recommends** that the District Court **grant** the Foreign Defendants' Motion to Dismiss for Lack of Personal Jurisdiction.

### V. Objections

The parties will have 14 days from the date of being served with a copy of this Report and Recommendations within which to file written objections, if any, with the District Judge. Each party may file a response to the other party's objection within 14 days of the objection. Failure to file objections timely shall bar the parties from a de novo determination by the District Judge of an issue covered in the Report and shall bar the parties from attacking on appeal unobjected-to factual and legal conclusions contained in the Report except upon grounds of plain error if necessary in the interests of justice. *See* 29 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140, 149 (1985); *Henley v. Johnson*, 885 F.2d 790, 794 (11th Cir. 1989); 11th Cir. R. 3-1 (2016).

**RESPECTFULLY RECOMMENDED**, in Chambers, in Miami, Florida, on May 25, 2023.

_____
Jonathan Goodman
UNITED STATES MAGISTRATE JUDGE

**<u>Copies furnished to:</u>**
The Honorable Federico A. Moreno
All counsel of record