## CONFERENCE REPORT ON S. 652, TELECOMMUNICATIONS ACT OF 1996

### SPEECH OF
### HON. BILL PAXON
#### OF NEW YORK
#### IN THE HOUSE OF REPRESENTATIVES
*Thursday, February 1, 1996*

Mr. PAXON. Mr. Speaker, the conference agreement provides that, in order for a Bell operating company to receive in-region interLATA relief, either the company must have entered into an interconnection agreement contemplated under section 271(c)(1)(A) with a facilities-based carrier or, if there has been no request for such an agreement, must have provided the statement of interconnection terms contemplated under section 271(c)(1)(B) (approved by a State under section 252(f)). Either the agreement or the statement must meet the requirements of section 271(c)(2)(B), which itemizes the competitive checklist, and must include each of the items in the checklist.

The purpose of these provisions is to ensure that a new competitor has the ability to obtain any of the items from the checklist that the competitor wants. It is very possible that every new competitor will not want every item on that list. In such cases, the legislation would not require the Bell operating company to actually provide every item to a new competitor under the agreement contemplated in section 271(c)(1)(A) in order to obtain in-region relief.

Under these circumstances, the Bell operating company would satisfy its obligations by demonstrating, by means of a statement similar to that required by section 271(c)(1)(B), how and under what terms it would make those items available to that competitor and others when and if they are requested. It would be entirely appropriate under this legislation for the Federal Communications Commission to determine under section 271(d)(3)(A) that the Bell operating company has fully implemented the competitive checklist.

Quite simply, Congress did not intend to permit the Bell operating companies' competitors to delay their entry into the in-region interLATA market by refusing to include checklist items in the interconnection agreements. Refusal for such reasons would not constitute good-faith negotiations by the competitors. Where the Bell operating company has offered to include all of the checklist items in an interconnection agreement and has stated its willingness to offer them to others, the Bell operating company has done all that can be asked of it and, assuming it has satisfied the other requirements for in-region interLATA relief, the Commission should approve the Bell operating company's application for that relief.

## AGRICULTURAL MARKET TRANSITION ACT

### SPEECH OF
### HON. DAVID FUNDERBURK
#### OF NORTH CAROLINA
#### IN THE HOUSE OF REPRESENTATIVES
*Wednesday, February 28, 1996*

Mr. FUNDERBURK. Mr. Speaker, once again North Carolina's version of the Washington Post, the Raleigh News & Observer has it wrong. In a recent editorial they called for the end of an important program for hard-working farmers of eastern North Carolina. They endorsed the elimination of the peanut program and they give as the reason the supposed increased benefit to the consumer. This could not be further from the truth. Peanuts and peanut products sell for more in Canada and Europe than in the United States. This is true even though those manufacturers purchase peanuts on the world market. Peanut farmers will suffer substantially if the proposal to eliminate the peanut program passes. The lost revenue in the first year will exceed $275 million. It has been argued that the farmers' losses will be transferred into savings for the consumer, but this will not happen. Lower input cost for the manufacturer will be retained and not passed on to the consumer. The importance of the peanut program in North Carolina cannot be overstated. Agriculture is our most basic industry. The House has recognized that changes in past policies were needed. But it also recognized that changes must be gradual in order to minimize hardships and at the same time insure the health of this most important industry.

## FLORIDA AIR NATIONAL GUARD ON DUTY IN CUBAN CRISIS

### HON. TILLIE K. FOWLER
#### OF FLORIDA
#### IN THE HOUSE OF REPRESENTATIVES
*Thursday, February 29, 1996*

Mrs. FOWLER. Mr. Speaker, the destruction of two unarmed civilian aircraft from the group "Brothers to the Rescue" and killing of four pilots has again focused our attention on the Castro regime's criminal behavior. I am pleased that the international community has responded swiftly to these horrible misdeeds.

I would note that even as our Government, the Congress, and the Security Council were working to fashion their political responses, the men and women of the Florida Air National Guard were on heightened alert status in defense of our national interests. Following the shoot-downs, Jacksonville-based F–15's of the 125th fighter wing, supported by the unit's C–26 operational support aircraft, redeployed to Homestead Air Reserve Base in South Florida. There they joined a detachment of the 125th that is on alert 365 days a year to assure protection of our Nation's airspace and perform the combat air patrol mission.

The air guard's speedy response to the Castro dictatorship's crimes is a tribute to the dedication and professionalism of our guard forces. We owe them all a debt of gratitude.

## TRIBUTE TO JACQUELINE CHARITY

### HON. EDOLPHUS TOWNS
#### OF NEW YORK
#### IN THE HOUSE OF REPRESENTATIVES
*Thursday, February 29, 1996*

Mr. TOWNS. Mr. Speaker, I am pleased to recognize Jacqueline Charity, who serves as deputy director for access and compliance with the New York City Board of Education, for her years of service. Ms. Charity has amassed an impressive résumé of selfless service in the cause of educating young people. She has been directly responsible for programs targeted at talented and gifted students, in addition to her outstanding supervision of the College Bound Program. Recognizing that it is essential for students to be competitive in math and sciences, Ms. Charity undertook the challenge to establish a math-science program at Stuyvesant High School.

Jacqueline attended primary and secondary school in Brooklyn, and received her undergraduate degree from Brooklyn College, and her masters degree from New York University.

A devoted mother and wife, Jackie finds the time to provide extensive community service in her church and for numerous civic organizations. Among her numerous awards is recognition from the Jack and Jill organization and the YWCA. Jacqueline maintains her spiritual center by serving as a eucharistic minister/lay reader at St. Phillips Episcopal Church. I am pleased to be able to bring the accomplishment of this noted Brooklyn educator to the attention of my colleagues.

## COMMEMORATING COMPOSER-CONDUCTOR MORTON GOULD

### HON. HOWARD COBLE
#### OF NORTH CAROLINA
#### IN THE HOUSE OF REPRESENTATIVES
*Thursday, February 29, 1996*

Mr. COBLE. Mr. Speaker, I rise to commemorate Morton Gould, the great composer, conductor, and recording artist who died on February 21 at the age of 82.

Gould's contributions included significant works for orchestra, chamber ensemble, band, chorus and soloists, as well as scores composed for film, television, Broadway, and ballet. Throughout his career, Gould's work was characterized as particularly American, integrating the elements of jazz, blues, spirituals, and folk music.

He was born on December 10, 1913 in Richmond Hill, NY. As a child prodigy, he composed and published his first work at age 6. Growing up during the throes of the Great Depression, Gould supported his family by working as a vaudeville pianist.

His music has been commissioned by symphony orchestras, the Library of Congress, the New York City Ballet, and the American Ballet Theatre. Gould's work has been performed worldwide by a number of prominent conductors.

He received the Kennedy Center Honor in 1994 and the Pulitzer Prize in Music the following year. Elected to the American Academy of Arts and Letters in 1986, Gould received 12 Grammy nominations and a Grammy award in 1966. He conducted more than 100 albums on three different recording labels.

Finally, Mr. Speaker, Gould was a great friend of the intellectual property community as an active participant in many ASCAP and ASCAP Foundation programs. A tireless advocate for new American composers, he was constantly seeking opportunities to expose their work. Gould also served with distinction on the Board of the American Symphony Orchestra League and on the National Endowment for the Arts Music Panel.

Mr. Speaker, Morton Gould was a great American artist whose talents and contributions to our national culture will be missed. I