AUTHENTICATED U.S. GOVERNMENT INFORMATION GPO

United States of America

# Congressional Record

PROCEEDINGS AND DEBATES OF THE 104th CONGRESS, SECOND SESSION

*Vol. 142* WASHINGTON, TUESDAY, MARCH 5, 1996 *No. 28*

# *Senate*

The Senate met at 9:30 a.m., and was called to order by the President pro tempore [Mr. THURMOND].

The PRESIDENT pro tempore. Our Chaplain this morning is Dr. O.S. Hawkins, pastor of the First Baptist Church of Dallas, TX. He is sponsored by Senator HUTCHISON.

PRAYER

The guest Chaplain, Dr. O.S. Hawkins, pastor of the First Baptist Church of Dallas, TX, offered the following prayer:

Dear Lord, thank You for the realization that You are truly alive today. Bring us to a conscious awareness that, as Your Word states, ''The Most High still rules over the affairs of men,'' that ''Your eyes run to and fro over this whole world to show Yourself strong in behalf of those whose hearts are fixed on You.''

Lord, impart a spirit of faith, hope, and love to this body of men and women in these strategic places of leadership. A spirit of faith because You said ''without faith it is impossible to please You.'' A spirit of hope because You are the personification of our hope, our blessed hope. And, a spirit of love because You said that is the single distinguishing characteristic by which we would be known. We ask these things in Jesus' name. Amen.

The PRESIDENT pro tempore, Senator HUTCHISON of Texas.

## ACCOLADES TO GUEST CHAPLAIN, DR. O.S. HAWKINS

Mrs. HUTCHISON. I want to say how pleased I am to have been able to invite Dr. O.S. Hawkins of the First Baptist Church of Dallas, one of the largest Baptist churches in the whole world, to be with us today. He is a very special person in my life, along with his wife, Susie, whose father I served with in the Texas Legislature. Susie Hawkins was just a girl when her father and I served in the legislature. My husband also served with Susie's father in the State legislature in Texas. Our family ties have gone back a long way.

I want to say Dr. Hawkins is one of the great future religious leaders of our country. He already has taken over this great Baptist church of Texas. We are very proud of him. He has been wonderful to my family and to me.

I also want to thank Dr. Ogilvie for helping us bring him in for the great honor of opening the Senate. I think it is a wonderful tradition we have to start every day as we do by just taking a moment to thank God for the blessings that we have in this country. I think Dr. Hawkins did it very well today. I commend him. I am proud to be one of his constituents.

Thank you, Mr. President. I yield the floor.

The PRESIDING OFFICER (Mr. COVERDELL). The Chair recognizes the Senator from Mississippi.

## SCHEDULE

Mr. LOTT. Mr. President, today the Senate will immediately begin consideration of the conference report accompanying H.R. 927, the Cuban sanctions bill. Under the current consent agreement reached last week, there will be 2½ hours of debate on the conference report divided equally between Senators COVERDELL and DODD.

Following debate on the conference report, the conference report will be set aside with a vote to occur on the adoption of that conference report at 2:15 today. At the hour of 12 noon today the Senate will begin 30 minutes of debate on the motion to invoke cloture on the District of Columbia conference report, with the vote to invoke cloture immediately following the 2:15 vote on the Cuban sanctions legislation.

The Senate will recess from the hours of 12:30 to 2:15 today for the weekly party conferences to meet. Senators should therefore be reminded there will be two consecutive rollcall votes beginning at 2:15 this afternoon, the first vote being on the Cuban conference report, followed by a vote on cloture on the D.C. conference report.

## CUBAN LIBERTY AND DEMOCRATIC SOLIDARITY [LIBERTAD] ACT OF 1996—CONFERENCE REPORT

The PRESIDING OFFICER. The Chair lays before the House a conference report on H.R. 927. The report will be stated. The assistant legislative clerk read as follows:

> The committee on conference on the disagreeing votes of the two Houses on the amendment of the Senate to the bill (H.R. 927) to seek international sanctions against the Castro government in Cuba, to plan for support of a transition government leading to a democratically elected government in Cuba, and for other purposes, having met, after full and free conference, have agreed to recommend and do recommend to their respective Houses this report, signed by a majority of the conferees.

The Senate proceeded to consider the conference report.

(The conference report is printed in the House proceedings of the RECORD of March 1, 1996.)

Mr. LOTT. I believe the managers of the legislation will be ready to go in a few minutes. Until they arrive, I suggest the absence of a quorum.

The PRESIDING OFFICER. The clerk will call the roll. The assistant legislative clerk proceeded to call the roll.

Mr. COVERDELL. Mr. President, I ask unanimous consent that the order for the quorum call be rescinded.

The PRESIDING OFFICER (Mr. LOTT). Without objection, it is so ordered.

PRIVILEGE OF THE FLOOR

Mr. COVERDELL. Mr. President, I ask unanimous consent that floor

● This ''bullet'' symbol identifies statements or insertions which are not spoken by a Member of the Senate on the floor.

Printed on recycled paper.

S1480                    CONGRESSIONAL RECORD — SENATE                    *March 5, 1996*

privileges are granted to the following staff members from the House Committee on International Relations, Mr. Roger Noriega and Mr. Stephen Rademaker, during the pendency of the conference report on H.R. 927 and for the rollcall votes thereon.

The PRESIDING OFFICER. Without objection, it is so ordered.

Mr. COVERDELL. Mr. President, we are beginning deliberation on the Cuban Liberty and Democratic Solidarity Act, H.R. 927. There has been much said about this piece of legislation. It has been controversial from the beginning.

I believe it is important that we put this legislation in context. This legislation, Mr. President, is directed at a dictator and regime that has engaged in the violation of human rights of their own people and others, murder, terrorism, exportation of revolution, and has been an open adversary of the United States of America and her people.

To put it in context, there have been decades of pursuit of the objectives I just referred to. In 1959, Cuba aided armed expeditions against Panama, the Dominican Republic, and Haiti. During the 1960's, Cuba backed attempts to develop guerrilla insurgencies in Guatemala, Colombia, Venezuela, Peru, and Bolivia. In the 1970's and the 1980's, Cuba had 50,000 troops in Angola; in Ethiopia, 24,000; and in Nicaragua 1,500.

By the end of 1960, the Cuban Government, under Fidel Castro, had expropriated all—all—private United States property in Cuba.

We all remember—or should remember—the confrontation between the United States and Cuba and the Soviet Union as they attempted to put hostile missiles on Cuban soil, directed at the United States. In July 1964 the Organization of American States voted to suspend diplomatic and trade relations with Cuba because of Cuban support for subversive activities in Venezuela.

In the 1980's, from April through September of 1980, 125,000 Cubans fled Cuba in the so-called Mariel boatlift. In February 1982 the Secretary of State added Cuba to the list of countries supporting international terrorists for its complicity with the M–19 movement in Colombia.

On April 29, 1994, Cuban border guards rammed and sank a private vessel, the *Olympia*, which had fled Cuba and was 25 nautical miles off its shores; 3 of the 21 Cubans aboard drowned, including two 6-year-old children.

On July 13, 1994, approximately 40 Cubans, many of whom were children, drowned when the tugboat *Trece de Marzo*, stolen by a group of Cubans attempting to flee Cuba, sank after being rammed by Cuban border guard vessels and flooded with fire hoses into the hold, sweeping the innocent citizens off the deck.

On December 22, 1995, the U.N. General Assembly approved a resolution, again calling on Cuba to cooperate fully with the U.N. Special Rapporteur,

regretting profoundly the numerous violations of human rights and fundamental freedoms in Cuba.

Beginning on February 15, 1996, the Cuban Government began a crackdown on members of the Concilio Cubano, an umbrella group of more than 100 dissident organizations that had applied for permission to hold a national meeting on February 24, 1996.

And then, Mr. President, on February 24, Cuban MiG–29 fighter jets shot down two United States private airplanes, Cessna 336's, in the Florida straits, flown by members of the Cuban-American group, Brothers to the Rescue.

Mr. President, I might add that both aircraft were destroyed, unarmed, in international waters, 4 and 6 miles beyond Cuban airspace.

This incident has caused considerable outrage and has caused the administration to alter its policy of befriending the Castro government; and they have now come together with the authors of this resolution, Senator HELMS of North Carolina and Representative BURTON of Indiana, in an agreement to finally pass the Libertad Act and direct our hostility toward the Cuban Government.

But the point is that this is not an isolated incident. This is but one of hundreds of incidents and infractions of common and civil and appropriate behavior on the part of the Cuban Government, which it continues to fail to practice.

Let us look at a summary of the Libertad Act. Title I: Strengthening international sanctions against the Castro government.

It urges the President to seek in the U.N. Security Council an international embargo against the Castro dictatorship.

It authorizes the President to furnish assistance to support the democratic opposition and human rights groups in Cuba.

It instructs the United States executive directors to international financial institutions to oppose Cuban membership until the President determines that a democratically elected government is in power in Cuba.

It codifies—this is very important—it codifies the existing embargo on Cuba, making it law unless a transition government is in place.

Title II: Assistance to a free and independent Cuba, instructs the President to develop a plan for providing support to the Cuban people during the transition to a democratically elected government; and it authorizes the President to suspend the embargo, once a transition government is in place, and to terminate the embargo once a democratic government is in power in Cuba.

Title III: Protection of property rights of United States nationals. It establishes, as of August 1, 1996, a private right of action by which U.S. citizens can protect their interest in property confiscated—stolen—by the Castro government. The President has the au-

thority to delay the effective date on a 6-month basis if he determines that such an act of delay is "necessary to the national interest of the United States and will expedite the transition to a democratic government in Cuba."

Title IV: Exclusion of certain aliens. It denies visas to aliens who confiscate, convert or traffic or benefit from property confiscated from United States nationals by the Cuban Government.

Mr. President, opponents of this legislation will contend that it will disrupt trade with our European and other allies and claim that the bill violates our international trade agreements. Although a number of our allies have expressed displeasure with this measure, the right-of-action provision will provide a measure of protection for all international investors by making it clear that trafficking in stolen property will not be tolerated.

We will be asked, "Why limit the property rights debate encompassed in this bill to Cuban-Americans? Why not expand it to Americans from Poland or China or Vietnam or other nations of Eastern Europe?"

In fact, the United States has reached settlements of confiscated American property claims with Albania, Vietnam, the People's Republic of China and most of the States of Central and Eastern Europe, including the former German Democratic Republic —East Germany—Bulgaria, Yugoslavia, Poland, Hungary, Romania, and Czechoslovakia.

Castro, conversely, has shown no serious interest in the settling of property claims—neither of American citizens at the time of the seizures in the early 1960's, nor for the thousands of Cuban citizens who had property stolen by the regime since then. The only remedy the Libertad bill allows is for American citizens who meet the jurisdictional requirements to have their day in court to deter the continuing wrong of Castro's exploitation of property.

Opponents will say that the bill will result in an explosion of claims in the United States court system; but the primary intent of the right of action is as a deterrent to would-be investors in Cuba. Few actions are expected to be brought under this conference report because both parties must be sufficiently present in the United States to sustain jurisdiction in our courts. The Congressional Budget Office, in its estimate of the House bill, stated that they expect that only a few cases would actually go to trial.

Further, in the process of arriving at this conference agreement, there is a cap. The cases must involve property valued at $50,000 or more. We have concluded that there are only about 700 claims, principally commercial interests, that would therefore come under the act.

Mr. President, the Libertad conference report, as I said, provides a way for American citizens whose property was stolen by Fidel Castro to protect

*March 5, 1996* CONGRESSIONAL RECORD — SENATE **S1481**

their claim or receive compensation from those who knowingly and intentionally exploit that property and are in the United States under the jurisdiction of U.S. courts.

Castro is running a fire sale in stolen properties. Since his loss of $5 to $6 billion in annual Soviet subsidies, Castro is looking to capitalize on the sale of stolen property. He has gotten into the business of joint ventures with stolen property.

Imagine if you were in an airport in Canada or Europe and picked up a brochure actually advertising these properties to the highest bidder? The Castro regime offers the sale of the Hermanos Diaz Refinery in Santiago, Cuba. Its rightful owner, however, Mr. President, is Texaco.

"Item 119" for sale is the Manuel M. Prieto sugar mill; its rightful owner is a naturalized U.S. citizen whom Castro has never been forced to compensate for the claim.

This is why title III is needed. It puts would-be investors—those who would be accomplices to a dictator and his property theft—on notice that, if they enrich themselves with stolen property, they will be held liable to the legitimate U.S. owners.

For some reason, the opponents of the pending bill have expressed outrage that American citizens would be given a means of defending their property in the United States. This bill violates no treaty or international convention. It does not violate customary international law, which recognizes that a nation's domestic courts may reach actions abroad when those actions directly affect that nation. There is no doubt that Castro's illegal confiscations and the exploitation of those properties has a direct effect on American citizens.

Mr. President, there is an old cliche that the truth is often stranger than fiction. I think that is the case here.

The United States has more effective mechanisms to protect fish and marine life than it has to protect Americans who have property stolen. We have statutes on the books to protect dolphins from tuna fishermen even when those provisions violate trade agreements. Other nations are required by U.S. law to protect sea turtles in order to continue having access to U.S. markets. Yet opponents of the Libertad bill object to protecting the legitimate interests of U.S. citizens.

Mr. President, property rights are the core of investments and commerce historically and forever.

I was recently in Nicaragua and had discussions with the Chamarro government, which was struggling to deal with property rights following the fall of the Sandinistas. Until they got that straight, there would be no investment. There will never be a rebuilt Cuba without property adjudication—never.

Mr. President, this legislation moves to the center of the debate the issue of property rights and international treatment of property rights. I believe

it is benchmark legislation. I believe it is legislation that can initiate positive new developments; that the scope and the breadth of it, as it moves the issue of property rights forward, will not only serve the citizens of the United States but the international community in general as we globally deal with the issue of property rights and the victims of property thefts. This is a singular case that demands our attention as it relates to Fidel Castro, his dictatorship, and the brutality of his regime.

Mr. President, I yield the floor to my distinguished colleague from Texas for a period of up to 5 minutes.

Mr. GRAMM. Can we make that 10?

Mr. COVERDELL. Can we use 5 minutes and come back?

Mr. GRAMM. All right.

Mr. GRAMM addressed the Chair.

The PRESIDING OFFICER. The Senator from Texas.

Mr. GRAMM. Mr. President, 50 years ago today Winston Churchill came to America to a tiny college in the middle of the Midwest—to Westminster College—and gave a speech that awakened America and the world to a crisis. We all know that speech. We all remember it from our childhood, or reading about it in history books. He talked about the descending of an iron curtain across the face of Europe. And, while the cold war was already underway, that speech probably more than anything else awakened America and the world to the Soviet threat.

We started to respond with the policy of containment. We responded by building up NATO and SEATO. We responded by fighting in Korea and Vietnam. We responded with the Marshall plan and the Truman plan to expand trade and work toward free trade. Our policies won the cold war, tore down the Berlin Wall, liberated Eastern Europe, and transformed the Soviet Union. We won one of the greatest victories in the history of mankind.

But there still is important unfinished business from the cold war. Communist China is in transition, and so is Vietnam. But there are two Communist regimes on this planet that are totally unchanged, that still believe in Marxism and Leninism, that still are committed to everything that we oppose in the world. One of those regimes is the military dictatorship in North Korea. The other is Fidel Castro's Cuba.

For 3 years, Bill Clinton has coddled both of those regimes. We have a policy in place today to give, through an international consortium, $4 billion to North Korea to build for them two nuclear powerplants even though there is no evidence whatsoever that either of the existing nuclear powerplants in North Korea was ever used to generate a watt of electricity or ever had any purpose other than building nuclear weapons. We are today supplying oil through that consortium to North Korea and propping up a Communist regime.

President Clinton for 3 years has coddled Fidel Castro. He announced a policy last year that enforced the imprisonment of the Cuban people—that actually used the United States Navy to enforce the imprisonment of the Cuban people. The United States Navy was given the assignment by the President of the United States to pick up people who risk their lives to flee Communist oppression from Cuba, put them in American naval vessels, and then turn those people back over to Fidel Castro. The President set out a policy that opened the door for nongovernment organizations to establish a presence in Cuba and in the process started what Fidel Castro believed, and the world believed, was a movement toward normalization. Voices were raised in Congress in opposition to the President's policy. Both the distinguished Senator from Georgia and I spoke out against it, as did many others.

We now see the fruit of that policy, and the fruit of that policy is that Fidel Castro brutally murdered four Americans. We have the tapes of the communications from the MiG's as they talked to their home base, identifying civilian planes with no armament. We have the tapes of those conversations when they then boasted how they were going to destroy these planes. On an order from their home base, they fired the missiles that killed four American citizens.

We are now considering a bill to change our relationship with Castro's Cuba and bring it back to what it has always been; that is, a policy of strong opposition.

The PRESIDING OFFICER. The Senator's 5 minutes has expired.

Mr. COVERDELL. Mr. President, I yield an additional 5 minutes to the Senator from Texas.

The PRESIDING OFFICER. The Senator from Texas.

Mr. GRAMM. Mr. President, our position expressed with this bill goes back to what our position has been with regard to Fidel Castro since the early days of that brutal regime. Our position is founded on the recognition that Fidel Castro is a brutal dictator and murderer and that his regime in Cuba must end.

Our position under Democrat and Republican administrations has always been—until the Clinton administration—a commitment to the isolation of Castro's Cuba, and a commitment to seeing the overthrow of Fidel Castro and his accomplices.

Today with this bill, we restore that policy and we hit Fidel Castro where it hurts the most. We hit him in the pocketbook. We allow Americans to sue those who buy their property stolen by Castro, to sue those who are trafficking in stolen goods. With this bill we allow Americans to sue international interests in American courts to recover damages. The effective result of that will be that private investors will think two and three times before they bring their investment money to Castro's Cuba.

Let me also say, Mr. President, that there is more that we can do. I think the President ought to act unilaterally to deny Americans the ability to send money to Castro's Cuba.

While it is true that allowing people to send money to their relatives provides some temporary assistance to them, some relief to them, those funds, that hard currency also props up Castro's Cuba, allowing Castro to continue his imprisonment of the people. It prolongs their misery, and in my opinion that should be ended.

I believe that we should demand that Cuba turn over the two pilots who fired the missiles, turn over the air traffic controller who gave the order to fire, and turn over anyone in the chain of command who was engaged in giving the orders or carrying those orders that killed four Americans. As we did in Iraq, as we have done in Bosnia, I think we need to declare a no-fly zone over Cuba for military aircraft until those people are turned over, and I think we ought to enforce that no-fly zone.

I believe we need to recommit ourselves to the principle that Fidel Castro and his regime will not survive the end of the 20th century. What a terrible tragedy it would be if this tidal wave of freedom which has covered the planet is allowed to subside before it drowns Fidel Castro. I think we have in these brutal murders a new example to remind us again of who Fidel Castro is and what he stands for, and I believe we should dedicate ourselves to the principle that the 20th century will not end and find the Castro dictatorship intact in Cuba.

This bill is a step forward. I urge the President to take other actions, such as to cut off cash transfers to Cuba by American citizens, to demand that the pilots and the air traffic controllers who were responsible for the death of four Americans be turned over, along with anyone in the chain of command who gave or carried out those orders. I think we ought to enforce that with a no-fly zone.

I congratulate our colleagues from Georgia and North Carolina for their leadership on this bill. This is long overdue. We should have made this bill the law of the land last year. I remind my colleagues and the American people that up until the last few days President Clinton fought this bill and threatened to veto this bill. He thought his policy of coddling Fidel Castro was working. He thought a movement toward normalization of relations with Castro's Cuba could be successful. We now know what the fruits of that policy were: death for four Americans. I say enough is enough. Let us restore freedom and democracy to Cuba. Let us do it in this century. Starting with this bill let us get serious.

I thank our colleague for yielding to me.

Mr. COVERDELL. Mr. President, I yield the Senator from New Mexico 3 minutes to speak in support of the conference report.

Mr. DOMENICI. Mr. President, I rise to support the conference report of H.R. 927, the Cuban Liberty and Democratic Solidarity Act. I commend Senator HELMS and Congressman BURTON for their foresight and fortitude in tackling the Castro regime.

On Saturday, February 24, two Cuban MiG fighter jets shot down two civilian, unarmed Cessna aircraft off the coast of Cuba. The Cuban pilots gave the Cessnas no warning. These planes were operated by Brothers to the Rescue, a group based in Miami whose mission is to look for Cuban refugees floating toward the United States.

The Havana government has failed to provide proof that the Cessnas were in Cuban airspace, but never mind that. No country has the right to shoot down civilian planes. Cuba even adopted the 1983 international rules stating that there is never a justification for such actions.

These planes posed no threat to Cuba's security. They were unarmed on a nonviolent humanitarian mission, and the Cuban Government knew it. To respond with deadly force is a shamelessly cruel act. This is cold-blooded murder and shows Fidel Castro's total disregard for human life as an alleged attempt to enforce Cuban sovereignty.

My deepest sympathy goes out to the families and friends of the four pilots killed.

Mr. President, some politicians and businessmen were encouraged over this past year, encouraged that Castro and Cuba were reforming and open to a warmer United States relationship. But we should not have been surprised by Cuba's latest crime against the United States. Castro is a ruthless dictator and we must stop underestimating him.

No matter how open the Cuban economy becomes, Castro never will change. A dictator who enforces doctrines through the secret police, firing squads, taking political prisoners, confiscating property, and limiting the basic rights of Cuban citizens. Only a brutal and vicious dictator could justify the murder of these four unarmed pilots all to counter the threat the Brothers to the Rescue makes on his cruel, authoritarian government.

Our best chance to oust Fidel Castro from power is now. The Cuban economy is in a crisis and Castro's totalitarian leadership has been threatened. H.R. 927 is our chance to exert more pressure on Mr. Castro, on the Cuban economy, and on those aiding the Cuban economy by trafficking in confiscated United States property.

Within 2 weeks of taking power in 1959, Castro issued his constitutional amendment authorizing the confiscation of property. In the following 2 years, Castro demolished private property rights by expropriating all businesses in Cuba owned by United States citizens, nationalizing industries owned by United States companies, and confiscating personal property of Cubans who left the country.

No compensation has been made in any U.S. claim in 37 years. Instead Castro has energetically promoted the exploitation of this stolen property by third-country joint ventures and foreign investment in order to sustain its faltering economy. These joint ventures have abounded, but to the benefit of Castro, not to the Cuban people whose labor is exploited. The Cuban Government has used the exploitation of working people and the absence of individual human rights as a lure to attract investors.

Mr. President, I rise in support of H.R. 927 because it would stop such deals and stop the resources Castro needs to restrain his ruthless and repressive regime.

Might I say to my friend from Texas, Senator GRAMM, I listened to part of his remarks, and I commend him for them. I think the Senator would share with me a concern about the very strange situation that in the United States we are bragging about. The world is moving toward democracy and free enterprise and private property rights—we kind of call it Pax Americana. Everybody is moving in that direction, and everybody is saying we are going to have a better life for billions of people than we ever thought we would have had 10 years ago when the potential for Communist dictatorships was very prevalent throughout the world. Is it not strange that right off our coastline sits a Communist dictator who is still in power, still in office while his people suffer, while his economy deteriorates, while people have no chance there of freedom and individual opportunity and individual rights?

I am sorry that it takes this kind of incident for the U.S. Government to become serious about doing everything in its power to erase that dictatorship from the face of the Earth.

