UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 1:22-cv-21796-FAM

JOSE BASULTO, an individual, and
BROTHERS TO THE RESCUE, INC. a
Florida not-for-profit corporation,

    Plaintiffs,

v.

NETFLIX, INC., a Delaware corporation,
ORANGE STUDIOS, S.A., a French anonymous
society, OLIVIER ASSAYAS, an individual,
NOSTROMO PICTURES, SL, a Spanish
corporation, US ONE COMERCIO
E SERVICIOS DE CRIACAO E PRODUCAO
DE OBRAS COM DIREITOS AUTORAIS, LTD, a
Brazilian limited company, CG CINEMA, SASU,
a French simplified joint stock company, RODRIGO
TEIXEIRA, an individual, CHARLES GILLIBERT,
an individual, and LOURENCO SANT'ANNA, an
individual,

    Defendants.
_____/

### PLAINTIFFS' OBJECTIONS TO REPORT AND RECOMMENDATION ON THE FOREIGN DEFENDANTS' MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION [ECF NO. 177]

    Plaintiffs JOSE BASULTO ("Basulto") and BROTHERS TO THE RESCUE, INC. ("BTR") (collectively, "Plaintiffs"), by and through undersigned counsel and pursuant to Federal Rule of Civil Procedure 72, hereby file their *Objections to Report and Recommendations on the Foreign Defendants' Motion to Dismiss for Lack of Personal Jurisdiction [ECF No. 177]* (the "Objections") and, in support thereof, state as follows:

In the Report and Recommendations on the Foreign Defendants[1] Motion to Dismiss for Lack of Personal Jurisdiction (the "Report") [ECF No. 177], the Magistrate Judge granted the Foreign Defendants' Motion to Dismiss for Lack of Personal Jurisdiction (the "Motion to Dismiss") [ECF No. 33]. There are two primary issues presented by the Motion to Dismiss: (1) whether the Foreign Defendant are subject to Florida's Long Arm Statute; and (2) whether the Foreign Defendants have sufficient minimum contacts such that this Court's exercise of personal jurisdiction over them comports with due process. In his Report, the Magistrate Judge found that the Foreign Defendants are subject to Florida's Long Arm Statute. *See* Report at p. 16-17. However, the Magistrate Judge erroneously found that the Foreign Defendants do not have sufficient minimum contacts such that this Court's exercise of personal jurisdiction over them does not comport with due process. Through the instant Objections to the Report, Plaintiffs' object to the Magistrate Judge's finding that the Foreign Defendants do not have sufficient minimum contacts with Florida, and Plaintiffs submit that the exercise of personal jurisdiction over the Foreign Defendants does comport with due process.

    **I.    THE EXERCISE OF PERSONAL JURISDICTION OVER THE FOREIGN DEFENDANTS COMPORTS WITH DUE PROCESS UNDER THE CO-CONSPIRACY THEORY**

Counts IX and X of Plaintiffs' Complaint comprise of claims for conspiracy to defame. See ECF No. 1 at p. 56. As described below, the "co-conspirator theory" provides that the exercise of personal jurisdiction over a conspirator comports with due process where personal jurisdiction may be exercised over one of the other conspirators to the conspiracy. As described fully below, the exercise of personal jurisdiction over the Foreign Defendants comports with due process because they took part in a conspiracy with Defendant Netflix, Inc. ("Netflix") for Netflix to publish the Film, *Wasp Network*, in Florida. Significantly, the Foreign Defendants knew that Defendant Netflix, Inc. would publish the Film in Florida. The Report cites *Oueiss v. Saud*, 2022 WL 1311114 (S.D. Fla. 2022) in support of its rejection of "plaintiff's theory that personal jurisdiction over one co-conspirator automatically satisfied due process for other co-conspirators.

---

[1] The "Foreign Defendants" are US One Comercio E Servcios De Criacao E Producao De Obras Com Direitos Autoriais, Ltd. ("RT Features"), CG Cinema, SASU ("CG"), Rodrigo Teixeira ("Teixeira"), Charles Gillibert ("Gillibert"), Lourenco Sant'Anna ("Sant'Anna"), Orange Studios, SA ("Orange") and Nostromo Pictures, SL ("Nostromo").

2

*See* Report at p. 20. *Saud* is distinguishable from the instant case. As described fully below, the defendant in *Saud* was not part of any conspiracy for any tortious activity to take place in Florida and the defendant did not have any knowledge that any tortious activity would or did occur in Florida. In contrast, the Foreign Defendants were part of a conspiracy with Netflix for Netflix to publish the Film in Florida and they took extensive action, such as licensing the Film to Netflix, precisely so that Netflix would publish the Film in Florida. The Foreign Defendants always intended for the Film to be published in Florida, *as is alleged in the Complaint*. *See* Complaint at ¶37 (the Foreign Defendants "intended and agreed for the film to be published and broadcast nationally in the United States, including in Florida."). These allegations are not disputed by any Declaration filed by the Foreign Defendants in support of their Motion to Dismiss. Accordingly, as the Motion to Dismiss tests Plaintiffs allegations, the *Saud* case is irrelevant since the holding in that case was that the defendant had no intention for any tortious activity to occur in Florida.

The Report reads as if the co-conspirator theory is nonexistent. But it does exist pursuant to binding precedent and it establishes that due process is satisfied when a nonresident conspirator participates in a conspiracy where overt acts in furtherance of the conspiracy occur in Florida.

