## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO: 1:22-cv-21796-MORENO/GOODMAN

JOSE BASULTO, an individual, and
BROTHERS TO THE RESCUE, INC. a
Florida not-for-profit corporation,

      Plaintiffs,

v.

NETFLIX, INC., a Delaware corporation,
ORANGE STUDIOS, S.A., a French
anonymous society, OLIVIER
ASSAYAS, an individual, NOSTROMO
PICTURES, SL, a Spanish corporation,
US ONE COMERCIO E SERVICIOS DE
CRIACAO E PRODUCAO DE OBRAS
COM DIREITOS AUTORAIS, LTD, a
Brazilian limited company, CG CINEMA,
SASU, a French simplified joint stock
company, RODRIGO TEIXIEIRA, an
individual, CHARLES GILLIBERT, an
individual, and LOURENCO
SANT'ANNA, an individual,

      Defendants.

_____ /

---

**THE FOREIGN DEFENDANTS' RESPONSE TO PLAINTIFFS' OBJECTIONS
TO THE MAGISTRATE'S REPORT AND RECOMMENDATION ON THE
FOREIGN DEFENDANTS' MOTION TO DISMISS PLAINTIFFS'
COMPLAINT FOR LACK OF PERSONAL JURISDICTION**

---

## **INTRODUCTION**

The Court should adopt Magistrate Judge Goodman's Report and Recommendation (the "R&R") and grant the Fed. R. Civ. P. 12(b)(2) motion to dismiss of Defendants Orange Studio, S.A. ("Orange"), Charles Gillibert ("Gillibert"), CG Cinema International ("CGI"), Rodrigo Teixeira ("Teixeira"), Lourenço Sant'Anna ("Sant'Anna"), US One Comércio e Serviços de Criação e Produção de Obras com Direitos Autorais LTD ("RT Features"), and Nostromo Pictures, SL ("Nostromo," and collectively, the "Foreign Defendants") as against them for lack of personal jurisdiction.

Magistrate Judge Goodman correctly found that the exercise of personal jurisdiction over the Foreign Defendants would violate due process. Plaintiffs Jose Basulto and his non-profit entity Brothers to the Rescue, Inc. (together, "Plaintiffs") alleged defamation, intentional infliction of emotional distress ("IIED"), and conspiracy to defame based upon their portrayal in the film *Wasp Network* (the "Film"), of which the Foreign Defendants are credited as producers. The Foreign Defendants reside in France, Spain, and Brazil, where their work on the Film was conducted. The Film was licensed to Netflix, Inc. ("Netflix"), which is located in California, and which made the Film available nationally on its streaming platform. The license agreement between Orange and Netflix (the "License Agreement") gave Netflix complete discretion as to the publication of the Film. The Foreign Defendants have no connection to Florida and played no role in the Film's publication, including in the United States or Florida. As Magistrate Judge Goodman properly held, the only link between the Foreign Defendants and Florida is Plaintiffs' presence in the forum. Under settled Supreme Court jurisprudence, that is insufficient for the exercise of jurisdiction over the Foreign Defendants.

The Eleventh Circuit applies a three-part test to determine whether due process has been met: (1) the exercise of jurisdiction must "arise out of or relate to" at least one of the defendant's contacts with the forum; (2) the defendant must have "purposefully availed" itself of the privilege of conducting activities within the forum state; and (3) the exercise of jurisdiction must not violate traditional notions of fair play or substantial justice. It is Plaintiffs' burden to establish the first two prongs, which the R&R correctly found they failed to do.

Plaintiffs' arguments to the contrary fail. They argue that the first prong of the analysis is met because Plaintiffs were injured in the forum and the Foreign Defendants "intended and agreed" for the Film to be published in the forum. As the R&R correctly found, the evidence does not

support that the Foreign Defendants "intended and agreed" for the Film to be published in Florida. In fact, Netflix had complete discretion over the publication of the Film, and none of the Foreign Defendants had any role, control, or decision-making authority over that publication. At most, the evidence establishes that they were aware the Film would likely be nationally distributed, which would include Florida – along with 49 other states. But, as Plaintiffs' own leading case holds, due process is not satisfied where the Foreign Defendants are not the publishers of the Film, "did not control its circulation and distribution," and at most were "mere[ly] aware[]" that the Film might be available for viewing in Florida. *Madara v. Hall*, 916 F.2d 1510, 1519 (11th Cir. 1990). Nor is due process met if the Defendant has no substantive connection to the forum other than the Plaintiffs' injury, as is the case here.

Plaintiffs argue that the Foreign Defendants purposefully availed themselves of the privilege of conducting activities in Florida because, they allege, the so-called "effects test" has been met. Plaintiffs' argument suffers from two fatal flaws. First, there are two different tests the Court may apply to assess purposeful availment: the effects test and the traditional minimum contacts test. Plaintiffs fail to address the traditional minimum contacts test at all, effectively conceding it has not been met. As to the effects test, the R&R correctly found that the Plaintiffs put forward no evidence that the Foreign Defendants intended to purposely exploit the Florida market, unlike in *Calder v. Jones*, 465 U.S. 783 (1984), the Supreme Court's seminal effects test. Thus, Plaintiffs failed to meet their burden on both prongs of the due process analysis, justifying dismissal of the action for lack of personal jurisdiction.