This bill will push in that direction, but obviously this country also requires sustained leadership at the top levels of our Government. Leadership that will not bend its ideas to any concept that Castro is going to reform, and that things are going to work out in some normal way. We have to lend ourselves in legitimate ways to getting rid of this dictator and letting those people be free.

Can you imagine what is going to happen to that country when they are free and when enterprise is alive again? Just go to Florida and see what those people who have escaped this yoke are doing. Cubans will do the same in their country once they are free, but for now they cannot.

Today, Cubans are prisoners in their own country.

Again, I compliment the committee for what they have done in this bill and urge that the President sign it. I think that is what the Senator is saying, and perhaps that is not even enough, but let us get started today.

Mr. President, I yield the floor.

Mr. COVERDELL. Mr. President, I yield 5 minutes to the Senator from

*March 5, 1996*                    CONGRESSIONAL RECORD — SENATE                    **S1483**

Florida to speak in support of the conference report.

(Mr. FRIST assumed the chair.)

Mr. MACK. I thank the Senator from Georgia for yielding me this time.

I rise today in support of the Cuban Liberty and Democratic Solidarity Act, H.R. 927. I am proud that I was an original cosponsor of this bill and to have worked in support of its passage.

I commend my colleagues, particularly Senator HELMS and Congressmen BURTON, DIAZ-BALART, and MENENDEZ, and Congresswoman ROS-LEHTINEN for their efforts.

This bill reflects the heartfelt desire of many Americans to see the end of the tyranny and decades-long repression Castro has inflicted on his people. Make no mistake: The killing of the four Brothers to the Rescue was not out of character for Fidel Castro. The Cuban Government's heinous conduct reminded the world of Fidel Castro's true colors.

I might just say to those who take the opportunity to read about Fidel Castro's history, you will find that those words I just mentioned about not being out of character are quite accurate. The Cuban Government's heinous conduct, as I said a moment ago, reminded the world of his true colors. The brutal murder of unarmed Brothers to the Rescue occurred on a weekend when a prodemocracy and human rights group was to conduct an organizational meeting before Castro stopped it. Scores of Cubans affiliated with the group have been arrested, detained and harassed. In 1994, a tugboat with freedom-seeking Cubans was rammed by Cuban Government ships until it sank. Year after year, Cuba has had one of the world's worst human rights records.

It is time for tough talk to give way to tough actions. Guided by the principle that freedom is the core of all human progress, the bill contains provisions designed to isolate Fidel Castro, squeeze him from power and usher in an era of democracy and freedom.

In the best spirit of the American people, this legislation holds out the prospect of United States aid to transition and democratic governments in Cuba.

America will be there as soon as we can but not a moment before the long nightmare of the Castro regime is ended. So long as Fidel Castro is in power, United States hard currency, financing and other kinds of support will not go to the Cuban regime. We know that Castro uses the hard currency he gets from foreign investment to support the instruments of power and repression, and that must stop.

President Clinton last week finally agreed to support the Cuban Liberty and Democratic Solidarity Act. His support for the bill is welcome, if overdue. I am sorry it took the tragic murder of four pilots to focus the administration's mind on this bill.

Castro's efforts to intimidate the United States through onslaughts of refugees and now through the brutal and calculated shooting down of civilian humanitarian planes have come during Democratic administrations when Cuban policy has been weakened. It was incumbent upon President Clinton to stop delaying the Cuban Liberty and Democratic Solidarity Act. Anything less would have been a travesty and dishonored the lives of the Brothers to the Rescue who lost their lives.

With the President's agreement and with his call to congressional Democrats to support the legislation, America's long history of bipartisan opposition to tyranny in Cuba has been restored.

The bill that passed the House-Senate conference is even stronger than the bill that first passed the House. It contains the extremely important provisions of title III which deny Castro the ability to profit from illegally confiscated properties of Americans.

It also contains title IV's powerful provisions denying U.S. visas to individuals who traffic in confiscated property.

Although the bill gives waiver authority to the President, President Clinton will be hard pressed to find conditions that merit waiving the title III provisions.

It took tremendous pressure from the Congress to make the President accept title III. He will face the same pressure again should he attempt to delay the effect of title III's right to sue.

The bill also provides that all provisions of the United States embargo against Cuba will be codified in law, ensuring that the embargo will be preserved until a democratic transition is underway in Cuba.

All existing Cuban embargo Executive orders and regulations will now be signed into law. This is a major victory for the opponents of the Castro regime. No longer can President Clinton react unilaterally to a supposed reform in Cuba and lift a sanction here or there. No longer can administration wavering on the embargo threaten the historic policy of isolating the repressive Cuban regime.

When President Clinton announced measures in reaction to the shooting down of American citizens, he said they were a first step, and they had better be. While Ambassador Albright's performance at the United Nations was commendable, the administration must do more to convince our allies to impose an international embargo against Cuba and treat Fidel Castro as an outcast. His record deserves nothing less.

The fight must be taken up in every capital around the world. I believe our allies would respond to a sincere and concerted effort to win our cooperation in the embargo. Our Government must make the case that foreign investment perpetuates a dictatorship bent on brutality and repression, and it must stop.

I thank the President's support of the Libertad bill. Now he must take our Cuba policy to another level—to make it a priority with our allies to stop foreign investment in Cuba for the life of the Castro regime. I promise you, without that foreign investment, Castro's regime of repression cannot stand. It will be all that much sooner when the Cuban people can create a new society of freedom, justice, democracy and the protection of basic human rights.

I yield the floor.

Mr. BINGAMAN addressed the Chair.

The PRESIDING OFFICER. The Senator from New Mexico.

Mr. BINGAMAN. Mr. President, I wish to add my voice to those who have expressed their outrage about the Cuban Government's reckless and calloused shooting down of two small, unarmed civilian aircraft flown by the exile humanitarian group, Brothers to the Rescue. These shootings, which took place on the 24th of February, are deplorable, and I endorse the President's efforts to console and aid the families of those who died in this tragedy.

But as heinous as this shooting was, it does not justify the passage of wrongheaded legislation. Everything that was wrong with the Helms-Burton legislation before the incident remains wrong today.

I am reminded of the words of former Chief Justice Oliver Wendell Holmes who, in a dissenting decision, stated as follows:

Great cases like hard cases make bad law. For great cases are called great, not by reason of their real importance in shaping the law of the future, but because of some accident of immediate overwhelming interest which appeals to the feelings and distorts the judgment. These immediate interests exercise a kind of hydraulic pressure which makes what previously was clear seem doubtful, and before which even well settled principles of law will bend.

Mr. President, the shooting of these planes have created, in Justice Holmes' words "overwhelming interest which appeals to the feelings and distorts the judgment." We in the Senate are feeling that "hydraulic pressure" to which Justice Holmes referred. Senator HELMS and others who have stated that the message of this bill is "Farewell, Fidel," are ignoring the utter failure of 35 years of our embargo against Cuba.

Rather, the Helms-Burton legislation is now being adopted and embraced by both parties and, unfortunately, by the President in a bid to curry favor with the Cuban-American community. As I have argued before on this floor, the passage of this bill will harm rather than help American interests in Cuba. It will restrict this President and any future President's hand in conducting foreign policy with an important neighboring nation and in responding to events quickly when the need arises. And it will codify in law an Executive order imposing an economic embargo on Cuba that has clearly failed.

Our Nation's foreign policy is rife with anachronisms, and I cannot support helping to reinforce and entrench in our foreign policy such an outmoded and regressive policy as is reflected in this bill.

In October of last year, the President announced a plan that received much bipartisan praise. The President promised to more vigorously enforce laws against unlicensed travel to Cuba, but to broaden support for cultural, intellectual and educational exchange in a way that the people of Cuba could encounter more frequently and broadly the fruits of democracy at work in the United States.

The President stated that he would license non-Government organizations to operate in Cuba, to provide information and to provide emergency relief when needed, to provide the necessary infrastructure to help guide Cuba and its people toward democracy in the future.

The President also noted that Cuban-Americans with relatives still in Cuba would be permitted to visit Cuba to tend to family crises and that these one-time-per-year licenses to visit would not be stymied by the delays and management problems that frustrate American citizens attempting to get to Cuba when a family emergency hits.

These steps were important ones and they did not strengthen Castro's hand. What these provisions did was to help bond the people of Cuba to the people of the United States. For 35 years, we have tried to bring Fidel Castro down with heavy-handed tactics. One would think that during such a long period of time, we might have figured out that our policy had completely failed. We need a new direction, and it must involve building bridges with the Cuban people.

The Helms-Burton legislation will only injure and alienate ordinary Cubans, weaken Cuba's civil society, and retard Cuba's democratization. And the unprecedented effort to impose United States policies on other countries will make it more difficult for the United States Government to cooperate with its allies in fashioning a joint approach towards Cuba.

The problems with the bill before us are summed up well in an article this week by Walter Russell Mead in the New Yorker. Let me just quote a couple of sentences from that article. He says:

Now President Clinton has agreed to sign the so-called Helms-Burton bill—a piece of legislation that will cement the embargo into law and deprive the President of the option of modulating it for diplomatic purposes. It will also permit lawsuits in American courts against Canadian, Mexican, European and other foreign companies whose Cuban investments involve the use of expropriated property—a category broad enough to include virtually every activity in Cuba. Moreover, the officers of these companies will be ineligible for American visas . . .

. . . Fidel Castro has survived the enmity of nine American Presidents. In concert with his enemies in South Florida, he retains a hypnotic ability to induce stupidity in Yankee policymakers. That seems unlikely to change until the United States Government gets around to taking control of its Cuba policy away from a small, self-interested lobby group.

Mr. President, this bill is an anachronism that ties America to a past from which it needs to move on. America is the only industrial power in the world maintaining an economic embargo against Cuba. It is time we consider a new course. The shooting down of two civilian aircraft was a great tragedy that we all should mourn, but as Chief Justice Holmes warned, we need to stand strong against the "hydraulic pressure" of momentary events that evidently will cause this Congress to enact this very misguided law.

Mr. President, I yield the floor.

Mr. COVERDELL. Mr. President, I yield 3 minutes to the Senator from New Hampshire.

The PRESIDING OFFICER. The Senator from New Hampshire.

Mr. GREGG. Mr. President, I wish to congratulate the Senator from Georgia and also the Senator from North Carolina for bringing forward the Libertad Act, which is a very appropriate act in light of what has happened recently in Cuba, but it is more appropriate in light of what has happened in the last 37 years.

This is not an event of momentary instance, as was just referred to by the Senator from New Mexico, in my opinion. This is a problem that has existed and confronted this country for 37 years, and we have failed to take the aggressive action we should have to relieve the Cuban people of the dictatorship which has oppressed them in the last 37 years.

The least we can do as a nation is not aid and abet the activities of Fidel Castro and his actions, which have been to oppress his people, by giving him economic assistance and by giving him psychological support. This bill makes it very clear that no longer shall we give Cuba economic assistance in any way, indirectly or directly. We will no longer allow our citizens, American citizens, to have their property expropriated and mismanaged by this illegal and criminal government which now governs Cuba, but rather we will say clearly to the world that you have to choose between a democracy of America and American citizens whose rights are being abused, and in the instances of 2 weeks ago actually being killed, at the hands of this dictatorship, or you can choose the Government of Cuba operated by a dictator.

That is what this bill essentially says. It says to the world it is time to choose up in this confrontation. Unfortunately, this administration has had a schizophrenic, almost bumper-car approach to its foreign policy, but also on its policy to Cuba, it almost looks as if with Cuba they are looking through the eyes of the radical chic, the 1960's view of the world, which still views Castro as some sort of character of sympathy or character of international quality, whereas, in fact, he has proven himself over 37 years to be nothing more than a petty 2-cent dictator who has oppressed his people for his own personal gain.

Yet, this administration is not willing to face up to that, or has not been until American citizens lives were lost. Now we are going to give this administration and this country some teeth to come forward and say to Cuba, "No longer will we tolerate your form of government and to support the Cuban people and especially Cuban Americans who have lost their property in that nation."

So I want to commend again this bill, and I want to commend the authors of this bill. I was one of the original co-authors of this bill. I strongly support its initiatives, and I congratulate the Senator from North Carolina and the Senator from Georgia for bringing it forward today. I hope we will pass it overwhelmingly, send it to the White House, and we will finally see a definitive course from the White House by their signing this piece of legislation.

I yield back the remainder of my time.

Mr. PELL addressed the Chair.

The PRESIDING OFFICER. The Senator from Rhode Island.

Mr. PELL. Mr. President, I believe we all want to promote a peaceful transition to democracy and economic liberalization in Cuba. Where we clearly differ is on how we get there.

Despite the recent tragic loss of life in the shootdown of two unarmed civilian aircraft by the Cuban Air Force, I continue to believe that the Cuba legislation before us takes us further away from achieving the goal of democracy and economic reform on the island of Cuba.

If anything, the conference agreement takes us even further down that wrong road than either the House- or Senate-passed versions of the bill did.

It is naive, in my view, to think that this bill or any sanctions legislation we might pass will succeed in forcing Castro to step aside when all similar actions in the past over many, many years have failed.

All we are likely to ensure is that the living conditions of the Cuban people are made even worse, making a mass exodus from for Miami the only attractive option. Taken to its most extreme, this bill could even provoke serious violence on the island.

In some ways, this legislation is even more problematic than earlier efforts to tighten the screws on Castro. I say this because its implications go well beyond United States and Cuban relations. It now allows that our foreign allies and friends can be sued in American courts for undertaking activities totally lawful in their own countries. It mandates that the Secretary of State deny entry into the United States those foreign businessmen and women and their families. Clearly, these measures can only alienate our allies and undermine American global foreign policy objectives.

Thirty-five years of policies of United States isolation have failed to change Castro, or convince our allies of the wisdom of our policy. Is it not time to try something else? I think of the success we had in Eastern Europe, when

*March 5, 1996*                     CONGRESSIONAL RECORD — SENATE                     **S1485**

freedom, free thinking and democracy came over those countries as they opened. Is it not time to try a similar approach in Cuba, particularly when we think that it has now been 35 years that we have been trying this approach and we have had absolutely no success?

We are just about where we were—a little worse off with our relationship—35 years ago.

I continue to hold the view that contact and dialog between Havana and Washington is more likely to bring about democracy on the island of Cuba, not isolation and impoverishment. Perhaps if we took that approach, our allies would be more likely to support our policy with respect to Cuba, which virtually none of them do at this time.

The bill before us has gone through a number of changes since it was first introduced. However, no version to date resolves the fundamental problem that I have with the direction it takes U.S. policy. It takes us further down the road and leads to no where rather than reversing course, as we should have done years ago and can still do, and open up. When we have a free exchange of ideas in which we have free competition between democratic ideas and Communist ideas, democracy usually, one can say always, wins out.

I yield the floor.

Mr. DODD. Mr. President, I yield 5 minutes to my colleague from Illinois.

Mr. SIMON. Mr. President, I recognize this bill is going to pass, and I recognize the President is going to sign it. It is bad legislation. It is an emotional reaction to a situation that, obviously, all Americans are unhappy about. The action of Castro in shooting down those planes is indefensible. I have to add, our policy toward Cuba has been the basic cause of the friction. If that policy had changed a long time ago, those planes would not have been shot down.

I will take two examples—Cuba and China. Will anyone here suggest—and I do not for a moment defend the human rights policies of Fidel Castro—but does anyone here suggest that Cuba's human rights policy is worse than China's? Yet, what do we do? We say to China, "We are going to give you the MFN status, the favorable treatment on trade." When China growls, as the Presiding Officer knows, we quake.

I think it is a bad policy to have one policy like this on China and another totally different policy on Castro, who is not a threat to anybody. How many nations in the world follow the policy that we do on Cuba? None. Not even our good friend, Israel, who frequently, probably sometimes in embarrassment, votes with the United States. No nation follows our policy on Cuba. It just does not make sense.

Stephen Chapman had an op-ed piece in the Chicago Tribune—he is a regular columnist there—in which he quotes Senator DOLE as saying:

"Firmness and pressure" is what we have to use against Cuba. He says, "Firmness and pressure are what the United States has used

against Castro since he came to power in 1959, and if they had succeeded, we wouldn't be dealing with him today. The Cuban dictator has outlasted eight American presidents, and the odds are good that Bill Clinton will also leave office long before Castro does. By any conceivable standard, our efforts to bring down his regime or force him into democratic reforms have been a monumental failure."

No question about it. If in the old days of the Soviet Union, the Soviets and Castro had gotten together and said, "How can we design American policy so Fidel Castro can stay in power," they could not have designed a better policy than the United States followed. It is absolutely self-defeating.

It is interesting how we treat two different incidents. Belorussia shot down two American balloonists—innocent balloonists. We protested. Belorussia apologized. The incident has been forgotten. Now, there are differences. One is that Cuba has not apologized, which they should. But the other difference is, those balloonists were completely innocent. They were not trying to overthrow the Government of Belorussia.

It is a different situation, but the response is obviously an emotional response on our part. Foreign policy ought to represent national interests and not national passion. What our policy toward Cuba represents is national passion, rather than national interests and a desire to get those electoral votes in Florida.

Now, both parties are guilty. I recognize that. That is not the way you ought to make foreign policy.

Mr. DODD. I yield 2 additional minutes to the Senator from Illinois.

The PRESIDING OFFICER (Mr. THOMAS). The Senator from Illinois.

Mr. SIMON. It does not make sense.

The bill that is before the Senate, among other things, codifies existing sanctions. That means, and I say to my colleague from Georgia and I say to my colleague from Wyoming, if BOB DOLE is elected President of the United States and wants some flexibility in dealing with Cuba, we have taken that away. I think we ought to leave flexibility in the hands of the President of the United States.

Canada's Trade Minister, quoting in the Washington Post:

"If the United States wants to get at Cuba, that's one thing. But what they are doing here is contrary to the relationship we have had with them and it is a violation of NAFTA." That is the Trade Minister of Canada.

I read, and I regret I did not cut out an article by a woman professor who is a Cuban exile who said we are just playing into Castro's hands. What he wants is for the United States to beat up on Castro so he can say, "I am standing up to this big bully."

In the Washington Post, March 3, Louis F. Desloge had an article in which he says, talking about this bill, "They may very well achieve just the opposite of what they seek by buttressing, not undermining, Castro's

support at home and weakening, not strengthening, the embargo's prohibition on trade with Cuba."

This is a Cuban-American exile. This whole thing just does not make sense. The only thing that makes sense is yielding to the national passion and yielding to electoral politics. It is not good foreign policy. I will vote against it.

Mr. DODD. Mr. President, I yield myself such time as I may consume. Let me thank my colleagues, Senator PELL of Rhode Island, Senator BINGAMAN of New Mexico, and my colleague from Illinois, Senator SIMON, for their statements here this morning.

Mr. President, I rise to express my strong opposition to this legislation. This piece of legislation before us is truly just a bad proposal, Mr. President. The unfortunate part of it is that it comes in the wake of a tragedy of significant proportions in the Straits of Florida. That is what makes it so difficult to act sensibly.

Obviously, the authors of the legislation had a difficult time, over a year or so, moving this bill forward for the obvious reasons that the bill is so flawed substantively that many Members were reluctant to sign on to it. However, in the wake of what I call a terrorist act in the straits of Florida by a rogue government attacking innocent pilots and unarmed planes, it is virtually impossible at this point to have an intelligent discussion about the specifics of this bill.

I suspect that today this measure will pass overwhelmingly, and I feel that is a great tragedy. I think it will come back to haunt us terribly. With the provisions of this bill—we are carving out exceptions that will create a nightmare for us in our Federal courts, in our consular offices, in our relations with our friends and allies—I will go through the reasons why here this morning.

I certainly want to begin my remarks, Mr. President, by saying to my colleagues and others, and particularly to the families of these young men who lost their lives at the hands of an armed MiG attacking single-engine planes, Piper-Cubs how much I regret that violent act. To me it does not matter whether they were flying over Havana. It is inexcusable for a heavily armed plane to attack unarmed commercial private planes under any circumstances.

The debate ought not be about whether or not we are all horrified and angry over what happened a week ago Saturday in the straits of Florida. That is not the debate. I think people agree with the President's actions—he spoke out clearly on this issue immediately. I want to applaud Madeleine Albright, our Ambassador at the United Nations, who did a remarkable job. Getting the People's Republic of China to agree to a statement of condemnation was no small feat considering the relationship that exists between Cuba and the PRC. The fact she was                                   able                                   to

do that speaks volumes about her ability as our Ambassador.

I regret we did not build on that particular momentum and seek to expand the support within the United Nations for other joint initiatives which might have had even a greater effect on Cuban behavior. As we all know, every time there has been an issue in the United Nations on the Cuban embargo, we get two or three votes in support of our policy and that is it. We get clobbered on this issue. I suspect as a result of the legislation we are about to adopt here today that will be the case once again. Instead of building on Ambassador Albright's efforts, the Security Council will now squander that particular achievement.

Mr. President, again, I do not take a back seat to anybody when it comes to condemnation of this act. I do not take a back seat to anyone in my desire to see change in Cuba. It is a dictatorship. No other way to describe it. That is what it is. Our hope is that democracy will come to this island as the last nation in this hemisphere to be denied the opportunity of its own people to choose its own leadership.

In the strongest of possible terms, Mr. President, I would say to my colleagues that I carry no brief for the Cuban Government—none whatsoever. Nor do any of my colleagues who join me in opposition to this bill. Our opposition to this legislation is rooted in something that each and every one of us ought to ask ourselves when we consider any bill that comes before the Congress, particularly one involving international relations: Is it good for my country first and foremost? It is not about Cuba, not about Castro, not about others. It is strictly is it good for us? What does it do to my country? I am a U.S. Senator; I am not a Senator for any particular group. I am not a Senator for any particular nation except my own.

So the first, threshold question is: What does this bill do to my people, to my country, to my interests?

I will make the case here this morning that this bill is devastating to my people and to my country. It is foolish. Despite the obvious emotion surrounding what happened last week, we ought to be looking carefully at the contents of this measure. There is a reason why the Senate is a deliberate body—why we follow a process here.

The consideration of this bill has been anything but deliberative. We had no markup of this bill in the Senate Foreign Relations Committee, not a markup of this bill. We held a hearing on a very early version of the bill and no followup hearings once the legislation had been significantly altered. The bill itself came directly to the Senate floor without any vote to report it from the committee of jurisdiction.

Normally, on a bill of this significance, this magnitude, considering what an exception we are creating in law, you would have thought we would have had extensive hearings and a markup in the Senate Foreign Relations Committee. That was not the case. The conference was similarly conducted with the proponents of the bill working behind closed doors to produce yet another version of the bill.

By the way, the bill has been changed at least four times on the Senate side alone. Similarly the final conference agreement is decidedly different than either the House or Senate passed bills I am sure my colleagues have not read all the details of it. I do not expect them to; they are busy. Nonetheless, we are about to vote on something here that is just bad law.

There is a reason why we take our time in the U.S. Senate. It is because we do not want to react to the emotion of the moment. We have seen too many occasions, historically, when this body, because of the emotions of the moment, has passed legislation and looked back only weeks later and wondered what it was doing at the time. If this is a good bill, it will be a good bill a week from now, a month from now, 6 months from now. If it is a bad piece of legislation, it does not change. Taking a few days, which we are not going to have, to analyze the implications of enacting this measure into law, how it will affect our country, is the least we ought to be able to do.

I will make a case here—by the way, for the many people who showed up in the Orange Bowl the other day who may have claims, against the Cuban Government who think that they are going to be able to seek compensation once this bill becomes law. They may not know it, but many of them are excluded from exercising the right of private action included in this bill.