For example, in *Int'l Underwriters AG v. Tripl I:Int'l Invs., Inc.*, 2007 WL 9701852 (S.D. Fla. 2007), the Southern District of Florida held that a nonresident defendant was subject to personal jurisdiction in Florida because, "By allegedly joining and participating in the conspiracy with knowledge that overt acts in furtherance of the conspiracy would and did take place in Florida, defendant Knock purposefully availed himself of the privilege of conducting activities within this State, and his connection with this state is accordingly such that he should reasonably anticipate being haled into court here." *Int'l Underwriters AG*, 2007 WL 9701852 *5 (S.D. Fla. 2007); *See also J&M Assocs., Inc. v. Romero*, 488 F.App'x 373, 375-76 (11th Cir. 2012) (holding a nonresident defendant had minimum contacts with Alabama because his co-conspirators committed an overt act in furtherance of the conspiracy in Alabama.); *Platypus Wear, Inc. v. Clarke Modet & Co., Inc.* 515 F.Supp.2d 1288, 1294 (S.D. Fla. 2007) ("This Court can then exercise jurisdiction over Mr. Caldas if the contacts of the conspiracy (imputed to Mr. Caldas Sr.) constitute sufficient minimum contacts."); *Diversified Mgmt. Sols., Inc. v. Control Sys. Research, Inc.*, 2016 WL 4256916 *15 (S.D. Fla. 2016) (finding minimum contacts satisfied for co-conspirator who did not engage in activities in Florida because "the bulk of the conspiracy took place in Florida."); *Amersham Enterprises, Inc. v. Hakim-Daccach*, 333 So.3d 289, 302 (Fla. 3d

3

DCA 2022) ("Under a well-developed body of precedent…acts of a conspirator in furtherance of a conspiracy may be attributed to the other members of the conspiracy and personal jurisdiction over a nonresident conspirator may be exercised even absent sufficient personal minimum contacts with the forum if those contacts are supplied by another.' Accordingly, 'the conspiracy theory of personal jurisdiction is viewed as consistent with the requirements of due process."). Plaintiffs note that *Romero* is binding precedent.

The Report also cites *Walden v. Fiore*, 571 U.S. 277 (U.S. 2014) for the general proposition that the Foreign Defendants' connection with Netflix's publication of the Film was too "random, fortuitous, or attenuated" to establish personal jurisdiction. *See* Report at p. 20-21 (*citing Walden*, 571 U.S. at 286). However, *Walden* did not deal with a conspiracy theory. In addition, the Foreign Defendants contacts with Netflix's publication of the Film was not too "random, fortuitous or attenuated." *Id*. Again, the Foreign Defendants took action, such as licensing the Film to Netflix, precisely so that Netflix could publish the Film in Florida. Licensing the Film to Netflix for publication in the U.S. and in Florida is not fortuitous, it was a deliberate action that was made in order to profit.

Accordingly, personal jurisdiction is established over the Foreign Defendants in connection with their claim for conspiracy because the co-conspiracy theory for personal jurisdiction is, in fact, valid and the actions taken by the Foreign Defendants are not too "attenuated" to Netflix's publication of the Film. At the very minimum, this Court should find that it has personal jurisdiction over Orange because Orange licensed the Film to Netflix. Orange's licensing of the Film to Netflix should not be considered to be too "attenuated" to Netflix's publication of the Film. It is undisputed that the exercise of personal jurisdiction over Netflix comports with due process, and that all three prongs of the due process analysis (1. Arising out of or relating to; 2. Purposeful availment; 3. Reasonably anticipate being haled into court) are satisfied with respect to Netflix. *Fraser v. Smith*, 594 F. 3d 842, 849 (11th Cir. 2010). As such, personal jurisdiction may be exercised over Netflix's co-conspirators involved in the conspiracy for Netflix to publish the Film in Florida, the Foreign Defendants.

In *Saud*, relied upon in the Report, the plaintiff was a journalist and an anchor for the Al Jazeer news organization headquartered in Qatar. One of the defendants was Mohammed Bin Salman (the "Crown Prince"). "At a high level, Plaintiff allege(d) that the Crown Prince spearheaded a conspiracy to hack her mobile device and then, through a network of agents located

4

in the United States and abroad, defamed and harassed Plaintiff on the internet for her reporting on the Crown Prince's approval of the high-profile killing of international journalist Jamal Khashoggi, a critic of Saudi Arabia and the Crown Prince (the "Conspiracy")." *Oueiss v. Saud*, 2022 WL 1311114 *4 (S.D. Fla. 2022). The distinguishing factor is that the Crown Prince did not know that any overt acts of the conspiracy would take place in Florida. In other words, the allegations indicated that the Crown Prince was not part of the conspiracy at issue. Notably, the Southern District of Florida stated, "there is no indication that the Crown Prince was aware of any act in furtherance of the Conspiracy that took place or would take place in Florida." *Id*. at 18. The Southern District of Florida found that the conspirator theory cannot be invoked "where the nonresident defendant has no knowledge that overt acts in furtherance of the conspiracy did or would take place in the forum." *Id*. at n. 11. There was no indication that the two U.S. Defendants residing in Florida were connected to any conspiracy involving the Crown Prince. *Id*. at 16. There was no indication that the Crown Prince had any involvement, awareness or knowledge of any of the tortious activity committed by others in Florida. *Id*. at 17.