Finally, apparently recognizing the weakness of their due process claim, Plaintiffs dedicate the majority of their brief to arguing that their conspiracy to defame claim justifies the Court foregoing the entire due process analysis under the so-called "co-conspirator theory." As a threshold matter, Plaintiffs' conclusory allegations of conspiracy fail to state a claim and cannot justify the exercise of personal jurisdiction over the Foreign Defendants. Further, as the R&R properly held, "the viewpoint that proper personal jurisdiction over one purported co-conspirator necessarily satisfies due process as to every other co-conspirator is *not* well-settled" (R&R at 19 (original emphasis)), and conflicts with the Supreme Court's more restrictive teaching in *Walden v. Fiore*, 571 U.S. 277 (2014), that it is inappropriate to consider *another party's* activity in determining whether a defendant has sufficient contacts with the forum to justify the exercise of personal jurisdiction. Plaintiffs' attempted end-run around the due process analysis fails.

Therefore, as detailed herein, personal jurisdiction is lacking over the Foreign Defendants, and they should be dismissed from the action with prejudice for the reasons set forth in Magistrate Judge Goodman's R&R.

## RESPONSE TO OBJECTIONS

I. **The Magistrate Correctly Found That Due Process Is Not Satisfied**

    A. **Legal Standard**

"Generally, a federal court may properly exercise personal jurisdiction over a non-resident defendant only if two requirements are satisfied: (1) the state long-arm statute,[1] and (2) the Due

---

[1] The R&R held that the long-arm statute was satisfied with regard to Plaintiffs' defamation claim. The Foreign Defendants respectfully disagree. Publication is an element of the tort of defamation, and the Foreign Defendants are not alleged to have, and did not, publish the Film. (Compl., D.E. 1, at ¶ 34.) Therefore, Plaintiffs fail to state a claim for defamation, and the defamation claim cannot support personal jurisdiction under the long-arm statute. *Wendt v. Horowitz*, 822 So. 2d 1252, 1260 (Fla. 2002) (where plaintiff fails to state a claim for the underlying tort, it fails to state a *prima facie* case for personal jurisdiction based thereon); *Sifonte v. Fonseca*, No. 1:21-CV-20543, 2022 WL 4110705, at *8-10 (S.D. Fla. Aug. 12, 2022) (no jurisdiction over television producer who did not post or publish allegedly defamatory content), *report and recommendation adopted*, No. 21-20543-CIV, 2022 WL 4111199 (S.D. Fla. Sept. 8, 2022); *see Johnson v. Darnell*, 781 F. App'x 961, 964 (11th Cir. 2019), *cert. denied*, 140 S. Ct. 1268 (2020) ("[A] valid claim for defamation under Florida law would need to allege that the defendants themselves were responsible for publishing the defamatory material … – not that something they did indirectly led to the publication of that material.") (citation omitted); *Klayman v. City Pages*, No. 5:13-CV-143-Oc-22PRL, 2015 WL 1546173, at *10 (M.D. Fla. Apr. 3, 2015), *aff'd*, 650 F. App'x 744 (11th Cir. 2016) (defendant cannot be held liable for statements in work he did not publish, and rejecting liability for third-party republication); *Markle v. Markle*, No. 8:22-CV-511-CEH-TGW, 2023 WL 2711341, at *6 (M.D. Fla. Mar. 30, 2023) (same).

Plaintiffs argue that the Foreign Defendants published the Film at various film festivals and sent the Film to Netflix for internal screening, which, they argue, satisfies the publication element of the tort. (Br. at 10, 13.) (Plaintiffs also misleadingly suggest that R&R found this to be the case. Not so. The R&R found the Foreign Defendants were not publishers of the Film, which formed part of its basis for finding due process not satisfied.) (R&R at 22-23.) These alleged publications cannot sustain jurisdiction over any of the Foreign Defendants. The Film was screened at the Venice Film Festival in Italy, the Toronto Film Festival in Canada, and the New York Film Festival in New York – not in Florida. (R&R at 24-25; *see also* Deposition Transcript of Rodrigo Teixeira, dated February 6, 2023 ("Teixeira Tr."), D.E. 121-1, at 15:10-13.) Likewise, Creative Artists Agency ("CAA"), which was engaged by RT Features as a sales agent for the Film (Teixeira Tr. at 10:24-25), sent a copy of the Film to Netflix in California for *internal screening* – not nationwide publication on its platform where it could be viewed in Florida. (*See* D.E. 115-9 at 3.) Further, these publications fall outside of Florida's two-year statute of limitations for defamation and thus cannot support that claim. *See* Fla. Stat. Ann. § 95.11(4)(g) (West 2012).

Process Clause." *Mother Doe I v. Al Maktoum*, 632 F. Supp. 2d 1130, 1134 (S.D. Fla. 2007).[2]  To determine whether the exercise of jurisdiction comports with due process, the Eleventh Circuit applies a "three-part test": (1) whether the claims "arise out of or relate to" the defendant's contacts with the forum; (2) whether "defendant purposefully availed itself of the privilege of conducting activities within the forum state"; and (3) whether "the exercise of jurisdiction would violate traditional notions of fair play and substantial justice." *Waite v. All Acquisition Corp.*, 901 F.3d 1307, 1313 (11th Cir. 2018) (quoting *Louis Vuitton Malletier, S.A. v. Mosseri*, 736 F.3d 1339, 1355 (11th Cir. 2013)).  It is the Plaintiffs' burden to establish the first two prongs of the test.  *See Carey v. Kirk*, No. 21-20408-CIV, 2022 WL 4594124, at *5 (S.D. Fla. Aug. 4, 2022), *reconsideration denied*, No. 21-20408-CIV, 2022 WL 4594125 (S.D. Fla. Aug. 31, 2022).  (R&R at 7, 18.)[3]