Pay attention, Cuban-Americans, pay attention. The majority of you are probably not going to be benefit from this legislation. It is the fat cats who are going to get the money, not you. Pay attention to this bill and pay attention to those who would seek to have this legislation passed and what their interests are.

So, again, I regret we are moving as quickly here as we are, carving out unique and special pieces of legislation that I think will come back to haunt us very, very quickly.

Mr. President, let me take some time here, if I can, just to go over some of the provisions contained in the conference agreement. I probably have had more time than some of my colleagues to follow the changes that have been made in this legislation. In my view, the fundamental premises of this legislation remain fatally flawed; namely, that it will strangle Fidel Castro, causing him to scream "uncle" and step down; that our allies will be bludgeoned—we are going to beat up our allies—into going along with this approach; and that there will be no negative consequences to the United States, to the American people, or to the myriad other outstanding foreign policy concerns that we have in common with our allies around the globe.

It may seem trite to say this, Mr. President, but I believe, as I said a moment ago, that our legislative process as it has evolved with experience exists to protect citizens from bad laws. There is a reason that we normally hold hearings on legislative proposals and conduct markups to examine highly complex issues. There is a reason we seek to take testimony from recognized experts on the implications of a measure, intended or unintended. There is a reason that our Founding Fathers provided for the possibility of extended debate in the U.S. Senate. We all know why. It is to try to at least protect against the passage of bad laws.

In the case of this legislation, we have short-circuited that process, particularly in the U.S. Senate. Most Members of this body, let alone the general public, do not have the vaguest idea what is in this legislation before us. The conference report was only available yesterday—and on a very limited basis, I might point out.

Suffice it to say, the final version of the Helms–Burton bill is worse than the previous versions that passed either body of this Congress last year. I fear many of us are going to be in for a surprise once legal experts and others have an opportunity to review this bill. Unfortunately, that will not happen until it has already become law.

As I said on numerous occasions, the stated purposes of the legislation are laudable. I do not have any debate with what the purposes are: to assist the Cuban people in regaining their freedom and prosperity, to encourage the holding of free and fair elections, and to protect American nationals' property against confiscatory takings by the Castro regime. We all agree on that. That is not what is at issue. Unfortunately, the conferees on this measure adopted legislation that will not make any of this achievable.

We only have a couple of hours to make the case against this bill. I will attempt to do that this morning. I would say that I believe we would all have been better served had outside analysts had an opportunity to review and comment on this measure before we vote. That isn't going to be possible.

Let me begin by highlighting some of the more problematic provisions in the final conference agreement that were in neither the House bill nor the Senate-passed bill as it came out of conference.

First among these is codification in law of all current embargo regulations. Let me point out here, this is unique, what we are about to do here and pass here. To the best of my knowledge we have never codified in law outstanding regulations and executive orders targeted at Libya, Iran, Iraq, China, Vietnam, North Korea—none of these countries. We are now going to say, with regard to Cuba, that all of the sanctions and regulations are now going to be codified into law. Senator SIMON of Illinois was making this point. Any effort

on the part of this President or future Presidents to in any way modify what are normally executive branch decisions when it comes to economic sanctions can occur only once we enact a law to change them until democracy has come to Cuba. We have never taken such a draconian action anyplace else in the world. This is really going far beyond anything we have ever done. As angry as we were about what happened to our hostages in Iran, as angry as we were about what happened in Iraq, as angry as we are about what could happen in North Korea, or as we watch the human rights abuses in China, yet Presidents have had the flexibility to deal with those situations through executive orders and the promulgation of regulations.

In the case of Cuba that isn't tough enough. Read the bill; we codify these sanctions. That is unwise foreign policy. It is unwise. Yet the emotions of the moment are carrying us along here. We are going to be looking back in a matter of days and saying, ''My Lord, what did we do here by doing that?''

So that is my first concern. I urge my colleagues to look at section 102(h) of the conference agreement. We have never, in my view, done that before. We have imposed a lot of sanctions and done a lot of things, but codifying them all into law is, I think, very dangerous. With the codification of the embargo regulations we have tied the hands of this and future Presidents, as I said a moment ago, in their efforts to respond flexibly to changes that we hope will occur in Havana. None of us knows for sure if they will. They may not. But if they do, Presidents ought to have the ability to respond to that. Make no mistake about what this codification does. It sidelines, our Government as a participant in facilitating positive change in Cuba for the foreseeable future.

Let me turn to what I believe is the most troublesome provision in this conference report, and that is title III. This title, which was deleted from the Senate-passed version, grants a private right of action to some individuals who have had property expropriated by Fidel Castro. While the sponsors have tinkered with this title continuously in response to criticisms leveled against it, the essence of this title remains fundamentally the same and, therefore, continues to be objectionable.

Instead of the United States utilizing the Foreign Claims Settlement Commission to validate the claims of American citizens and the U.S. Government to then espouse those claims with the foreign government that has taken U.S. citizens' property to obtain compensation—which, by the way, has been the practice for more than 40 years,—our Federal court system, the Federal court system, now will be given the role of effecting compensation for expropriated property claims.

By the way, the historic treatment by the United States of expropriated property claims is not unique to our country. It has been international law for 46 years. So, all of a sudden, 46 years of law and practice world wide are going to be overturned for one particular country in one part of the world.

Moreover, this legislation will broaden the universe of those eligible to be compensated to include individuals who were not U.S. citizens at the time their property was taken. For those who follow this expropriation of property without compensation, a fundamental principle for 46 years internationally has been that you must have been a citizen of the country that seeks to espouse your claim at the time the property was taken. That is, you must have been a United States citizen, in this case, at the time your property was expropriated in Cuba. That is the rule internationally.

We are now saying, ''No, in this case you do not have to be a U.S. citizen at the time of the expropriation, and you go to the Federal courts.'' I urge my colleagues, no matter how angry you are about what happened a week ago, consider what we are doing here. We have already rejected over the years similar attempts to change the eligibility requirements for property compensation cases.

So my colleagues on the Foreign Relations Committee will recall it was a difficult case—expropriation of property. They came and said, ''Won't you allow Hungarians who were not citizens at the time to be able to be covered in the compensation program?'' We said as a body here, ''We are deeply sorry. We understand your point. You have a vehicle available to you through your courts. If we carve out an exception for you, then what are we going to say to Polish-Americans, Chinese-Americans, Vietnamese-Americans, and Arab-Americans?'' Up until now, we have said ''no'' to them. Now we are saying ''yes'' here. Now we are going to have to back other countries, I presume, who are likely to seek similar treatment.

No matter how angry we are, to carve out an exception to one country here and deny others the opportunity is a bad, bad practice.

The principle of international law and practice in the area of expropriation is very well established. Let me quote from the legal brief prepared by Mr. Robert Muse which summarizes very clearly the international law of claims:

If international law is to apply to a governmental taking of property, a party claiming the loss must occupy at the time of loss the status of an alien with respect to the Government that took the property. The injured person must be a foreign national.

The U.S. courts have stated on numerous occasions that confiscations by a State of the property of its own nationals, no matter how flagrant and regardless of whether other compensation has been provided, do not constitute violations of international law.

This is not the first time, as I said a moment ago, an effort has been made to mandate legislatively that the United States depart from the nationality principle of international claims laws. Fortunately, on those occasions Congress wisely rejected such efforts.

During the 84th Congress the Senate Foreign Relations Committee expressed very clearly why that should not be done in its report dealing with claims programs related to property losses in Hungary, Romania, and Bulgaria.

The committee said:

The committee has carefully considered the arguments advanced in support of the proposed extension of eligibility which, if adopted, would mark the first time in claims history of the United States that a declaration of intention was equated with citizenship. While sympathetic to the plight of those unfortunate individuals who are not American citizens when they sustained war losses, the committee has to keep utmost in view the interests of those individuals who did possess American nationality at the time of the loss.

That is why I said our first responsibility is to our own citizenry—to American citizens. We are placing them in second-class status. That is why in the 84th Congress we rejected, no matter how laudable, no matter how sympathetic we are to the claims of Hungarians, Rumanians, and Bulgarians, we said, ''No. We are sorry. We cannot do that.'' Today we are about to reverse that. Forget the other countries where individuals may have similar cases to make. They, of course, will not be handled accordingly, although they may come forward and seek similar treatment, I presume, once this legislation has been adopted.

The committee went on to say, ''Further, these persons who have a paramount claim [speaking about American citizens] to any funds which may be available to include the not-national-in-origin group will only dilute the funds still further and increase the injustice to American owners.''

So here you are going to take an action that is likely to increase the injustice against those American citizens whose property was taken by Castro— 1,911 of them. I say that because their chances of being fully compensated for their losses once this bill passes will be worse than beforehand because of the vastly expanded pool of claimants produced by this bill. In essence we are taking funds that might otherwise be available to them and diluting them by carving out this one exception to our global property claims programs.

So, if you run to pass this bill and sign up for it, remember what you are doing. You are taking American citizens and putting them in second place. U.S. citizens at the time of the expropriation get second-class status when this bill passes because we are caught up in the emotion and the horror of what happened a week ago. Why not slow down and take a few days and think about what we are doing here instead of jamming this through on the emotion of the moment?

Proponents of the Helms–Burton legislation appear to be indifferent, I must

say, to the injustice that this legislation will entail to certified American claimants, although these claimants are terribly mindful of it and for that reason continue to oppose title III in this bill.

I ask unanimous consent to have printed in the RECORD a February 29 letter that we received from one of the largest U.S. claimants, Mr. David Wallace, chairman of Lone Star Industries, who states quite clearly his opposition to this change in law and practice.

There being no objection, the material was ordered to be printed in the RECORD, as follows:

> JOINT CORPORATE COMMITTEE
> ON CUBAN CLAIMS,
> *Stamford, CT, February 29, 1996.*
>
> Hon. CHRISTOPHER J. DODD,
> *Ranking Member, Foreign Relations Subcommittee on Western Hemisphere and Peace Corps Affairs, Dirksen Senate Office Building, Washington, DC.*
>
> DEAR SENATOR DODD: As Chairman of Lonestar Industries and on behalf of the Joint Corporate Committee on Cuban Claims, I want to express my deep appreciation for your unwavering leadership in standing up for the rights of U.S. certified claimants.
>
> The Joint Corporate Committee deplores the recent actions of the Cuban Government in the strongest possible terms, but as egregious as those actions are, we should not let the passions of the day lead us to uncritically enact legislation that is harmful to the rights of U.S. certified claimants, contrary to international law, and constitutionally suspect.
>
> As I've indicated in my previous communications to you, Title III of the Helms-Burton bill will lead to a flood of litigation in our federal courts. As you know, the Title is so broadly drafted that not only third country foreign investors would be subject to suit in U.S. courts for "trafficking" in confiscated properties, but agencies and instrumentalities of the Government of Cuba also would be subject to suit. As a consequence, we can reasonably expect that tens if not hundreds of thousands of Cuban-Americans will file Title III lawsuits for the property losses they suffered over thirty years ago as Cuban nationals.
>
> Apart from the burden these lawsuits will place on our already clogged federal court system, serious constitutional questions arise that may result in substantial liability to our government. The harm U.S. certified claimants will suffer as a result of the enactment of Title III is indisputable. The U.S. State Department has estimated the total value of Cuban-American claims at $94 billion. U.S. certified claims, by contrast, total $6 billion. Faced with the prospect of tens of billions of dollars in federal court judgments, the Cuban Government will have neither the means nor the incentive to negotiate a settlement of the U.S. certified claims. This effective nullification of the property interests of the U.S. certified claimants is not without consequence. Under the takings clause of the Fifth Amendment, if the U.S. Government elects to advance a foreign policy objective at the expense of the certified claims lawfully held by its citizens, it will be required to pay just compensation to that group of citizens. In other words, by enacting Title III, we may be putting the U.S. taxpayer in the shoes of the Government of Cuba—ironically, the very Government this legislation seeks to punish—to pay the debt these claimants are owed under international law.

Finally, the creation of a lawsuit right that benefits one national origin group, Cuban-Americans, at the exclusion of all others, will not be tolerated under our Constitution. The equal protection clause of the Constitution will require the extension of this lawsuit right to other national origin groups. Consequently, Vietnamese-Americans, for example, will be able to sue U.S. companies that today or in the future are "trafficking" in the properties they once owned as nationals of Vietnam. The same right will be extended to all naturalized citizens who have lost properties in their native countries as a result of governmental actions.

I regret that in its haste to demonstrate our abhorrence of the Castro regime's actions, Congress is prepared to enact ill-conceived legislation that, apart from strengthening sanctions against the Cuban Government, will penalize U.S. certified claimants and create a myriad of undesirable domestic consequences. Your principled opposition to Title III and your resolute support of the claimants is all the more appreciated under these difficult circumstances.

Sincerely,

DAVID W. WALLACE.

Mr. DODD. Mr. President, ironically title III, which has been so fiercely defended by its sponsors, is not going to do much to harm Fidel Castro either. He is not likely to make himself available, as I point out, as a defendant in our courts coming down the road.

Mr. President, this legislation will have serious implications on our Federal court system, on the value of claims of certified U.S. claimants and on our relations with our close trading partners who will feel much of the brunt of these lawsuits. If this new approach to resolving expropriated claims is so good, why do a number of the largest U.S. certified claimants continue to oppose the legislation?

I believe that many of my colleagues in the Senate had come to share my view that title III was not in the interest of the United States and, for that reason, they joined in opposing its inclusion in the Senate-passed version of the bill.

While the events of a week ago Saturday were tragic and senseless, Mr. President, they do not in any way change the fact that title III is contrary to the interests of our country, of the United States, and inconsistent, as I have tried to point out, with international law.

To disregard, without even a markup in our committee, 46 years of international law and practice in the handling of expropriation issues, as this title does clearly, is foolhardy, in my view.

There is also a question of whether title III is constitutional because of the equal protection provisions of law.

But even if on narrow legal grounds this bill stands the constitutional test, on political grounds it is indefensible, Mr. President. As I said earlier, why should not Polish-Americans, Vietnamese-Americans, Arab-Americans—the list of 38 countries where we have claims outstanding—be granted similar access to our United States courts? Will they not come forward tomorrow,

or the next day, and demand equal treatment as we are giving in this particular case? Why not? Is this somehow different than the horrors that went on in Poland, or Vietnam, or China? Is anyone going to stand up on this floor and suggest to me that they are somehow different, were not quite as bad as what goes on in Cuba when we lose four citizens in a tragic act of shooting these people down, as horrible as it is?

What about the young people on the Pan Am flight that we now know Libya was involved with? What about claims there? They have a case to make? I do not see them included in this bill.

What happened under the Communist regimes before? Where are they here? They had their property expropriated and taken from them. Why are they not included in this bill? If I were they, I would be angry. This is special-interest legislation carving out extraordinary treatment for a special group.

By the way, in order to exercise the provisions of title III with respect to the right of private action you will have to have a claim worth more than $50,000—I will get to that in a minute—so your average poor Cuban is not included in this. Out of 5,911 U.S. certified claims, only slightly more than 800 will benefit from title III. The rest of them are excluded. Pay attention, Cuban-Americans. Pay attention to what this bill does or doesn't do for most of you. You are not going to get any benefit. It is the fat cats who are going to benefit. The tobacco and the rum interests are going to be the beneficiaries of this. Read carefully how the law is written here.

So, Mr. President, to all of those who say they support title III of this bill, I would say that I hope they have had an opportunity to study the final version and understand the implications. I suspect, for example, that when the more than 85 percent of the 5,911 U.S. certified claimants discover that they are precluded by provisions in this title from availing themselves of this new private right of action, they are going to be doubly opposed to this bill. Unfortunately, they will not find out until it is passed.

In the final conference report, the sponsors sought to address a significant criticism leveled against this title—that it would cause an avalanche of lawsuits in our courts. They have responded to that by putting a floor on the value of the claims that will be admissible in U.S. court in adjudication. Putting aside my underlying objection to that, the floor in the bill is $50,000. The problem with their efforts to limit lawsuits is that only suits that are really excluded by this floor are those by U.S. certified claimants whose property has already been valued at $50,000 or less.

Can you imagine, in 1959, $50,000 of value of United States citizen property in Cuba? It has to be valued at the time of the taking, by the way. As a result of that, you are seeing here a situation where 85 percent of the 5,911 certified

claimants get excluded. They cannot go to court here—just the 800 or so people that have claims in excess of that can. I presume that Cuban/Americans who were ineligible to submit their claims to the Foreign Claims Settlement Commission and who therefore have no particular value associated with their claim will start alleging claims in excess of $50,000 so that they can get access to the courts.

On the other hand, of course, the $50,000 floor is not likely, as I said, to limit filing of lawsuits by Cuban-American claimants. They are obviously going to allege more than $50,000. You can argue $50,001 and you get into court. That is available to them. But our people, U.S. citizens, who have already been certified by the commission as having a property value of $50,000 or less can't try the same thing. These U.S. citizens are out of luck.

Again, let us remind ourselves why we are here, who we represent, to whom is our first obligation. Last time I looked it was to U.S. citizens—U.S. citizens. That is my first obligation, U.S. citizens. They get taken to the cleaners on this; 85 percent of them do not get any advantage under this. And for the bulk of people who have claims of less than $50,000 who were not United States citizens when their property was taken, they will allege more and they get to access to our courts. So U.S. citizens lose. U.S. citizens lose. Clearly, these small claimants would be foolish, as I said earlier, not to avail themselves of this relief by alleging a claim in excess of $50,000.

They can claim that their property falls above the threshold value, file suit and attempt to convince the courts that they qualify for a positive judgment. At the very least, this will put them in a position to perhaps negotiate a side deal with the alleged offending party, clearly permissible under this law, negotiation of a deal.

I predict that even in this latest version there will be a flood of lawsuits in our courts. What is most troubling about putting our courts at the centerpiece of this legislation is that it transforms our judicial system, the principal duty of which is to adjudicate legal disputes, into an instrument of U.S. foreign policy, something we have always tried to avoid in this body, always tried to avoid. Do not turn your courts into an instrument of foreign policy. And yet this provision of this bill not only vaguely requires that; it insists upon it.

So all of a sudden we say to the Federal courts now, with all the complaints we get from our States about the overload of work, here comes another load of work in your lap. When people start complaining about handling criminal cases in the United States and drug cases, consider the fact you are going to be inundated now with a bunch of claims matters, that we have all of a sudden involved you in a foreign policy matter with Cuba.

The inclusion of periodic Presidential waiver authority in this title, in my view, does not change that conclusion at all—this is bad law.

There are also serious problems with other parts of the legislation, Mr. President, provisions that restrict our ability to provide assistance to Russian and other New Independent States countries. As angry as we are at Cuba and what the Cuban authorities have done, why are we going to jeopardize our relationship with Russia and the New Independent States. That is what the bill does. Read it.

I understand the anger. I understand the frustration. But why would we jeopardize the delicate relationship we are trying to build in Russia and the New Independent States and have those relationships hang on legislation here dealing with Cuba? That is not smart. That is dangerous, in my view.

Provisions in this bill also impact on our adherence to provisions of GATT and NAFTA, provisions that seek to micromanage our relationships with future Cuban Governments—post-Castro governments.

Let me predict right now our allies' response to title IV of the bill. Let me spend a minute or so talking about this part of the bill. And people ought to pay attention to this so-called exclusion of certain aliens title of the bill. It is going to make foreign commerce and travel a nightmare, in my view, for our business community.

Title IV calls upon the Secretary of State—listen to this—calls upon the Secretary of State to deny entry into the United States to any alien whose been involved in the confiscation or trafficked in Cuban property formerly owned by a United States national. The actions called for by title IV, require that the Secretary of State and the Attorney General deny entry into the United States by any foreign business person, foreign official and their family members for an activity which is lawful in the country where that person is a citizen and consistent with international law. This action flies in the face of international commitments we have made. We talking about potentially a great many countries being effected here.

I ask unanimous consent that this list be printed in the RECORD.

There being no objection, the list was ordered to be printed in the RECORD as follows:

U.S.-CUBA TRADE AND ECONOMIC COUNCIL, INC.

NON-UNITED STATES COMPANIES AND THE REPUBLIC OF CUBA

Corporations and companies cited in the international media as having commercial activities with the Republic of Cuba.

Australia: Western Mining Corp.

Austria: Rogner Group (tourism)

Brazil: Andrade Gutierrez Perforacao (oil), Coco Heavy Equipement Factory (sugar), Petrobras S.A. (oil).

Canada: Advanced Laboratories (manufacturing), Anglers Petroleum International, Bow Valley Industries Ltd. (oil), Canada Northwest Energy Ltd. (oil), Caribgold Resources Inc. (mining), Commonwealth Hospitality Ltd. (tourism), Delta Hotels (tourism), Extel Financial Ltd., Fermount Resources Inc. (oil), Fortuna Petroleum, Fracmaster (oil), Globafon, Havana House Cigar and Tobacco Ltd., Heath and Sherwood (oil), Hola Cuba, Holmer Goldmines, Joutel Resources (mining), LaBatt International Breweries, Marine Atlantic Consultant (shipping), MacDonalds Mines Exploration, Metal Mining, Mill City Gold Mining Corp, Miramar Mining Corp. (Minera Mantua), Pizza Nova (tourism), Realstar Group (tourism), Republic Goldfields, Scintres-Caribe (mining), Sherrit Inc. (mining), Talisman Energy Inc., Teck (mining), Toronto Communications, Val d'Or (mining), Wings of the World (tourism).

Chile: Dolphin Shoes (clothing), Ingelco S.A. (citrus), Latinexin (food/tourism, New World Fruit, Pole S.A. (citrus), Santa Ana (food/tourism), Santa Cruz Real Estate (tourism).

Colombia: SAM (an Avianca Co.) (tourism), Intercontinental Airlines, Representaciones Agudelo (sporting goods).

Ecuador: Caney Corp. (rum).

China: Neuke (manufacturing), Union de Companentes Industriales Cuba-China.

Dominican Republic: Import-Export SA (manufacturing), Meridiano (tourism).

France: Accord (tourism), Alcatel (telecommunications), Babcock (machinery), Bourgoin (oil), Compagnie Europeene des Petroles (oil), Devexport (machinery), Fives Lille (machinery), Geopetrol, Geoservice, Jetalson (construction), Maxims (cigars-owned by Pierre Cardin), OFD (oil), OM (tourism), Pernod Ricard Group (beverages/tourism), Pierre Cardin, Pompes Guinard (machinery), Societe Nationale des Tabacs (Seita) (tobacco), Sucres et Donrees (sugar), Thompson (air transport), Total (oil), Tour Mont Royal (tourism).

Germany: Condor Airlines (charters for Lufthansa), LTU (LTI in Cuba) (tourism).

Greece: Lola Fruits (citrus).

Holland: Curacao Drydock Company (Shipping), Golden Tulips (tourism), ING (banking), Niref (minerals).

Honduras: Facuas Foods.

Hong Kong: Pacific Cigar.

Israel: GBM (citrus), Tropical (manufacturing), World Textile Corp. S.A.

Italy: Benetton (textiles), Fratelli Cosulich (gambling), Going (tourism), Italcable (telecommunications), Italturis (tourism), Viaggo di Ventaglio (tourism).

Jamaica: Caricom Investments Ltd. (construction), Caricom Traders (Int'l mrktg of Cuban products), Intercarib (tourism), Superclubs (tourism).

Japan: Mitsubishi (auto'/tourism), Nissan Motor Corp. (auto), Nissho Iwai Corp. (sugar), Toyota, Sumitomo Trading Corp. (auto), Suzuki Motor Corp. (auto).