In contrast, as described below, the Foreign Defendants were acutely aware that Netflix was going to publish the Film in Florida in furtherance of their conspiracy. The Foreign Defendants' contacts with Florida were not "random, fortuitous, or attenuated." *See* Report at p. 20-21 (*citing Walden*, 571 U.S. at 286). Indeed, the Declarations submitted by the Foreign Defendants in support of their Motion to Dismiss (which may be relied upon by this Court in determining the Motion to Dismiss)[2], as well as their testimony and documents produced in this case[3], demonstrated that the Foreign Defendants took affirmative action to ensure that Netflix published the Film in the U.S. and Florida.

    i.    **Orange**

Out of all the Foreign Defendants, Orange's actions are the most directly related to Netflix's publication of the Film in Florida because Orange executed the License Agreement which

---

[2] *See Randall v. Offplan Millionaire AG*, 2019 WL 5188368 *5 (M.D. Fla. 2019) (Court may rely on affidavit statements in ruling on a motion to dismiss for lack of personal jurisdiction).

[3] *See Court-Appointed Receiver for Lancer Management Goup, LLC v. Cable Road Investments Ltd*., 2007 WL 9698235 *2 (S.D. Fla. 2007) ("Defendants further assert that …the Receiver has failed to allege facts sufficient to establish personal jurisdiction. Even if that assertion is true, the Receiver should be permitted the opportunity to conduct limited discovery in order to establish jurisdiction over the Defendants and plead accordingly.").

provided Netflix with the legal rights to publish the Film. Indeed, Orange negotiated the License Agreement directly with Netflix, and licensed to Netflix the U.S. distribution rights of the Film. *See* the Declaration of Teixeira, ECF No. 36 at ¶12; Declaration of Kristina Zimmerman, ECF No. 35 at ¶6; Transcript of February 3, 2023 Deposition of Orange ("Orange Depo.") [ECF No. 115-11] 29:1-9. Orange signed the License Agreement and is the only other signatory to the License Agreement aside from Netflix. *See* License Agreement, ECF No. 115-3; Orange Depo., 26:8-25. Accordingly, Orange provided vital assistance in the conspiracy for Netflix to publish the Film in Florida. Indeed, Orange provided to Netflix the rights to do so pursuant to the License Agreement. Again, this is not "random fortuitous or attenuated" to Netflix's publication of the Film, as stated in the Report. *See* Report at p. 20-21 (*citing Walden*, 571 U.S. at 286). Netflix could not have published the Film without Orange's signature on the License Agreement, and Orange signed the License Agreement precisely so that Netflix would publish the Film in the U.S. and Florida.

Further, subsequent to the execution of the License Agreement, Orange delivered to Netflix certain items which were necessary for Netflix to publish the Film in the U.S. and Florida, further establishing Orange's involvement in the conspiracy. *See* Orange Depo., 63:15-23. For example, Orange provided to Netflix copyrights for the Film. Orange Depo., 68:10-22. Orange also supplied to Netflix the "chain of title" contemplated by the License Agreement, which serves to identify and validate the legal rights that Netflix acquired to license the Film. Transcript of February 7, 2023 Deposition of Charles Gillibert ("Gillibert Depo.") [ECF No. 115-12 at 12:11-25; 13:1-25; 15:1-25; 17:23-25; 18:1-9; 35:23-25: 36:1-25; License Agreement, at Bates No. NETFLIXINC000653. Notably, Netflix produced emails in this case demonstrating that it relied on the Chain of Title provided by Orange in its decisions regarding who to include in the Film's credits. See ECF No. 115-13. Orange also participated in organizing press interviews with Netflix prior to the release of the Film. *See* ECF No. 115-14. Netflix produced a total of 98 emails that it exchanged with Orange after the License Agreement was issued. *See* ECF No. 115-15.[4]

---

[4] While Orange's direct involvement with Netflix is evidence enough of Orange's role in the conspiracy for Netflix to publish the Film, it is also notable that Orange produced the Film. Orange was the primary financer of the Film aside from RT Features. See February 2, 2023 Deposition of Lourenco Santa'Anna (the "Santa'Anna Depo"), ECF No. 115-6 at 14:8-13; 16; 54:16-19; 61:1-4; 69-70; Teixeira Depo at. 36:13-21. Also, Orange was a producer of the Film and assisted with, among other things, the casting of actors for the Film. See Zimmerman Declaration, ECF No. 35 at ¶5; Orange Depo. at 11;16-21, 16:17-25.

6

As such, it is abundantly clear that Orange knew that Netflix would publish the Film in Florida, making this case like *Int'l Underwriters AG* rather than *Saud*.

A civil conspiracy requires: (a) an agreement between two or more parties, (b) to do an unlawful act or to do a lawful act by unlawful means, (c) the doing of some overt act in pursuance of the conspiracy, and (d) damage to plaintiff as a result of the acts done under the conspiracy." *See Parisi v. Kingston*, 314 So.3d 656, 661 (Fla. 3rd DCA 2021). "Florida courts may exercise personal jurisdiction over parties to a Florida civil conspiracy even if the alleged civil conspirator otherwise has no connection to the state. Under Florida law, then, personal jurisdiction can be exercised over a non-resident defendant under the 'co-conspirator theory' if: (1) jurisdiction can, under the traditional tests discussed below, be asserted over a 'resident' defendant (*i.e.* one with sufficient ties to the state); (2) the plaintiff can demonstrate the existence of a conspiracy in which the non-resident defendant and the resident defendant participated; and (3) an overt act in furtherance of the conspiracy took place within the state." *Schrier v. Qatar Islamic Bank*, 2022 WL 4598630 *12 (S.D. Fla. 2022). In order to establish that the Foreign Defendants conspired with Netflix, Plaintiffs merely need to show that the Foreign Defendants entered into an "implied agreement" for Netflix to publish the Film and "assisted [Netflix] in some way." *See Woodward-CM, LLC v. Sunlord Leisure Products, Inc.*, 2022 WL 890065 *9 (S.D. Fla. 2022) (Noting that the agreement element of conspiracy may be satisfied by showing an "implied agreement" and stating, "[A] conspiracy is a combination of two or more persons by concerted action to accomplish an unlawful purpose or to accomplish some purpose by unlawful means. Each coconspirator need not act to further a conspiracy; each need only know of the scheme and assist in it in some way to be held responsible for all of the acts of his coconspirators.").[5] It is not necessary for Plaintiffs to show that Defendants had any role in the publication of the Film.[6]