## B. Plaintiffs' Claims Do Not "Arise Out of or Relate to" the Foreign Defendants' Nonexistent Contacts with Florida

The R&R correctly found that "[t]he analysis of this factor properly focuses on a defendant's relationship with the subject forum," and noted the Supreme Court "has 'rejected attempts to establish personal jurisdiction based solely on a plaintiff's injury in the forum.'" (R&R

---

[2] Plaintiffs allege specific personal jurisdiction under Fla Stat. § 48.193(1)(a)(2) for "any cause of action arising from . . . [c]ommitting a tortious act within [Florida]." (R&R at 8.)  Plaintiffs do not allege general jurisdiction over the Foreign Defendants, nor could they. *Sifonte*, 2022 WL 4110705, at *7 (Florida courts hold "the exercise of general jurisdiction is only proper when the nonresident defendant's contacts with Florida are 'so continuous and systematic as to render [the defendant] essentially at home in the forum state.'") (quoting *Daimler AG v. Bauman*, 571 U.S. 117, 127 (2014)).  It is apparent this standard is not met with regard to the Foreign Defendants.

[3] The R&R does not address the IIED claim (R&R at 17 n. 5), and Plaintiffs ignore it in their Objections, other than glancing references. (Br. at 15, 17.)  In any event, the IIED claim cannot confer jurisdiction over the Foreign Defendants because the claim fails.  It is barred because it is based on the same allegations as the defamation claims. *See, e.g., Rubinson v. Rubinson*, 474 F. Supp. 3d 1270, 1278 (S.D. Fla. 2020) (finding IIED claim barred as duplicative of defamation claim, noting, "[A] plaintiff cannot transform a defamation action into a claim for intentional infliction of emotional distress simply by characterizing the alleged defamatory statements as 'outrageous'.") (citation omitted).  Moreover, Plaintiffs fail to allege facts that reach the exceedingly high bar for "outrageous" conduct required to state a claim for IIED under Florida law. *Martinez v. Netflix, Inc.*, Case No. 20-cv-24328, 2023 WL 2630337, at *2 (S.D. Fla. Feb. 23, 2023) (dismissing IIED claim based on the plaintiff's portrayal in this Film as it "fail[ed] to meet the difficult showing of outrageous conduct by Defendants").  Thus, Plaintiffs' IIED claim fails and cannot support jurisdiction over the Foreign Defendants.

at 22 (quoting *Waite*, 901 F.3d at 1315).)  Rather, this prong depends upon the contacts "the *defendant* itself creates with the forum state."  (*Id.* (quoting *Walden*, 571 U.S. at 284).)  As set forth in the R&R, the Foreign Defendants have no substantive contacts with Florida (*e.g, id.* at 6, 24-25),[4] and thus, Plaintiffs' claims cannot arise from or relate to those nonexistent contacts.

Plaintiffs claim the R&R incorrectly analyzes the first "arise out of or relate to" prong, and erred in holding it was not met because the only link between the Foreign Defendants and the forum is Plaintiffs.  (Br. at 13 (citing R&R at 22).)  In the context of intentional torts, Plaintiffs argue, the first "relatedness" element may be met where a foreign defendant caused injury to a forum resident.  (*Id.*)  Plaintiffs are mistaken: the R&R's analysis is accurate.  *See, e.g., USA Mgmt. Grp., LLC v. Fitness Publications, Inc.*, No. 14-22477-CIV, 2015 WL 11233075, at *2 (S.D. Fla. Mar. 4, 2015)  ("As to the first prong—*arising out of or relatedness*—a court should 'focus on the direct causal relationship between the defendant, the forum, and the litigation.'") (citing *Louis Vuitton Malletier, S.A. v. Mosseri*, 736 F.3d 1339, 1355-56 (11th Cir. 2013)).

Plaintiffs also repeatedly assert that their claims arise out of or relate to the Foreign Defendants' contacts with the forum because they alleged that the Foreign Defendants "intended and agreed" for the Film to be published in Florida, and that no declaration rebuts this allegation.  (*E.g.*, Br. at 3.)  Plaintiffs simply misrepresent the evidence.  The Foreign Defendants have submitted declarations stating that they had no agreement with any other party to publish the Film, and that they had no intent for the Film to be published specifically in Florida.  (D.E. 121 at 5 (collecting evidence); Zimmermann Decl., dated Oct. 19, 2022, D.E. 35, ¶ 7 ("Orange had no agreement with any other Defendant to publish the Film in the United States.  Orange merely licensed distribution rights to Netflix.  Orange had no control over how, when or whether Netflix would publish the Film, and had no control over the marketing of the Film to audiences in the

---

[4] Plaintiffs speculate that planes used in the shooting of the Film were sourced from Florida.  (Br. at 12.)  Even if that were true, that would still be a *de minimis* contact with Florida given that all of the work done in connection with the Film was performed outside the United States.  *Future Tech. Today, Inc. v. OSF Healthcare Sys.*, 218 F.3d 1247 (11th Cir. 2000) (due process not met where – as here – defendant entered into a single service contract, not a continuous business arrangement, and negotiations took place remotely); *Storms v. Haugland Energy Grp., LLC*, No. 18-CV-80334, 2018 WL 4347603, at *8 (S.D. Fla. Aug. 17, 2018), *report and recommendation adopted*, 2018 WL 4347604 (S.D. Fla. Sept. 4, 2018) ("Hiring and transporting a worker from Florida to the Virgin Islands where all work was to be completed does not constitute a strong enough nexus to confer specific jurisdiction over Defendant…").  (*See* R&R at 25.)