Mexico: Aero-Caribe (subsid. of Mexicana de Aviacion), Bufete Industrial, Cemex (construction), Cubacel Enterprises (telecommunications), Del Valle (manufacturing), Domeq (export-rum), DSC Consortium (tourism), Grupo Domos (telecommunications), Grupo Industrial Danta (textiles), Grupo Infra de Gases, Incorporacion International Comercial (beer), Industrias Unidas de Telephonia de Larga, Distancia, La Magdalena Cardboard Co., Mexpetrol (oil), Pemex, Bancomex, Mexican Petroleum Institute, Protexa, Bufete Industrial, Inggineiros Civiles Asociados, Equipos Petroleos Nacionales, Telecomunica- cionales de Mexico, Vitro SA (manufacturing).

Panama: Bambi Trading

South Africa: Anglo-American Corp. (mining), Amsa (mining), De Beers Centenary (mining), Minorco (mining), Sanachan (fertilizers).

Spain: Caball de Basto (S.L., Camacho (manufacturing), Consorcio de Fabricantes Expanoles, Cofesa, Corporacion Interinsular Hispana S.A. (tourism), Esfera 2000 (tourism), Gal (manufacturing), Guitart Hotels

S.A., Grupo Hotelero Sol, Hialsa Casamadrid Group, Iberia Travel, Iberostar S.A. (tourism), Kawama Caribbean Hotels, K.P. Winter Espanola (tourism), Miesa SA (energy), National Engineering and Technology Inc., Nueva Compania de Indias S.A., P&I Hotels, Raytur Hoteles, Sol Melia (tourism), Tabacalera S.A. (tobbaco), Tintas Gyr SA (ink manufacturer), Tryp (tourism), Tubos Reunidos Bilbao (manufacturing), Vegas de la Reina (wine imports).

Sweden: Foress (paper), Taurus Petroleum.

United Kingdom: Amersham (pharmaceuticals), BETA Funds International, Body Shop International (toiletries), British Borneo PLC (oil), Cable & wireless comm., Castrol (oil), ED&F Man (sugar), Fisions (pharmaceuticals), Glaxo (pharmaceuticals), Goldcorp Premier Ltd., (manufacturing), ICI Export (chemicals), Ninecastle Overseas Ltd., Premier Consolidated Oilfields, Rothschild (investment bank), Simon Petroleum Technology, Tate & Lyle (sugar), Tour World (tourism), Unilever (soap/detergent), Welcomme (pharmaceuticals).

Venezuela: Cervecera Nacional, Covencaucho, Fiveca (paper), Fotosilvestrie, Gibralter Trading (steel), Grupo Corimon, Grupo Quimico, Durabal Trading, Interlin, Intesica, Mamploca, Mamusa, Metalnez, MM Internacional, Pequiven, Plimero del Lago, Proagro, Sidor, Venepal, Venoco.

Mr. DODD. On this list are roughly 26 countries and nearly 200 foreign companies doing business in Cuba today. And so under this provision of title IV of the bill, as you go through the list now, we are going to have to go and I guess do a fact finding of some kind or another and determine whether or not—I presume that a lot of this may in some way touch on confiscated property in Cuba. Obviously, we have seen that happen—they were involved in confiscation. All these companies are going to have to go through it. And then, of course, we will have to let our consular service know because any one of the people involved in these companies or family members who seek to come to the United States can be stopped from coming. It is going to put us in a difficult situation in Australia, Austria, Brazil, Canada, Chile, and so on.

Read the language. If you do not think we are going to get reprisals from this nightmare, this quagmire, let us see what happens when an Israeli is denied a visa because some of their people are doing business in Cuba or what happens when Canadians try to come to this country. Do not think we are not going to feel the brunt of it.

Again, I ask my colleagues to read this legislation. This is unwise. This is unwise. Why are we not doing this in China? My Lord, there are human rights problems there. Imagine if you tried to do that here. You would be laughed off the floor if you tried it here, or Vietnam or other places. And yet are they any less guilty in a sense. And so here are 26 countries, most of them allies, where we are now going to have our immigration service at the gates denying entry to members of families of people who are doing business on property that may have been confiscated without compensation in Cuba.

Again, I urge my colleagues just look at what we are doing here; we are

about to run through and adopt this legislation probably on an overwhelming vote, without for a moment considering and the consequences of it.

I know in some quarters it is considered good form to say the United States is prepared to renounce our trade agreements. I listened to the Presidential debate going on and certainly there are those who are against NAFTA and against GATT, well, we are about to do it here. You do not have to wait for Buchanan to become President of the United States. We are about to do it.

I do not think those of our citizens who count on the integrity of these agreements to protect the sanctity of their international business transactions find this acceptable. I for one take these national commitments seriously. When I vote on them here, I vote on them seriously because I think they are right and the right direction to go. I think most Americans do, and I think most of our colleagues do.

Overall, this bill is bad for U.S. business. It will undercut efforts by the United States to ensure that U.S. investors face a stable and predictable environment when they do business abroad.

We can hardly insist that our trading partners respect international law in the areas of trade and investment when we ourselves are prepared to violate it. Where is our moral high ground when we give these speeches around the world about the sanctity of the efforts to try and get the world to live by the rules we adopt. Here we are about to go in and just blow that apart on our own, and then presumably give a lecture to the rest of the world about how they ought to live up to these agreements.

I wonder what our response is going to be when other governments whose citizens are adversely affected by this legislation decide to enact some special interest legislation of their own directed at our people, our country, our citizens and their properties abroad. We are hardly going to be in any position to object or to assert some provision of international law in that situation.

This legislation, Mr. President, has a great deal of hortatory language. Much of it I agree with. For example, section 201 sets forth U.S. policy toward a transition and a democratic government in Cuba. It is good language. Among other things, it states that it is the policy of the United States to "support the self-determination of the Cuban people and to recognize that the self-determination of the Cuban people is a sovereign and national right of the citizens of Cuba which must be exercised free of interference by the government of any other country."

Exercising their right, the right of the citizens of Cuba which must be exercised free of interference by the Government of any other country in that transition. Who can disagree with that? I could not have written it better myself. I love it. I think it is wonder-

ful. However, the operative provisions of the bill are totally at odds with what we state is our policy in section 201. There are 19 criteria in this bill that the future Cuban government must meet—a future government, not the Castro government in order for the United States to engage in any significant way with that government. Nineteen criteria they have to meet, 19 of them, before we deem it to be in transition to democracy including when it should hold its elections—within 18 months, how and who must not be at the head of State.

Does this really constitute respect for self-determination? Can you imagine if we had these criteria with the New Independent States or in Russia? Do you know how difficult their transition has been, as they have wrestled with trying to form their own notion of democracy. When you want to help that process, nurture it, provide aid and assistance that would be impossible if this legislation governed our relations with those countries. We would be prohibited from doing it in this bill. Similarly even if Castro goes and the Cuban Government is in transition, we cannot do anything meaningful to assist until the requirements of the bill have been met. That is foolhardy—foolhardy—to do that.

Mr. President, I have said on numerous occasions, when we consider foreign policy legislation of this nature—and I said at the outset—we have to ask ourselves two very basic questions: Is what is being proposed in the best interest of our own country, and is it likely to achieve the stated goals in the country to which it is directed?

Two basic questions: Is it good for my country, and is it likely to achieve the stated goals in the country that may be the target of the legislation?

In the case of the pending legislation, I think the answer to both of these questions is a resounding no.

I regretfully say that I think this is a bad bill, and for that reason, I strongly oppose it. I also realize that I may be in the minority, a small minority, but I could not stand here and watch this go by today and not point out the fundamental flaws in the whole approach.

I will point out again that I think it is dreadful what happened a week ago Saturday—dreadful what happened. There is no excuse for it. But if we rush to legislate a bill that has been around a year or so, and it has been around because, frankly, people had serious problems with it. The problems are not any less because of what happened last Saturday. This bill would have passed a long time ago if it had intelligent provisions in it dealing with how might effectively we deal with Castro.

The only reason it is up today is because of the tragedy a week ago. In fact, I argue the bill is worse today than before. There are a lot of provisions, as part of this conference report, that none of us ever voted on.

I realize this may be a futile effort on my behalf to urge my colleagues in the next few hours to do something, which I guess none of us do with great frequency. And that is to just read this conference report, in particular read title III and read title IV. Consider what we are about to do. I believe if you sit back objectively and look at this and see how we are changing so many things in this bill, carving out unique exceptions that, I think, are going to cause us serious problems, you will come to the same conclusions I have.

This does not diminish our determination to see change occur in Cuba, to see democracy and freedom come to the Cuban people; that Fidel Castro leave or that we find ways in which to effectively make our case that what happened there not only should not happen but must not happen again.

We will not forget what happened in the Straits of Florida, and we will not forget who is responsible. Let us not, in the emotion of the moment in dealing with that particular issue, do damage to ourselves. My sole point is this bill does damage to our country. It does damage to our citizens. It does damage to our ability as the leading superpower in the world today to negotiate and to conduct its foreign policy.

I ask unanimous consent to have printed in the RECORD a number of editorials and articles in opposition to this bill.

There being no objection, the material was ordered to be printed in the RECORD, as follows:

[From the Los Angeles Times, Mar. 3, 1996]
THE RECIPROCAL OBSESSION OF CASTRO AND WASHINGTON

(By Gaddis Smith)

NEW HAVEN, CT.—Throughout our history, the U.S. government, on the one hand, and whatever regime was in power in Cuba, on the other, have been prone to spasms of reciprocal obsession—marked by wild rhetoric, economic warfare and sometimes armed violence. Cuba's stupidly brutal shooting down of two U.S. civilian airplanes last weekend, and President Bill Clinton's subsequent surrender to Congress on maniacal legislation aimed at the destruction of Fidel Castro's regime, mark the latest spasm.

Today, no U.S. presidential candidate dares challenge the wisdom of escalating intervention against a small, if unpleasant, neighboring government. The angriest voices in Washington and Florida advocate a naval blockade and do not rule out invasion—ignoring international law and the opinion of other governments. This furor has an all-too familiar ring.

Since the early 19th century, Cuba's proximity to the United States, strategic location on the seaways of the Caribbean and economic importance have induced U.S. politicians to assert the right to dictate Cuba's foreign policy and internal arrangements. But the line between legitimate U.S. national-security interests in Cuba and domestic political partisanship has always been blurred.

For example, in 1853, Washington, influenced by the slaveholding states, tried to buy Cuba from Spain to increase the area of slaveholding and suppress a feared insurrection of slaves in Cuba and its spread to the United States. Spain refused to sell. In response, three senior U.S. diplomats—including soon-to-be President James Buchanan—issued the "Ostend Manifesto," which argued that Spain's continued possession of Cuba threatened "our internal peace and the existence of our cherished Union." If we cannot acquire Cuba in any other way, said the diplomats, we should take it through war. Nothing came of this because the United States was hurtling toward civil war—but its tone and its intimate connection to politics in the United States set a pattern.

In the 1870s and again in the 1890s, the Cuban people rose in armed rebellion against the Spanish colonial regime. The Spaniards became alarmed, with good reason, over the support for the rebels coming from the United States, in general, and Cuban Americans, in particular.

Spain suppressed the first insurrection, but not the second, in 1895–98. This time, Cuba was a far hotter issue in U.S. politics—thanks to coverage by mass-circulation newspapers, deeper economic interconnections, the strident lobbying of Cuban Americans and heightened concerns in Washington over the strategic security of the Caribbean. President William McKinley, eager to assure his reelection, joined those who said Spain must be ousted. The sinking, in Havana harbor, of the U.S. battleship Maine as a result of an internal explosion in February 1898, (260 Americans died) inflamed a war spirit—though it is highly unlikely that the Spanish government was responsible. McKinley did not make a serious effort to negotiate. The Spanish government, in turn, preferred war to what it considered dishonorable concessions. And war it was—"the splendid little war" of 1898. Spain lost Cuba—along with Puerto Rico and the Philippines.

The Cuban freedom fighters expected immediate independence. Instead, the United States militarily occupied the island for four years, then imposed, through the Platt Amendment, its right to control Cuba's foreign relations and to intervene, with troops if necessary, in the country's internal affairs. President Franklin D. Roosevelt formally relinquished these rights in 1934—but U.S. influence remained pervasive.

Fast-forward to Jan. 1, 1959. Fulgencio Batista, a corrupt and non-ideological dictator, fled Havana and Castro, leader of a successful rebellion, entered the city and established the regime he heads to this day. Scholars debate whether the regime was communist from the outset or became so within a year or two. They also debate whether an accommodating posture by Washington, instead of an obsession with undermining the regime, could have preserved amicable relations. Or were Castro's obsession with Washington as the source of all Cuba's problems and his welcome of the Soviet Union as protector the real obstacles? There can be no question, however, that a pattern of reciprocal obsession and provocation was evident from the outset. Washington organized an exile force to invade Cuba at the Bay of Pigs in April 1961. It was, as one historian said, "the perfect failure."

More serious, of course, was the 1962 crisis over the placement of Soviet nuclear missiles in Cuba—the most dangerous moment of the Cold War and a genuine threat to U.S. security. Castro was ignored in the negotiated Soviet-U.S. settlement. The Russians removed the missiles and Washington promised not to invade Cuba.

For the next 30 years, Castro poked his finger in Uncle Sam's eye at every opportunity—supporting leftist revolutionaries in Latin America, sending troops to Africa at Moscow's behest—and Washington did everything possible to inflict economic pain and make Cuba a pariah state—only to be thwarted by the subsidies sent to Castro by the Soviet Union.

With the end of the Cold War and disappearance of the Soviet Union, easing tensions, even normalizing relations, might have been expected. But objective security interests and domestic politics are different matters. Castro was too proud—and too convinced of U.S. hostility—to make conciliatory gestures toward Washington. Castro also believed that Mikhail S. Gorbachev lost control of the Soviet Union because he abandoned a repressive political system. Castro says he will not make the same mistake. And in the United States, politicians of both parties competed for the support of the Cuban American community by demonstrating how tough they could be on Castro.

By 1995, Republicans in Congress appeared to have won the tough-posture competition. The Helms-Burton bill—officially the Cuban Liberty and Democratic Solidarity Bill—sets new heights of obsession with Cuba and pretensions for dictating that country's future. And it has gained tremendous momentum since the planes were shot down.

The bill's purpose is unequivocal: Use economic strangulation to eliminate Castro, then establish, with military help, a transitional government and market economy under U.S. supervision, followed by free elections. These measures are justified both on the idealistic ground that Castro is a violator of human rights—which he is—and on a fanciful description of his regime as a threat to U.S. security and international peace. The bill's arrogant and overblown rhetoric recalls the Ostend Manifesto and its specific provisions are more intrusive than the Platt Amendment of 1903–34.

Helms-Burton assumes that Castro is on the edge of a cliff and the Cuban economy is in shambles. But both assumptions are wrong. Castro is paranoiac about internal criticism, but remains popular. And the island's economy is reviving with expanding trade and considerable new investment from Canada and Europe.

This trade and foreign investment are the real targets of Helms-Burton. If its provisions become law, and are sustained in the courts, they would burn down the house of U.S. foreign policy. Seeking to overthrow the regime of one little country, the law inflicts great injury to the larger fabric of U.S. trade and investment.

The key provisions flow from the assertion that the confiscation and nationalization of private property in Cuba, carried out by the regime sine 1959, violates U.S. and international law. Therefore, any person, corporation or state entity engaging in trade and investment in Cuba is likely to be "trafficking" with stolen property—since, by definition, virtually all economic activity in Cuba is based on confiscated property. Any current U.S. citizen, or any U.S. corporation—like the Bacardi rum company—with a claim to such property can sue these "traffickers" in U.S. courts and be awarded damages.

Furthermore, individual traffickers, or officers or controlling stockholders of trafficking corporations—including their spouses and children—can be excluded from the United States. In theory, the son or daughter of an executive of a Canadian hotel company with Cuban interests attending school in the United States could be deported. The bill's implementation would create a nightmare for U.S. courts and would violate major treaties and international-trade agreements.

Last summer, Secretary of State Warren M. Christopher recommended that Clinton veto the bill when and if it came to his desk. Until Feb. 24, the chances of the bill being passed and signed were slight. But then Castro blundered into the hands of his enemies—by authorizing the destruction of the two civilian planes flown by the Brothers to the Rescue group. The Cuban government is brazenly unapologetic and said it was defending

its sovereignty—but even Castro's newest friend, China, has joined in deploring the deed.

By this action, Castro achieved what his most fervent critics in Congress could not: He persuaded Clinton to agree to Helms-Burton. Clinton, like McKinley in 1898, wants a second term. The final details of the legislation remain to be worked out, but the president said he will sign. Reciprocal obsessions have again triumphed.

---

[From the Washington Post, Feb. 29, 1996]
U.S. POLICY: HELD HOSTAGE IN MIAMI
(By Richard Cohen)

Question: Who sets U.S. policy toward Cuba?

(A) The president.

(B) Congress.

(C) Any Cuban American with an airplane.

The answer, apparently, is "C"—or, if you'd like a name, Jose Basulto. He is the leader of Brothers to the Rescue, the humanitarian group with a political mission, and a survivor of the recent massacre in the skies near (or over) Cuban waters. Four others died when their unarmed Cessnas were downed by Cuban MiGs. They were brave men.

It is important to say, as the American government has, that Cuba was wrong. The downing of the two planes, no matter what their location, was a violation of international law—not to mention common decency. It was as if the police here had caught some burglars red-handed, determined they were unarmed and executed them on the spot. Fidel Castro committed murder—and not for the first time.

Whatever its faults, though, the nature of the Castro regime is well known. It is a museum piece, a relic of the communist era, frozen in ideological amber and, like Pavlov's famous dog, predictable in its reaction to certain stimuli. After years of a U.S. embargo—after the Bay of Pigs and other CIA operations, after Radio Marti and numerous attempts at coups, a farcical facial (the CIA tried to make his beard fall out) and, probably, assassination—it would be just plain insulting to call Castro paranoid. The man has enemies, and they are out to kill him.

One of them, in fact, is Basulto. Not only was he flying the one plane that was not downed, but he announced himself to the Cuban authorities as the guy in the cockpit: "Cordial greetings from Brothers to the Rescue, from its president, Jose Basulto, who is talking."

That greeting, it turned out, was met with a warning: "Sir, be informed that the north zone of Havana is activated." Basulto was then told he was in "danger," and he responded with an acknowledgment: "We are aware that we are in danger each time we cross the area to the south of the 24th [parallel], but we are willing to do it as free Cubans."

Ah, but Basulto is not merely a "free Cuban." He is also a Cuban American. As such he reminds me of those zealous Israeli settlers who, citing the Bible, declare a certain spot divinely zoned for Jewish occupation and promptly establish a settlement there. The Arabs respond with clenched teeth and unsheathed daggers, and the settlers demand that the Israeli army protect them. Which side are you on? they demand to know, ours or the Arabs? The army moves in.

In this case, the Clinton administration is playing the role of the Israeli army: Deep down it has all sorts of reservations about the United States' traditional Cuba policy, but it cannot afford to show good sense lest it be seen as weakness. The boycott of Cuba has done little more than make the Cuban people miserable. Castro remains—resplendent, entrenched and still wearing those silly fatigues. He is no more and no less a communist than the leaders of Vietnam, old foes with whom we now do business.

The influence Cuban Americans have over U.S.-Cuba policy is neither illegitimate nor novel. American Jews have a passionate concern about Israel, and the Irish here are intensely interested in the Irish there. One might even suggest that the recent U.S. occupation of Haiti would not have happened were it not for the political clout of African Americans—an assertion, you might say; a fact, I would insist.

Yet, some Cuban Americans are in a class of their own. Basulto, for one, does more than write his congressman or raise money. He was at the Bay of Pigs and, a year later (1962), was one of 23 men who took two converted PT boats into Cuban waters and shelled a Havana suburb. The Associated Press named him "the man behind the gun." Since then, he has formed Brothers to the Rescue, which, among other things, has dropped anti-Castro leaflets on Havana, testing the dictator's celebrated sense of humor.

Basulto had been warned by both Washington and Havana to watch his step. That does not excuse the subsequent killings, but it does tend to explain them. The same holds for Washington's policy toward Havana. It's easy enough to explain why Washington toughened the embargo in response to the shoot-down (all those votes in Florida), but harder to excuse. It makes little sense. Toughening the embargo causes ordinary Cubans—not Castro—to suffer even more.

The Clinton administration had little choice but to get tougher with Castro. But it has to be firmer, too, with certain Cuban Americans. U.S. policy toward Cuba, inching toward sanity until the recent shootings, cannot become the captive of anyone, no matter how well-intentioned, who literally flies off on his own. More than planes got shot down the other day. So did U.S. policy.

---

[From the New York Times, Mar. 2, 1996]
A BAD BILL ON CUBA

The Clinton Administration had done many things right and one thing terribly wrong in response to Cuba's shootdown of two unarmed planes flown by Miami-based exiles.

Providing a Coast Guard escort to accompany an exile flotilla to the site of the downing today registers American determination to protect the security of international waters and airspace. Equally important, it minimizes the risk of either the exiles' or Havana's provoking a new incident. The Administration's decision earlier this week to suspend charter flights to Cuba and to impose travel restrictions on Cuban diplomats in this country made clear that Havana had attacked not just anti-Castro activists but international law itself.

However, the Administration is about to make a huge mistake by signing into law a bill, sponsored by Senator Jesse Helms and Representative Dan Burton, that aims to coerce other countries into joining the American embargo of Cuba. By dropping his opposition to the bill, Mr. Clinton junks his own balanced policy for encouraging democracy in Cuba and signs on to an approach that will inevitably slow the opening of Cuban society and pick a pointless quarrel with American allies.

The bill threatens foreign companies with lawsuits and their executives with exclusion from American soil if they use any property in Cuba ever confiscated from anyone who is now a United States citizen. Some of its provisions appear to violate international law and trade treaties, and the Administration had been saying since last summer that it would veto the measure unless these provisions were removed.

The United States is the only country that maintains an economic embargo against Cuba, an outdated policy that has failed in 35 years to topple the Castro Government. Trying to coerce other countries to join the embargo is offensive to American allies and unlikely to succeed.

Backers of the Helms-Burton bill believe the Cuban economy has been so enfeebled by the loss of subsidized Soviet trade that the Castro regime can be brought down with one final shove. But Cuba's economy, though hurting, has already revived from the depths of the early 1990's. Its recovery has been built on austerity, limited reforms and new trade relationships with the rest of the world. It is unrealistic to think that a reinforced American embargo would bring Mr. Castro down.

What Havana really worries about is the resurgence of opposition in Cuba itself. Opposition groups have been invigorated by Cuba's widened contacts with the outside world. They are also encouraged by a more supportive attitude on the part of Miami-based exile organizations. These used to view all Cubans who remained on the island, even opposition activists, with suspicion. Now groups like Brothers to the Rescue, the organization whose planes were shot down last week, see opposition groups on the island as a key to political change.

The Castro regime is alarmed by this potential link between domestic opponents and outside support groups, heralded by Brothers to the Rescue's previous airborne leafletting of Havana. Indeed, Havana's concern over this prospect may have been a factor in last week's missile attack against the exile's planes. Washington should be doing everything it can to promote opposition within Cuba by encouraging more human interchange between the island and the outside world, not less.

The Helms-Burton Act is not an appropriate response to Cuba's murderous deed. It is a wholesale policy reversal that weakens America's ability to encourage democracy in Cuba. Mr. Clinton should return to his original sound position.