---

[5] In accordance with *Woodward*, the "agreement" element of a conspiracy may be "implied." *Schrier v. Qatar Islamic Bank*, 2022 WL 4598630 (S.D. Fla. 2022). *See Parisi v. Kingston*, 314 So.3d 656 (Fla. 3rd DCA 2021) (""A civil conspiracy requires: (a) an agreement between two or more parties, (b) to do an unlawful act or to do a lawful act by unlawful means, (c) the doing of some overt act in pursuance of the conspiracy, and (d) damage to plaintiff as a result of the acts done under the conspiracy.").

[6] For example, in *Caroll v TheStreet.com, Inc.*, 2012 WL 13134547 (S.D. Fla. 2012), the defendant, The Street.com, published a defamatory article about the plaintiff with defamatory material from another defendant, Third Point, LLC. Even though Third Point, LLC did not publish any defamatory material itself, the Southern District of Florida held that the plaintiff stated a claim

Further, Netflix having discretion to publish the Film under the License Agreement does not foreclose the existence of an implied agreement that Netflix would use its discretion to publish the Film. If parties to a conspiracy could simply state that there really was no conspiracy in a document in order to absolve themselves from all liability, then the cause of action of civil conspiracy would be eviscerated. Notably, there was no contractual obligation to publish at issue in *Caroll*. It is obvious that Orange knew the Film would be published in the U.S. and in Florida. Indeed, Netflix's platform is a website that is available nationally throughout the U.S. with "72.9 million U.S. subscribers, including many who are in the State of Florida." *See* Complaint, ECF No. 1 at ¶23. *See Geller v. Von Hagens*, 2011 WL 2193329 *2 (M.D. Fla 2011) (Middle District of Florida exercised personal jurisdiction over a defendant who intended defamatory material to be published nationally in the U.S. on the television network, ABC, because such national publication necessarily includes Florida).

Also, the Foreign Defendants may argue that a conspiracy to distribute the Film does not give rise to personal jurisdiction to the extent that they did not "intend" to harm or defame Plaintiffs. This goes to the merits as it pertains to whether the Foreign Defendants acted with malice or reasonable care (depending on the standard used)[7] in taking part in a conspiracy to distribute the Film. Notably, a conspiracy to defame is a valid cause of action. *See Caroll v TheStreet.com, Inc.*, 2012 WL 13134547 (S.D. Fla. 2012) (Holding that the plaintiff stated a claim for conspiracy to defame). Indeed, a conspiracy is simply "an agreement…to do an unlawful act," such as the agreement among the Foreign Defendants and Netflix for Netflix to publish the Film. Parisi v. Kingston, 314 So.3d 656, 661 (Fla. 3rd DCA 2021).

Finally, although the Foreign Defendants have **not** filed a Motion pursuant to Rule 12(b)(6), they have nonetheless argued that Plaintiffs have failed to allege a conspiracy with the

---

for civil conspiracy stating, "[Plaintiff] has alleged that Defendants formed an agreement to defame him, which is all that is needed to support a claim for civil conspiracy." *Id.* at *8.

[7] Since Plaintiffs are private persons, they must merely prove that Netflix acted with negligence, "*i.e.* without reasonable care" in publishing the Film. *Miami Herald Pub. Co. v. Ane*, 423 So.2d 376, 378 (Fla. 3rd DCA 1982). In the event that Plaintiffs are public figures, then they must show that there is enough record evidence to "allow a reasonable juror to conclude (clearly and convincingly)" that Netflix acted with malice. *Berisha v. Lawson*, 973 F.3d 1304,1313 (11th Cir. 2020).

requisite specificity. In response to this argument Plaintiffs contend that the Declarations filed in this case provide the requisite specificity. Indeed, the Declarations describe how Orange negotiated the License Agreement and signed the License Agreement. Teixeira Decl. [ECF No. 36] at ¶12. Zimmerman Decl. [ECF No. 35] at ¶6. In addition, Plaintiffs have through discovery gained knowledge of above-mentioned facts regarding how Orange assisted in the conspiracy after the License Agreement was executed.

      ii.      **RT Features and Rodrigo Teixeira**

Like Orange, RT Features and Teixeira took action in further of the conspiracy for Netflix to publish the Film in Florida. While RT Features may not be a signatory to the License Agreement, RT Features possessed the U.S. distribution rights for the Film and authorized Orange to execute the License Agreement. *See* Zimmerman Declaration, ECF No. 35 at ¶6; Teixeira Decaration, ECF No. 36 at ¶12; February 6, 2023 Deposition Transcript of Teixeira ("Teixeira Depo."), ECF No. 115-4 at 8: 2-19; 36:13-21. This is enough to establish personal jurisdiction over RT Features under Plaintiffs' claim for conspiracy. Significantly, **RT Features, and its CEO Teixeira, testified that it was always their intention for the Film to be published throughout the United States and that they knew and understood that Netflix would publish the Film on Netflix's platform as a result of Orange licensing the Film to Netflix on behalf of RT Features**. *See* Teixeira Depo., 5:13-18; 24:17-24; 35:15-21; Teixeira Declaration, ECF No. 36] at ¶2. This makes this case like *Int'l Underwriters AG* rather than *Saud*.