United States and specifically in Florida."); Gillibert Decl., dated March 28, 2023, D.E. 122, ¶ 2 ("[N]either I nor CGI had any agreement, express or implied, oral or written, with any other named Defendant in the above-captioned action to publish the Film, including in the United States or Florida."); Sant'Anna Decl., dated March 27, 2023, D.E. 124, ¶ 5 ("[N]either I nor, to my knowledge, RT Features had any agreement with any other named Defendant to publish the Film."); Teixeira Tr., D.E. 121-1, 8:24-9:2 ("Q: Did you have any agreements with any of the coproducers regarding the publication of the *Wasp Network*? A: No.").; Guerra Decl., dated March 30, 2023, D.E. 127, ¶ 5 ("Nostromo had no agreement with Netflix or anyone else, including any named defendant in the above-captioned action, concerning the distribution or publication of the Film in the United States, let alone in Florida specifically.").)

Unable to tether the Foreign Defendants directly to Florida, Plaintiffs argue that the Foreign Defendants published the Film to Netflix, who published the Film in Florida, and claim this suffices for jurisdiction under *Madara*. (R&R at 22.) But as the R&R finds, *Madara undermines* Plaintiffs' argument and militates in favor of dismissal. There, the Eleventh Circuit affirmed dismissal of a defamation action against the speaker of an allegedly defamatory statement because he was not the publisher thereof, and as a result, jurisdiction was incompatible with due process. *Madara*, 916 F.2d at 1518-19. (R&R at 22-23.) Plaintiffs weakly protest that the record in *Madara* did not reveal whether the defendant was aware that the magazine in which his remarks would be published were distributed in Florida at the time he gave his interview, whereas here, the Foreign Defendants knew the Film would be published in Florida. (Br. at 15.) But in fact, the *Madara* opinion specifically states that the defendant knew his remarks would be published in a magazine with a national circulation (just as the Netflix platform is nationally accessible). *Id*. at 1517. The Eleventh Circuit held that "mere awareness" that allegedly defamatory material will enter the forum state, where the defendant is not the "publisher and did not control its circulation and distribution," "is not enough to cause [the defendant] to anticipate being haled into court in Florida." *Id.* at 1519.[5]

---

[5] Plaintiffs argue the Court should follow *Geller v. von Hagens,* No. 08:10-CV-01688-EAK, 2011 WL 2193329 (M.D. Fla. June 6, 2011), rather than *Madara*. (Br. at 15 n.14.) As the R&R finds,

Plaintiffs further attempt to distinguish *Madara* on the basis that the plaintiff was not a Florida resident. As the R&R found in rejecting this argument, this "oversimplifies Madara's reasoning and overemphasizes the importance of this isolated factual difference." (R&R at 23 (noting the *Madara* court also considered the defendant's lack of control over publication of the magazine and lack of contact with Florida, among numerous other factors).) Moreover, nationwide publication – like in *Madara* and in the instant action – does not target (or constitute contact with) a specific state, irrespective of whether the plaintiff is a resident of the forum state. *See Sovereign Offshore Servs., LLC v. Shames*, No. 17-CV-80172, 2017 WL 7798664, at *4 (S.D. Fla. Aug. 3, 2017) ("Defendant's awareness that his blog posts would be accessible in Florida, by virtue of the nature of the world-wide web, and [the plaintiff's] physical location in Florida are insufficient to establish that Defendant has minimum contacts with Florida."); *Shrader v. Biddinger*, 633 F.3d 1235, 1244 (10th Cir. 2011) ("[M]erely posting information on the internet does not, in itself, subject the poster to personal jurisdiction wherever that information may be accessed. This principle has particular salience for defamation cases: 'Posting on the internet from [outside the forum state] an allegedly defamatory statement [about a forum resident] ... does not create the type of substantial connection between [the poster] and [the forum state] necessary to confer specific personal jurisdiction.' . . . '[T]he plaintiff's residence in the forum, and suffering of harm there, will not alone support jurisdiction under *Calder*.'") (internal citations omitted); *Behav. Analyst Certification Bd., Inc. v. Moates*, No. 22-CV-01247-NRN, 2022 WL 17486792, at *7 (D. Colo. Dec. 7, 2022) ("[T]he only argument the [plaintiff] makes about the supposed Colorado 'focus' of Defendants' actions is that Mr. Moates knew the [plaintiff] was located in Colorado and the nationwide distribution of supposedly defamatory statements would have impact [sic] on the [plaintiff] in Colorado. This is simply not enough."); *TransAct Techs., Inc. v. FutureLogic, Inc.*, No. 3:05CV0818 (PCD), 2006 WL 8449240, at *7 (D. Conn. Aug. 31, 2006) ("[M]ere knowledge that the alleged defamatory statements will be read in the forum state and cause injury there is not sufficient to support personal jurisdiction, unless the <u>Defendant</u> has

---

not only is *Madara* controlling Eleventh Circuit law, but also *Geller*'s perfunctory analysis – a single sentence – is too limited to be helpful. (R&R at 22.) 2011 WL 2193329, at *4. It is also notable that *Geller* is an out-of-district case from 2011 that has never been cited for this proposition. And it is distinguishable on its facts, as the defendant was a direct competitor of the plaintiff and the speaker of the allegedly defamatory statement broadcast on the show 20/20, not the producer of 20/20, which would be analogous to the Foreign Defendants here.

affirmatively distributed the statements to Connecticut.") (emphasis in original); *Blankenship v. Napolitano*, 451 F. Supp. 3d 596, 622-23, 625-27 (S.D.W. Va.), *on reconsideration in part sub nom. Blankenship v. Fox News Network, LLC*, 510 F. Supp. 3d 356 (S.D.W. Va. 2020) ("The allegedly defamatory statements were comments during broadcasts about national political issues to a national audience. It would not be reasonable for [defendants] to anticipate being haled into a West Virginia court on the basis of comments in a broadcast about political issues across several states aimed at a national audience.").