---

[From the Chicago Tribune, Mar. 1, 1996]
SURRENDERING U.S. POLICY ON CUBA

After more than 30 years of them, it should be clear that trade sanctions against Cuba will not force Fidel Castro to surrender. What a shame, then, that a great power like the United States has surrendered its foreign policy to a tiny population of hard-line anti-Castro Cubans. What an embarrassment.

By agreeing this week to impose new economic penalties against Cuba, President Clinton and the Republican-controlled Congress have proven that, given a choice between sound foreign policy and pandering to the rabid anti-Castro crowd in a critical electoral state, they'll pander.

In no way do we defend Castro's dictatorship or the outrageous disregard for human life represented by Cuba's downing last weekend of two small civilian aircraft. But in that regard, an old American adage is instructive: Don't go looking for trouble, it cautions, cause it'll find you anyway.

Brothers to the Rescue, an exile group, went looking for trouble by violating Cuba's sovereign air space to drop leaflets and by playing hide-and-seek with Cuban jets along its periphery.

By law, private citizens may not make foreign policy. Yet the Cuban exiles invited this "crisis," if they didn't actually manufacture it, and suckered both a Democratic president and a Republican Congress into making policy to suit their purposes.

Ironically, the new sanctions, while aimed at isolating Castro and weakening his power, are certain only to complicate trade relations with key U.S. allies and commercial partners such as Canada, Mexico and France.

Under the sanctions, U.S. visas will be denied to foreign corporate executives—and their stockholders—if these firms are among those that have invested billions of dollars in Cuban property. (The U.S. is the only nation that observes the absurd embargo of Cuba.)

Another provision would allow U.S. citizens to file suit against foreign firms utilizing property that was seized by Castro. But in a cynical provision designed to render that very same proposal, the president is granted power to waive the rule every six months to throw out the backlog of anticipated cases.

Like all dictators, Castro shows unwavering patience in allowing his people to suffer. But if America wants to influence Cuba to liberalize, then more ties—not a trade embargo—is the answer.

---

[From the Washington Times, Sept. 30, 1995]

CUBA EXPROPRIATION BILL COULD END UP COSTING U.S. TAXPAYERS BILLIONS

In his Sept. 25 Op-Ed, Rep. Dan Burton understates an important aspect of his Cuban Liberty and Democratic Solidarity Act of 1995 ("Cuban-American claims . . . and counterclaims").

Mr. Burton says that his proposed legislation will allow U.S. citizens to sue "foreigners" who "buy or use" expropriated properties in Cuba. The litigation provisions of Mr. Burton's bill, like Sen. Jesse Helms' counterpart Cuba bill that is awaiting action in the Senate, are far broader than that.

In fact, the nation of Cuba itself will be the chief defendant in the 300,000 to 430,000 lawsuits that will be filed in the federal courts of Florida by naturalized Cuban Americans if Mr. Burton's bill becomes law.

It is this aspect of the bill that its proponents tend to downplay. The reason such an avalanche of litigation is inevitable is that the bill bestows—in flagrant disregard of international law—a set of retroactive lawsuit rights against their native country upon Cuban Americans who were naturalized in the United States after suffering property losses in Cuba.

Unfortunately, the unprecedented rights that are intended to be conferred on Cuban Americans by the bill are at the expense of U.S. citizens who do have rights under international law with respect to Cuba—that is, the 5,911 holders of $6 billion in claims certified against that nation by the Foreign Claims Settlement Commission in the 1950s. (One such certified corporate claimant is my client, Amstar.)

If the lawsuit provisions of Mr. Burton's bill become law, certified claimants will see their prospects of recovering compensation from an already impoverished Cuba extinguished in a sea of Cuban-American claims that have been estimated by the State Department at approximately $95 billion.

It is ironic that a pair of well-meaning Republican legislators are threatening with their bill (1) to create a litigation explosion in this much-heralded year of tort reform, and (2) to destroy or gravely damage the adjudicated interests of one group of Americans in an era of supposed greater protectiveness of the property rights of U.S. citizens.

The bill raises two further serious questions. First, on what principled basis are the lawsuit rights proposed to be given Cuban-Americans to be denied other national-origin groups (e.g., Vietnamese-Americans, Chinese-Americans, Polish-Americans, Palestinian-Americans, etc.) that have suffered property losses in their former countries?

If history is any guide, the courts will not void the rights proposed to be accorded Cuban-Americans by the Burton bill; rather they will decree, pursuant to the equal protection clause of the Constitution, that such rights be extended to other similarly situated national-origin groups. It is anyone's guess how many additional hundreds of thousands of litigations will then ensue.

The second question posed by the Burton bill is, once a class of hundreds of thousands of Cuban-Americans judgment creditors against Cuba is created, how will relations ever be normalized with that country? The answer is that such normalization will inevitably require the dismissal of the underlying federal court awards because of the running-sore problems of the attachments in the United States—following the lifting of the embargo—of Cuban bank accounts, ships, airplanes, agricultural produce and manufactured items of Cuban origin by hundreds of thousands of Cuban-American judgment holders.

When those judgments are dismissed by the president, the issue of liability of the U.S. government to the Cuban-American holders of extinguished federal court awards inevitably will arise.

It is not alarmist to warn that the U.S. taxpayer may well be made, under the Fifth Amendment "takings clause" of the Constitution, to indemnify hundreds of thousands of Cuban-Americans in the amount of approximately $95 billion.

If anyone doubts that Mr. Burton's bill harbors such consequences for the U.S. Treasury, then he or she might usefully consult the Supreme Court's opinion in Dames & Moore vs. Regan, 453 U.S. 654 (1981). We should hope that the Senate, member by member, will do precisely that before voting on Mr. Helms' bill—Robert L. Muse, Washington.

Mr. DODD. I yield the floor.

Mr. COVERDELL. Mr. President, I yield 5 minutes to the Senator from Kansas to speak on behalf of the conference report.

The PRESIDING OFFICER. The Senator from Kansas.

Mrs. KASSEBAUM. Mr. President, I appreciate the Senator from Georgia yielding. I intend to vote in favor of this conference report despite some serious reservations about several of the provisions.

The Senator from Connecticut has just spoken strongly about several of the same reservations that I hold, although I suggest, Mr. President, I think some of the examples he has given about unintended consequences might be a bit exaggerated.

I would like to outline some of my concerns and the reasoning for them.

First, I question whether this bill, on the whole, moves us in the right direction. The laws of nature dictate that Castro cannot remain in power forever, and I am skeptical that the best means at this point of ensuring a peaceful transition is to further tighten the noose around Cuba, despite the outrageous acts of a week ago.

Second, I remain concerned about title III of the legislation, as has been addressed, which allows new lawsuits in Federal court against investors of property that was confiscated in Cuba.

I opposed this provision when the legislation first came before the Senate, and I am disappointed it has been re-

stored in the conference report. I still believe it is unwise for Congress to set up United States Federal courts as tools in the pursuit of foreign policy objectives in Cuba, although I take some comfort in the new authority provided for the President to weigh this provision.

Third, I also am disappointed that the conference report goes further than the Senate bill in two important areas, which, of course, the Senator from Connecticut also discussed, neither of which has had the benefit of examination in the Senate.

The conference report would deny United States visas to any person who invests in confiscated property in Cuba with only two narrow exceptions. We have allowed no flexibility to accommodate the awkward situations that inevitably will arise. The conference report also codifies in statute all existing sanctions and embargoes against Cuba, stripping this President and future presidents of the flexibility to respond step-by-step to changes in the situation in Cuba.

For these many reasons, I would prefer that we enact something other than this bill. But, Mr. President, that is not an option. Nobody has done more to ensure enactment of this legislation than Fidel Castro himself. By shooting down two American civilian airplanes last week, he demanded that we respond.

I strongly believe we must respond to this latest provocation and that America should speak with one voice on this matter. While this particular legislation would not be my preference, it clearly is the preference of the Republican leadership in both houses of Congress. It now is the preference of the President of the United States. I am one who believes the President should have some discretion to shape U.S. foreign policy.

The situation reminds me of a young cowboy who worked hard each week to earn money so he could ride into town each weekend and play poker. He always lost. After months of watching him lose, a sympathetic bartender pulled him aside one evening and said, "Son, I just want you to know, this game is rigged. The cards are marked. The deck is stacked. And the dealer keeps an ace up is sleeve."

"I know," replied the young cowboy.

The bartender was flabbergasted. "You know?" he exclaimed. "Then why do you keep coming back?"

"That's simple," replied the cowboy. "This is the only game in town."

Mr. President, there is no other option before this body for those of us who believe strongly that the United States must respond to Fidel Castro's latest outrage. Despite its faults, this legislation is the only game in town. For that reason, I will support it.

I yield back any time I may have, Mr. President.

Mr. COVERDELL. Mr. President, I yield 4 minutes to the distinguished Senator from Texas.

The PRESIDING OFFICER. The Senator from Texas [Mrs. HUTCHISON] is recognized.

Mrs. HUTCHISON. I thank the Chair and the manager of the bill, Senator COVERDELL.

Mr. President, the premeditated, cold-blooded murder of four American citizens by Cuban war planes last Saturday is an outrage, an outrage against the United States of America, against international law, and against every concept of human decency. Neither the United States nor the world community can allow these murders to go unpunished. The four Americans who were killed were part of Brothers to the Rescue, an organization that has helped to save countless Cuban citizens who risked their lives to flee oppression and poverty in their country. Without the Brothers' heroic, humanitarian efforts, thousands of Cuban families would have died on the open seas.

How did the Cuban Government react to this heroism? How did it reward those who had saved thousands of its own citizens? It carried out the ruthless execution of four of these brave Americans.

The Cuban Government can try to argue that its actions were justified as an act of self defense, but the whole world knows the truth—that Cuban MiG's pursued and shot down the crews of two unarmed Cessna aircraft.

The whole world was watching, Mr. Castro. It was not self-defense. It was cold-blooded murder.

We are shocked by what happened the weekend before last, but nobody should be surprised. Mr. Castro is a brutal dictator with no regard for basic human rights, no respect for international law, and he has an abiding hatred for the United States and everything it stands for.

This is a man responsible for the suffering in Cuba—hunger, forced labor, oppression, and worse. This is the man who has exported military equipment and Cuban soldiers to foment civil war in nations in our hemisphere and around the world. This is the man who tried to put his finger on the launch button of nuclear missiles aimed at the United States.

Mr. President, he is an evil man. A series of American Presidents, Republicans and Democrats, have understood this and have sought to isolate and individually bring down his government, for the good of the Cuban people and the world. Nevertheless, Mr. Castro always has had his apologists in this country. Until Saturday before last, it had become popular in some circles to see him as ''older and mellower,'' a more ''moderate'' revolutionary Communist. That view of a ''kinder, gentler'' Fidel Castro was evidenced in the recent relaxation of travel and other restrictions against Cuba. The folly of appeasement and accommodation is now tragically apparent.

Today, we will act to restore United States policy to its previous and proper direction—to isolate the Castro government, and hasten the day that it will fall.

The legislation before us will reinstate and reaffirm United States economic sanctions, it will deny foreign investment and hard currency to sustain this corrupt government, and it will protect the interests of American citizens whose property was seized illegally by the Cuban Government.

Without huge Soviet subsidies that propped it up for decades, the provisions of this legislation will inevitably bring the Castro government to the brink of two alternatives: give up power voluntarily, or have it taken away by the long-suffering Cuban people. The goals of United States policy toward Cuba must be: the end of the Castro regime, and the opportunity for freedom and democracy for the Cuban people.

Mr. President, we must do more than we are even doing today. This is a step in the right direction, and I am pleased that we are going to pass this important legislation. I am also pleased that the President has thought better of his earlier opposition to this legislation. But we must also address another urgent problem, and that is the threat posed by Cuban construction of two nuclear reactors. These reactors are fatally flawed—Chernobyls in the making. In the event of a meltdown, lethal radioactivity would threaten the entire southeastern United States. These two reactors cannot be allowed to go online. This is a matter of direct and vital national security interest to the United States.

Our allies and the Cuban Government must understand that we cannot permit the existence of this threat to our country. So I call on the President today to take the lead in coming to grips with this impending crisis.

I extend my sympathies to the families of the four brave men who lost their lives in the name of freedom. Nothing can replace the husbands and fathers they lost. But it would be a fitting testament to the sacrifices of these American patriots if the tragedy strengthened American resolve and thereby hastens the day that the Castro dictatorship crumbles and freedom is restored to the people of Cuba.

Thank you, Mr. President.

Mr. COVERDELL. Mr. President, I yield 4 minutes to the Senator from Virginia.

The PRESIDING OFFICER. The Senator from Virginia [Mr. WARNER] is recognized.

Mr. WARNER. Mr. President, I join others in expressing our profound appreciation to the chairman of the Foreign Relations Committee, the Senator from Georgia, and other colleagues on that committee, for their absolute steadfast determination to bring this measure to the Senate for a vote and eventually for passage and enactment into law. That took real courage. And it is regrettable that the final impetus to get this legislation passed had to come in a week of absolute tragedy.

I want to deal with that for a minute, Mr. President. This world today is sieged with acts of terrorism. All of our hearts are filled with compassion and sadness for the people of Israel today for the total useless taking of life in those recent terrorist acts. We admire the courage the people of Israel have shown in the face of these attacks.

Just over a week ago, four innocent lives were lost in the Straits of Florida due to the Cuban shoot-down of two unarmed civilian aircraft. These acts, at the explicit direction of Fidel Castro, were first-degree, premeditated murder—offenses which would be punished in the United States upon conviction, and in most instances with the death penalty. I regret the level of reaction by the current administration. But this legislation will go further and bring about, through economic means, an incentive to stop it, because terrorism knows no boundaries, and unless it is thoroughly and unanimously opposed across the board, it will spring up elsewhere, as we see in this very troubled world today.

Castro's total lack of support for democratic reform, and his lack of willingness to even attempt to provide some economic recovery for his repressed people, brought about, in some measure, this legislation.

The Cuban Liberty and Democratic Solidarity Act—what a fine name that is—contains three primary objectives: To strengthen international sanctions against the Castro regime, to develop a plan for future support for a free and independent Cuba, and provide for the protection of property rights of United States nationals.

I firmly believe that this legislation, if passed and signed into law by the President, will greatly enhance the likelihood that Cuba, some day, will join the other nations in this hemisphere with a democratic form of government and a freedom to which those people are entitled.

Mr. President, as I look through the technical aspects of this legislation, I would like to address a question, for clarification, to the distinguished manager of the bill. It is about a concern I have with respect to the $50,000 limitation in section 302 of title III. It seems to me that a lot of people under the figure of $50,000 are severely injured, as are those above the figure of $50,000. To them, the few dollars they could recover, with a lesser cap, is of equal importance to them and their families—and to try and assure their life in this country to be a better one—than the higher limit. I know it was a difficult decision. But if the distinguished Senator from Georgia could give me some background on that particular issue, I would appreciate it.

Mr. COVERDELL. Mr. President, the $50,000 cap comes from the workings of the Congress itself. The distinguished Senator from Connecticut, in his opposition to the bill, and several others, were worried about a flood of court cases, and so the cap was placed to address that concern. There are some

*March 5, 1996* CONGRESSIONAL RECORD — SENATE **S1495**

500,000 claims, or so some opponents claim, that could have come into the court system without the cap. So in response to the concern that the court system could not manage this number of claims, the cap came into play. Secondarily—

Mr. WARNER. To make that fair, Mr. President, in other words, the initiative to put the cap in came from those originally opposed to the legislation?

Mr. COVERDELL. Absolutely. Second, the focus of this bill is to discourage and chill economic joint ventures with Castro. Economic joint ventures do not involve residential housing properties, instead they deal with the broad commercial properties. So there were these two reasons for setting the $50,000 cap. I, myself, more than welcome the opportunity at some later point to lower the cap to zero.

Mr. WARNER. Mr. President, with that assurance, I depart the floor better informed, because if at a later time Congress, looking at how well this act has performed and will serve the goals in here, would begin to consider that perhaps there is a hardship, and could address that.

Mr. COVERDELL. I join the Senator in welcoming that.

Mr. WARNER. I yield the floor.

Mr. COVERDELL. Mr. President, how much time remains on the proponents side?

The PRESIDING OFFICER (Mr. ASHCROFT). The Senator from Georgia has 16½ minutes.

Mr. COVERDELL. I yield to the Senator from Florida for 10 minutes.

Mr. GRAHAM. Thank you, Mr. President. I appreciate the opportunity to speak today on this very important issue.

Mr. President, as an original cosponsor of the Helms-Burton bill, I urge my colleagues to support this legislation, which has taken on increased importance as the level of repression has escalated both within and outside Cuba.

For 37 years, Fidel Castro has held the Cuban people hostage to his brutal repression and mismanagement. He has brazenly violated their human rights.

Since 1992—a year after the collapse of the Soviet Union and its subsidization of Cuba's economy—United States Cuba policy has been based upon tightening the economic embargo around Castro's neck, while at the same time extending the hand of democracy and human rights to the Cuban people.

The Cuban Democracy Act of 1992 started us down this road. Today's action will accelerate our pace.

Our drive to free Cuba from Castro's grip would benefit from the example of an organization whose bravery, selflessness, and unflagging humanitarian spirit deserves recognition on this historic occasion.

On February 24, four brave members of Hermanas al Rezkate—Brothers to the Rescue—lost their lives at the hands of a dictator and his brutal regime.

They were the victims of a pattern of escalating human rights abuses that previously had been reserved for the citizens of Cuba. This time, Fidel Castro extended his violent reach outside his own airspace.

These men knew, when they embarked on their <mark>mission</mark>, that it involved significant personal risk. But they also believed that the suffering of the Cuban people demanded courage in the face of risk.

The brave, tireless, humanitarian acts of Brothers to the Rescue must live on despite the deaths of these brave pilots.

Mr. President, their mission must become ours.

CASTRO OPPRESSES, THE BROTHERS RESCUE

While Fidel Castro has terrorized the Cuban people, Brothers to the Rescue has extended the hand of brotherhood to his victims.

Fidel Castro has never hesitated to resort to violence to protect his autocratic rule. Last weekend's incident is a perfect example of that inclination toward violent action.

<mark>Brothers to the Rescue deplores violence. Their mission is strictly humanitarian. Its leaders receive training at the Martin Luther King Center for Non-Violence in Atlanta. Its leaders speak and practice Gandhi's precepts of nonviolence.</mark>

They use volunteer pilots to search for Cuban rafters and others in need of rescue. They drop bottled water, protective clothing, and other needed supplies to those refugees.

Castro has harassed thousands of Cuban journalists and thousands of nonviolent political dissenters. Recently:

July 11, 1995: Cuban police initiate a widespread crackdown on independent journalists;

February 16–24, 1996: Castro cracks down on the nonviolent Concilio Cubano, a coalition of 131 prodemocracy dissident groups; and

On February 24, Castro murdered four U.S. citizens over international waters.

The Brothers have rescued more than 5,000 men, women, and children refugees from the waters of the Straits of Florida.

First flight: May 15, 1991.

Total flights: Over 1,780.

SOME WILL ACCUSE BROTHERS TO THE RESCUE
OF BEING PROVOCATEURS

To be sure, there were instances where the organization's commitment exceeded its charter. On several occasions, they have penetrated Cuban airspace and dropped leaflets.

Two such occasions were:

June 1994—returning from Guantanamo Bay, dropped Brothers to the Rescue bumper stickers on Eastern Cuba; July 13, 1995—dropped leaflets on Havana.

These were leaflets—their impact on Cuban citizens was the power of their ideas.

These actions, however, were taken to provide the Cuban people with information they are badly lacking—information on their basic human rights.

Each leaflet reproduced one of the Universal Articles on Human Rights. This is information the Cuban people do not have because the Castro regime refuses to allow a free press, or the free exchange of ideas.

MAKING THE BROTHERS' MISSION OUR OWN

Changes are afoot in Cuba. The best way we can take advantage of those changes and bring democracy, prosperity, and an end of the Castro regime to Cuba is to make the Brothers to the Rescue mission our own.

The Brothers are committed humanitarians. They reach out to all people in need.

Last week, I had the privilege of meeting with some of the family members and friends of the lost pilots. One of them recounted a story about Mario De La Pena, a 24-year-old Miami resident who had flown with Brothers to the Rescue for several years.

Last Christmas Eve, Mario was returning home from a mission when he spotted a man stranded in the water.

The man was not a Cuban rafter, but Mario dropped supplies anyway. Mario flew home to join his family for Christmas Eve, but the thought of this man trapped in the Straits of Florida during Christmas haunted him.

The next morning, he woke up early and flew back to check on the stranded boater.

To his relief, the man was fine. He was soon rescued, and later that day, Mario saw the man on television, jubilant and relieved. Mario's friends tell me that this rescue, and the others he participated in, were among the biggest thrills of his life.

The United States must continue to support people-to-people humanitarian efforts to free Cuba. We must continue our support for those nongovernmental organizations working to encourage democracy in Cuba.

The Brothers rescue people in danger.

The determination to rescue Cubans from Castro's enslavement was embodied by Armando Alejandre, who also lost his life on February 24. Armando didn't just look for rafters in the Straits of Florida. He carried food and supplies to Cuban refugees stranded in the Bahamas. And he never passed on an opportunity to criticize the Castro regime for its brutal suppression of rights.

The enslaved people of Cuba are in danger of further abuses by the Castro regime. We must rescue them.

The fallen Brothers pilots were brave men. They took enormous risks to bring hope to the Cuban people.

Another one of last weekend's victims was a young man named Carlos Costa. His sister tells me that he was terrified of the small Cessna he flew for Brothers to the Rescue. The winds in the Straits of Florida violently buffeted his plane and frightened Carlos and his passengers. Yet he volunteered to fly his rescue plane every week. He flew on Christmas and other holidays.

We must also be willing to take risks to hasten Castro's fall from power. We

need a tougher, more ambitious Cuba policy.

The Brothers were tireless, searching every mile of the Straits of Florida for Cuban rafters.

Some of the most determined were those pilots who had once been rafters themselves. Pablo Morales was one of those pilots. He fled Cuba on a raft in 1992 and quickly became an active volunteer in Brothers to the Rescue.

He returned to help others on February 24—Castro sentenced Pablo Morales to death in these same Straits of Florida.

We must be as vigilant as Pablo was. We must not rest until we have searched for every possible way to force Castro from power.

SEIZING THE DAY—MORE PRESSURE ON CASTRO

Fidel Castro has once again shown that he is a brutal dictator. We must reiterate our commitment to ending his stranglehold on Cuba.

How? There are three ways:

First, enact Helms-Burton.

This will tighten the economic chokehold on Castro, and sharpen his isolation from his own people.

This will continue the work of the Cuban Democracy Act, which began our effort to sanction and isolate the Castro regime with one hand, and reach out to the Cuban people with the other.

Helms-Burton will help us in our goal of building democratic sentiment among the Cuban people.

Second, work with our allies to bring international pressure to bear on the Castro regime.

Last month, I visited Chile to assess the shape of United States-Chilean relations. And though Chile maintains diplomatic relations with the Castro government, I was pleased to return with a firm commitment that Chile will support the U.N. resolution condemning Castro's human rights abuses.

Third, assess our preparedness for dealing with Castro in the future.

We must maintain a clear understanding of what our objectives are: To support the legitimate aspirations of the Cuban people to replace Fidel Castro with a democratic, human rights-friendly government that brings about the political and economic reconstruction of Cuba.

In the future, we cannot afford to wait 48 hours to issue a response. That is an unacceptable delay. Our Government needs to develop an anticipatory stance. We need contingency plans that can be implemented swiftly and judiciously.