Netflix presented the License Agreement as a "take it or leave it offer" to RT Features. It was the decision of Rodrigo Teixeira, as the owner and CEO, to accept the offer on behalf of RT Features. Teixeira Depo., 21:7 -22:12. Teixeira did, in fact, accept the offer on behalf of RT Features. Teixeira Depo., 27:8 – 28:4; 32:9-23. Teixeira authorized Orange to execute the License Agreement. *Id*. Accordingly, Teixeira played a vital part in the conspiracy and is personally liable and subject to jurisdiction. *See First Financial USA, Inc. v. Steinger*, 760 So.2d 996, 997 (Fla. 4th DCA 2000) (officers of corporation "may be held personally liable for their tortious acts, even if such acts were committed within the scope of their employment or as corporate officers."). The corporate shield doctrine does not protect officers, such as Teixeira, from liability for intentional torts, such as conspiracy to defame, committed in their capacity as corporate officers. *See Louis Vuitton Malletier, SA. v. Mosseri*, 736 F.3d 1339 (11th Cir. 2013) ("[U]nder Florida law, this corporate shield doctrine is inapplicable where the corporate officer commits intentional torts…

Because Louis Vuitton alleges that Mosseri committed intentional torts, his corporate shield defense to personal jurisdiction fails under Florida law."); *Scutieri v. Miller*, 605 So.2d 972, 973 (Fla. 3d DCA 1992) (corporate officers were liable for defamation committed in their capacities as corporate officers).

RT Features committed additional acts in furtherance of the conspiracy and RT Features also satisfied the publication element of defamation by publishing the Film to Netflix. Indeed, as described fully below, RT Features (i) financed and produced the film (Teixeira Depo., 9:5-7; February 2, 2023 Deposition Transcript of Sant'Anna ("Sant'Anna Depo."), ECF No. 115-6 14:8-13); (ii) assisted Netflix with respect to Netflix's marketing and publication of the Film (*see e.g.*, ECF Nos. 115-7 & 115-8)[8]; (iii) provided the Film to Netflix through RT Features' agent, Creative Artist Agency (CAA)[9] (*See* March 2, 2023 Deposition Transcript of Netflix, Inc. ("Netflix Depo."), ECF No. 115-5 at 191:16 – 195:19;[10]); (iv) published the Film to Netflix and other distributors at film festivals; and (v) promoted the Film on videos accessible on the internet.

Further, Teixeira assisted in the production of the Film. Teixeira Depo., 6:4-6. Teixeira also hired CAA to identify a purchaser for the Film, and CAA identified and provided the Film to Netflix. *See* Netflix Depo., 191:16 – 195:19; Teixeira Depo., 10; 20-25; 11:1-14; 14:3-19; 19:8-13;20:10-15; 23:6-25; 24:1-8. In addition, in an effort to generate interest in the Film from distributors, RT Features and Teixeira participated in and published the Film at film festivals in Toronto, Venice Sao Paulo and New York. Teixeira Depo., 11:15-25; 12:1-2; 14:23-25; 15-:6-9; Sant'Anna Depo., 19: 22-25; 20: 1-18; 21:20-23. Netflix made the decision to acquire the Film after viewing the Film for the first times at the Venice and Toronto film festivals. *Id*.; Netflix

---

[8] ECF No. 115-7 is a copy of email correspondence where Netflix states that RT Features' "press wrap" is "incredibly helpful." Ex. 7, p. 1. ECF No. 115-8 is a copy of an email chain among Netflix and the Foreign Defendants concerning the marketing and publicity being done prior to the release of the Film.

[9] Creative Artist Agency ("CAA") is a sales company that worked for RT Features as its "agent" in finding buyers for the Film. Teixeira Depo., 10; 20-25; 11:1-14; 14:3-19; 19:8-13;20:10-15; 23:6-25; 24:1-8. CAA, on behalf of RT Features, contacted Netflix and provided the Film to Netflix. *Id*.

[10] ECF No. 115-9 is a copy of an email correspondence wherein CAA provides Netflix a link to the Film.

Depo., 19:19-25; 20:1-7. Teixeira also promoted the Film at "press conferences" which have been published on the internet on websites such as Youtube. Teixeira Depo., 16:15 – 17:1-25.