Contrary to Plaintiffs' argument, the License Agreement between Orange and Netflix for the international publication of the Film, including in the United States, does not alter this analysis. (R&R at 23.)  *See USA Mgmt. Grp., LLC*, 2015 WL 11233075, at *3 (holding that the plaintiff's claims did not arise out of the defendant's contacts with Florida because no precedent supports a finding that "sale of a licensed product by a licensee constitutes use in commerce on the part of the licensor, even absent any actual sales by the licensor")[6]; *Outdoor Channel, Inc. v. Performance One Media, LLC*, 826 F. Supp. 2d 1271, 1280-81 (N.D. Okla. 2011) (defendant did not "purposefully avail[] itself of the privilege of conducting business in Oklahoma by way of its contracts with DISH and DirecTV for the national broadcast of ICTV programming"); *see also Bridgeport Music, Inc. v. Still N The Water Publ'g*, 327 F.3d 472, 480 (6th Cir. 2003) (under same standard articulated by the Eleventh Circuit, no jurisdiction over foreign licensor where license permitted, but did not require, nationwide distribution of allegedly tortious content as licensor was "merely aware" of such distribution, and the exploitation of the content was "pretty much out of [its] hands"); *Kernel Recs. Oy v. Mosley*, No. 09-21-21597-CIV, 2010 WL 2812565, at *11 (S.D. Fla. July 5, 2010) (citing *Bridgeport Music, Inc.* for same proposition).

As the Magistrate Judge correctly found, the same outcome as in *Madara* is warranted here. Jurisdictional discovery at most established "that the Foreign Defendants wanted the Film published and took efforts to find a publisher who would buy the rights from them.  But none of

---

[6] Plaintiffs attempt to distinguish *USA Management Group* on the basis that it "involved trademark infringement as opposed to an intentional tort, such as defamation."  (Br. at 14.)  But *USA Management Group* specifically noted that "trademark infringement is considered an intentional tort," foreclosing Plaintiffs' futile attempt to distinguish it.  2015 WL 11233075, at *3.  Plaintiffs further undermine their own argument by citing *Gazelles FL, Inc. v. Cupp*, No. 6:18-CV-544-ORL-22-KRS, 2018 WL 7364591, at *13 (M.D. Fla. Sept. 26, 2018), also a trademark infringement case, which ultimately grants a motion to dismiss for lack of personal jurisdiction.

*their* actions took place in Florida." (R&R at 24.)[7] The Foreign Defendants undertook no intentional actions expressly aimed at Florida and had no reason to anticipate being haled into court here; the fact that Plaintiffs' alleged injuries occurred in Florida is simply not enough. *See, e.g., Estes v. Rodin*, 259 So. 3d 183, 190 (Fla. Dist. Ct. App. 2018). Due process precludes jurisdiction over the Foreign Defendants.

      **C.**      **The Foreign Defendants Did Not Purposefully Avail Themselves of Conducting Activities in the Forum State**

As noted above, there are two tests courts may apply to assess purposeful availment in the context of an intentional tort: the traditional minimum contacts test, and the effects test. Plaintiffs do not even attempt to argue that the traditional minimum contacts test is met, effectively conceding that it is not. The analysis on this factor could conclude there. But the R&R further correctly found that the effects test is not met either, distinguishing *Calder v. Jones*, 465 U.S. 783 (1984), the seminal effects test case relied upon by Plaintiffs. "Unlike *Calder*, Plaintiffs here have put forward no evidence that the Foreign Defendants intended to purposely exploit the Florida market. At most, Plaintiffs established that the Foreign Defendants had a general desire that the Film be published in the United States (which would include Florida – along with 49 other states)." (R&R at 30.)[8]

Plaintiffs' sole objection to the R&R on this factor is that "the Foreign Defendants did, in fact, know that Netflix would publish the Film in the U.S., which necessarily includes publication in Florida." (Br. at 17.) But as detailed above, national publication is insufficient to establish purposeful availment of any particular state, even if the plaintiff resides in the forum state. (*See supra* at 7-8.)

---

[7] Plaintiffs claim the evidence shows that the Foreign Defendants took actions to ensure Netflix published the Film in the U.S. and Florida. (Br. at 5.) This claim misrepresents the evidence, as the R&R correctly found.

[8] In *Calder*, where the Court found due process satisfied with regard to a non-resident reporter and editor in California, not only was the plaintiff located in California, but the allegedly defamatory story was written based upon California sources, and the publication's highest circulation by a substantial margin was in California. *Walden*, 571 U.S. at 287; *Calder*, 466 U.S. at 786; *Sovereign v. Offshore Servs., LLC v. Shames*, No. 17-CV-80172, 2017 WL 7798664, at *3 (S.D. Fla. Aug. 3, 2017) (distinguishing *Calder* on this basis). Neither element is alleged here, and in fact, the Foreign Defendants had only *de minimis* contact with Florida in producing the Film. That the Film is set in part in Miami is irrelevant. *Cf. Walden*, 571 U.S. at 287 (noting that in *Calder*, "California [wa]s the *focal point* both *of the story* and of the harm suffered.") (emphasis added).

As the R&R concludes,

> The cases Plaintiffs cite do not support their sweeping viewpoint
> that anyone who financed the production or advertising of a
> purportedly defamatory film can be haled into any jurisdiction in
> which a third party publishes the film.  If this were true, then any
> film producer, interviewee, or financer could be haled into any
> United States Courthouse whenever the defamatory material was
> published by another entity on a national scale, even if publication
> was only through internet accessibility.

(R&R at 33.)  Plaintiffs do not so much as address this statement, effectively conceding its truth.