We must be committed to a response which is proportional to the offense.

As the Helms-Burton and other sanctions take hold, we must anticipate the potential for further escalation of attacks against U.S. citizens and U.S. interests. This means making certain that our borders are secure from Castro's terror.

I continue to be concerned about incidents such as that which occurred in 1994, when a Cuban defector landed a

Cuban military plane on the United States naval station near Key West, FL. He landed that plane unchallenged. Castro has made repeated threats against a major nuclear power facility in the southern portions of my State.

We must expand our efforts through television and Radio Marti to reach out to the people of Cuba.

Mr. President, this past weekend, the remaining members of Brothers to the Rescue led another mission in the Straits of Florida. This time, their goal was not to rescue but to celebrate the memories and brave acts of those four fallen pilots.

As they have for the past 5 years, the boats and planes dispatched on this mission encountered tremendous obstacles. Mother Nature greeted them with rough seas, black skies, pounding rain, and fierce winds.

But when the flotilla stopped to lay wreaths and hold religious services in memory of their fallen colleagues, the black clouds disappeared. For a moment, the Sun came out and shone down on the boats gathered below, as if to smile upon their mission.

Mr. President, for the last 5 years, Brothers to the Rescue has been a ray of light in the black clouds hovering over the Cuban people. If we are to turn that ray of light into permanent sunshine, the United States must salute their mission by making it our own.

I urge my colleagues to do that by supporting the Helms-Burton Cuba sanctions bill.

Mr. McCAIN. Mr. President, increasingly an anachronism in the affairs of the world, Fidel Castro has burnished his credentials as the Western Hemisphere's most vicious dictator. Unfortunately for the four downed Brothers-to-the-Rescue pilots and their families, and the members of Concilio Cubano, he has again turned to terrorism to assert his control over the Cuban people.

All of the overtures made by the Clinton administration, some Members of Congress and the business community have failed to pacify Fidel Castro. Only weeks ago he arrested more than 50 Cuban citizens in anticipation of a conference by the dissident coalition Concilio Cubano. Apparently, Castro felt so threatened by a peaceful assembly of free Cubans that he disregarded the concern of the international community. To his relief, the Concilio Cubano conference was canceled.

Determined to maintain control over the information and views to which his countrymen are exposed, Fidel also seeks to limit dissent from abroad. He has always been too weak to directly confront the United States and terminate our efforts to bring freedom to the people of Cuba. But Fidel Castro can no longer even muster the strength to terrorize our friends in Latin America. He has been reduced to lashing out at unarmed Americans guilty only of straying too close to his Marxist paradise.

Fidel Castro cannot have it both ways. He cannot cultivate a new rela-

tionship with the United States and U.S. business and still run roughshod over the rights of his people. He is a member of a dwindling circle of friends. Fidel still believes in building a utopian socialist society. A fraudulent nationalist, he believes his people incapable of the exercise in self-government we have witnessed from Haiti to Russia. Fine—he can believe what he wants to. But he should not expect to have his egomaniacal dreams of totalitarianism and socialism subsidized by Americans.

This is why I support the Cuban Liberty and Democratic Solidarity Act. It makes the choice for Cuba clear.

The bill codifies the existing embargo of Cuba. Many of the actions taken in response to Fidel's outrages, including President Clinton's recent response, have been done by Executive order. By including them in this bill, we have ensured that they will not be overturned without a genuine democratic transition in Cuba.

The bill also builds on the current embargo in important ways. It attempts to freeze foreign investment in Cuba by denying United States visas to those who improve on investments in confiscated property; by giving, with the approval of the President, United States citizens the right to sue those who invest in confiscated property; and by barring Cuba from international financial institutions.

The bill also restricts assistance to Russia in proportion to the assistance Russia offers Cuba. This is an especially important provision. It is high time that we make a concerted attempt to enlist the support of our allies and friends in the efforts to end the Castro dictatorship.

The bill provides for a lifting of the embargo in response to democratic change in Cuba.

Castro has a choice. He can continue to isolate his nation, or by allowing his people to exercise their God-given rights, he can bring his nation the benefits of a relationship with the United States.

I do not know how long it will take before the pressure of the tightened embargo has its intended effect. It may still be years away. I do know, however, that one day democracy will come to Cuba, and that in the meantime, Americans should do everything in their power to withhold support from a government that so thoroughly denies its people their basic rights. I believe the bill before us does that.

Ms. SNOWE. Mr. President, I will keep my remarks brief, as I know there are so many of my colleagues who wish to add their voices in support of this conference report. As a member of the Foreign Relations Committee, and as an original cosponsor and conferee on this landmark legislation, I rise in the strongest possible support for the Cuban Liberty and Democratic Solidarity Act.

Before going further, I would like to join so many other Americans in expressing personal outrage at the most

recent crimes of the Castro regime. Just 11 days ago, Cuban dictator Fidel Castro ordered the shooting down of two unarmed civilian small planes over international waters, murdering four American citizens. I extend my deepest sympathy to the victims' families. They deserve justice for Castro's murderous, tyrannical act, and this legislation is a first step in process.

For 36 years, Castro has ruled Cuba with an iron, totalitarian hand. But as he steadily impoverished and brutalized the Cuban people, his key source of support came from massive subsidies from the old Soviet Union. But since the 1991 collapse of the Soviet Union, those subsidies have ended, the ideological underpinnings of his tyranny have evaporated, and his regime has come under pressure as never before.

Castro has tried to compensate for the loss of Soviet aid by developing a hard-currency tourist industry. To build that industry, he has sold off at fire-sale prices confiscated American property to foreign companies for development. The purpose of this bill, among other things, is to deter these kind of actions by foreign companies who may be tempted to invest in Castro's Cuba at the expense of uncompensated Americans.

This bill accomplishes that in two ways. In title IV it applies mandatory travel restrictions on top Cuban Government and foreign individuals who participate in trafficking in confiscated American property. Permanent exclusion from the United States is a serious sanction that will give any multinational firm second thoughts about taking possession of stolen U.S. property.

In title III, the bill permits American citizens to bring suit against foreign persons who traffic in their confiscated property in Cuba. To obtain the administration's support for this bill, in conference we granted the President renewable 6-month waiver authority. But this still achieves the main goal of this title by creating an environment of uncertainty that foreign firms will want to avoid.

All would-be foreign traffickers in confiscated United States property in Cuba will be put on notice that if they would always be within 6 months of having legal action taken against them in the United States for their actions. And this presupposes that the President will even initially invoke his waiver authority, which in the current climate is not, I believe, a foregone conclusion.

This bill also:

Calls for an international embargo against Cuba.

Prohibits any United States loans to foreign individuals who purchase United States-owned property confiscated by the Cuban government.

Requires the United States to vote against multilateral bank loans to Cuba until the country has had a democratic election.

Disapproves of Russia's $200 million in loans to Cuba in exchange for continued access to intelligence-gathering facilities in Cuba.

Calls on the President to develop a plan for providing support to Cuba during that country's transition to a democratically elected government.

Also permits during the transition period Eximbank financing, Overseas Private Investment Corporation-supported investment projects, Trade and Development Agency assistance, counter-narcotics assistance, and Peace Corps assistance.

Fully terminates the United States trade embargo upon President's certification of a democratic government in Cuba, and provides for extension of most-favored-nation status.

Mr. President, with Castro's regime facing its gravest crisis ever, it is important to understand that his decision to kill four innocent Americans in cold blood is not an isolated act. This action came on the heels of yet another brutal crackdown on the Cuban people just the week before. From February 15 to 18, Castro ordered arrested 50 leaders of the Concilio Cubano, an pro-democracy umbrella group similar to Poland's Solidarity movement.

The arrest was Castro's answer to their attempt to simply hold a meeting to discuss the future of democracy in Cuba. Many of these pro-democracy leaders have already been convicted by the Castro regime, and have joined the thousands of Cuban political prisoners that today languish in Cuba's gulags.

I would like to recognize the stalwart leadership of the sponsor of this legislation and the distinguished chairman of the Foreign Relations Committee, Chairman HELMS. I also congratulate the leadership of the chairman of our Western Hemisphere Subcommittee, Senator COVERDELL, who is managing this conference report today. Together, they have been unswerving in their commitment to supporting the efforts of the Cuban people to bring freedom and democracy to that long-troubled island nation.

I would also note that in both the House and Senate this has long been a bipartisan cause, and I hope and expect that this conference report will receive overwhelming support from both sides of the aisle. The bipartisan nature of this bill is further demonstrated from the fact that last week, after Castro's brutal action against innocent Americans, President Clinton himself gave his support to this legislative initiative. Now, we will be able to move forward together to strengthen our Nation's resolve to see an end to 36 years of totalitarian rule just 90 miles from our shores.

Again, Mr. President, I would like to congratulate the efforts of all those who worked on this bill over the past year. I urge my colleagues to join in supporting the conference report we will soon be adopting.

Mr. GRAMS. Mr. President, I am pleased that the conferees on H.R. 927, the "Liberatad bill" were able to reach an agreement with the administration that will offer a tough, united response to the recent destruction of two small planes and four American lives by Cuban MiG's. While I would have preferred a compromise which eliminated titles III and IV of the conference report, the agreement moves us in the right direction.

I believe all of us are united in our desire to see a peaceful transition to democracy in Cuba, Mr. President. The downing of the planes heightened the concerns of many of us that we should take further steps to bring about this transition. There are many differences in how we reach our goal of a democratically elected government in Cuba. While I supported the Senate version of the Helms-Burton legislation, I had some problems with the possible inclusion of titles III and IV of the House bill in a conference agreement. Fortunately, the conferees added waiver authority to enable the President to waive title III, and, in effect title IV, for national security reasons or if necessary to promote a democratic transition.

Because election pressures may make a waiver difficult, I would like to remind my constituents what my concerns with titles III and IV are. In my judgment, these titles will cause more harm to our own country than to serve their intended purpose of limiting foreign investment in Cuba and thereby exacerbating Cuba's economic problems, which would increase pressures for a new government.

To remind my colleagues, there was concern about titles III and IV in the Senate, and neither of these titles was included in the Senate version of the bill. Modified versions of both titles are included in the conference report, along with the waiver authority.

My primary concern with title III is its extraterritorial reach. I have concerns with laws which attempt to impose our own laws and standards on other countries that they face costly lawsuits if they seek to invest in Cuba on properties which ownership 37 years ago may be difficult to verify, is unwise, in my judgment. This kind of U.S. attempt to infringe on the sovereignty of other nations should concern us.

Some of our allies have communicated to us that they do not view their investment in Cuba any differently than our own efforts to invest in Vietnam or China, which also could be on disputed properties. It is possible that one or more of these countries could reciprocate against us in the future, in injuring United States companies and jobs.

While I sympathize with anyone who has had property confiscated in any country, I believe the foreign claims settlement process is the right way to pursue property claims for United States citizens. There are many certified claimants now eligible for claims against the Cuban Government for confiscated properties, which will be pursued once a transition has occurred in

CONGRESSIONAL RECORD — SENATE *March 5, 1996*

Cuba. This bill was designed to help Cuban-Americans, who were not United States citizens at the time of the take-over, receive similar benefits through the courts. Now, those citizens would have the right to pursue their claims in Cuba once a transition occurs, which would be a parallel effort to that of our own certified claimants. Title III would provide a private right of action in Federal courts to all United States citizens, including the Cuban-Americans who were not citizens at the time of confiscation. This is a radical departure to our traditional use of the courts and is contrary to international law. Despite efforts to narrow this right of action, this change will create a precedent in our courts that would allow this right to be extended to naturalized citizens of over 85 countries where we have had similar property disputes. This would result in a flood of lawsuits at a time we are striving for tort reform.

One inconsistency in title III is that only properties valued over $50,000 at the time of confiscation can be involved in the lawsuits. I am not sure how this would accomplish the bill's authors' goal of limiting foreign investment in Cuba. And again, despite this attempt to limit the right of action, I still believe a court precedent is created for an expanded right of action in the future.

The language which would terminate the right of action for new cases once a democratically elected government is in power combined with the President's current authority under the International Emergency Economic Powers Act to nullify any claims and judgments against the Cuban Government after a transition also concerns me. This sounds attractive, but many legal experts have concluded that these citizens would have private property rights under the takings clause of the fifth amendment. So what will happen is that Cuba won't have to pay any judgments—the United States taxpayers will pay. They will pay treble damages for property confiscated from people who weren't citizens at the time. United States citizens who were certified claimants for years will be only partially reimbursed from funds negotiated from the new Cuban Government.

Title IV forces the President to restrict visas for any foreigner who traffics in any property under dispute. Fortunately, this language was made prospective, for new investments. Further, it would not kick in if title III is waived. It is further limited since visas are not currently required for residents of all countries which may be subject to this restriction in the future. However, this title could affect multinationals with thousands of employees globally in the future, most of whom would have had nothing to do with decisions to invest in Cuba. In a global economy it could be counterproductive to limit this type of access.

Mr. President, I support this conference report but hope that the President will exercise his authority to waive title III.

Mr. CRAIG. Mr. President, I am pleased to speak today in support of the Cuban Libertad Act.

We were all troubled by the announcements that two civilian aircraft belonging to the Brothers to the Rescue, Organization had been shot down by a Cuban MiG–29. However, this event, described by the President and other world leaders as "abominable" and "abhorrent," was not an isolated incident. Rather, it was the most recent act of aggression perpetrated by Castro's tyrannical regime.

In the last few years, the Castro government has taken a hard-line position and has continued to tighten the crackdown on dissent, arrested human rights activists, and staged demonstrations against their regime's critics.

Mr. President, the harassment, intimidation, and beatings of activists was well documented.

Dissidents and political prisoners were routinely subjected to a variety of actions. For example, sleep deprivation in prisons was used to coerce statements from inmates. In addition, prison conditions were characterized by habitual beatings, severe overcrowding and a lack of food, and medical care.

Arbitrary arrests, detention, and exile are routine methods of discouraging dissidents from speaking out against the Government. Freedom of expression is severely restricted. One person was arrested for wearing at t-shirt which said, "Abaja Fidel," which means "Down With Fidel." This individual was taken to a police station, beaten and held incommunicado for 8 days. He was finally tried and sentenced to prison for 6 months.

Mr. President, 1994 was also a period of tyranny on the high seas. In April and July of that year, the Cuban Government was implicated in the sinking of two vessels which resulted in the deaths of a number of people, including children.

President Clinton has referred to the attack in the press as, "An appalling reminder of the nature of the Cuban regime: repressive, violent, scornful of international law."

I couldn't agree with him more. It is another action taken by Castro that shows nothing but disregard for human life, let alone international law, norms, and values.

This action requires more than just a rhetorical response. Therefore, I am pleased that we will be voting today on the conference report to the Cuban Libertad Act, or Helms-Burton Act, as it has been referred to in press accounts.

President Clinton announced a series of actions he proposed in response to this unwarranted attack. These included: ensuring that the families of the pilots are compensated; imposing restrictions on Cuban nationals traveling in the United States; suspending United States charter flights into Cuba; and, passing the Helms-Burton Act.

This bill includes a number of provisions which would: strengthen international sanctions against the Castro Government in Cuba; develop a plan to support a transition government leading to a democratically elected government in Cuba; and enact provisions addressing the unauthorized use of United States-citizen-owned property confiscated by the Castro government.

Mr. President, I am pleased that President Clinton has committed to support and sign this legislation.

Mr. President, some Senators and Members have concerns about the ramifications of this legislation. I respect those concerns and am pleased that the sponsors of the legislation have done such an excellent job of working on addressing some of those concerns. Certainly, some concerns that I had with respect to certified claimants under title III have been addressed. I appreciate the efforts of Chairman Helms, and his staff.

In closing, I would just reiterate that this bill is a response to far more than the recent attack on civilian aircraft. It is a response to the continued aggression of Castro's regime.

Mr. HATCH. Mr. President, today we are again debating U.S. foreign policy toward the Communist regime of Fidel Castro. We are here to strengthen the policy that the majority of both parties have supported for over 30 years.

And, we are here to show that as long as Mr. Castro and his brutal regime remain, he shall see no easing of that policy.

That policy has been one of economic containment and diplomatic isolation. That policy has worked. It has isolated a brutal regime and restrained its ability to undermine stability around the world.

Unfortunately, this policy has not forced Castro from power, nor eliminated his ability to cause mayhem about the world. Castro was still able to send his forces to Angola, prolonging that war as a payback to Castro's Soviet masters. Our containment policy did not prevent Castro's henchmen from conspiring with Latin American drug bosses to smuggle cocaine poison into our country. And, our policy did not prevent Castro from shooting down two unarmed airplanes in international airspace last week, killing four American citizens.

But, Castro's behavior should never surprise us. His regime is built on oppression; his currency is flagrant disrespect for basic human rights.

Now that Fidel Castro's tab at the Moscow cafe has been closed, we see how desperately his regime is to survive. Without rubles and oil, the dictator of Havana stands without the slightest shred of a functionary economy. Without his Soviet sponsors, Emperor Castro has no clothes. Our embargo has ensured that the United States has not in any way participated in granting a figleaf of legitimacy to the aging strongman.

I say let us strengthen our embargo. If Castro wishes to use foreign investment to replace the rubles from his Communist masters, let us at least ensure that the firms that would succor the Castro regime do not do so with property stolen from U.S. citizens. Foreign investors are free to take the place of the Kremlin powerbrokers, but they cannot trade in stolen property without consequence.

In recent years, the debate over U.S. policy toward the autocratic Castro regime and, in particular, the debate over maintaining the embargo have included the introduction of two arguments.

One argument suggests that, now that we are in a post-cold-war world, we need not maintain a cold war policy toward Cuba.

A second argument we have heard suggests that if we can engage authoritarian states like China and Vietnam, we should be able to engage in the Cuban regime.

Regarding the first argument, we are constantly reminded that we now live in the post-cold-war world. In this new world, we are told, we need to revisit so many of the crises and flashpoints that we saw through the bipolar lens of cold war competition.

Derivative of this approach is the notion that we must learn to give up our neuralgic distaste for the few remaining Communist regimes, and we must recognize that the basic security and political notions of the cold war no longer provide the touchstones for U.S. policy. A specific point of this rationale is that our Cuba policy must no longer be containment.

The problem with this argument is simple: The cold war may be over, but Fidel Castro still rules. While I admit that the Cuban regime is a cold war anachronism, which certainly belongs on the scrap heap of history, the harsh political reality is that Castro and his secret police remain as the dictatorship of Cuba.

With the conclusion of the cold war, we saw the end of our global competition with Communist states and the collapse of totalitarian regimes before the popular will of newly freed peoples.

Throughout Central Europe, the withdrawal of Soviet support combined with the decay of Communist client governments. Faced with the uprisings of the people demanding freedom, the dictators fled and freedom won the day. The result was the transformation of a part of Europe that had been frozen in time and oppression for nearly 50 years.

The United States welcomed these nations to the democratic fold, for we were no longer threatened by their hostile diplomatic postures, their support for terrorists, and their dedication to undermining democracies around the world.

But the end of the cold war brought no popular revolution to Cuba. Castro denounced the last Soviet leaders as having failed the Communist cat-echism. The evaporation of Soviet subsidies brought more misery for the Cuban people, and Castro, no doubt thinking more of Ceausescu than of Havel, clamped down even more. Human rights have not improved in Cuba.

No talk about looking at Cuba from a post-cold-war perspective will change this dismal fact. The Cuban people are not free. They are not free to choose their own government; they do not have an independent judiciary; they cannot work in a free economy. They are never free from their political jailers. Those brave ones who dare attempt political discourse continue to be harassed and jailed by Castro's police, as we saw 2 weeks ago when dozens of members of Concillio Cubano were arrested, interrogated, and jailed.

The second argument suggests that if we can engage China and Vietnam, under the hope of moderating and influencing their policies, we can do the same for Cuba.

I am not sympathetic to the analogy with Vietnam, mostly because I am not sympathetic to opening relations with Vietnam.

I believe that Vietnam had much more to gain from recognition by the United States than we did, and that, as a result, we should have been able to extract more concessions before we granted the valuable diplomatic asset of recognition. For recognition from Washington, we should have gained from Hanoi more openness on the POW-MIA issue, and more concessions on human rights.

It's clear the authorities in Hanoi recognized that they were getting away with a lot: Less than a month after recognition, they jailed a handful of elderly Buddhist monks. We recognized their dictatorship, and the jailers kept jailing. In all the debate over Vietnam, I never heard adequate reasoning for why we should, at this time, open our Embassy there. So, from my perspective, Vietnam hardly justifies as a reason to adjust our Cuba policy.

Mr. President, I don't believe we can compare countries. Cuba is not China, which has the world's largest population, a booming economy, a predominant position in Asia, and a nuclear arsenal. Global foreign policy for this country must take into account this Asian giant, and United States national security must account for the role of China.

Cuba has 11 million people, a supine economy, and has become largely irrelevant in Latin America. With no Communist sponsors, it no longer provides a major security threat.

While I don't believe it can threaten stability in the region—unless Castro unleashes another wage of refugees—we have seen that the regime is a threat to international civility. When MiG's are dispatched to shoot down Cessnas, you know that the regime is showing its true colors, and those are not the colors of a civilized nation.

Mr. President, containing the Castro regime has worked. We must remain vigilant rather than provide sustenance. We must tighten the embargo, rather than engage in the ''Lax Americana'' policies of President Clinton.

Mr. President, this bill addresses the role the United States will play during the transition from the Castro dictatorship. In this manner, this legislation provides some forward thinking that I believe was lacking in some of our policies conducted during the cold war. This bill looks to a post-Castro regime, and outlines our responsibility to prepare for the inevitable.

It is one of the many paradoxes of a current historical myopia that many view the cold war from simply a security perspective. The result is that we hear the reasoning that says, ''now that we defeated the Soviet Union, we need not concern ourselves with an island run by a bunch of ragged and increasingly isolated Communists.''

But, the cold war was not just fought for security reasons alone. It was fought over ideals: the ideals of humankind's right to liberty, to democratic government and to freedom from oppression. These are the fruits that many of the formerly captive nations of Central Europe now enjoy; these are the fruits denied to captive citizens of Castro.

But, in Castro's Cuba, the instruments of oppression remain. And, this is why this body now debates the merits of the bill presented by the distinguished chairman of the Foreign Relations Committee, which stands for continuing a firm and resolute policy toward the dictator Castro.

And, this is why, today, I believe that we should declare that we stand for a policy that recognizes that the Cuban dictatorship remains in place, and that this brutal reality demands of us that we remain vigilant in our opposition to the Castro regime, determined to outlast it, and dedicated to help the Cuban people when the dictatorship falls.

Because fall it will, as so many of those rusted and despised statues dedicated to Communists ideals fell all over Central Europe and the newly independent states when the victors of the cold war were finally freed.

I urge my colleagues to support the Libertad bill.

Mrs. BOXER. Mr. President, we consider this conference report less than 2 weeks after a tragic day for the cause of democracy in Cuba. On February 24, Fidel Castro's brutal regime shot down two unarmed American aircraft belonging to Brothers to the Rescue who were flying over international waters.

This unprovoked ambush was a gross violation of international law and an affront to standards of human decency. It was a cowardly attack, demonstrating clearly that Fidel Castro will resort to any means—no matter how vile and repugnant—to hold on to power.

I was appalled by this despicable incident and I would gladly vote for legislation that directly addresses this attack as well as legislation that would

foster the democratization of Cuba. Unfortunately, the bill before us today will not carry out those objectives.