### iii. Lourenco Santa'Anna

Lourenco Sant'Anna, an employee of RT Features, negotiated the terms of the License Agreement. *See* February 2, 2023 Deposition of Lourenco Santa'Anna (the "Santa'Anna Depo"), ECF No. 115-6 at 19:19-22. Sant'Anna knew and understood that Netflix would publish the Film in Florida as a result of the License Agreement. *Id*. at 22:3-9. Significantly, prior to the release of the Film on Netflix's platform, Sant'Anna and Orange participated in discussions with Netflix regarding the date that Netflix would release the Film as well as marketing materials for Netflix to use in order to promote the Film. *Id*. at 14-15. 17-18. Sant'Anna approved of the release date. *Id*. at 16. Santa'Anna provided to Netflix input and feedback on Netflix's general promotion of the Film as well as the marketing materials utilized by Netflix to promote the Film. *Id*. at 24:19-25; 25:1-3; see *also* Composite Exhibit 7 and Exhibit 8 at ECF Nos. 115-7 & 115-8. In response to an email from Netflix with instructions on how the Foreign Defendants should publish marketing materials on social media regarding the release of the Film on Netflix's platform, Mr. Sant'Anna stated, "[v]ery exciting to be able to share the news with the world!" See ECF No. 115-10. Accordingly, Santa'Anna took part in the conspiracy as he assisted with the licensing of the Film to Netflix and provided marketing assistance to Netflix.

### iv. CG Cinema and Charles Gillibert

Charles Gillibert is the founder and corporate representative of CG Cinema. *See* February 7, 2023 Deposition of Charles Gillibert (the "Gillibert Depo."), ECF No. 115-12 at 5:3-22. CG Cinema produced the Film. *Id*. at 4:20-25. In addition, Gillibert and CG Cinema provided to Orange the items, described above, which Orange delivered to Netflix and which were necessary for Netflix to publish the Film. *Id*. at 12:11-25; 13:1-25; 15:1-25; 17:23-25; 18:1-9; 35:23-25: 36:1-25. Indeed, Charles Gillibert and CG Cinema reviewed the License Agreement and provided to Orange the chain of title referenced in the License Agreement so that Orange could provide the chain of title to Netflix, which it did to as described above. *Id*. Also, Gillibert and CG Cinema provided to Orange the copyrights for the Film so that Orange could transfer them to Netflix pursuant to the License Agreement. *See* Orange Depo. at 68:10-22. Netflix produced a total of 61 emails that it exchanged with CG Cinema after the License Agreement was issued. *See* Exhibit

11

"16." As such, Gillibert and CG Cinema participated in the conspiracy for Netflix to publish the Film.

### v. Additional Florida Contacts

The Film is set in Miami, Florida. Parts of the Film that depict Miami and the Miami skyline were shot in Miami, Florida. Netflix Depo. at 241:19-25; 242:1-4; *see also* ECF No. 115-17, at Bates No. NETFLIXINC000233 (Defendant Olivier Assayas stated in an interview that "we shot a very few simple exteriors in Miami…"); ECF No. 115-18 (Netflix marketing material for the Film). In addition, the planes used in the Film were obtained from U.S. resources. *Id*., at Bates No. NETFLIXINC000234 (Defendant Olivier Assayas stated in an interview, "We wound up sourcing Beechcrafts and Cessnas through private collectors in the U.S…"). Florida is the closest U.S. resource for planes, and the planes were likely obtained from Florida resources; however, none of the Foreign Defendants could remember at deposition where the planes were sourced. Further, Defendant Nostromo Pictures, SL stated that GoFly Tours, an Opa Locka based company, provided planes for the movie. Although the plane originated in Italy and was flown to Spain and Nostromo made payments for the plane to a bank account locatedin France and Italy, there were likely communications with people in Opa Locka. As described above, all of the Foreign Defendants produced the Film, and these Florida contacts are additional reasons why the Foreign Defendants should reasonably anticipate being haled into Court in Florida.

### II. THE EXERCISE OF PERSONAL JURISDICTION OVER THE FOREIGN DEFENDANTS COMPORTS WITH DUE PROCESS BECAUSE THEY COMMITTED DEFAMATION IN FLORIDA

Counts I - VIII of Plaintiffs' Complaint constitutes claims for defamation against the Foreign Defendants. The Report correctly concludes that the Foreign Defendants are subject to personal jurisdiction under Florida's Long Arm Statute for publishing the Film to Netflix (an element of defamation) who then published it in Florida, just as the defendants in *Madera* and *Geller* published defamatory statements to reporters who subsequently published the statements in Florida. *Madara v. Hall*, 916 F.2d 1510, 1515 (11th Cir.1990); *Geller v. Von Hagens*, 2011 WL 2193329 (M.D. Fla 2011).

RT Features and Teixeira provided the Film to Netflix through their agent, Creative Artist Agency ("CAA")[11] Netflix Depo. at 191:16 – 195:19; Teixeira Depo[12]. Further, Sant'Anna participated in publishing the Film at the Venice and Toronto film festivals. Santa'Anna Depo at 21:18-19. As described above, Netflix made the decision to acquire the Film after viewing the Film for the first times at the Venice and Toronto film festivals. *Id*.; Netflix Depo., 19:19-25; 20:1-7. Orange also participated in publishing the Film at the Venice and Toronto film festivals where Netflix viewed the Film. Teixeira Depo. at 15:17-19. In addition, CG Cinema and Charles Gillibert participated in and published the Film at the Venice and New York film festivals. 23:13-22; Teixeira at Depo., 15:13-25. As such, all the Foreign Defendants committed the publication element of defamation and are thus subject to Florida's Long-Arm Statute, as the Report correctly states.

The due process prerequisites to the exercise of specific jurisdiction over a defendant are less restrictive than the requirements for general jurisdiction. The minimum-contacts test for specific jurisdiction has three elements. First, the defendant must have contacts related to or giving rise to the plaintiff's cause of action. Second, the defendant must, through those contacts, have purposefully availed itself of forum benefits. Third, the defendant's contacts with the forum must be such that it could reasonably anticipate being haled into court there." *Fraser v. Smith*, 594 F. 3d 842, 849 (11th Cir. 2010) (internal citations omitted); *Oldfield v. Pueblo De Bahia Lora, S.A.*, 558 F.3d 1210, 1220 (11th Cir. 2009).