If Plaintiffs fail to meet their burden on *either* of the first two prongs of the due process analysis, jurisdiction is precluded and the Foreign Defendants must be dismissed.  *See Carey*, 2022 WL 4594124, at *5.  Here, Plaintiffs failed to meet their burden on *both*, necessitating dismissal.

## II.   The Conspiracy to Defame Claim Cannot Support Jurisdiction Over the Foreign Defendants

Apparently recognizing the futility of their due process arguments, Plaintiffs dedicate the majority of their objections to the R&R to arguing that the Court may forego the due process analysis entirely because jurisdiction is properly exercised over the Foreign Defendants based on Plaintiffs' conclusory and baseless allegations of conspiracy with Netflix.  The R&R properly rejected this argument.  As an initial matter, Plaintiffs have failed to adequately allege a conspiracy to defame Plaintiffs between Netflix and the Foreign Defendants.  And even assuming, *arguendo*, that they had, as the R&R details, to satisfy constitutional due process requirements, minimum contacts must be analyzed based upon *each* Defendant's contacts with the forum.  (R&R at 21.)

### A.   Plaintiffs Fail to Sufficiently Allege Conspiracy

Plaintiffs insist that a conspiracy to defame Plaintiffs exists because the Foreign Defendants knew that Netflix would publish the Film in Florida.  (Br. at 2.)  As an initial matter, the Foreign Defendants could not have "known" this, as Netflix had complete discretion over the publication of the Film.  As the R&R notes, Netflix could have decided not to publish the Film or to wait years before publishing it, and the Foreign Defendants would have had no recourse.  (R&R at 31.)

Furthermore, knowledge that Netflix would publish the Film is not sufficient to establish that Netflix and the Foreign Defendants entered into a conspiracy to defame Plaintiffs.  The law is clear that one who inadvertently participates in an illegal scheme is not liable for conspiracy.  *See Sargeant v. Maroil Trading Inc.*, No. 17-81070-CIV, 2018 WL 3031841, at *12 (S.D. Fla. May

30, 2018) ("To join a conspiracy, a person must have knowledge of the illegal objective of the agreement and must intend to further that objective.").  Plaintiffs argue that the Foreign Defendants' alleged intent to defame Plaintiffs goes to the merits of the conspiracy claim, not the jurisdictional analysis.  (Br. at 8.)  This is incorrect.  To be liable for conspiracy, each of the Foreign Defendants must know of the illegal objective of the scheme, *i.e.*, to defame Plaintiffs, and intend to further it. Here, that is not the case.  (Gillibert Supp. Decl., D.E. 122, ¶ 3; Zimmermann Supp. Decl., D.E. 123, ¶ 2; Teixeira Supp. Decl., D.E. 125, ¶ 2; Sant'Anna Supp. Decl., D.E. 124, ¶ 2.)  Plaintiffs' argument, taken to its logical extreme, would mean that any individual or entity with any role in the publication of the Film, such as an outside vendor that processes it, could be swept into the alleged conspiracy, based on conclusory allegations that they knew the statements about Plaintiffs to be false.  This would be an absurd result, which is not countenanced by the law.

Even if, *arguendo*, Plaintiffs only must allege a conspiracy to publish the Film rather than to defame Plaintiffs, they have failed to adduce evidence that the Foreign Defendants conspired with Netflix *in the actual publication* of the Film.  The License Agreement quite simply is not an agreement to *publish* the Film.  It is an agreement that grants Netflix the *right* to publish the Film, which right remains entirely within Netflix's discretion.  None of the Foreign Defendants had any role in or control over the actual publication of the Film.[9]  Netflix's viewing the Film at film festivals and internally in connection with the decision to license the Film (Br. at 10, 13) does not establish that the Foreign Defendants assisted in the publication of the Film on Netflix's platform.

Nor do Netflix's communications with any of the Foreign Defendants concerning the premiere date of the Film on the Netflix platform or the marketing of the Film constitute assistance in *publication* of the Film.  (Br. at 10-11.)  As an initial matter, the testimony is that only Mr.

---

[9] There is a single license agreement that conveyed U.S. distribution rights to Netflix.  Orange and Netflix are the sole signatories to that agreement.  (*See* D.E. 115-3 at 14.)  RT Features is the sole owner of the U.S. distribution rights.  (Teixeira Tr., D.E. 121-1, at 8:14-19.)  RT Features permitted Orange to convey the U.S. distribution rights to Netflix, which Orange did as part of an international license agreement for the distribution rights to the Film (Orange owned international rights to the Film).  (Teixeira Tr., D.E. 121-1, at 8:4-6; Rasamoela Tr., D.E. 121-2, at 26:4-27:24). CGI possessed no distribution rights in the Film and received no compensation from the License Agreement.  (Gillibert Tr., D.E. 121-5, at 9:10-23, 16:14-16).  The Foreign Defendants had no agreement with Netflix concerning the publication of the Film (as distinct from the distribution rights to the Film), and Netflix retained complete discretion as to the Film's publication.  (*See supra* at 1-2, 10-11.)

Sant'Anna, as an executive of RT Features, communicated with Netflix after the Licensing Agreement was signed concerning the start date of the Film and the marketing campaign leading up to its release on the platform.  (Sant'Anna Tr., D.E. 121-4, at 16:22-24, 17:3-5; Teixeira Tr., D.E. 121-1, at 30:7-23; Rasamoela Tr., D.E. 121-2, at 49:10-13, 63:25-64:7; Gilibert Tr., D.E. 121-5, at 18:25-19:2.)  RT Features had no control over the start date or the marketing materials. Netflix kept RT Features apprised of those details as a matter of courtesy.  (Rocque Tr., D.E. 121-3, at 237:4-7 ("For filmmakers, it's important to know what's going on with their film.  Even though they don't have control, it's a gesture to keep them part of the process.").)[10]  Moreover, the marketing has no bearing on the publication of the Film, and is not a prerequisite for it, and there are no allegations that the marketing contains any defamatory statements concerning Plaintiffs.