The conference report would deny a United States travel visa to anyone with a stake in certain companies that do business in Cuba. This provision threatens to seriously damage relations with many of our closest allies, including Canada, whose citizens could be denied entry into the United States.

The measure creates a new cause of action in U.S. courts allowing citizens to sue any foreign national who traffics in confiscated Cuban property. This alone could result in a huge logjam in our Federal courts. But by establishing an arbitrary $50,000 claim threshold, the legislation denies legal recourse to many Americans whose homes or shops were confiscated by the Castro regime. There is no logical justification for this discriminatory treatment. It winds up helping the wealthiest and hurting middle-class Americans. It makes sense to adopt measures to punish Fidel Castro and his thugs for their reprehensible action. It makes no sense, however, to do so in a way that will hurt many Americans and punish our best allies.

Mr. KERREY. Mr. President, I come to the floor of the Senate today to express my opposition to the legislation currently under consideration. While the Helms-Burton legislation seeks to hasten the end of the Castro regime in Cuba—a goal that is shared by every Member of this body—I am concerned that it will in fact do more to damage our larger foreign policy goals than bring about a democratically elected government in Cuba.

The shootdown by the Cuban military of two unarmed United States civilian aircraft engaged in humanitarian activities in international airspace is reprehensible. This clear violation of international law required a strong U.S. response—a response which was delivered by the Clinton administration immediately following the attack. Charter flights between the United States and Cuba were suspended, steps were taken to compensate the victims' families from Cuban assets frozen in the United States, and the United States led a successful campaign in the U.N. Security Council to strongly deplore the unprovoked attack on these unarmed aircraft.

Mr. President, there is now great pressure for those of us in the Senate to voice our distaste for the Castro regime by passing the Helms-Burton legislation. I will vote against this bill, not because I am opposed to trying to tighten sanctions on Castro's Government, but because I believe that provisions of the Helms-Burton bill would have a detrimental effect on relations with our closest allies.

Last fall, I voted in favor of the Senate version of this bill which, in my opinion, represented a bipartisan approach to strengthening economic sanctions on Cuba. The Senate bill included provisions which sought to include the international community in our efforts to ratchet down the pressure on the Castro while holding out the promise of United States assistance to a post-Castro Cuban Government striving to achieve democratic, free-market reforms in Cuba. I still support this approach, and believe our policy should continue to move in this direction. However, the bill that we have before us today includes provisions not in the version that passed the Senate. Titles III and IV of Helms-Burton will open the floodgates to new lawsuits in U.S. courts and will put us in an adversarial position in our relations with our allies throughout the world.

Provisions of title III and IV which give United States citizens the right to sue foreign companies that operate in Cuba are viewed by our allies as an attempt by the United States to act unilaterally to dictate to them a Cuba policy. This will undoubtedly lead to resentment and resistance to future United States policy efforts in connection with Cuba. Rather than alienating our allies, our policies toward Cuba should seek to be inclusive.

It is far too easy to vote in favor of Helms-Burton as an emotional response to Castro's unlawful shootdown of United States civilian aircraft, but to do so would ignore the negative impact this legislation will have on our foreign policy objectives both in Cuba and in a larger sense. Mr. President, it is my hope that we will be able to separate our current anger at the Castro Government from these proceedings. I say this not to minimize the gravity of Cuba's actions, nor would I necessarily rule out further action against Castro, but rather because I believe that the legislation before us will hurt our ability to exact change in Cuba. By straining our relations with our closest allies, it is my fear that we will further isolate ourselves from the international community on this issue, and that in the future we will be unable to work on a multilateral basis to bring about a democratic Cuba.

I conclude, Mr. President, by urging my colleagues to fully consider their vote today in the larger context of how this legislation will affect U.S. foreign policy.

Mr. FEINGOLD. Mr. President, on February 24, the Cuban regime shot down and killed four men, American citizens, apparently flying over international waters, off the coast of Cuba. No matter how one judges the intent of these four Brothers to the Rescue—and some have pointed out that in the past Brothers to the Rescue violated Cuban airspace and went so far as to overfly Havana and drop anti-Castro leaflets over the Cuban capital—the fact is that they were flying in small, unarmed civilian aircraft. They certainly did not represent a real, physical threat to Cuban security. But the Castro government—no respecter of human rights, of international law, or of common decency—had its MiG fighters shoot down those two defenseless Cessnas. I join my colleagues, the U.S. Government, and the international community in deploring this act of brutality.

As appalling as this act was, Mr. President, it should not surprise us. Castro is a dictator who, for 37 years, has ruthlessly trampled on the rights of the Cuban people. The State Department and all reputable human rights organizations point to the routine use of torture, beatings, economic coercion, and suppression of legitimate protest by the Castro regime.

Only 2 weeks ago, a small pro-democracy group, the Concilio Cubano, was prevented from holding a meeting and two of its members were summarily thrown into prison after kangaroo court proceedings. That Castro would have his military lash out callously and viciously at a perceived threat, then, is pretty much what we could expect.

What surprises me, Mr. President, is how a small, poor island like Cuba continues to elicit the most knee-jerk response from Washington. Certainly, the administration did the right thing in seeking an international condemnation of these intentional murders. I also support President Clinton's order requiring restitution by the Cuban Government—drawing on frozen Cuban assets—for the families of the victims, and the increased use of Radio Marti—and notably not that proven failure, TV Marti—to bring uncensored news and information to the Cuban people. The rush to punish, however, must stop at that point where ill-considered policies undermine U.S. national interest, or lead to a misguided and ineffective policy altogether. That's what this bill did before the shootdown, and what it's going to do regardless of the shootdown.

In seeking to pound the final nail in Castro's coffin, H.R. 927 misses its target, causing pain for all but Castro. Very briefly, allow me to enumerate the most obvious flaws:

Title I instructs the President to seek a mandatory international embargo against Cuba. This is untenable: The United States is regularly outvoted at the United Nations by margins along the lines of 140 to 2 when we seek to defend our unilateral trade embargo. It is all the less likely to pass given that our closest allies object vociferously to the other provisions of this bill.

Title I also requires the President to make it clear to the Cuban Government that:

The completion and operation of any nuclear power facility, or b) further political manipulation of the desire of Cubans to escape that results in mass migration to the United States, will be considered an act of aggression which will be met with an appropriate response. . . .

What does this mean? Are we threatening, in fact, to bomb or disable a nuclear energy facility in Cuba? I should hope not, and suggesting it as a policy undermines U.S. credibility.

Another fault of the bill is section 102, which codifies the trade embargo

as law. By this provision, Congress deprives the executive branch of the right to modify, ease or even strengthen the embargo. It would restrict the President's ability to react quickly to events within Cuba or on the international scene as related to Cuba. Mr. President, I am a strong supporter of the Congress' constitutional prerogative to advise and consult closely with the White House on matters of foreign policy. But I do not support leaving Congress alone to legislate United States foreign policy, and in fact fear that we do a disservice to the country if we try.

With title III, Mr. President, the bill steps beyond domestic politics and into offending accepted norms of international law. This section, which grants to persons, including those not U.S. citizens at the time of the alleged taking, a cause of action in U.S. Federal court against individuals and foreign entities trafficking in expropriated Cuban properties. This procedure not only threatens to clog U.S. courts, but also defies logic. Their cause of action is rightfully in some, future, Cuban court, not the United States judiciary.

Furthermore, contrary to the assertions of supporters of this bill, an international claims settlement procedure already provides an effective mechanism for asserting claims, which is why most certified claimants oppose this bill. Moreover, this provision will not benefit the little guy who lost property in Cuba, since there is a threshold level of $50,000 in controversy, a tremendous amount in 1959 Cuba. Further, to mollify critics, a filing fee of perhaps $4,500 will be imposed. Of course, very few beyond corporate interests can afford to pursue such a costly litigation.

If that was not bad enough, title IV of this conference report takes the extraordinary step of mandating the exclusion from the United States of third-party nationals who traffic in such property. Canadian and European business executives, and their governments, are understandably upset at the prospect of their citizens being kept out of the United States because they do business with Cuba. There is an international consensus that countries such as Iran pose a threat to global stability, and therefore travel by its officials should be limited. But people doing business in Cuba are not threats to our security, and accordingly should not categorically be denied access to the United States. Of course, most of our allies don't need visas and will enter anyway, undermining the force of the statute. But it looks tough —and is more or less pointless.

Mr. President, this bill's myopic focus on Cuba is one that I find particularly disturbing. Cuba is not significant on the world scene; whatever geostrategic threat it may have posed disappeared 5 years ago, a fact our own military acknowledges.

In China, by comparison, we find a country bordering on superpower status. The Chinese Government regularly takes steps which threaten international security in fact: Nuclear equipment sales to Pakistan; saber-rattling across the Taiwan strait; human rights violations on a very brutal scale. China's policies on intellectual property even violate major United States financial interests. Why are we not imposing sanctions on China? Sadly, I know that a bill proposing the same sanctions on China that we are today imposing against Cuba would fail—indicating that to the United States Congress fossilized cold war fantasies are more powerful than the real national security goals of 1996.

Mr. President, Cuba is a pariah. Certainly we as a nation have the right to limit our relations, economic and otherwise. Although some might note that after 35 years of embargo, Castro remains entrenched and that the policy needs careful review, I am not advocating a loosening of the embargo. That cannot take place absent an improvement in the atrocious human rights situation in Cuba. But I think we should be consistent in our foreign policy. If we sanction Cuba, then why not those current and former Communists—including those which are actual threats to international security, such as China, or with whom we met in battle at the cost of 55,000 United States soldiers, such as Vietnam? If we choose, instead, to engage such countries in dialog and with economic relations to effect change, then why not Cuba?

Instead, we shoot ourselves in the foot. This bill will not topple Castro; it will only give him cause to tighten his grip in the face of the Yanqui threat. It increases our isolation internationally and hobbles our ability to influence events in Cuba in a positive manner. It is an expensive resolution which will bring United States-Cuba politics into our courts. Helms–Burton damages the United States national interest and hurts innocent Cubans and I will vote against it.

Mr. BOND. Mr. President, as we consider instituting the provisions of title III of the Cuban Sanctions Act, I am troubled that in a rush to exact retribution for the heinous act of shooting down United States unarmed civil light aircraft by Cuban MiG fighters, we will accomplish nothing more than antagonizing our worldwide trading partners.

First, monetary restrictions and filing procedures currently in the language, prevent compensation to by the vast majority of Cuban exiles and benefit only large business concerns which look to use the offices of the U.S. Government to practice international tort law through legislation. This course of action can only lead to the muddying of the legal trade policies and agreements which we have long supported.

Second, though we are unarguably the leader in free trade throughout the world, this action will isolate us from our loyal and historic trading partners. Even as we contemplate this drastic course of action, our trading partners have vociferously objected to its long-term ramifications. Some of our closest allies are considering equally harmful measures in response and you know that once we start down this type of road, it will be extremely difficult to halt until an economic disaster occurs.

Third, the further starving of the Cuban people in an attempt to force a change in their government is not the way to promote a democratic movement. In order to win the hearts and minds of a subjugated people one doesn't beat them even more. We want to see them change their government from within and view us as a benefactor and not as a martinet.

I too, want the Cuban Government to change. I too, want the Cuban Government to bear full responsibility and consequence for their totally unwarranted and illegal actions. I don't believe that unilaterally attacking world wide trading policies and harming our relationships with our allies and partners is the way to do it.

Mr. JEFFORDS. Mr. President, I must strongly condemn the Cuban Government for its gross violation of international law in shooting down two small, unarmed civilian aircraft last Saturday, resulting in the presumed loss of four American lives. This was a cowardly, cold-blooded act by Cuban authorities. There is no excuse for this violent act and no explanation that Cuba can offer which justifies such blatant disregard for international norms.

I must note that Cuba's action on Saturday came on the very date that the Cuban Council, an alliance of human rights and dissident groups, had asked to hold a first-ever conference of such groups in Cuba. Beginning on February 15, the Cuban Government responded to the council's request, a request made in accordance with Cuba's Constitution, by retaining and arresting more than 50 people active in the council. I must also strongly condemn the Cuban Government of Fidel Castro for this crackdown.

By these actions, the Cuban Government has once again demonstrated its fundamental disregard for internationally recognized humanitarian norms. These actions also sadden me because they have extinguished summarily the pin-pricks of light which were beginning to show, for the first time in many, many years, in our relations with Cuba. Recently, there had been an increased number of exchanges and visits, activities which I continue to believe are crucial to creating space for a democratic change in Cuba.

The legislation before the Senate today, however, is not an appropriate, or even a relevant, response. As I noted during our consideration of this bill last October, instead of promoting democratic change in Cuba, this legislation, namely title III, creates a potential windfall for a small group of people at the expense of the greater interests of the United States. This bill alienates major allies and trading partners, such as Canada, Mexico, and

France, with its clear extra-territorial application. Further, the effects of this legislation risk destabilizing Cuba to the point where we could face another exodus of boat people. We must ask ourselves: Are we ready to deal with such a crisis anew in order to serve the interests of a deep-pocketed few? I say we are not. The Presidential waiver provision for title III is not enough to overcome my deep reservations. This bill also carries with it a high human cost and I should note that the Cuban-American community is far from monolithic in its support for this bill.

I am also deeply concerned by this bill's codification of the Executive orders and regulations that implement the existing embargo. In spite of Cuba's recent actions, codifying the embargo takes us in the wrong direction, making our eventual and necessary rapprochement all the more difficult. I also believe that a mandatory visa ban on officers and majority shareholders companies which are trafficking in such properties is an unnecessarily petty provision. I will vote against this legislation.

### DRACONIAN HELMS-BURTON CUBA SANCTIONS BILL GOES TOO FAR

Mr. WELLSTONE. Mr. President, today we will be voting on legislation to codify permanently some of the most far-reaching, harshest economic and political sanctions the United States has ever imposed by law upon another country. While I support the goal of pressing Cuba toward democratic rule, this bill is not the way to get there.

Let me be clear: Cuba's recent shocking attack against unarmed civilian aircraft, apparently in international waters, was an outrageous breach of international law, even considering the unwise acts of the Cuban-American pilots who had been consistently warned of the dangers. This action, and Cuba's detention of members of the Cuban Council—journalists, human rights activists, and others—has been met with widespread condemnation, both here and abroad. Cuba must respect international aviation law, internationally recognized human rights, and democratic freedoms if it is to reenter the community of nations.

The President has responded with a series of firm economic and political steps, unilaterally and multilaterally. This bill simply piles on, in a way that I don't believe is in U.S. long-term interests. I know that in the wake of the air tragedy, it will pass by overwhelming margins in both Houses, and will be signed by President Clinton, despite his earlier strenuous opposition. While there are elements of the bill which I support, including its authorization of assistance to democratic organizations, human rights groups, and international observers, as a whole it embodies a fundamentally flawed policy.

It's true that the people of Cuba have for too long been denied basic political rights, including the right to speak freely, to criticize their Government, and to associate with one another as they wish. And for too long, Cubans have been unable to improve their standard of living through much-needed economic reforms. I would of course support and vote for legislation if I thought it would achieve that goal.

But unfortunately that's not the case. Instead we have before us the so-called Helms-Burton legislation, and we have to decide if it is likely to move us toward the twin goals of greater economic opportunity and greater political freedom in Cuba. Unfortunately, the answer, I believe, is no. So while I share the goal of my colleagues who support this bill—a peaceful transition to democracy in Cuba—I do not believe this bill will get us to that goal. There are several major areas of concern that I want to focus on.

First, as I observed, I fear that the burden of harsh sanctions often falls on innocent Cubans, not on the Government or on elites. Its provisions to enact into law prohibitions on families in the United States sending any significant funds to their own family members in Cuba, to all but cut off travel between the United States and Cuba so family members can at least visit one another, and to prohibit investments in open telephone communication between the United States and Cuba are especially unfair and counterproductive.

Its provision to place in law a prohibition on sales of food and medicines to Cuba—even to nongovernmental organizations, like churches or relief groups—is wrong, and likely to do further real harm to those whom proponents claim most to want to help. As is so often the case when ideology presses all other considerations into the background, the reality of people's lives—those innocent Cubans who will be most directly affected, and who struggle to maintain their families under Cuba's repressive government—is dismissed as inconsequential.

Second, I do not believe it is in our national political or economic interest to codify into law, and then tighten, this already harsh U.S. embargo. I will offer a few examples later of the reasons why, including my concerns, as one who represents a State which borders Canada, about its impact on United States-Canada relations, on Minnesota firms which do business with our Canadian neighbors.

Third, even if it were judged to be in our interest, I don't believe it will have the desired effect on Fidel Castro's government that its proponents intend. In fact, it could backfire on us, prompting Castro to become more repressive, and worsening social and political tensions there which could in turn lead to violence, and another major outflow of refugees to the United States. It was not long ago we had thousands of Cubans coming across the Florida Straits in leaky boats, who were stopped and then held at Guantanamo Naval Base for many months, at a cost of millions of dollars. Is that what Americans want to see again? I don't think so. But that very well could happen.

Ultimately, additional harsh sanctions could undermine, not bolster, opposition-backed hopes for political and economic liberalization there by enabling Fidel Castro to play the nationalist card, using the U.S. sanctions as a rationale for tightening his grip on power. We have seen in Russia, Vietnam, Eastern Europe, and to some degree even in China that the process of political and economic reform in these places has been accelerated by a more open exchange of ideas, people, information, technology, and other goods and services—not by increasing the isolation of these people from the outside world.

North Korea is a good example of what happens when we isolate Communist states; a disaster for United States policy. In Cuba, as elsewhere, ensuring an open flow of Western, democratic ideas, information, and technology could be critical to helping to transform those societies. This bill flies in the face of almost all of our recent positive experience in helping to transform collapsing Communist states around the world.

The bill could also prompt our allies and trading partners to retaliate, putting limits on U.S. firms which trade abroad, and eliminating the good-paying U.S. jobs that depend on such trade. Many are already voicing loud complaint, and some have threatened such retaliation. Over 50 countries now have substantial business interests in Cuba. Should we refuse visas to businesspeople—and their families—from Britain, France, Germany, Japan, or other of our trading partners who want to do business and create jobs within the United States, if they hold an interest in a Cuban business? Under this bill, in many cases we would have to do just that.

Americans expect a tough, firm response to Cuba's recent actions. But they also expect common sense, something which has been in short supply in America's policy approach to Cuba for a long time. Usually, if a policy doesn't work, you try something else. United States-Cuba policy, like the shop-worn Communist policies of the Cuban Government itself, has been frozen in ideological amber for too long, driven as much by domestic political concerns as by responsible foreign policy.

Let me offer a few examples that I think highlight why this bill is not in our own national interest. Russia is now moving toward elections that could determine the fate of the reform movement there for years to come. United States aid has played a key role in helping the Russians to dismantle their nuclear arsenals, open up their economy, and become a more open and democratic society. But this bill would require substantial reductions in United States aid to any country, like Russia, that provides assistance to Cuba. The way I read it, we couldn't provide key assistance, including that designed

to bolster Russia's ability to buy United States products, if they provide aid, however unrelated, to the Cubans. This is true not only of Russia, but of any of our allies or trading partners whose firms have long been doing business in Cuba.

The tight and inflexible strictures this bill places on assistance to a transitional government there would also not be in our political interest. When the transition to a post-Castro, more democratic Cuba begins, we must be ready to move quickly to help to ensure its success, as we did in Haiti. The new rules proposed by this bill could leave us on the sidelines in a rapidly-moving transition—a dangerous place to be during such an unstable period.

As in Haiti, the United States needs the flexibility to respond to changing circumstances, sometimes even to overnight changes. But it takes months for Congress to act on simple bills declaring National Auto Safety Week, or National Ice Cream Day. It's unrealistic to think we would move quickly to provide aid to a new government. We should be there with resources, ideas, and the diplomatic flexibility to react just as the transition begins—not panting up to the finish line once it's over.

Nor is this bill in our economic interest. Its provisions to effectively impose a boycott on third-party countries and businesses who are not the primary target of Cuba sanctions are especially unwise. For example, should Minnesota farmers who sell grain to Russian joint Venture partners be penalized because Russia trades with Cuba?

Should Minnesota businesses who may be working in partnership with Canadian firms be subject to multi-million dollar lawsuits simply because their Canadian partner happens to sell computers, or medical equipment, or anything else, to a Cuban humanitarian organization? I don't think so. But this bill would do that, exposing firms in my State to huge potential liabilities for something they have little or no control over. That's not common sense, and it would endanger jobs and trade for Minnesotans.

There are other objections that have been raised about the legal implications of this bill. As Senators DODD, PELL and others have observed, the bill would open U.S. courts to potentially thousands of new property claims. This provision was dropped from the original Senate bill. Current law provides for a means of addressing property claims, through a Claims Settlement Commission. This bill would give special rights under United States law to a particular class of people, Cuban citizens who can make a claim that their properties were nationalized in the late 1950's by the Cuban Government, and who later became U.S. citizens by means of very generous United States immigration laws—more generous than for virtually any other group. Why are we giving these special rights to Cubans who became citizens? Why not

give the same rights to Bulgarians, Russians, Poles, Vietnamese, Chinese, Hmong, Lao, too, who may have had unresolved property claims when they were citizens of their own countries? Providing access to U.S. courts for claims filed on behalf of those who weren't even U.S. citizens, and thus not entitled to U.S. court review when the claims originally arose, sets a precedent which I am sure we will regret, and which will likely be very expensive. Who pays to give this special treatment to this special group? U.S. taxpayers pay. Of course, this disparate treatment not only raises legal questions. It also raises constitutional questions, especially about equal protection of the law, which its proponents have brushed aside.

Don't let anyone confuse the issue by leaving the impression that this bill is designed to protect small Cuban landholders who lost their homes and offices when Cuba overthrew the brutal Batista regime. These regular folks get left out. As is so often the case, the big corporate interests who reportedly helped to draft the bill, like the rum manufacturers and sugar processors, many of whom supported the brutal and corrupt Batista regime in the 1950's, and the big families that composed Cuba's elites for decades, are the ones who would most benefit from the new legal rights accorded by this bill. But they cloak themselves in the rhetoric of protecting the little guy who lost his shack on the beach in Havana, in order to persuade Congress, and other Americans, to protect their economic interests.

Mr. President, it's clear that we must send a strong message to the Cuban Government, and that we must do all we can to help accelerate a democratic transition there. But this bill would harm innocent Cubans far more than it would serve to pressure the Cuban Government. It could undercut the very efforts at political and economic reform that its proponents support, escalating social tensions, and prompting another outflow of refugees to U.S. shores.

Given the new frictions it will cause with our allies, and the other problems I've discussed, I do not believe it is in America's long-term interests. I know it will pass today. But I would be less than honest if I took the politically expedient route and voted with many of my colleagues who want to simply send a strong signal, whatever the vehicle, whatever the potential costs and unintended consequences, whatever the troubling legal precedents it sets. This bill does not meet the Minnesota common sense test. It does not meet the fairness test. It will not, in my view, have the effect its proponents hope. I urge my colleagues to oppose it.

The PRESIDING OFFICER. The Senator from Connecticut.

Mr. LIEBERMAN. Mr. President, I gather there has been an agreement between the forces supporting and opposing this measure. Pursuant to that agreement, I ask unanimous consent to

speak for up to 6 minutes from time that had been allotted to the opponents of this bill.

The PRESIDING OFFICER. Without objection, it is so ordered.