> **A.    The first "relatedness" element and the third "reasonably anticipate being haled into court" element may be established by showing that the Foreign Defendants knew that the Film would be published in Florida.**

The Report, citing *Walden*, erroneously states that the first "Arise out of or relate to" prong of due process is not met because the Supreme Court has "rejected attempts to establish personal jurisdiction based solely on a plaintiff's injury in the forum." *See* Report at pg. 22. This language

---

[11] Creative Artist Agency ("CAA") is a sales company that worked for RT Features as its "agent" in finding buyers for the Film. Teixeira Depo., 10; 20-25; 11:1-14; 14:3-19; 19:8-13;20:10-15; 23:6-25; 24:1-8. CAA, on behalf of RT Features, contacted Netflix and provided the Film to Netflix. *Id*.

[12] ECF No. 115-9 is a copy of an email correspondence wherein CAA provides Netflix a link to the Film.

pertaining to injury in the forum not being enough relates to the second "purposeful availment" prong, not the first "arise out of or relate to" prong. Rather, it relates to the second "purposeful availment" prong. *See e.g. MAG IAS Holdings, Inc. v. Schmuckle*, 854 F.3d 894, 901 (6th Cir. 2017) ("Walden simply holds that an out-of-state injury to a forum resident, standing alone, cannot constitute purposeful availment."). While the second "purposeful availment" element is the "tricky" one, the first and third elements of due process may be established, in the context of intentional torts such as defamation, by showing that a foreign defendant's conduct was calculated to cause the forum resident's injury.

The first "relatedness" element "centers on whether a plaintiff's claim ... arise[s] out of or relate[s] to at least one of defendant's contacts with the forum." *Gazelles FL, Inc. v. Cupp.*, 2018 WL 7364591 (M.D. Fla. 2018). In the context of intentional torts, the first "relatedness" element may be satisfied by showing that a foreign defendant caused injury to a forum resident. For example, the plaintiff in *Cupp*, a Florida corporation, asserted a claim against the defendant, a citizen of the State of Washington, for conversion based on the defendant's failure to remit to the plaintiff monies owed. The Middle District of Florida in *Cupp* held that the plaintiff's injury was suffered in Florida because the plaintiff was a Florida resident, and that the injury resulted in contact with the forum by the defendant which satisfied the "relatedness" prong of the due process analysis. *See Gazelles FL, Inc. v. Cupp.*, 2018 WL 7364591 * 10 (M.D. Fla. 2018) ("Gazelles, a Florida corporation, suffered injury in Florida as a result of Defendants' alleged actions supporting these claims, such as....Defendant's failure to pay Gazelles the dues derived from Gazelles International division for the second quarter of 2018. This conduct resulted in contact with the forum in the form of Gazelles' injury. 'At least in the case of intentional torts, such claim-causing contact is sufficient to satisfy the first prong.'") (internal citations omitted).

*USA Mgmt. Grp., LLC v. Fitness Publ'ns, Inc.*, 2015 WL 11233075 at *3 (S.D. Fla. 2015), cited by the Report, is distinguishable because it involved trademark infringement as opposed to an intentional tort, such as defamation. *See* Report at p. 23. The Report also states that *Madara v. Hall*, 916 F.2d 1510 (11th Cir. 1990) "cuts against Plaintiffs' due process arguments" and that the plaintiff not being a Florida resident is not enough to distinguish *Madera*. *See* Report at p. 22-223. Plaintiffs respectfully emphasize that the plaintiff not being a Florida resident was a substantial factor in the Court refraining from exercising personal jurisdiction in *Madara*. Further, another distinguishing factor is that in Madara only a small number of magazines containing the

14

defamatory material were distributed in Florida[13] and, significantly, the record did not reveal whether the *Hall* was even aware that a small number of copies of the magazine were distributed in Florida at the time he gave the interview. *Id*. at 1517. In contrast, here, as described above, the Foreign Defendants knew that Netflix was going to publish the Film in Florida such that the Film would be accessible to numerous Florida residents.

Just like the first element, the third, "reasonably anticipate being haled into court" element is also satisfied, in the context of intentional torts like defamation, in the form of a plaintiff's injury occurring within the forum. *See e.g. Licciardello v. Lovelady*, 544 F.3d 1280 (11th Cir. 2008) (The defendant's "intentional conduct in his state of residence was calculated to cause injury to Carmen in Florida. Lovelady cannot now claim surprise at being haled into court there." *Licciardello v. Lovelady*, 544 F.3d 1280, 1288 (11th Cir. 2008). For example, in *Geller*, where the defendant made defamatory comments in Germany to a reporter which were then published by a television station nation-wide in the U.S., the Middle District of Florida held that the defendant could reasonably anticipate being haled into court in Florida because he knew that his defamatory comments would be broadcast in Florida, where the plaintiff resided.[14] *See Geller*, 2011 WL 2193329 *5 (M.D. Fla 2011)

Here, none of the Declarations rebut Plaintiffs' allegations that the Foreign Defendants "intended and agreed for the film to be published and broadcast nationally in the United States, including in Florida." *See* Complaint at ¶37. Again, just because Netflix may have allegedly retained discretion to publish the Film, that does not mean that the Foreign Defendants did not intend for the Film to be published in Florida or for Netflix to exercise its discretion to publish the Film. As such, the first and third Due Process elements are met with respect to Plaintiffs' claims for Defamation and IIED Claims.