Thus, even under Plaintiffs' cases, the Foreign Defendants' conduct is too attenuated from publication of the Film to support a conspiracy claim.  (Br. at 7.)  *Carroll v. TheStreet.com*, the sole conspiracy to defame case cited by Plaintiffs, concerns the publisher, author and source of the allegedly defamatory material, who allegedly "joined together" to publish a false and defamatory story about the plaintiff, with knowledge that the statements about the plaintiff were false.  2012 WL 13134547 13134547, at *7 (S.D. Fla. 2012).  Here, by contrast, RT Features and Orange, financiers of the Film (not its publisher, author, or source of information therefor), entered into a license agreement with Netflix in order to recoup their investment in the Film (Teixeira Tr. at 10:10-11, 19:11-14), pursuant to which the flat license fee was paid in exchange for the right to publish the Film on the Netflix streaming platform, with no obligation on Netflix's part to do so. *Amersham Enters., Inc. v. Hakim-Daccach*, 333 So. 3d 289, 296-97 (Fla. 3d DCA 2022) found conspiracy sufficiently pled because all defendants participated in a plan to defraud plaintiff pursuant to which specific communications were directed to Florida.  But an agreement merely to conceal or fraudulently convey the funds, to facilitate a later divestiture, would not be sufficient.

---

[10] Plaintiffs erroneously state that Orange participated in organizing press interviews with Netflix. (Br. at 6.)  The email chain they point to (D.E. 115-14) involves communications with Sylvie Barthet, working as an assistant to the director Olivier Assayas.  Her email address is @orange.fr, which is a carrier in France akin to Verizon or AT&T; it is not Defendant Orange.  Ms. Barthet is unaffiliated with Orange. *The Foreign Defendants explained this in their Supplemental Reply, yet Plaintiffs willfully ignored it and misleadingly presented it to the Court as a basis for objection to the R&R.*  (D.E. 121 at 8 n.9.)  And as noted below, participation in marketing for the Film is irrelevant to its publication or any alleged conspiracy to defame Plaintiffs.

*Id.* Under the facts here, *Amersham Enterprises* militates against a finding of jurisdiction under the long-arm statute. Neither does *Woodword-CM, LLC v. Sunlord Leisure Prods., Inc.*, No. 20-23104-CV, 2022 WL 890065, at *9 (S.D. Fla. Feb. 11, 2022) salvage Plaintiffs' failed conspiracy claim, as the Foreign Defendants did not "assist" in the publication of the Film, as detailed above.

Plaintiffs have failed to sufficiently allege conspiracy, thus foreclosing any attempt to sweep the Foreign Defendants into the net of personal jurisdiction on that basis.

**B.      Due Process Precludes Exercising Jurisdiction Over the Foreign Defendants Based on the Co-Conspirator Theory**

Even if, *arguendo*, Plaintiffs sufficiently alleged conspiracy, that would satisfy only the Florida long-arm statute. As the R&R correctly found, a separate due process analysis is required for each of the Foreign Defendants, and as set forth in the R&R and above, here the exercise of jurisdiction over the Foreign Defendants would violate due process. (R&R at 19-21 (citing *Walden*, 571 U.S. at 284-86; *Oueiss v. Saud*, No. 1:20-cv-25022-KMM, 2022 WL 1311114, at *18 (S.D. Fla. Mar. 29, 2022).[11])

As the R&R held, "the viewpoint that proper personal jurisdiction over one purported co-conspirator necessarily satisfies due process as to every other co-conspirator is *not* well-settled." (R&R at 19 (noting that even the secondary source on which Plaintiffs' cited case relies states that "some authorities emphasize that due process requirements remain applicable to coconspirators, as to any other defendants, and the absence of sufficient contacts with the forum by a nonresident coconspirator will defeat personal jurisdiction allegedly predicated on the defendant's participation in a conspiracy with forum residents").) Magistrate Judge Goodman went on to conclude that this viewpoint is more constitutionally sound in light of the Supreme Court's recent jurisprudence in *Walden*, holding that the "unilateral activity of another party . . . is not an appropriate consideration when determining whether a defendant has sufficient contacts with a forum State to justify an assertion of jurisdiction." (R&R at 20 (citing *Walden*, 571 U.S. at 284-85.) He also relied on another recent case in this jurisdiction that likewise rejected the contention that personal jurisdiction over one co-conspirator automatically satisfied due process for the others. (*Id.* (citing *Oueiss*, 2022 WL 1311114, at *18).)

---

[11] The state law case Plaintiffs cite, *Amersham Enters., Inc.*, 333 So. 3d at 298, is not controlling. *Patriot Rail Corp. v. Maryland Midland Ry., Inc.*, No. 07-81096-CIV, 2008 WL 11417810, at *4 (S.D. Fla. Feb. 4, 2008) ("[S]tate law is not controlling on the issue of constitutional due process.").