Mr. LIEBERMAN. Mr. President, I rise in support of the Cuban Liberty and Democratic Solidarity Act. I am pleased and proud to say I am an original sponsor of this legislation which passed the Senate, passed the House, and languished in a conference committee because of a dispute over certain provisions of the bill. But, as so often happens, dictators like Castro, if given the time, will show their true inclination and will, by their acts, provide the best evidence and the best support for action by great and free nations like ours against them. So it was, painfully, tragically, in the case of Cuba and Castro, over the last few weeks.

This is in the context of attempts by many in our country, well-intentioned attempts, to open some lines of communication with Castro to see if that might tame this beast, if that might make this tiger into a pussy cat. Just a few weeks ago, a distinguished group of visiting Americans had pictures taken with Castro, all looking very friendly. But what is happening on the ground at the same time in Cuba? In response to the deterioration of the economy and the continued suppression of the human rights of Cubans, I gather for the first time in three decades, the disparate opposition groups, that is groups opposed to Castro—and it is not easy, as we all know, to be opposed to Castro in Cuba—come together, form this group, Concilio Cubano, and begin to discuss peaceful, nonviolent ways to oppose the dictatorial regime of Castro.

What is the response of that government, of Castro's government, to this group? He arrests its leaders, the leaders of the opposition, and puts them in jail. Think about the contrast. A distinguished group of Americans visiting, holding peaceful discussions, and at the same time the courageous domestic opposition to Castro—finally beginning to come together against the force of this state—gets locked up; all that in the week or so before this next tragic incident.

They were four Americans. Sometimes we are too sensitive about things said in the media, but it struck me at the outset, when these planes were shot down, they were described as being piloted by representatives of the Cuban exile community. There is a Cuban-American community that has left Cuba. But these are not Cuban exiles in the sense that the term suggests, that they are somehow the other. They are us. These are Cuban-Americans who have attained citizenship and are proud of their extraordinarily productive community in Florida.

So, four Americans in these unarmed planes were shot down, without appropriate warning under international

**S1504**

CONGRESSIONAL RECORD — SENATE

*March 5, 1996*

law: an outrageous act; an act of murder—let us call it that, plain and simple. An act of murder of civilians by a military government has now dislodged this bill from the conference committee and brought it to the floor, and I am grateful for the support that has been given to the bill.

The act of cowardice represented by that military attack demonstrates—as clearly as we could ask for it, much more clearly than any of us could argue on this floor or had argued before on behalf of this bill—that the Cuban Government's opposition to freedom is as strong as ever. The Castro regime remains hostile to the United States and the people of Cuba. This crackdown on the opposition, the shootdown of these planes, the litany of outrageous dictatorial acts that my friend and colleague from Florida has stated, show us once again that Castro is not redeemable. Forget it. Do not have idealistic dreams that this man, who comes out of the Stalinist era of communism, can suddenly become a freedom fighter.

In supporting the Cuban Liberty and Democratic Solidarity Act, we are acting in the best traditions of America's foreign policy because we are acting in the interests of human rights. We are acting in the interests of human rights. We are acting on behalf of the suppressed people who have lived too long under Castro's domination in Cuba. They have no less a right to live in freedom than the other peoples of the world toward whom we have extended ourselves, or against whom we have imposed economic sanctions to try to raise the liberty of the people who live within those countries.

There are those who say that Castro denies human rights. That is true. And it is in the tradition of America, the best tradition of our foreign policy, to stand for human rights.

Mr. President, pursuant to the previous agreement, I wonder if I might ask for 3 more minutes from the time of the opponents to the legislation?

Mr. COVERDELL. I would like to yield to the Senator from Connecticut 2 minutes, if I might.

Mr. LIEBERMAN. The Senator from Connecticut gratefully accepts.

The PRESIDING OFFICER. Without objection, it is so ordered.

Mr. LIEBERMAN. Mr. President, the point is this. The opponents of the bill and others may say, "Yes, Castro denies human rights, but he does not represent a threat to the United States." He does not, in a fundamental sense of our existence and security. But so long as there is a hostile government in Cuba, the fact is that enemies of the United States will find a partner. So long as there is a hostile government in Cuba 90 miles from our shore, those who wish us ill will find an ally. For that reason of our own national security, as well as the faithful support of the best principles of our country, human rights, I think the Cuban Liberty and Democratic Solidarity Act is a strong step in the right direction.

Keep the pressure on. Bring Castro down. Let us move together on a bipartisan basis. The President strongly supports this legislation. Great majorities of both parties in this Congress support the legislation. Let us pass it and send the strongest possible message of hope to those who live under tyranny in Cuba, and, hopefully, the strongest possible message that will bring fear to that individual who has tyrannized this proud people and that great island for much too long.

I thank the Chair and I yield the floor.

Mr. COVERDELL. Mr. President, I yield myself 3 minutes.

The PRESIDING OFFICER. The Senator from Georgia.

Mr. COVERDELL. Mr. President, I ask unanimous consent that the letter from President Bill Clinton to Majority Leader BOB DOLE in support of the conference report be printed in the RECORD.

There being no objection, the material was ordered to be printed in the RECORD, as follows:

THE WHITE HOUSE,
*Washington, March 5, 1996.*
Hon. ROBERT DOLE,
*Majority Leader, U.S. Senate, Washington, DC.*

DEAR MR. LEADER: The Cuban regime's decision on February 24 to shoot down two U.S. civilian planes, causing the deaths of three American citizens and one U.S. resident, demanded a firm, immediate response.

Beginning on Sunday, February 25, I ordered a series of steps. As a result of U.S. efforts, the United Nations Security Council unanimously adopted a Presidential Statement strongly deploring Cuba's actions. We will seek further condemnation by the international community in the days and weeks ahead. In addition, the United States is taking a number of unilateral measures to obtain justice from the Cuban government, as well as its agreement to abide by international law in the future.

As part of these measures, I asked my Administration to work vigorously with the Congress to set aside our remaining differences and reach rapid agreement on the Cuban Liberty and Democratic Solidarity (LIBERTAD) Act. Last week, we achieved that objective. The conference report is a strong, bipartisan response that tightens the economic embargo against the Cuban regime and permits us to continue to promote democratic change in Cuban.

I urge the Congress to pass the LIBERTAD bill in order to send Cuba a powerful message that the United States will not tolerate further loss of American life.

Sincerely,

BILL CLINTON.

Mr. COVERDELL. Mr. President, I ask unanimous consent that the letter of endorsement of the conference report by the U.S. Cuba Business Council be printed in the RECORD.

There being no objection, the material was ordered to be printed in the RECORD, as follows:

U.S.-CUBA BUSINESS COUNCIL,
*Washington, DC, September 20, 1995.*

DEAR COUNCIL MEMBER: As you know, the U.S.-Cuba Business Council has closely monitored congressional and Executive Branch action on the Cuban Liberty and Democratic Solidarity Act of 1995 [H.R. 1868], known as the LIBERTAD Act or the Helms-Burton

bill. The LIBERTAD Act has undergone significant change since the bill was originally introduced. Council members have inquired as to how the Council views the potential impact of this bill on the U.S. business community.

The measure, in its current form, addresses many of the concerns expressed by the Executive Branch, the business community and legal scholars. As modified, we believe that the LIBERTAD Act is fundamentally consistent with the goal of current U.S. policy on Cuba designed to foster a democratic change with guarantees of freedom and human rights under the rule of law. Congressional action on the bill may take place as early as this week.

Chapter I of the bill includes measures to strengthen the embargo against Cuba. Questions have been raised about the "extra-territoriality" of these provisions. As currently drafted, LIBERTAD Act is consistent with U.S. obligations under the North American Free Trade Agreement and the General Agreement on Tariffs and Trade and does not involve secondary boycotts.

Chapter II establishes a framework for trade with, and economic assistance to, a transitional or democratic government in Cuba. Some U.S. certified claimants have expressed concerns that Section 737 of the bill may diminish the pool of available assets for American property claimants by conditioning U.S. assistance to Cuba on resolution of claims held by those who were not U.S. citizens at the time of confiscation. Section 737 of the LIBERTAD Act has been significantly modified to address such concerns. As amended, this section protects the rights of certified U.S. claimants by conditioning assistance to a transitional government in Cuba on U.S. Presidential certification that the Cuban government is taking appropriate steps to resolve property claims involving U.S. claimants as described in Section 620(a)(2) of the Foreign Assistance Act of 1961.

A key element of the LIBERTAD Act involves measures under Chapter III to defend U.S. property rights and discourage foreign investors from trafficking in confiscated U.S. properties. Under these provisions, foreign firms trafficking in stolen U.S. property in Cuba would risk action by U.S. claimants against their U.S.-based assets [(Chapter III) Sections 741–744] and invite U.S. action to revoke entry visas of foreign corporate executives trafficking in confiscated U.S. properties.

We believe these measures will enhance the leverage of U.S. claimants seeking to discourage prospective foreign investors from trafficking in their confiscated properties in Cuba, facilitate the rapid and effective resolution of claims disputes, and level the playing field for U.S. firms preparing to participate in the economic development of a democratic Cuba.

Some U.S. claimants have expressed concerns about allowing Cuban American claimants to file suits against traffickers or to obtain default judgements against the Cuban government. Sections 742 and 744 of the LIBERTAD Act have also been modified to clarify that the bill does not authorize the President to espouse the claims of naturalized U.S. citizens in any settlement with Cuba and will not dilute the pool of assets available to U.S. claimants. As modified, the LIBERTAD Act significantly narrows and limits the filing of suits to effectively target foreign firms trafficking in confiscated U.S.-owned property.

In the new version of LIBERTAD, it is not possible to obtain a default judgement against the current government of Cuba. Moreover, the right of action to sue a trafficker in stolen U.S. assets applies almost

exclusively to commercial property. Claimants must provide suspected traffickers with 180 days notice before filing legal action and the case must involve property worth more than $50,000. The Cuban government claims a total of 212 joint ventures on the island. Few of those enterprises are likely to have U.S.-based subsidiaries or other assets. Thus, only a handful of cases against foreign firms in the U.S. would qualify for consideration in U.S. courts. Accordingly, the Congressional Budget Office estimated that the cost of enforcement of the LIBERTAD Act would be less than $7 million. Furthermore, under current law the President could halt such suits through his authority under the International Emergency Economic Powers Act once a transition regime is in power in Cuba.

On balance, the Council considers the LIBERTAD Act, in its current form, to be consistent with the Council's mission statement and beneficial for the U.S. business community, protection of U.S. property rights, and the economic development of a free market, democratic Cuba.

Please contact me or USCBC Executive Director Tom Cox in our Washington office (202) 293–4995 if you need further information on issues relating to this measure. I look forward to hearing from you.

Best regards.

Sincerely yours,

OTTO J. REICH.

Mr. COVERDELL. Mr. President, I want to remind all listening to this debate that we are not talking about normal business transactions. We are talking about a dictator, a murderer, a violator of human rights, and an evil force in our hemisphere. That is the basis of this conference report.

It was suggested that we have not had appropriate time to deal with this legislation. It has been before the Senate for 13 months. There have been two subcommittee hearings on the measure and, of course, extensive negotiations between the White House and the committee itself.

It has been suggested that it violates NAFTA. The administration has confirmed our finding that this document does not violate NAFTA.

It has been suggested that we have a $50,000 cap denying the residential owners with smaller claims the opportunity to be benefited by the act. That is a result of the opponents' complaint that the number of claims under the original bill would crowd the court system. So we have acceded to their demand to limit the number of cases. We are perfectly willing to open these legal remedies to those with claims valued at less than $50,000 and welcome legislation to lower this cap.

It had been suggested that it is a violation of 40 years of international law, that no nationalized citizens have ever had rights under an international claims settlement. I would suggest the opposition read the 1992 annual report of the Foreign Claims Settlement Commission of the United States. You will find the precedents for our efforts to provide compensation to naturalized citizens.

It has been suggested that we are going to chill the business community, that this just deals with business transactions. I want to remind all listening, and the opposition, that the bill is directed at people who engage in the business of exploiting stolen—I repeat stolen—property confiscated by Fidel Castro and his regime.

Mr. President, until the Soviet aid was cut off, joint ventures were not the key issue that they have become. In 1981, there was one transaction of this type. But by 1993, there were 60; and in 1994, there were 74. Yet, just the introduction of the Helms–Burton legislation has cut the number of new joint ventures in half.

Mr. President, I ask unanimous consent to have printed in the RECORD a chart titled "Cuban Economic Association with Foreign Capital Participation", showing joint ventures in Cuba by country and year.

There being no objection, the material was ordered to be printed in the RECORD, as follows:

CUBAN ECONOMIC ASSOCIATIONS WITH FOREIGN CAPITAL PARTICIPATION

[By country and year]

| Country | 1988 | 1990 | 1991 | 1992 | 1993 | 1994 | 1995 | Total |
|---|---|---|---|---|---|---|---|---|
| Spain | | 1 | | 3 | 9 | 10 | 14 | 10 | 47 |
| Mexico | | | | 2 | 3 | 3 | 4 | 1 | 13 |
| Canada | | | | | 2 | 8 | 16 | | 26 |
| Italy | | | | | 1 | 5 | 4 | 7 | 17 |
| France | | | 1 | | 3 | 5 | 2 | 2 | 13 |
| Holland | | | | | 1 | 2 | 3 | 3 | 9 |
| Offshore | | | 1 | 3 | 10 | 5 | 12 | | 31 |
| Latin America | | | | 2 | 3 | 11 | 9 | 4 | 29 |
| Other | | | | 1 | 1 | 11 | 10 | 4 | 27 |
| Total | | 1 | 2 | 11 | 33 | 60 | 74 | 31 | 212 |

Source: Cuba, Inversiones y Negocios 1995–96, CONAS, Havana, 1995, p. 18.

Mr. COVERDELL. Mr. President, it has been stated that our allies, some 58 countries, are going to be intimidated. I hope they are chilled by this. I hope they are. We are saying "quit dealing and assisting this dictator by giving him hard currency in exchange for the use of our stolen property."

Mr. President, let me say that I think the argument that international law, which protects these types of transactions, has a higher standing than our country's interest in defending our property owners is flawed. I think the pursuit of perfecting international law to protect our citizens from a rogue regime is legitimate and good sound public policy.

I yield the floor.

Mr. President, how much time is remaining total?

The PRESIDING OFFICER. Five minutes and fifty-one seconds.

Mr. COVERDELL. It is my understanding that no one chooses to speak on the measure. So I will make a closing comment and then yield back time.

The PRESIDING OFFICER. Without objection, it is so ordered.

Mr. COVERDELL. Mr. President, first, I think we owe the authors, Senator HELMS and Congressman BURTON, the cosponsors, and the White House—all who participated extensively to perfect this conference report that I believe will soon become law—a great deal of support. They need to be complimented extensively for the vast work they have done to perfect this legislation over the last 2 years.

Mr. President, I believe that this legislation will send a signal worldwide about this rogue regime, that it is not in the interest of business, or individuals, to be predators over confiscated and stolen property. I think the effects that I just alluded to moments ago are very positive, and I hope that all will take note and that there will be no more transactions in stolen property.

I hope that we give comfort to those who have had their lifelong possessions confiscated by the Cuban Government, that we will begin to signal hope to them, that there may be light at the end of the tunnel, and that they will be compensated for that which was lost.

I hope to the Cuban people we will be saying that the United States stands here ready to be an ally and ready to be an assistant to the transition to democracy and to the transition to a democratic government.

Mr. President, I see the author of the bill has arrived on the floor. I yield whatever time is remaining to the distinguished Senator from North Carolina.

Mr. HELMS. I thank the Senator from Georgia.

Mr. HELMS addressed the Chair.

The PRESIDING OFFICER. The Senator from North Carolina.

Mr. HELMS. Thank you for recognizing me, Mr. President.

Mr. President, let me first say with the friendliest of intent to our neighbors to the north, Canada, who have overspoken themselves in criticism of the United States—and particularly of this bill—declaring that they think it is all right for them and others to continue to deal with Castro. Let me remind them that Castro has had a murderous regime from the very beginning. More Cuban citizens have been killed, murdered, locked up, imprisoned, robbed—you name it—than anybody can imagine.

They advocate making a deal with Castro.

That is precisely what Neville Chamberlain advocated about dealing with Hitler. Mr. Chamberlain went to Munich, was wined and dined by Hitler. When he came back, he declared, "We can do business with Hitler. We can make a deal. We can have peace in our time." Well, Neville Chamberlain was wrong; one man, Winston Churchill, rebuked Chamberlain and declared that he was wrong. Winston Churchill was right.

Furthermore, I will say to our critical friends in Canada that some of us in the United States are a bit weary about Canada's flagrant transshipment of Cuban sugar and other things which are brought into Canada and then unlawfully shipped into the United States.

So, if the Canadians want to discuss what's right, what's moral, they should bear in mind that all of us become a part of what we condone. And by their advocacy in this matter, by their opposition to this bill, the Canadians are condoning Fidel Castro. Shame on them.

Mr. President, about a year ago, on February 9, 1995, I introduced legislation to hasten the day when Fidel Castro no longer can inflict terror and hardship upon the people of Cuba. Today, the Cuban people have reason to hope that Castro's days are indeed numbered: The Cuban Liberty and Democratic Solidarity Act is on its way to the White House for the President's promised signature.

So, we are today one step away from seeing the long-awaited legislation signed into law. This conference report has broad bipartisan support, and the President has endorsed the bill and is urging all Members of Congress to support it.

The Libertad Act may very well persuade Fidel Castro to withdraw his stranglehold on the Cuban people. It is difficult to see how Castro can sensibly continue to hope that his dictatorship can survive the tough provisions of this legislation, for example, the strengthening of all international sanctions by putting into law all the scores of Cuban embargo Executive orders and regulations enacted and imposed since President Kennedy. Simply stated, the embargo cannot and will not be lifted until Castro has departed and a democratic transition is underway in Cuba.

In short, it is time for Mr. Castro to wake up and smell the coffee.

Most importantly, the Libertad Act forces foreign investors to make a decision, a choice: They can trade with the United States or they can trade with Cuba, but not with both without paying a serious price. This legislation specifically creates a right of action for American citizens to sue those who traffic in property stolen from them by the Castro regime. The bill also makes it mandatory that the Secretary of State deny entry into the United States to individuals who are enriching themselves with confiscated American properties.

Mr. President, it may be hard to believe but there are still a few voices calling for the United States to lift the embargo. In the past 2 weeks, those arguments have been completely, totally, and utterly discredited. For during these past 2 weeks, the Castro regime deliberately, intentionally, and in violation of international law, blew two unarmed civilian planes out of the sky. Castro has launched the most brutal crackdown on dissidents in more than a decade. There have been wholesale arrests in the middle of the night, followed by show trials; there have been illegal searches that have shown what Fidel Castro is—a brutal dictator.

These atrocities have not surprised the Cuban people who, for three decades now, have witnessed brutal atrocities every day of their lives under Castro's tyrannical regime.

Fidel Castro has also launched a crackdown on members of the independent news media in Cuba. Since early 1995, Castro and his agents have arrested and jailed journalists who made the mistake of trying to make

objective reports regarding Cuban Government activities.

They arrested Olance Nogueras Roce for trying to protect the health and well-being of his fellow Cubans by detailing the perilous violations of safety regulations and the faulty construction of the Cuban nuclear powerplant.

Perhaps the most despicable attacks made by Castro, Mr. President, were against Cuba's blossoming religious community. After years of persecution and open hostility by the Castro regime, the Cuban people, especially the young people, are flocking to the church in record numbers. But, fearful that the church will tell the truth about Fidel Castro, his security agents have closed churches, arrested clergy, and harassed church-goers. Freedom to worship is nonexistent in Castro's dictatorship.

So, Mr. President, this conference report recommending that the Libertad Act become law is more desperately needed by the people of Cuba than ever before. The enactment of the Libertad Act will give these beleaguered Cuban people hope.

This is the light at the end of the tunnel for which the Cuban people have prayed—those poor souls locked in Castro's gulags, those desperate people who attempt to cross the dangerous straits to Florida, the journalists and clergy who have sought the freedom to shed light on Castro's lies, and the average Cuban citizen struggling to survive under Castro's tyranny. Now that they are about to have this new law on their side, surely it will be only a matter of time before the Cuban people enjoy the freedoms that too many Americans take for granted.

Mr. President, earlier I mentioned that President Clinton supports the Libertad Act. I ask unanimous consent that the President's letter to the distinguished majority leader be printed in the RECORD.

There being no objection, the letter was ordered to be printed in the RECORD, as follows:

THE WHITE HOUSE,
*Washington, March 5, 1996.*

Hon. ROBERT DOLE,
*Majority Leader, U.S. Senate,*
*Washington, DC.*

DEAR MR. LEADER: The Cuban regime's decision on February 24 to shoot down two U.S. civilian planes, causing the deaths of three American citizens and one U.S. resident, demanded a firm, immediate response.

Beginning on Sunday, February 25, I ordered a series of steps. As a result of U.S. efforts, the United Nations Security Council unanimously adopted a Presidential Statement strongly deploring Cuba's actions. We will seek further condemnation by the international community in the days and weeks ahead. In addition, the United States is taking a number of unilateral measures to obtain justice from the Cuban government, as well as its agreement to abide by international law in the future.

As part of these measures, I asked my Administration to work vigorously with the Congress to set aside our remaining differences and reach rapid agreement on the Cuban Liberty and Democratic Solidarity (LIBERTAD) Act. Last week, we achieved

that objective. The conference report is a strong, bipartisan response that tightens the economic embargo against the Cuban regime and permits us to continue to promote democratic change in Cuba.

I urge the Congress to pass the LIBERTAD bill in order to send Cuba a powerful message that the United States will not tolerate further loss of American life.

Sincerely,

BILL CLINTON.

Mr. HELMS. I thank the distinguished manager of the bill, Mr. COVERDELL, of Georgia.

I yield the floor. I yield such time as I may have.

The PRESIDING OFFICER. Who yields time?

Mr. COVERDELL. Mr. President, I ask that all time be yielded and the debate be concluded.

The PRESIDING OFFICER. All time is yielded.

━━━━━━━━━

DISTRICT OF COLUMBIA APPROPRIATIONS ACT, 1996—CONFERENCE REPORT

The PRESIDING OFFICER. Under the previous order, the clerk will report the conference report to accompany H.R. 2546, the District of Columbia appropriations bill.

The assistant legislative clerk read as follows:

The committee of conference on the disagreeing votes of the two Houses on the amendment of the Senate to the bill (H.R. 2546) making appropriations for the Government of the District of Columbia and other activities chargeable in whole or in part against the revenues of said District for the fiscal year ending September 30, 1996, and for other purposes, having met, after full and free conference, have agreed to recommend and do recommend to their respective Houses this report, signed by a majority of the conferees.

The Senate resumed consideration of the conference report.

The PRESIDING OFFICER. Under the previous order, there are 15 minutes allotted to each side.

Who yields time?

Mr. KOHL addressed the Chair.

The PRESIDING OFFICER. The Senator from Wisconsin.

Mr. KOHL. Mr. President, my remarks will be very brief. This afternoon—after the vote on the Cuba resolution—the Senate is scheduled to vote on a third motion to invoke cloture on the D.C. appropriations bill. The first motion was rejected by a vote of 54 to 44. Last Thursday, the Senate rejected a second cloture motion by a vote of 52 to 42. Today, I urge my colleagues to reject this motion as well.

The time has arrived for the Senate to move beyond single issue politics to address the urgent needs of our Nation's Capital. It is clear that there is a significant—and unresolvable—difference of opinion on the scholarship program proposed in the conference report.

Repeated attempts to move this report have failed, and I am certain that the question of vouchers will not be settled on this particular legislative