---

[13] "Music Connection distributed a small number of copies in Florida…In fact, just eighteen copies of the November 24-December 14 issue were mailed to Florida…Madara alleges additional copies were sold on newsstands." *Madara v. Hall*, 916 F.2d 1510 (11th Cir. 1990)

[14] *Geller* is in contrast to *Hall*, where the Eleventh Circuit Court of Appeals held that the plaintiff could not reasonably anticipate being haled into court in Florida because the Plaintiff was not a Florida resident. Since Plaintiffs here are Florida residents, *Geller* is the more applicable case and provides that the Foreign Defendants are subject to personal jurisdiction consistent with due process for creating defamatory content in the Film which they intended would be published in Florida and cause injury to Plaintiffs.

### B. Purposeful Availement

"When the underlying claims involve intentional torts, the Eleventh Circuit applies the 'effects' test for purposes of determining purposeful availment." *See Gazelles FL, Inc. v. Cupp.*, 2018 WL 7364591 * 10 (M.D. Fla. 2018) *citing Oldfield*, 558 F.3d 1220 n. 28; See also *Licciardello*, 544 F.3d at 1285-86. "The effects test requires that a defendant must have "(1) committed an intentional tort (2) that was directly aimed at the forum, (3) causing an injury within the forum that the defendant should have reasonably anticipated." *Id.* (citations omitted). "Under the effects test, a nonresident defendant's single tortious act can establish purposeful availment even if a defendant does not have any additional contacts with the forum state." *See Gazelles FL, Inc. v. Cupp.*, 2018 WL 7364591 * 10 (M.D. Fla. 2018) (*citing Lovelady*, 544 F.3d 1285. The first element of the effect test is met because the defamation is an intentional tort, and the Foreign Defendants have not argued that Plaintiffs have failed to state a claim for defamation. The third element of the effects test, causing an injury within the forum that the defendant should have reasonably anticipated, is easily met because Plaintiffs are Florida residents and the Foreign Defendants have not rebutted Plaintiffs allegations that the Foreign Defendants intended for the Film to be published in Florida, as described above.

With respect to the second element (directly aiming conduct at the forum), in *Walden v. Fiore*, 134 S.Ct. 1115 (U.S. 2014) the Supreme Court explained that this element was met in *Calder v. Jones*, 104 S.Ct. 1482 (U.S. 1984), which involved a libel suit in California against a Florida reporter whose libelous story was published in a magazine circulated in California. The *Walden* Court explained that personal jurisdiction was established by virtue of the "nature of the libel tort." *Walden*, 134 S.Ct. 1115, 1124 (U.S. 2014). The *Walden* Court reasoned that the damage to reputation from the libel in Calder occurred as a result of other California residents reading the libelous story, and stated that the "injury to the plaintiff's reputation in the estimation of the California public connected the defendant's conduct to California, not just to a plaintiff who lived there." *Id.* at 1124. The Walden Court also found it relevant that the libelous story was about California, stating, "In sum, California was the focal point of both the story and of the harm suffered." at 288. This case is similar to Calder. The harm to Plaintiffs has occurred as a result of the Florida public viewing the Film, connecting the Foreign Defendants to Florida. Complaint, ¶38. In addition, the Film's focal point is Miami, Florida, further connecting Defendants to Florida.

See Complaint at ¶¶3, 4, 6, 71, 86, 94, 95, 100, 104, 109,  As such, the effects test is met here with respect to Plaintiffs' Claims for Defamation and IIED.

The Report states that there was no purposeful availment because the "Plaintiffs have here put forward no evidence that the Foreign Defendants intended to purposely exploit the Florida market. At most, Plaintiffs established that the Foreign Defendants had a general desire that the Film be published in the United States (which would include Florida – along with 49 other states)." *See* Report at p. 30. However, as described above, the Foreign Defendants did, in fact, know that Netflix would publish the Film in the U.S., which necessarily includes publication in Florida.

Finally, asserting jurisdiction over the Foreign Defendants comports with traditional notions of fair play and substantial justice because Plaintiffs suffered injury in Florida. *See Geller v. Von Hagens*, 2011 WL 2193329 *5 (M.D. Fla 2011) (Court held that exercise of jurisdiction comported with fair play and substantial justice because "Florida possess a substantial interest in adjudicating a dispute over alleged conduct that purportedly caused an injury within the state."). The Report states that the "Foreign Defendant have not met their burden" on this element of traditional notions of fair play and substantial justice." *See* Report at p. 33.

Dated: June 8, 2023,               Respectfully submitted,

                                               **HIRZEL DREYFUSS & DEMPSEY, PLLC**
                                               *Counsel to Plaintiffs*
                                               121 Alhambra Plz., Suite 1500
                                               Miami, Florida 33134
                                               Telephone: (305) 615-1617

                                            By: /s/ *Andre Dreyfuss*
                                                  **LEON F. HIRZEL**
                                                  Florida Bar No. 085966
                                                  hirzel@hddlawfirm.com
                                                  **ANDRE DREYFUSS**
                                                  Florida Bar No. 94868
                                                  dreyfuss@hddlawfirm.com

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that the foregoing document was filed on June 8, 2023, via CM-ECF, which will generate Notices of Electronic Filing to all counsel of record.

                                               By: /s/ *Andre Dreyfuss*
                                                  **ANDRE DREYFUSS**