Plaintiffs attempt to distinguish *Oueiss* on the basis that the defendant was not part of any conspiracy for tortious activity to take place in Florida.  (Br. at 3.)  As detailed above, that is not a basis to distinguish *Oueiss* as the same is true here.  In any event, Plaintiffs fail to grapple with the analysis pointed to by Magistrate Judge Goodman in the R&R, which states: "Even assuming the plaintiff's amended complaint adequately pleaded the inclusion of Van Rider and Jundi in the conspiracy, the plaintiff would, in any event, not be able to establish that conspiracy-based personal jurisdiction over the Crown Prince satisfies the requirements of Due Process" – clearly evidencing that due process must be analyzed individually for each defendant even if a conspiracy is properly alleged.  (R&R at 20.)

Plaintiffs' primary objection to this portion of the R&R is based on a misstatement of the law.  Plaintiffs wrongly claim that *J&M Assocs. v. Romero*, 488 F. App'x 373, 375-76 (11th Cir. 2012), is binding precedent that requires this Court to apply the co-conspirator theory.  (Br. at 3.) However, *Romero* was not selected for publication in West's Federal Reporter.  Therefore, according to the Eleventh Circuit's Rule 36-2, it is *not* binding precedent.  11th Cir. R. 36-2, "Unpublished                 Opinions,"              *available*                  *at* https://www.ca11.uscourts.gov/sites/default/files/courtdocs/clk/RulesFRAP36_DEC16.pdf ("Unpublished opinions are not considered binding precedent…").  Plaintiffs affirmatively misrepresent this to the Court.[12]

---

[12] Plaintiffs' cited cases applying the co-conspirator theory are also distinguishable.  *Int'l Underwriters AG v. Triple I: Int'l Invs., Inc.*, No. 06-80966-CIV, 2007 WL 9701852 (S.D. Fla. May 30, 2007), is distinguishable because no overt act took place in Florida.  The Film was shot in Cuba and Spain.  The License Agreement was negotiated and executed between Netflix and Orange, who are located in California and France, respectively.  The Film was distributed nationally, but no party engaged in any conduct specifically aimed at Florida.  *Diversified Mgmt. Sols., Inc. v. Control Sys. Rsch., Inc.*, No. 15-81062-CIV, 2016 WL 4256916 (S.D. Fla. May 16, 2016), is distinguishable because the "bulk" of the conspiracy did not take place in Florida, for the reasons set forth above.  *Platypus Wear, Inc. v. Clarke Modet & Co., Inc.*, 515 F. Supp. 2d 1288, 1294 (S.D. Fla. 2007) *grants* a motion to dismiss where the plaintiff did not have specific evidence of the defendant's involvement in the conspiracy.  It militates in favor of dismissal here for the same reason.  In discussing the co-conspirator theory of jurisdiction, *Platypus Wear* cites to two Florida cases, *Execu-Tech Bus. Sys., Inc. v. New OJI Paper Co.*, 708 So. 2d 599 (Fla. Dist. Ct. App. 1998), *decision quashed*, 752 So. 2d 582 (Fla. 2000), and *Wilcox v. Stout*, 637 So. 2d 335,

Plaintiffs' only other argument is that *Walden* does not militate against the application of the co-conspirator theory to the Foreign Defendants because their contacts with Netflix's publication of the Film were not "random, fortuitous or attenuated."  (Br. at 4.)  Plaintiffs improperly represent the legal question with this argument.  It is not about the Foreign Defendants' contacts with Netflix, but about their contacts with the forum.  And as the language from *Walden* quoted in the R&R makes clear, a defendant's contacts with another party who has contact with the forum cannot form the basis of minimum contacts.  Plaintiffs' objection fails.

For the reasons set forth above, due process precludes jurisdiction over any of the Foreign Defendants.

## **CONCLUSION**

For the reasons set forth above, the Foreign Defendants respectfully request that the Court adopt Magistrate Judge Goodman's Report and Recommendation and dismiss the claims against the Foreign Defendants pursuant to Rule 12(b)(2) of the Federal Rules of Civil Procedure for lack of personal jurisdiction.

---

337 (Fla. Dist. Ct. App. 1994).  In *Execu-Tech*, the defendant *admitted* participation in the alleged conspiracy, and in *Wilcox* it was successfully alleged.  Together, *Platypus Wear*, *Execu-Tech* and *Wilcox* stand for the legal principle that "circumstantial indications" and conclusory allegations of conspiracy – as exist here – are not sufficient to impute the conduct of alleged co-conspirators to another defendant to obtain jurisdiction over it.  *See Marjam Supply Co. of Florida, LLC v. Pliteq, Inc.*, 2016 WL 11501768, at *4-5 (S.D. Fla. Sept. 13, 2016) (discussing *Execu-Tech*, *Wilcox*, and *Platypus*, and granting motion to dismiss where Plaintiff failed to sufficiently allege conspiracy).  And, as discussed above, *Amersham Enters., Inc.*, 333 So. 3d at 296-97, found conspiracy sufficiently pled because all defendants participated in a plan to defraud plaintiff pursuant to which specific communications were directed to Florida, in contrast to the facts here.

Dated: June 22, 2023

Respectfully submitted,
**PRYOR CASHMAN LLP**
255 Alhambra Circle, 8th Floor
Miami, Florida 33134
Telephone: (786) 582-3010

*s/ James G. Sammataro*

James G. Sammataro (Florida Bar No. 520292)
Tom J. Ferber (admitted *pro hac vice*)
William L. Charron (admitted *pro hac vice*)
Felicity S. Kohn (admitted *pro hac vice*)
jsammataro@pryorcashman.com
tferber@pryorcashman.com
wcharron@pryorcashman.com
fkohn@pryorcashman.com

*Attorneys for the Foreign Defendants*

**<u>CERTIFICATE OF SERVICE</u>**

**I HEREBY CERTIFY** that on June 22, 2023, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will send Notices of Electronic Filing to all counsel of record.

*s/ James G. Sammataro*

James G. Sammataro