**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

**CASE NO. 1:22-cv-21796 MORENO/GOODMAN**

JOSE BASULTO and
BROTHERS TO THE RESCUE, INC.,

      Plaintiffs,

v.

NETFLIX, INC., a Delaware
corporation, et al.,

      Defendants.

_____/

**REPORT AND RECOMMENDATIONS ON**
**<u>DEFENDANT NETFLIX'S SUMMARY JUDGMENT MOTION</u>**

*"A free press can, of course, be good or bad, but, most certainly, without freedom, the press will never be anything but bad."*

- Albert Camus (1913 – 1960) (French philosopher and author and winner of the 1957 Nobel Prize in Literature)

*"In Czechoslovakia, there is no such thing as freedom of the press. In the United States, there is no such thing as freedom from the press."*

- Martina Navratilova (1956 – ) (former professional tennis player)

\*     \*     \*

The First Amendment is powerful, no doubt about that.

For example, it has the power to provide substantial Constitutional protection to

defamation defendants who are sued by public officials or public figures.

But is the First Amendment strong enough to justify a summary judgment ruling in favor of Defendant Netflix, Inc., a movie and television streaming service provider, when: (1) Netflix did not at all probe the accuracy of an allegedly defamatory docudrama (about Cuban spies who infiltrated Miami-based exile organizations) and (2) the movie was filmed in Cuba with the cooperation of the communist Cuban government?

Netflix's answer is "yes," and its position is that: (1) it is a mere licensee who did not create or produce the film; (2) it relied on a warranty of accuracy from the producer; (3) it cannot possibly be expected to automatically factually investigate movies it did not create or produce; (4) it did not know the movie allegedly contained defamatory content and did not recklessly disregard the true facts; and (5) Plaintiffs here were not, in any event, defamed by the scenes they pinpointed in the lawsuit as supposedly being false.

Plaintiffs, of course, weave a starkly different scenario. They say the answer is "no." At bottom, they contend that the film portrays them as terrorists funded by illegal drug trafficking.

They say that the communist Cuban government was actually involved in the filming of the movie and was a source for some of the supposedly defamatory information. They also say the film was, in effect, a propaganda device which promoted

a Cuban government agenda to minimize worldwide criticism of its decision to shoot down two unarmed airplanes operated by pilots working for Plaintiff Brothers to the Rescue, Inc. ("BTR"). Plaintiffs argue that Netflix should have known that the film's accuracy was doubtful because: (1) the Cuban government does not permit movies to be made in the country unless it approves of the script and (2) the Cuban government was in a dispute with BTR (which, Plaintiffs say, means that there were reasons for Netflix to investigate the film's accuracy before it made the film available on its streaming platform).

Plaintiffs' position will not prevail. After extensive briefing and a multi-hour hearing, the Undersigned **recommends** that the Court **grant** Netflix's motion and enter summary judgment in its favor.

Jose Basulto ("Basulto"), one of the Plaintiffs, is a Bay of Pigs veteran who formed BTR as a Florida not-for-profit corporation in 1991. He and BTR filed this defamation lawsuit against Netflix (and other Defendants who were dismissed on personal jurisdiction grounds) after Netflix released the film *The Wasp Network* (Orange Studios S.A. 2020) ("the Film") on its streaming service. The Film focuses on spies from Cuba's Ministry of the Interior (the "Cuban Five") who were dispatched to Miami in the early 1990s and whose activities led to the death of four Americans in 1996 (when Cuba used missiles to shoot down two BTR planes, killing all four occupants). The Film was scripted from Brazilian author Fernando Morais' spy-thriller novel, *The Last Soldiers of*

*the Cold War* ("*Soldiers*").

The Film contains depictions of Basulto and BTR. Plaintiffs allege that the Film falsely portrays BTR and its leader, Basulto, as "terrorists who engaged in criminal terrorist attacks and other terrorist activity, criminal drug trafficking activity, and other criminal activity." But Plaintiffs contend that they were searching for, and rescuing, rafters stranded in the Atlantic Ocean by flying planes to spot the rafters and then dropping them food and water from the planes. They describe the Film as an attempt to justify the Cuban Five's espionage and Cuba's act of shooting down the BTR planes. They further contend that Morais was good friends with Fidel Castro and the Cuban regime and "is not a traditional journalist in search of the truth, but rather another instrument to distribute the propaganda of the communist Cuban government."

Senior United States District Judge Federico A. Moreno referred [ECF No. 68] the case to me for all pretrial purposes, and Netflix filed a summary judgment motion [ECF No. 158].

Netflix contends that Basulto is a CIA-trained intelligence officer who is a public figure with a history of terrorist actions. It likewise contends that BTR is a public figure with a militant history. It says that it licensed the Film as a completed docudrama and does not vet fully-completed films (including *The Wasp Network*) created and produced by others. As a practical matter, Netflix says, it could not do so for the hundreds of films it offers each year in the online entertainment streaming market. Instead, it relies on

representations and warranties from its licensors that their completed works contain no defamatory content.

According to Netflix, it had no knowledge of any possible defamatory content in the Film until it received a pre-suit notice letter[1] from Basulto's counsel on October 23, 2020, more than four months after the Film was first published on Netflix's streaming platform (on June 19, 2020).

Netflix's summary judgment motion asserts several grounds: (1) it says the scenes identified in the Complaint are not defamatory; (2) it emphasizes that Plaintiffs have no evidence of any damages; (3) it notes that Basulto admitted that the lawsuit is merely a "political statement" by them, designed to shut down speech which they view as overly-sympathetic to the Cuban government; (4) it stresses that Plaintiffs are public figures -- and that Plaintiffs cannot meet their burden of establishing that Netflix acted with "actual malice"; (5) it contends that Basulto's claim for intentional infliction of emotional distress fails because he cannot prove the requisite "outrageous conduct" by

---

[1]     In the Complaint, Plaintiffs contend that Netflix was *not* entitled to the Notice Letters or any pre-suit notice under Florida Statutes §§ 770.01 and 770.02. They say [ECF No. 1, pp. 35-36] the Notice Letters were issued "out of an abundance of caution" and "in an effort to obtain certain corrections and retractions." They say they reserve all rights, including the right to maintain that Netflix and other Defendants are not media defendants. Section 770.01 requires a written notice at least five days before a civil action for libel or slander is instituted for publication or broadcast in a "newspaper, periodical, or other medium." Section 770.02 limits a plaintiff's recovery to only actual damages if a newspaper or broadcast station issues a full and fair correction, apology or retraction under circumstances specified in the statute.

Netflix and because he has no evidence confirming manifestation of harm caused by the Film; and, finally, (6) Plaintiffs are not entitled to injunctive relief (which they demanded in their lawsuit).

For the reasons outlined below, the Undersigned concludes that, under the specific record evidence of undisputed facts developed here, the First Amendment *is* sturdy enough to support Netflix's defense.

Assuming that at least *some* of the movie scenes are defamatory, Plaintiffs still cannot prevail. They have not established (let alone with clear and convincing evidence, which is required here) that Netflix acted with actual malice, the standard used to provide significant protection to those who speak and publish about public officials and public figures. Given this ruling, the Undersigned respectfully recommends that Judge Moreno **grant** Netflix's summary judgment motion.

## I.   FACTUAL BACKGROUND

### The Complaint

Plaintiffs' 60-page, 11-count Complaint against Netflix and other Defendants[2] is

---

[2]    The Undersigned issued [ECF No. 177] a Report and Recommendations ("the R & R") which recommends that Judge Moreno grant a motion to dismiss for lack of personal jurisdiction filed by certain Defendants known as "the Foreign Defendants." The "Foreign Defendants" are Orange Studios, S.A. ("Orange"), Charles Gillibert ("Gillibert"), CG Cinema International (incorrectly identified as CG Cinema SASU) ("CGI"), Rodrigo Teixeira ("Teixeira"), Lourenço Sant'Anna ("Sant'Anna"), and US One Comércio e Serviços de Criação e Produção de Obras com Direitos Autorais LTD ("RT

primarily for defamation and defamation-related theories, while one count is for intentional infliction of mental distress filed by only Basulto. [ECF No. 1]. Noting that the Film has been marketed and promoted as being "based on true events," Plaintiffs list the specific instances of "defamatory scenes" from the Film, which they say "contain false portrayals" of them, in numbered paragraph ¶ 107. The Complaint provides the specific times in the movie when each alleged defamation appears. Because this is a defamation case and words therefore matter, the Undersigned is quoting the Complaint's allegations verbatim (although long sections of text are sometimes divided into paragraphs):

a) Expectedly, The Film wastes no time to defame Mr. Basulto, the "Arch enemy of the Cuban Revolution" 00:08:40 – 00:08:43.

b) Within the first ten minutes of the Film, Mr. Basulto, using his true name, falsely describes himself as a man who was "Trained by the U.S. as a terrorist." 00:09:48 – 00:09:56.

---

Features"). After Nostromo Pictures, SL ("Nostromo") was served, it filed a Notice of Joinder, advising that it was joining and adopting the motion to dismiss. [ECF No. 126]. The Court now considers Nostromo to be a "Foreign Defendant." Plaintiffs filed Objections [ECF No. 191] and Defendants filed a Response [ECF No. 211]. After oral argument at an in-person hearing, Judge Moreno adopted the R & R and dismissed the Foreign Defendants without prejudice for lack of personal jurisdiction. [ECF Nos. 253; 262].

c) While describing the Brothers to the Rescue job opportunity to Rene, Rene asked who pays the pilots, Basulto responds "Jorge Mas Canosa, money is not a problem for him." 00:10:40-00:10:50. Later in the Film, during the wedding scene, Mr. Basulto introduces Jorge Mas Canosa to (Juan Pablo) Roque as the president of CANF. 00:46:04 - 00:46:27. In reality, Jorge Mas Canosa did not attend the wedding. Then at a meeting in the White House, the representative for Cuba states "then you know that the CANF is financing terrorists and that the operations are carried on by mercenaries recruited in Central America." 01:41:40 – 01:42:00. These scenes combined paint the picture that Brothers to the Rescue and Mr. Basulto were funded by the criminal activities [sic] Jorge Mas Canosa and CANF, and that Brothers to the Rescue are "terrorists" who assist in "operations carried on by mercenaries recruited in Central America."

d) While flying a Brothers to the Rescue plane with Rene, Basulto is depicted saying "We are not just a humanitarian organization. We're a militant organization." 00:13:09 – 00:13:15. Mr. Basulto is referring to Brothers to the Rescue and this scene leaves no doubt that Mr. Basulto and Brothers to the Rescue are a "militant organization."

e) While speaking with Roque to recruit Roque to fly with Brothers to the Rescue, Mr. Basulto explains to Roque that "We don't respect safety rules or the laws of aeronautics." When Roque responds to Mr. Basulto and tells him, "My friend, that's

illegal," Mr. Basulto "laughs" (as described by Netflix's Audio Description Subtitles) and says "Illegal . . ." 00:24:10 – 00:24:43.

f) The Film contains scenes which depict Brothers to the Rescue planes aiding and abetting an attempted terrorist attack against Cuba, and which undeniably paint the picture that Mr. Basulto is the recruiter and organizer for a terrorist group disguised as humanitarians. Immediately following the last scene where Mr. Basulto is recruiting Roque as a pilot for Brothers to the Rescue, Roque "flies one of Jose's planes over the open ocean." (Netflix's Audio Description Subtitles). The plane has the Brothers to the Rescue emblem on its side. While flying, Roque looks down at a Cuban Coast Guard boat and starts speaking over the radio. "November 58, Bravo-Bravo to base. Cuban Coastguard spotted at 23-80 by 81-77 heading north/north-west. 00:25:06-00:25:19.

The Film then cuts to a boat captain at the helm with a man holding a machine gun standing over his shoulder, both listening to Roque's radio call which identified a Cuban Coast Guard ship and specified its coordinates and direction. The man holding the machine gun next to the captain then says "Cuban Coast Guard ahead, change course. South-Southeast Varadero." The captain nods his head in agreement. Then the Film depicts the boat turning in the ocean and shows three men in street clothes leaning against the back of the boat. Netflix's Audio Description Subtitles describe that scene by saying "Helmsman turns the wheel and the boat changes course, men hefting machine guns lean against the transom" 00:25:19 – 00:25:34.

9

As such, the Film depicts Brothers to the Rescue serving as a lookout for terrorists planning to carry out an attack on Cuba. Brothers to the Rescue successfully warns the terrorists that the Cuban Coast Guard is nearby, and the terrorists change course. As described below, in a subsequent scene, Brothers to the Rescue serves as a lookout for terrorists, informs the terrorists that the Cuban Coast Guard is not nearby, and the terrorists proceed to carry out a terrorist attack.

At a minimum, the foregoing scene (wherein Brothers to the Rescue warns the machinegun wielding men about the proximity of the Cuban Coast Guard) depicts Brothers to the Rescue aiding and abetting an illegal weapon smuggling mission. Directly after, Roque is seen landing the Brothers to the Rescue plane at the airport. Roque is wearing a Brothers to the Rescue shirt and walks over to meet Rene who is at the airport bar. 00:25:35 – 00:25:45.

Roque, referring to the terrorist and weapons smuggling mission he was just serving as the look-out for while flying for Brothers to the Rescue, asks Rene "how did it go? [sic] Rene responds, "things went wrong". Roque then follows up with "nabbed by the Cubans?" Rene says "They changed course. Their engine broke down off Varadero. U.S. Customs found. Seized their weapons." Roque then says "Shit!", "Hope they don't talk", "No one must know we guided them." 00:25:45 – 00:26:06. These scenes leave viewers with no doubt that Mr. Basulto and Brothers to the Rescue participated in illegal terrorist and weapons smuggling activity that was thwarted by

U.S. Customs.

g) When Olga is speaking about why she won't take her daughter and join Rene to live in the United States, Olga mentions Mr. Basulto particularly. Stating that her daughter will not "live close to a terrorist, like Jose Basulto." 00:30:26 – 00:30:32. Thus, the Film once again expressly categorizes Mr. Basulto as a "terrorist."

h) The next portion is particularly confusing and misleading. There is one line that is supposed to differentiate that Rene is no longer flying for Mr. Basulto and Brothers to the Rescue. Roberto says "I heard Rene left Basulto and joined the PUND[3], better pay supposedly, with them you never know where the fight for a free Cuba ends and drug smuggling begins." 00:30:44.

The next scene, shows Rene flying a plane with Viamonte as his passenger. Viamonte directs him to continue south and when Rene questions him and says "its [sic] not our flight plan?", Viamonte asks "did you follow the flight plan when you worked for the Hermanos?" And Rene responded with "not really" 00:31:00 – 00:31:06. Then Rene lands a plane to offload smuggled drugs. 00:31:09 – 00:32:15. Rene infers that he committed illegal activities for Brothers to the Rescue by admitting he didn't always follow the flight path. In addition, there is no second recruitment meeting with someone besides Mr. Basulto, and no visual depiction of Rene making a switch to work

---

[3]     Partido de Unidad Nacional Democratico.

for a different origination. Thus, a regular viewer watching this scene would logically believe that Rene was depicted smuggling drugs for Brothers to the Rescue.

i) The Film contains additional scenes depicting Brothers to the Rescue aiding a successful terrorist attack in Cuba. The scenes display Mr. Basulto as approving of the terrorist attack and as the leader and orchestrator of the terrorist attacks against Cuba. These scenes leave no doubt that the Film is defamatory. 00:41:22 – 00:44:00.

(1) Rene is seen flying a Brother [sic] to the Rescue plane as cover and as a lookout for a speedboat transporting men holding machine guns. Rene radios down to the boat to tell them the "sea is clear," informing the men with machine guns that there are no Cuban authorities to stop the terrorist attack the men plan to carry out. The man on the boat announces to the group of men holding machine guns "no coast guard, lets [sic] go!", and the men with the machine guns then run onto the beach and start shooting rounds in the air, while people are running for their lives and screaming. The screen then fades to black.

Next, Mr. Basulto is pictured, sitting at the airport bar as Rene approaches. Mr. Basulto asks Rene "back from a mission?" and Rene responds by saying "Don't you have your sources" to which Mr. Basulto confirms by smiling and saying "they say the operation was a success. No casualties, but damage."

Accordingly, the Film represents that Mr. Basulto has inside knowledge of the "operation" -- i.e., the terrorist attack, the Film states that Mr. Basulto considers the

terrorist attack a "success," and the Film states that Mr. Basulto considers the lack of casualties disappointing and is pleased with "damage" that was caused by the terrorist attack. These false depictions of Mr. Basulto approving of the terrorist attack and as connected to and coordinating the terrorist attack are extremely defamatory.

(2) Rene then asks if the "damage" done was "bad," to which Mr. Basulto responds (while still smiling), "Bad enough. The Cubans won't shout it from the rooftops as you can imagine." Thus, the Film reinforces the false portrayal of Mr. Basulto being the organizer of the terrorist attack, being connected with the terrorist attack, approving of the terrorist attack, and having inside knowledge of the terrorist attack.

(3) Rene then expressed his disgust with the mission he had just completed and says, "The Movimiento may be proud. Not me." Mr. Basulto responds by saying, "Why, if it's indiscreet?" Thus, the Film depicts Mr. Basulto as expressing that Rene should be proud of Rene's and Brothers to the Rescue's involvement in the terrorist attack. After Mr. Basulto expresses that Rene should be proud of the terrorist attack, Rene expresses further disgust and states, "I didn't join the resistance to abet terrorists, just to save rafters." 00:42:23 – 00:42:37. So, the film expressly uses the word "terrorist," leaving no doubt in the viewer's mind that Brothers to the Rescue and Mr. Basulto are terrorists and/or are abetting terrorists and that Mr. Basulto and Brothers to the Rescue are deeply involved and intertwined with terrorist activities.

(j) The Film continues to paint Mr. Basulto as the ringleader and mastermind of criminal Cuban Exile groups at the wedding scene. During the wedding, Mr. Basulto pulls Ana and Roque aside to come meet someone. That someone is Jorge Mas Canosa, President of the CANF. In fact, upon meeting Roque, Jorge Mas Canosa says "my friend Basulto, says your [sic] our best pilot." This introduction scene coupled with Jorge Mas Canosa referring to Mr. Basulto as his "friend" leaves no doubt that Mr. Basulto is involved with Jorge Mas Canosa and the purported terrorist activities and smuggling activities of CANF. 00:46:04 – 00:46:39.

As stated earlier, the Cuban representative tells a White House representative that "CANF is financing terrorists." 01:41:40 – 01:42:00. In addition, another scene depicts two weapons smugglers who were caught burying explosives and guns in Cuba, and "both confessed to taking orders from CANF." 01:03:12 – 01:13:19. These scenes provide the audience with the belief that Mr. Basulto is a pawn of CANF and actively plans and coordinates terrorist activities.

k) The Film continues to defame Mr. Basulto in the tragic murder scene of the brave Brothers to the Rescue members. In this scene, the Film portrays the Brothers to the Rescue planes violating Cuban Air space [sic] when they were shot down, but in reality, the planes were shot down in international airspace, causing public outcry and condemnation of the Cuban regime internationally. 01:14:15 – 00:16:52. This representation is fabricated to shift blame away from the murderous Cuban

14

government onto Plaintiffs Brothers to the Rescue and Mr. Basulto for "knowingly" endangering the pilots by having them fly in Cuban airspace, which is against the law. The false representation in the Film that the Brothers to the Rescue planes violated Cuban Air space [sic] is defamatory with respect to Brothers to the Rescue and Mr. Basulto.

l) To further blame Brothers to the Rescue and Mr. Basulto for the shootdown of the planes, the Film added another false scene wherein Mr. Basulto is depicted flying over the city of Havana and dropping leaflets from the window. This scene is false and inaccurate. Mr. Basulto and Brothers to the Rescue studied the wind in the area and expertly dropped leaflets from international airspace, not Cuban airspace, and leaflets traveled by wind into Havana. The Film falsely portrays Mr. Basulto and Brothers to the Rescue as illegally flying in Cuban airspace as another justification for Cuba's shootdown of the planes.

m) Throughout the Film, Brothers to the Rescue and Mr. Basulto are depicted as being a part of the criminal enterprise composed of Cuban Exile groups. The Film makes no effort to clear Mr. Basulto or Brothers to the Rescue's good name and instead purposely confuses and lumps the groups and Plaintiffs Brothers to the Rescue and Mr. Basulto into the same criminal web.

For example, (Roque on the news after returning to Cuba), states, "I was deceived by militants, claiming to be patriots but who were in fact organizing terrorist

actions in Cuba while pretending to give humanitarian aid. They were told many times not to violate Cuban airspace. And I said it to Jose Basulto, you can ask him." Thus, the Film, once again, expressly refers to Plaintiffs Brothers to the Rescue and Basulto as "militants" who were "organizing terrorist actions." 01:18:50 – 01:19:43.

n) There is also some narration throughout the film. One portion of the narration says, "During the period, *The Wasp Network* was able to thwart 20 terrorist attacks, and seize a large quantity of explosives, weapons, and cash.". 01:02:33 – 01:02:43.

o) In Scene 65 of the Film, Ms. Martinez and Roque's Wedding, the Film shows an extravagant Rolls Royce arriving; a large cheering crowd outside the church; many rich "bigwigs" wearing flashy signet rings, guayaberas, sunglasses and smoking cigars; and a lavish press presence. *See* Scene 65 (00:44:00 – 00:48:20). All of the foregoing elements of the Film are entirely false and present a defamatory image of Mr. Basulto being involved in a mafioso-like lifestyle paid for by cocaine and terrorist activities." *Id.*

<u>The Related *Martinez* Case</u>

The same lawyers who represent Plaintiffs in this lawsuit also represent the Plaintiff in *Martinez v. Netflix, Inc.*, No. 20-CV-24328-WPD (S.D. Fla. July 21, 2023), another defamation lawsuit arising from Netflix's release of *The Wasp Network* on its streaming service. According to that complaint, the Film falsely depicted Ana Margarita Martinez, under her own name, "as a sexually immoral individual, who lives a lavish lifestyle paid for by drug money and terrorist activities, and who had associated herself

16

with criminal and/or terrorist enterprises." [ECF No. 1, p. 2, *Martinez* case]. Ms. Martinez is a member of the Cuban exile community who married one of the Cuban Five spies, Juan Pablo Roque, having no knowledge about his covert activities until after he abandoned her to return to Cuba. [ECF 142, p. 3, *Martinez* case].

The complaint also alleges that the Film does not disclose that "Ms. Martinez was a victim of a brutal and premeditated crime committed by Cuba's Ministry of the Interior or that she was a devoted loving mother with two young children who developed a close relationship with the Cuban agent and experienced insurmountable trauma as a result of the premeditated crime. Furthermore, the Film glamorizes Ms. Martinez's life as one of leisure and comforts when in reality she was a hard working mother who oftentimes bankrolled the life of Cuba's agent when he was out of work." [ECF No. 1, p. 3, *Martinez* case].

Not only is this lawsuit based on the *same* Film and filed by the *same* attorneys, but every page of the Complaint in the **instant** case (other than the first page) contains the *"Martinez v. Netflix, et al."* shorthand case descriptor in the upper right-hand corner.

In any event, the *Martinez* Court dismissed both the initial complaint and the amended complaint [ECF Nos. 97; 142, *Martinez* case]. The Court dismissed the amended complaint with prejudice because, after viewing the Film in its totality, it found that "the defamation claims are unsupported by the contents of the [F]ilm." [ECF No. 142, p. 6, *Martinez* case]. More specifically, the Court held that the amended

complaint's allegations "significantly mischaracterize the portrayal of Ana in the Film as a whole, as well as in the selected scenes." The Court noted: "While the Film may have an attitude of favorability to the Castro regime that the Cuban exile community disagrees with, that does not make the Film's portrayal of Ana defamatory to [the] [p]laintiff." *Id.*[4]

## II.   <u>UNDISPUTED FACTS</u>

Plaintiffs and Defendants each submitted an initial statement of material facts (and a response to their opponent's statement of facts).

<u>Introductory Remarks About the "Facts"</u>

The facts are generated from the paragraphs in the statement of facts (and statement of additional facts) or responses to the statements of facts which the opposing party expressly agreed are undisputed. For those purported facts which the opposing party classified as *partly* disputed, the Undersigned includes only the *undisputed* portions. At times, an undisputed fact is supplemented with a portion of the response in order to place the fact in context and provide a fuller understanding of the specific fact.

---

[4]     Plaintiff pursued an appeal, but the Eleventh Circuit Court of Appeals remanded the case to the district court for the limited purpose of determining the citizenship of the parties to establish whether diversity jurisdiction existed in the first instance. *Martinez v. Netflix, Inc.,* No. 23-10895, 2023 WL 3746377 (11th Cir. June 1, 2023). The district court has now issued an Order [ECF No. 165] finding that complete diversity existed among the parties at the time the lawsuit was commenced, and that diversity jurisdiction exists now. The Order also directs the Clerk to return the record, as supplemented, to the Eleventh Circuit for further proceedings.

The Undersigned sometimes changed the wording of an undisputed fact for stylistic and/or grammatical purposes. In addition, to enhance readability, I removed the specific record citations. They can be found in the source document, if needed.

If a party argued that a purported fact was disputed but did not provide record evidence to support the contention, then I deemed the fact to be *undisputed* if otherwise supported by record evidence.

I also ignored disputes that were not actual **disputes**. Adding an *additional,* but *not contrary*, fact, does not generate a bona fide factual dispute. Instead, the new fact is merely an additional fact which Plaintiffs are permitted to include in their own statement of additional facts if they believe it to be material.

This **non**-dispute scenario is illustrated by the following hypothetical: A defendant submits a statement of facts which contends through record evidence citations that a traffic light was green for the defendant at the time of the vehicle collision at issue, and the plaintiff's response is an affidavit claiming that this fact is **disputed** because it was raining at the time of the collision. The fact of rain does not create a factual dispute about the traffic light's status. Instead, it is simply an additional fact which a plaintiff can place in his own statement of additional facts.

This analogy applies even if the party opposing the summary judgment motion offered *several* additional facts to support the notion that the undisputed fact is actually disputed. Thus, if the hypothetical affidavit mentioned above also explained that it

19

was storming, the visibility was poor, the radio was on loud, it was dusk, the driver was changing stations on the car radio, the windshield wipers were inoperable and the defendant was speeding, none of these additional facts would cause the undisputed fact that the light was green for the defendant driver to somehow be deemed a disputed fact.

At times, the parties would contend that a dispute exists over deposition testimony. These so-called disputes could often be resolved by ignoring the gloss or interpretation which a party applied to some deposition testimony (and relying instead on a quote or objective and neutral summary from the actual transcript itself).

The Undersigned sometimes supplemented the specific paragraphs of undisputed facts with other undisputed record evidence relevant to that specific paragraph.

By including a fact as undisputed, the Undersigned is not *necessarily* finding that the fact is legally relevant and admissible. Rather, the listing of a fact simply means that it is undisputed. The Undersigned may, in the analysis section, choose to label a fact as irrelevant or to ignore it because it is immaterial. However, the Undersigned sometimes decided to omit a purported fact if it is clearly immaterial and inadmissible, or if it lacked a necessary factual foundation or predicate. When the Undersigned reached these conclusions, the reference "N/A" would also be used if there were no other facts which could fairly be classified as undisputed.

Framed by these rules, the following facts are undisputed unless otherwise noted. The numbered paragraphs correspond to the numbered paragraphs in Netflix's Statement of Undisputed Material Facts. [ECF No. 159]. If a purported fact was appropriately disputed, then the term "N/A" is listed next to the paragraph number. After listing the Undisputed Facts from Defendant Netflix's Statement of Undisputed Facts, the Undersigned then lists the Undisputed Facts from Plaintiffs' Amended Statement of Material Facts (which includes their Additional Material Facts). [ECF No. 228].

<u>Netflix's Undisputed Facts</u>

**<u>Basulto and BTR</u>**

1.      Basulto is a CIA-trained intelligence officer who "received training in just about everything having to do with warfare," including combat and the use of explosives.

2.      Basulto participated in the Bay of Pigs invasion in 1961 and was trained by the CIA for that military operation.

3.      In his deposition, Basulto testified that he could neither confirm nor deny that he told a Washington Post reporter, in a May 25, 1997 article, that "I was trained as a terrorist by the United States in the use of violence to obtain goals."

4.      N/A

5.      Basulto led a flotilla and "fired a cannon" at a hotel in Havana, Cuba,

in 1962.

6.      Basulto admits that his objective at the time was to "shoot Russians" believed to be staying at the hotel and to "scare the hell out of the Russians, who were a threat to U.S. national security because they were assembling the missiles that were the subject of the Cuban Missile Crisis.

7.      The people firing at the hotel from Basulto's flotilla, including Basulto himself, were not snipers.

8.      Basulto is "proud" of his participation in the effort to shoot Russians at a hotel from a boat in a flotilla.

9.      Basulto lists the following activities on his resume, which he uses "in promotion of [his] activities": military experience as a U.S. trained intelligence officer; veteran of the Bay of Pigs Invasion to Cuba in 1961; Counterinsurgency and Special Warfare Staff Officer Course at the U.S. Army Special Warfare School, Ft. Bragg, N.C.; Active participant in numerous activities against the Castro regime (1964-1969); received training in Guatemala, Panama, and U.S. from the C.I.A.; sent to Cuba in an intelligence/insurgency mission as a radio operator assigned to Santiago de Cuba and the province of Oriente, in support of the underground movement and the forthcoming Bay of Pigs invasion plan; member of the Cuban Brigade 2506 "Infiltration Teams" (Number 2522); Operated alone, reported to "Francisco," head of the Cuban underground in Havana and received instructions from the CIA/U.S. via radio;

Exfiltrated on May 22, 1961 through the Guantanamo Naval Air Station; Re-infiltrated in November 1961 at Santa Cruz del Norte, Havana as a radio operator in a C.I.A. commando operation; Upon return, broke all ties with the C.I.A. to the present date; Active in the Cuban underground movement against the Castro dictatorship (1959-1960).

10.     Basulto continues to promote and favor the overthrow of the communist regime in Cuba.

11.     N/A

12.     Basulto considers himself a public figure "as a consequence of what [he] does."

13.     Basulto "had enumerable press conferences … ["personally" and is "internationally recognized as Brothers to the Rescue spokesman."].

14.     Basulto "coordinated press coverage [for BTR] and acted as a spokesman for the organization on a local, national and international level."

15.     Basulto is a credited contributor to the book, *Seagull One,* published in 2010, which recounts significant moments in his life.

16.     Basulto reviewed and approved the contents of *"Seagull One"* and agrees they are accurate (i.e., in response to a deposition question about whether he confirmed the book is accurate, he testified: "the book is fairly fine.").

17.     In 1991, Basulto founded BTR, whose stated purpose was to rescue

rafters fleeing Cuba for the U.S.

18.    N/A

19.    BTR has misrepresented flight plans to the U.S. Federal Aviation Association ("FAA")[5] and violated Cuba's airspace to drop pro-democratic propaganda over Havana.

20.    BTR largely used volunteer pilots, who knew about BTR.

21.    BTR "never …advertised [or] paid for advertisements."

22.    According to BTR's corporate representative, Basulto participated in all of the TV and radio programs he was invited to. In fact, he never turned down a request for an interview. As Basulto explained in his deposition, "people love me here because I'm not a wrongdoer. I do things for the good of others."

Basulto believes that people still love him today. He admits to being a "public figure as a consequence of what I do." For example, Basulto explained that people will pay for his meals at restaurants. And he provided an anecdote about a woman who approached him at a concert and thanked him for saving four of her sons. Basulto said that there was a survey in Miami of who people trust and he was "at the top."

BTR's representative explained that its activities "motivated the community" and that people "just wanted to help" the organization. By way of example, high schools

---

[5]    The agency is actually known as the Federal Aviation *Administration*.

offered community service hours for students who showed up to prepare the packages the pilots threw to rafters.

BTR's representative explained in a deposition that they did not need to go out and solicit volunteers because the volunteers already knew about BTR and were offering their services.

23.     BTR is the subject of "*Seagull One*".

24.     The "Seagull One" aircraft was sold in or about 2009 to a collector exhibiting it in a museum.

25.     BTR has been the subject of substantial national and international press coverage, including following the Cuban air force's shooting down of two BTR planes in international airspace on February 24, 1996.

26.     On July 13, 1995, Basulto and other pilots arranged for news reporters to accompany them on flights over Havana, and Basulto admitted in his deposition that the aircraft did in fact fly over Havana.

27.     The U.S. National Transportation and Safety Board found that a BTR plane on which Basulto and another person were on board unlawfully crossed into Cuba's air space [sic] during a February 24, 1996 flight. That report concluded that Basulto was distracted by operating a video camera and the other passenger, who was not a pilot, was at the control of the aircraft.

28.     Basulto's pilot's license was suspended for 120 days because an

administrative law judge presiding over the FAA's complaint against Basulto concluded that he piloted an aircraft carelessly during a BTR flight which violated Cuban airspace. The judge's written decision noted that the danger to Basulto's aircraft from making an unauthorized flight into Cuban waters was evident and, in fact, Basulto was warned of the danger by Cuban Air Traffic Control earlier in the day. The judge determined that Basulto was careless in operating the BTR aircraft but concluded that his actions were inadvertent and not intentional or reckless.

29.   BTR still exists nominally but has not been operational since 2009.

**The Film**

30.   The Complaint alleges [ECF No. 1, ¶ 9] that the Film was scripted from Brazilian author Fernando Morais' spy-thriller novel, "*Soldiers*". In its Fifth Affirmative Defense (in its Amended Answer, [ECF No. 51, ¶ 248]), Netflix asserted that the film was inspired by the book (though it included a more-complete title -- *The Last Soldiers of the Cold War: The Story of the Cuban Five* – and asserted that Plaintiffs never complained about the book).

31.   According to "World Literature Today," Morais is one of Brazil's most important contemporary writers and journalists and his works have sold more than two million copies in more than nineteen countries.

32.   N/A

33.   The Film states that it is "based on a true story."

26

34.     The Film portrays Cuban spies infiltrating the Cuban exile community, including BTR.

35.     Rene Gonzalez ("Gonzalez") and Juan Pablo Roque ("Roque"), two Cuban spies, both appear to defect from Cuba to the U.S., and they both fly for BTR for periods of time.

36.     Other anti-Castro exile organizations, including "CANF," "PUND," and "Movimiento Democracia," are also portrayed in the Film.

37.     Midway through the Film, the inception of the "Wasp Network" four years earlier is described, revealing Gonzalez and Roque as spies.

38.     The Film's narrator explains through montage and voiceover how the "Wasp Network" functioned through the early-1990s.

39.     The narrator identifies groups and persons the spies were sent to infiltrate and monitor, including Alpha 66 ("the most aggressive terrorist group") and Luis Posada Carriles.

40.     N/A

**Netflix's Acquisition of the Film (i.e., the Producers' Representations and Warranties)**

41.     The last time that BTR and Basulto are depicted in the Film is at the 77-minute mark, more than 49 minutes before the Film's conclusion.

42.     Netflix is an entertainment content online streaming service.

43.     Netflix produces certain of its own content, but it also licenses completed

content produced by others.

44.    Its licensed, completed content includes documentaries and docudramas.

45.    N/A

46.    The online entertainment streaming market is competitive.

47.    Netflix does not vet completed content it licenses for accuracy.

48.    Netflix contends that it could not practicably vet for accuracy the hundreds of films it licenses each year within a competitive market, but Plaintiffs[6] challenge that position as unsupported by the evidence and note that Netflix's litigation team was able to conduct an investigation after receiving Plaintiffs' demand letter.

49.    Netflix's licensors provide representations and warranties that their completed documentaries and docudramas contain no defamatory content. Netflix contends that it relies on these warranties, but Plaintiffs dispute that, arguing that Netflix does not rely on the licensors for anything other than *indemnification*. Plaintiffs highlight Netflix's position that no due diligence was required on its part because it was acquiring a completed film from a reputable partner who provided warranties.

50.    Netflix licensed the film from Orange in December 2019 pursuant to a

---

[6]    Plaintiffs note that Netflix's corporate representative submitted a declaration which did not explain how many films based on a true story it licenses or negotiates each year, why Netflix would need to conduct independent research in order to reasonably ascertain whether a film contains defamatory content or how it would be impracticable for Netflix to do so (given its "vast" resources).

license agreement.

51.    The Film had been entirely written, developed, produced, directed, and shot before Netflix acquired it from Orange.

52.    Netflix's corporate representative submitted a declaration in which she advised that Orange is a well-known, established licensor in the film industry.

53.    Netflix has previously done business with Orange without any problems.

54.    The License includes a representation by Orange that Netflix's distribution of the Film "shall not violate or infringe any rights of any third party . . . or defame . . . such third party and shall not violate any applicable rule, law or regulation."

55.    The Film was first published on Netflix's streaming platform on June 19, 2020.

56.    In accordance with its general practice, Netflix did not vet the Film for accuracy, instead relying on representations and warranties from Orange. Netflix contends (through a declaration submitted by its corporate representative) that it **had no knowledge of any possibly defamatory content** within the Film concerning Plaintiffs or anyone else, when the Film was first published.

[But Plaintiffs dispute Netflix's no-knowledge-of-defamation position. They rely on several factors to support their contrary view that Netflix knew that: (1) the Cuban Government approved the script, regulated the making of the Film in Cuba, and "participated" in the making of the Film; (2) (i) the Cuban Government is not credible,

(ii) disseminates propaganda, (iii) engages in drug trafficking, and (iv) has a feud with Plaintiffs (the feud is the subject of the Film); (3) the Cuban Government censors speech, does not recognize freedom of the press and does not permit freedom of speech; (4) the Cuban Government will not allow films to be made in Cuba if the script is detrimental to the image of Cuba; (5) the Cuban Government required changes to be made to the script; (6) negative press which was published after the Film was shown at festivals by third parties but before Netflix published the Film stated that the Film is false Cuban propaganda which falsely depicts BTR as a "terrorist organization"; (7) Fernando Morais, the author of the fictional book, *"Soldiers"*, was close friends with Fidel Castro and Castro approved for Morais to write in Cuba; and (8) the U.S. Congress found that BTR has not engaged in covert operations against Cuba.

Therefore, Plaintiffs argue, at a minimum, even if Netflix did not know that the Film is false, Netflix entertained serious doubts as to the Film's veracity or purposefully avoided an investigation into the truth.].

57.    The first time that Netflix was aware of any claim of defamatory content concerning Plaintiffs was when Basulto sent his initial pre-suit letter on October 23, 2020.

58.    Before their depositions, neither Plaintiff had seen the Complaint filed in their names.

59.    Plaintiffs never reviewed, or were asked to review, the Complaint for

accuracy.

60.     Plaintiffs did not identify or select the 15 allegedly defamatory scenes in paragraph 107 of the Complaint, but they say they viewed the Film and communicated with their counsel before the Complaint was filed.

61.     Plaintiffs had never seen the specific allegations of defamation asserted in their Complaint as of the time they provided depositions (but they say they spoke with counsel before the lawsuit was filed).

**The Scenes Identified as Defamatory in the Complaint**

62.     Paragraph 107(a) complains of the Film's depiction of Gonzalez describing Basulto as the "arch enemy of the Cuban Revolution."

63.     The description is true.

64.     Basulto is proud of it.

65.     Paragraph 107(b) alleges the Film's depiction of Basulto "describ[ing] himself as a man who was "[t]rained by the U.S. as a terrorist" is defamatory.

66.     Basulto's resume says that the C.I.A. trained him in Guatemala, Panama, and the United States and that he was sent into an intelligence/insurgency mission as a radio operator in support of the underground movement and the forthcoming Bay of Pigs invasion plan. The resume also says that Basulto was an "active participant" in "numerous activities against the Castro regime" from 1964 through 1969.

67.     Multiple publications quote Basulto as saying, "I was trained as a terrorist

31

by [t]he United States in the use of violence to obtain goals . . . . When I was young, my

Hollywood hero was John Wayne. Now I'm like Luke Skywalker, I believe the Force is

with us."

68.     These quotes appear virtually verbatim in the Film.

69.     Paragraph 107(c) alleges that several scenes "combined paint the picture

that [BTR] and Mr. Basulto were funded by the criminal activities [of] Jorge Mas Canosa

and CANF, and that [BTR] are 'terrorists' who assist in 'operations carried on by

mercenaries recruited in Central America.'"

70.     For this, Plaintiffs rely on a scene where a "representative for Cuba" states

at a White House meeting that "the CANF is financing terrorists and that the operations

are carried on by mercenaries recruited in Central America."

71.     Plaintiffs have no evidence that such a meeting did not occur.

72.     N/A

73.     This scene does not even refer to Plaintiffs.

74.     The president of CANF, Jorge Mas Canosa, was a *legitimate* businessman.

75.     CANF donated to BTR.

76.     Paragraph 107(d) alleges that the Film's depiction of Basulto saying, '"[w]e

[i.e., BTR] are not just a humanitarian organization . . . [w]e're a militant organization,"

is defamatory.

77.     N/A

78.     Paragraph 107(e) alleges that the Film's depiction of Basulto saying "[w]e don't respect safety rules or the laws of aeronautics" and laughing that such conduct is "illegal," is defamatory.

79.     BTR engaged in extremely dangerous flying conduct.

80.     Paragraph 107(f) alleges that the Film defamatorily depicts BTR "as a lookout for terrorists" and as "aiding and abetting an illegal weapon smuggling mission" on a particular occasion.

81.     N/A

82.     BTR did not have in place a structure to supervise how its pilots were performing as pilots.

83.     N/A

84.     These events were also recounted in *"Soldiers"*.

85.     Plaintiffs never demanded that The New Yorker magazine retract statements contained in the January 26, 1998 article which reported that on July 17, 1995, Basulto took a cameraman from an NBC affiliate in Miami on a rooftop-level flight over downtown Havana and rained propaganda and religious medals on the streets below.

86.     Paragraph 107(g) alleges that the Film defamatorily depicts Olga, the character of the wife of Cuban spy Gonzalez, telling her brother-in-law that she does not want her daughter to "live close to a terrorist, like Basulto."

87.     The character of Olga was living in Cuba, believing that her husband had defected to the U.S. and betrayed the Castro regime, to which she was loyal.

88.     The Cuban regime viewed Basulto as a "terrorist" and an "enemy."

89.     N/A

90.     Paragraph 107(h) alleges that the Film defamatorily depicts BTS as involved in drug smuggling because Gonzalez is shown flying a plane on behalf of PUND and being directed to the head of PUND to divert from the filed flight plant to pick up drugs.

91.     N/A

92.     Gonzalez is flying a PUND, not a BTR plane here.

93.     N/A

94.     Paragraph 107(i) alleges that the Film depicts BTR "aiding a successful terrorist Attack in Cuba," and Basulto "approving of the terrorist attack and as the leader and orchestrator of the terrorist attacks against Cuba."

95.     This scene does not depict a BTR plane.

96.     The allegation that "Rene is seen flying a [BTR] plane as cover and as a lookout for a speedboat transporting men holding machine guns" is false.

97.     N/A

98.     BTR supported Movimiento.

99.     During a federal criminal trial in Miami concerning the BTR aircraft shot

34

down, Basulto testified that "violators of the Neutrality Act are patriots, whether they are right or wrong in the instruments they use for that is not for me to say."

100.    Basulto considered his 1962 attack on a Havana hotel to be a success because he damaged the hotel and scared people without causing any casualties.

101.    Paragraph 107(j) alleges that the Film's depiction of Mas Canosa referring to Basulto as his "friend" during a wedding scene is defamatory because it implies that Basulto is "the ringleader and mastermind of criminal Cuban Exile groups" and a "pawn of CANF" who "actively plans and coordinates terrorist attacks."

102.    Basulto attended Mas Canosa's funeral in 1997 "because he was a friend, he's a Cuban patriot."

103.    Basulto was at social events with Mas Canosa.

104.    Paragraph 107(k) alleges that the Film defamatorily depicts Basulto as "endangering the pilots" who were shot down in 1996, and as further portraying the downed planes as "violating Cuban air space [sic] when they were shot down" when, in fact, they were "in international airspace[.]"

105.    The Film does not depict the downed BTR planes as having been in Cuban air space [sic].

106.    Basulto's plane *did* cross into Cuban airspace the day of the shootdown, thereby endangering the lives of himself and the other pilots and planes flying on the same mission.

107.    Paragraph 107(l) alleges that the Film depicts BTR and Basulto as illegally "flying over the city of Havana and dropping leaflets from the window," and that such depiction is defamatory because it portrays "another justification for Cuba's shootdown of the planes."

108.    Plaintiffs' flights over Cuba incited the Cuban government.

109.    In paragraph 107(m), Plaintiffs allege they are depicted in the Film as "part of the criminal enterprise composed of Cuban exile groups" because Roque's character gives an interview criticizing BTR and Basulto as "organizing terrorist actions in Cuba while pretending to give humanitarian aid."

110.    Roque did give such an interview.

111.    Paragraph 107(n) alleges that "some narration" in the Film stating that the Wasp Network thwarted 20 terrorist attacks defames Plaintiffs.

112.    That specific portion of the Film, while expressly mentioning *other* anti-Castro groups, does not refer to BTR.

113.    Neither Plaintiff could explain why the cited scene is supposedly defamatory to them.

114.    Paragraph 107(o) alleges that the Film's wedding scene presents a "defamatory image of Mr. Basulto being involved in a mafioso-like lifestyle paid for by cocaine and terrorist activities," based on the scene's portrayal of a nice wedding with a luxury bridal car, well-dressed guests, and the presence of press.

**Plaintiffs' Evidence (or Lack Thereof) of Damages**

115.    Plaintiffs admit they have no evidence of any damages suffered by either of them in any liquidated amount(s) with respect to their claims.

116.    Plaintiffs admit they have no evidence that any of the 15 allegedly defamatory scenes caused any particular damages to either of them.

117.    Basulto admitted at his deposition that he has not done anything to eliminate the possibility that preexisting publications about him may have caused his alleged damages, rather than the film.

118.    In his deposition, Basulto testified that he: (1) did not know if the $30 million figure mentioned as damages is an arbitrary number; (2) had nothing to do with the picking of that number; (3) does not know whether anyone did anything to support that number; and (4) would be guessing if he tried to provide specifics.

119.    Basulto testified in his deposition that "people love [him] still to this day."

120.    Basulto has no evidence showing any manifestation of harm based upon the Film and has never seen a doctor for any ailment because of the Film.

121.    Asked at his deposition whether he viewed this lawsuit as a way for him to make a political statement about his views toward the Cuban government, Basulto testified: "My whole life has been a political statement against the government of Cuba."

Plaintiffs' Additional Undisputed Facts

122.    In the 1990s, the communist Cuban Government maintained a continuing ban on elections and inflicted continuing violations of human rights on its people.[7]

123.    N/A

124.    In a violation of international law, the communist Cuban Government authorized jets to shoot down two BTR planes, killing the planes' four occupants.

125.    After shooting down the aircraft, Cuba issued statements claiming that BTR engaged in covert operations, bombing campaigns, and commando operations against the Government of Cuba. Plaintiffs concede that they filed false flight plans with the FAA to illegally fly over Havana and drop pro-democracy information. Cuba was complaining about BTR before the February 1996 shootdown, however.

126.    In the 1990s, BTR, led by its founder, Basulto, saved thousands of lives by conducting hundreds of rescue missions in which its planes dropped food and water to Cuban rafters fleeing Castro's dictatorship of Cuba. [Netflix's only response was that this is "disputed as immaterial to the claims in dispute." But branding a factual assertion as only immaterial is insufficient to cause it to be deemed a disputed fact.].

127.    N/A

128.    N/A

---

[7]    During the multi-hour hearing on its summary judgment motion, Netflix would not concede that the communist Cuban Government censors speech. Its pre-hearing written objections to Plaintiffs' additional fact in ¶ 122 were legal, not fact-based.

129.   N/A

130.   N/A

131.   N/A

132.   N/A

133.   N/A

134.   N/A

135.   N/A

136.   N/A

137.   Some published articles about the Film describe how it portrays BTR as being financed with money obtained from drug smuggling and indicates that BTR engaged in illicit activity with CANF. [In his deposition, Basulto confirmed that BTR received funding from CANF.].

138.   N/A

139.   After the 1960s, Basulto says, he chose a path of non-violence. His decision was inspired by Martin Luther King Jr. Basulto's declaration says that he was not associated with any violent acts towards Cuba at any time in the 1990s, for decades before the 1990s, or at any time after that. He also declared that BTR was not associated with any violent acts toward Cuba at any time. Through BTR, Basulto advocated to the Cuban people that democracy in Cuba can be achieved through non-violence. [Netflix condemns this declaration as self-serving and uncorroborated, but it also points to a

January 2018 article about a street being named after him, where Basulto rolled a cannon down the street and fired it off before the actual street dedication ceremony occurred. The reporter speculated that his 1962 expedition to Cuba (in which he fired a mm cannon at a hotel) was the inspiration for his cannon-related activity at the 2018 street dedication.].

140.   N/A

141.   N/A

142.   N/A

143.   N/A

144.   N/A

145.   During a Rule 30(b)(6) deposition, Netflix's representative was asked if Netflix "understood that it has a responsibility not to publish defamatory material, even if it has been previously published by a third party." She gave the following answer: "No. Netflix has a responsibility to ensure that for a completed film, its partner has ensured that it hasn't, and reps and warrants to that effect."

146.   N/A

147.   For Netflix, taking a movie down from the streaming platform is a significant step because it interrupts the consumers' viewing and could impact talent relations and producer relations. Netflix has never removed a film from its platform for defamatory content.

148.    In the past five years, Netflix is unaware of any licensors which are not sufficiently reputable for Netflix to rely on when purchasing licensing rights to a movie purportedly based on a true story. Netflix does not maintain a list of standards for determining which licensors it can rely on, but staffers on the business and legal affairs team are expected to use their experience, knowledge and judgment when negotiating agreements with licensors.

149.    If a licensor is reputable, then Netflix has further confidence that the licensor partner can stand behind the representations and warranties.

150.    Netflix did not conduct any investigation into the accuracy of the Film or the Film's portrayals of Plaintiffs before publishing the Film.

151.    Cuba has a restrictive media environment. The formal media sector is owned and controlled by the state, and the constitution prohibits privately-owned media. The country's independent press operates outside the law, and its publications are considered enemy propaganda.

152.    N/A

152(a) Netflix publishes on its platform, the *Cuba Libre* documentary, which depicts the Cuban Government as not recognizing freedom of the press in Cuba and also shows that the Cuban Government censors speech in Cuba.

153.    Netflix's corporate representative testified that Netflix understands that the Film was shot in Cuba with the approval of the Cuban Government, which reviews

the script.

154.   Netflix knew, before it published the Film, that the Cuban Government approved the script and granted permission for the Film to be made in Cuba and that the producers did not contact Plaintiffs before making the Film. In addition, Netflix's representative testified that Netflix did not do anything after reviewing the following information because there was not necessarily a cause for concern: (1) Assayas said, in the Press Kit to which Netflix attached its logo, that the Cuban Government allowed filming on military bases, inside planes, and the exterior of the headquarters of the Cuban state security (where even Cuban film crews are not allowed to film); and (2) Assayas also said that the help of Cuban officials was precious and that he could not have made the movie without their support. Netflix's representative further testified that, regardless of these factors, the producers were expected to have completed their due diligence in connection with their warranty and representations.

155.   Orange sent the Press Kit to Netflix on February 13, 2020.

156.   Netflix read the Press Kit, put its logo on it and circulated the Press Kit before it published the Film on June 19, 2020.

157.   The Press Kit for the movie contains a verbatim transcript of a conversation interview with writer-director Assayas, who said, among other points, the following: (a) "All filming is run by the State, and very few movies get made there;" (b) "So the issue [of whether to permit the Film to be shot in Cuba] went all the way to the

top of the State, and they ended up green-lighting us"; (c) "The Cubans wound up being absurdly generous with us"; (d) "It's an authoritarian state, so it's a hard no and all the doors are closed, or it's yes and miraculously every possible door is open"; (e) "We did it all [filming] with the help of the military, the police and the State"; (f) "the military gave us access to them [vintage MIG-19 jet fighters] whether on the ground or in flight"; (g) "They had the planes take off for us and do flyovers and even allowed us to give a camera to a co-pilot who did in-flight shots based on our instructions"; and (h) "We even had access to the control tower of the Cuban Air Force Base."

157(a). Netflix's representative testified that none of the factors cited above and in paragraph 154 raised any red flags because the director also said that Cuban officials did not interfere with the Film's content. She emphasized that at no point did Netflix learn anything which caused it to doubt its position on the Film or to doubt its licensing of the Film.

157(b). Based on the information in the Press Kit, Netflix understood that the Cuban Government provided the assistance described by Assayas in the production of the Film but was unaware of whether the Cuban Government provided any other assistance to the filmmakers and has no further information on that issue.

157(c). Netflix contends that it did not discuss or express any view about whether Plaintiffs and the Cuban Government were adversaries before or at the time of the Film's publication on its streaming platform. Netflix's position is that the only

information in its possession about the relationship between the Cuban Government and Plaintiffs was in the Press Kit with its logo. The Press Kit explains that Basulto, after participating in the botched 1961 Bay of Pigs invasion, "goes on to dedicate the rest of his life to the struggle against the Castro regime" by creating BTR, which assisted Cuban refugees fleeing the island to reach Florida by sea. The Press Kit then notes that this "humanitarian mission" was "superseded by more militant actions such as the violation of Cuban airspace to drop leaflets on Havana."

158.    A June 5, 2020 email to Netflix staffers summarized an interview Assayas provided to *El Pais*, a Spanish daily newspaper, in which the following summary was provided: *El Pais* asked about his relationship with the Cuban government while in production. He said it was complex and again highlighted how surprised he was at the very fact of shooting the film in Cuba. He was very skeptical about it happening and it finally did **without even having to adapt the script.** He did mention that they were spied on during production, their mobiles monitored and some days he faced more difficulties because of **changes on the government's *ideas* on the film** but **in the end it turned out to work.** (emphasis added).

158(a). N/A

158(b). N/A

159.    N/A

160.    N/A

44

161.   N/A

162.   Netflix learned that the Film was based on a book authored by Morais after Morais demanded/requested that his name be in the credits and Netflix ultimately confirmed, in a June 17, 2020 email, that "Morias's credit does appear on screen as follows: 'inspired by ["*Soldiers*"], by Fernando Morais.'" That email also advised that "This is per the final Main and End Credits provided (attached), and my spot check of the [F]ilm itself (screen shot attached)."

163.   In a June 10, 2020 email, a Netflix official advised the "Wasp Network Filmmaking Team" that: "As you are well aware, we want to proceed with extreme sensitivity in certain regions given the current climate. We still feel that now is not an appropriate time to be overly promotional in the U.S. so that the country is able to focus on the incredibly important news cycle and active social conversation. That said, we understand that is not the case for all regions around the globe, so we have a bit of a unique plan and unique opportunity to debut the trailer with our service and in targeted regions outside of the U.S."

164.   In an April 28, 2020 email, a Netflix staffer wrote to two other Netflix colleagues and posed the following question: "will using the words "terrorist"/"terrorism" make it look like we're siding with either side of the political debate around these issues? Asking as Jessica had flagged for us a small amount of negative press about the Cuban/American politics following the premiere." The

response (from one of the two recipients) was as follows: "Even the Miami press called the bombings of the hotels terrorism. They were denounced in Miami Herald editorials. So I think we're safe, and also accurate. I don't think we'll get much flak but there's always some to be expected with Cuban projects."

165.    The Film's description on Netflix's platform states, "Based on a true and gripping story: Cuban spies infiltrate exile groups in the 1990s to stop terrorism against the island, but at a high personal cost."

166.    The Film states it is "Based on a True Story."

167.    In a July 2, 2020 email, a Netflix staffer wrote: "Rodrigo Teixeira (who did not join the call) continues to push for Oscars support for the film. I understand that this has been discussed between the PR and Awards teams and none of us feel the need to support for U.S. Awards. As previously agreed, we currently plan to pursue awards in Europe such as Goyas and European Film awards. Olivier thinks they will qualify in France (where we have an unbranded window in 3 years) for Cesars."

168.    Netflix received Plaintiffs' Notice Letter on November 4, 2020 and its legal team then performed an investigation into the accuracy of the film's content.

169.    At any time, Netflix had the technical ability to have removed the "Based on a True Story" description from the Film and from the description on its platform, and it could have included a disclaimer regarding Plaintiffs. However, Netflix's representative testified in a deposition that, because Netflix does not own the Film, it

cannot freely alter the Film that was provided to it -- and would need to obtain consent from Orange or the producers or be directed to do so by a Court.

170.    The Film has been viewed by Florida residents.

171.    Basulto and BTR claim that their reputations have been harmed. Basulto also says he has suffered personal humiliation, mental anguish and suffering, but BTR, a corporation, cannot experience those types of damages.

**III.    APPLICABLE LEGAL STANDARDS**[8]

Summary Judgment

Federal Rule of Civil Procedure 56 provides, "summary judgment is appropriate where there 'is no genuine issue as to any material fact' and the moving party is 'entitled to judgment as a matter of law.'" *See Alabama v. N. Carolina*, 130 S. Ct. 2295, 2308 (2010) (quoting Fed. R. Civ. P. 56(a)). The existence of some factual disputes between litigants will not defeat an otherwise properly ground motion for summary judgment; "the requirement is that there be no *genuine* issue of material fact." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986) (emphasis added). Mere "metaphysical doubt as to the material facts" will not suffice. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986).

---

[8]    At the beginning of the multi-hour hearing, both sides advised me that the Court need not resolve "Plaintiff's Motion for the Court to Take Judicial Notice of the Congressional Findings of Fact Contained in 22 U.S.C. 6046(a) for the Truth" [ECF No. 187] in order to rule on Netflix's summary judgment motion.

The basic issue before the court on a motion for summary judgment is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251 (1986). The moving party has the burden of showing the absence of a genuine issue as to any material fact, and in deciding whether the movant has met this burden, the court must view the movant's evidence and all factual inferences arising from it in the light most favorable to the nonmoving party. *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997). "If reasonable minds could differ on the inferences arising from undisputed facts, then a court should deny summary judgment." *Miranda v. B & B Cash Grocery Store, Inc.*, 975 F.2d 1518, 1534 (11th Cir. 1992).

If the moving party meets its legal obligation, then the burden shifts to the non-moving party to rebut that showing with admissible evidence to demonstrate a genuine issue of material fact. *Josendis v. Wall to Wall Residence Repairs, Inc.*, 662 F.3d 1292, 1314 (11th Cir. 2011).

In defamation cases, "because of the importance of free speech, summary judgment is the **rule, not the exception**." *Larreal v. Telemundo of Fla., LLC*, 489 F. Supp. 3d 1309, 1317-18 (S.D. Fla. 2020) (*adopting report and recommendations*) (emphasis supplied).

In analyzing Plaintiffs' defamation claims, the Court here applies Florida's substantive law. *Turner v. Wells*, 879 F.3d 1254, 1262 (11th Cir. 2018) (citing *Horowitch v. Diamon Aircraft Indus., Ind.*, 645 F.3d 1254, 1257 (11th Cir. 2011)).

Where the highest court -- in this case, the Florida Supreme Court -- has spoken on the topic, we follow its rule. *Molinos Valle Del Cibao, C. por A. v. Lama*, 633 F.3d 1330, 1348 (11th Cir. 2011). Where that court has not spoken, however, we must predict how the highest court would decide this case. *Guideone Elite Ins. Co. v. Old Cutler Presbyterian Church, Inc.*, 420 F.3d 1317, 1326 n.5 (11th Cir. 2005).

Decisions of the intermediate appellate courts -- here, the Florida District Courts of Appeal -- provide guidance for this prediction. *See Bravo v. United States*, 577 F.3d 1324, 1325 (11th Cir. 2009) (per curiam) (citing *West v. Am. Tel. & Tel. Co.*, 311 U.S. 223, 237, 61 S. Ct. 179, 183, 85 L. Ed. 139 (1940)). As a general matter, we must follow the decisions of these intermediate courts. *Id.* at 1325-26. But we may disregard these decisions if persuasive evidence demonstrates that the highest court would conclude otherwise. *Id.*

We will first review Florida law regarding the tort of defamation and then apply it to the purportedly defamatory scenes in the Film.

### Florida's Defamation Law

To establish a claim for defamation under Florida law, a plaintiff must demonstrate: (1) publication; (2) falsity; (3) knowledge or reckless disregard of falsity on a matter concerning a public figure, or negligence on a matter concerning a private person; (4) actual damages; and (5) that the statement is defamatory. *See e.g., Mennella v.*

*Am. Airlines, Inc.*, 824 F. App'x 696, 701 (11th Cir. 2020) (citing *Jews for Jesus, Inc. v. Rapp*, 997 So. 2d 1098, 1106 (Fla. 2008)).

To be defamatory, a statement must be "of and concerning" the plaintiff and must also "expose [the] plaintiff to hatred, ridicule, or contempt or injure[] his business or reputation or occupation." *Parekh v. CBS Corp.*, 820 F. App'x 827, 833 (11th Cir. 2020) (quoting *Jews for Jesus, Inc.*, 997 So. 2d at 1108-09) (internal quotation marks omitted).

When "a group is large, that is, composed of twenty-five or more members, courts consistently hold that plaintiffs cannot show the statements were 'of and concerning' them." *Thomas v. Jacksonville Television, Inc.*, 699 So. 2d 800, 805 (Fla. 1st DCA 1997); *accord Diaz v. NBC Universal, Inc.*, 536 F. Supp. 2d 337, 343 (S.D.N.Y. 2008), *aff'd*, 337 F. App'x 94 (2d Cir. 2009); *Adams v. WFTV, Inc.*, 691 So. 2d 557, 557 (Fla. 5th DCA 1997).

"True statements, statements that are not readily capable of being proven false, and statements of pure opinion are protected from defamation actions[.]" *Turner*, 879 F.3d at 1262.

Plaintiffs bear the initial burden of proving that each of the 15 allegedly defamatory scenes described in paragraphs 107(a)-(o) of their Complaint is false. *See e.g., Turner*, 879 F.3d at 1267; *Ludwin v. Proman*, No. 20-CV-81755-RS, 2023 WL 2401774, at *5 (S.D. Fla. Jan. 24, 2023) (rejecting the plaintiffs' attempt to shift the burden of proof to the defendant to prove that its statements were truthful and holding that "in

defamation cases . . . plaintiffs carry the burden of proving the merits of their claims"); *Montgomery v. Risen*, No. 15-20782-CIV, 2015 WL 5167628, at *2 (S.D. Fla. Sept. 3, 2015) (observing that it is "[the] [p]laintiff's burden to prove falsity" in a libel case).

"Under the substantial truth doctrine, a statement does not have to be perfectly accurate if the 'gist' or 'sting' of the statement is true." *Wentz v. Project Veritas*, No. 6:17-cv-1164-Orl-18GJK, 2019 WL 1716024, at *4 (M.D. Fla. Apr. 16, 2019).

"Whether [a] statement is one of fact or opinion and whether a statement of fact is susceptible to defamatory interpretation are questions of law for the court." *Turner*, 879 F.3d at 1262-63.

A court "must consider all the words used, not merely a particular phrase or sentence." *Byrd v. Hustler Magazine, Inc.*, 433 So. 2d 593, 595 (Fla. 4th DCA 1983) (citation omitted). Attention should also be "given to any cautionary terms used by the publisher in qualifying the statement." *Turner*, 879 F.3d at 1263 (admonishing plaintiff for "cherry pick[ing] statements . . . out of context"); *see also Dibble* v. *Avrich*, No. 14-CIV-61264, 2015 WL 12532615, at *6 (S.D. Fla. July 29, 2015) ("In determining whether an allegedly defamatory statement is an expression of fact or an expression of pure opinion and/or rhetorical hyperbole, *context* is paramount.") (quoting *Fortson v. Colangelo*, 434 F. Supp. 2d, 1369, 1379 (S.D. Fla. 2006) (emphasis added)).

As noted in other cases mentioned earlier, "words are defamatory [*per se*] when they charge a person with an infamous crime or tend to subject one to hatred, distrust,

ridicule, contempt or disgrace, or tend to injure one in one's business or profession."
*Rubin v. U.S. News & World Report, Inc.*, 271 F.3d 1305, 1306 (11th Cir. 2001). Otherwise, if
the words are not defamatory *per se*, **context** must be considered and "extrinsic facts
and innuendo are needed to prove the defamatory nature of the words." *Scobie v. Taylor*,
No. 13-60457-Civ, 2013 WL 3776270, at *4 (S.D. Fla. July 17, 2013). Where a court finds
that "a communication could not possibly have a defamatory or harmful effect, the
court is justified in dismissing the complaint for failure to state a cause of action."
*Rubin*, 271 F.3d at 1306.

Under Florida law, courts determine as a matter of law whether statements
"subject one to hatred, distrust, ridicule, contempt or disgrace," such that these
statements are reasonably capable of a defamatory interpretation. *Keller v. Miami Herald
Publ'g Co.*, 778 F.2d 711, 716 (11th Cir. 1985). "Rhetorical hyperbole" and "vigorous
epithet[s]" are not defamatory. *Greenbelt Co-op Publ'g Ass'n v. Bresler*, 398 U.S. 6, 14
(1970). To determine whether statements are reasonably capable of a defamatory
meaning, the Court must examine how a reasonable and common mind would
understand the statements, and it should not give the statements a tortured
interpretation. *Diplomat Elec., Inc. v. Westinghouse Elec. Supply Co.*, 378 F.2d 377, 381-82
(5th Cir. 1967)[9].

---

[9]      In *Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981), our appellate court

A defamation plaintiff must provide evidence identifying allegedly defamatory statements with "**sufficient particularity**." *Brown Jordan Int'l Inc. v. Carmicle*, No. 0:14-CV-60629, 2015 WL 6123520, at *10 (S.D. Fla. Oct. 19, 2015) (relying on *Razner v. Wellington Reg'l Med. Ctr., Inc.*, 837 So. 2d 437, 442 (Fla. 4th DCA 2002) ("When bringing a cause of action for defamation based on oral statements, a plaintiff need not set out the defamatory language verbatim; it is sufficient that the plaintiff set out the substance of the spoken words with **sufficient particularity to enable the court to determine whether the publication was defamatory**." (emphasis supplied)).

Thus, a defamation plaintiff must demonstrate that the statements were actionable because, if the allegations are not specific enough, it cannot be determined whether the statements were true statements of fact or merely a defendant's opinion. *See Razner*, 837 So. 2d at 442 (statements that are true or opinion are not defamatory); *Smith v. Martin*, 331 S.W.3d 637, 640 (Ky. Ct. App. 2011) ("A claim of defamation may be defeated by establishing the truth of the matter asserted which is an absolute defense.").

The need for a defamation plaintiff to demonstrate with specificity the alleged defamatory statements is so critical that courts have reversed judgments after trial when the precise statements were not adequately identified. *Am. Airlines, Inc. v. Geddes*, 960

---

held that all Fifth Circuit decisions issued before September 30, 1981 would become binding precedent in the Eleventh Circuit.

So. 2d 830, 834 (Fla. 3d DCA 2007) (reversing judgment after trial and entering judgment in favor of the defendant because "[n]either the complaint nor the evidence presented at trial identifie[d] the precise statements alleged to have been defamatory").

Only when a publication is "susceptible of two reasonable interpretations," one of which is defamatory, does the issue become one of fact for the jury. But when a communication "could not possibly have a defamatory or harmful effect, the court is justified in dismissing the complaint for failure to state a cause of action." *Rubin*, 271 F.3d at 1306 (Florida case law citations omitted).

Under Florida law, a party must specifically "identify and describe allegedly defamatory statements in a larger work." *Martinez v. Netflix*, No. 20-CV-24328-WPD, Order on Motions to Dismiss, ECF No. 95 p. 11 (S.D. Fla. Feb. 1, 2022) ("*Martinez I*"); *Michel v. NYP Holdings*, 816 F.3d 686, 705-06 (11th Cir. 2016) (limiting plaintiff to the allegedly false statements specifically enumerated in the complaint).

<u>Docudrama</u>

The Film is a docudrama, which means it is a dramatized version of real events "that may vary from historical fact" without being "false." *Martinez v. Netflix*, No. 20-CV-24328-WPD, 2023 WL 2630337, at *7 (S.D. Fla. Feb. 23, 2023) ("*Martinez II*").[10]

---

[10]     The *Martinez II* Court dismissed the amended complaint with prejudice after finding that none of the specifically identified scenes were defamatory as a matter of law. Both the *Martinez I* and *Martinez II* cases involved the same Film (i.e., *The Wasp*

Docudramas use "simulated dialogue, composite characters, and a telescoping of events occurring over a period into a composite scene or scenes." *Martinez II*, at *4 (quoting *Davis v. Costa-Gavras*, 654 F. Supp. 653, 658 (S.D.N.Y. 1987). *Martinez II* described the Film as *not* being "a documentary showing original footage, and interviews with people who were involved in the incidents." *Id.* at *4.

Because the Film is a docudrama "based on a true story," the Undersigned underscores the practical point that "viewers recognize docudramas as presenting dramatizations that may vary from historical fact even though they are based on true stories." *Id.* As a result, courts question whether a reasonable viewer would interpret a docudrama as "entirely factual" because "[v]iewers are generally familiar with dramatized, fact-based movies and miniseries in which scenes, conversations, and even characters are fictionalized and imagined." *Id.* (quoting *De Havilland v. FX Networks, LLC*, 21 Cal. App. 5th 845, 866 (2018)). When a work is a "so-called docudrama or historical fiction," that status "might indicate that . . . quotations should not be interpreted as the actual statements of the speaker to whom they are attributed." *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 513 (1991).

---

*Network*). The plaintiff there was (and still is) being represented by the same lawyers who represent Plaintiffs here. The plaintiff there, however, is a woman with different defamation allegations about the same movie.

Given the Film's status as a docudrama, the actual malice inquiry (which we will define below and which we use here because Plaintiffs are public figures, for reasons outlined later in this ruling) "must take into account how a reasonable viewer would understand the contents of the scene." *Lovingood v. Discovery Commc'ns, Inc.*, 800 F. App'x 840, 847 (11th Cir. 2020) (affirming summary judgment for the defendants – a media company and television networks – in a defamation lawsuit).

As explained by our appellate court in *Lovingood*, 800 F. App'x at 847, the "overall format, tone, and direction of the film" are "most telling." Similar to the reaction of a reasonable viewer watching the film at issue in *Lovingood,* a reasonable viewer watching *The Wasp Network* would know "within the first two minutes that he is not watching a documentary film that consists mainly of historical footage and interviews with the historical figures." Instead, he would "understand that most of the film uses actors to portray historical events with some amount of artistic license." *Id.* Likewise, the same reasonable viewer would also understand that condensing several years of events into a less-than-two-hour movie "required the selective editing of real history, not only for time but also for clarity, flow and emotional impact." *Id.*

However, the mere fact that the Film is a "docudrama" does not insulate Netflix from liability. *See Gaprindashvili v. Netflix, Inc.*, No. 2:21-cv-07408, 2022 WL 363537, at *5 (C.D. Cal. Jan. 27, 2022) (denying Netflix's motion to dismiss and stating, "the fact that [*The Queen's Gambit*] was a fictional work does not insulate Netflix from liability for

defamation if all the elements of defamation are otherwise present . . . . The test is whether a reasonable viewer would understand the character to be the person identified and to have the characteristics as described."); *Partington v. Bugliosi*, 56 F.3d 1147, 1155 (9th Cir. 1995) (affirming summary judgment in favor of defendant television network and attorney in defamation lawsuit and explaining that creators of docudramas that mix fact and fiction "must attempt to avoid creating the impression that they are asserting objective facts"); *Lovingood*, 800 F. App'x at 848 (There is no "invincible shield of protection for all works characterized as a docudrama or historical fiction."); *Fairstein v. Netflix, Inc.*, 553 F. Supp. 3d 48 (S.D.N.Y. 2021) (denying Netflix's motion to dismiss a defamation claim based on a docudrama).

As the Supreme Court has noted, statements made in "a so-called docudrama or historical fiction" should "not be accepted unquestioningly." *Partington*, 56 F.3d at 1155 (quoting *Masson*, 501 U.S. at 512–13). In fact, as *Partington* points out:,

> [d]ocudramas, as their names suggests, often rely heavily upon dramatic interpretations of events and dialogue filled with rhetorical flourishes in order to capture and maintain the interest of their audience. We believe that viewers in this case would be sufficiently familiar with this genre to avoid assuming that all statements within them represent assertions of verifiable facts. To the contrary, most of them are aware by now that **parts of such programs are more fiction than fact**.

*Id.* (emphasis supplied).

Constitutional Requirements for Public Figures

Assuming that a defamation plaintiff adequately establishes that published statements are defamatory, a plaintiff who is a public official or public figure must demonstrate by clear and convincing evidence that the defendant acted with "actual malice." *See, e.g., Klayman v. City Pages*, 650 F. App'x 744, 750 (11th Cir. 2016) ("[A] public figure must prove actual malice by clear and convincing evidence" at summary judgment); *Berisha v. Lawson*, 973 F.3d 1304, 1310 (11th Cir. 2020), *cert. denied*, 141 S. Ct. 2424 (2021) (same).

The "actual malice" standard is designed to preserve First Amendment protection, and that protection requires the plaintiff to prove that the defamatory statement was "made . . . with knowledge that it was false or with reckless disregard of whether it was false or not." *Lovingood*, 800 F. App'x at 846 (affirming summary judgment in favor of media company and relying on *New York Times Co. v. Sullivan*, 376 U.S. 254, 279-80 (1964), for the actual malice standard used for a public official plaintiff).[11]

Public figure status is a question of law for the Court. *See, e.g., Turner*, 879 F.3d at 1271 (citations omitted); *Michel*, 816 F.3d at 702. "An individual may qualify as a public figure either generally . . . or for only 'limited' purposes, where the individual has thrust

---

[11]   "Actual malice under the *New York Times* standard should not be confused with the concept of malice as an evil intent or a motive arising from spite or ill will." *Lovingood*, 800 F. App'x at 846, n. 5 (quoting *Masson*, 501 U.S. at 510).

himself into a particular public controversy and thus must prove actual malice in regard to certain issues." *Berisha*, 973 F.3d at 1310. An entity may likewise qualify as a public figure. *See, e.g., Silvester v. Am. Broad. Cos.*, 650 F. Supp. 766, 777 (S.D. Fla. 1986) ("[F]or purposes of applying First Amendment to defamation claims, corporations can be public figures."), *aff'd*, 839 F.2d 1491 (11th Cir. 1988) (citation omitted); *Hindu Am. Found. v. Viswanath*, No. 21-CV-01268 (APM), 2022 WL 17820331, at *10-11 (D.D.C. Dec. 20, 2022) (applying standard to non-profit organization).

The Eleventh Circuit has identified "two 'fundamental criteria'" that distinguish public and private figures: "(1) 'public figures usually have greater access to the media which gives them a more realistic opportunity to counteract false statements than private individuals normally enjoy'; and, more importantly, (2) public figures typically 'voluntarily expose themselves to increased risk of injury from defamatory falsehoods.'" *Berisha*, 973 F.3d at 1310 (citation omitted).

When a plaintiff is a public figure, he must show, by clear and convincing evidence, that the defendant "in fact entertained serious doubts as to the truth of the publication." *Berisha*, 973 F.3d at 1312. This standard is so high that this Court last found a triable issue on actual malice in cases against media defendants brought by public figures in 1983.[12]

---

[12]     *See Michel v. NYP Holdings, Inc.*, 816 F.3d 686, 701-02 (11th Cir. 2016) (affirming

As outlined above, Plaintiffs take issue with Netflix's position that it did not need to vet the Film or investigate its accuracy because it was relying on the warranty and representations from its licensor. But Plaintiffs' challenge is different from the standard for reckless disregard, which is "still higher." *Lovingood*, 800 F. App'x at 850.

"**[F]ailure to investigate** before publishing, even when a reasonably prudent person would have done so, is **not sufficient** to establish reckless disregard." *Harte-Hanks Comm'ns, Inc. v. Connaughton*, 491 U.S. 657, 688, 109 S. Ct. 2678, 105 L. Ed. 2d 562 (1989) (emphasis added). Because actual malice "is not an objective standard, arguments about what a reasonable producer should have done will not avail." *Lovingood*, 800 F. App'x at 850.

Rather, to show reckless disregard that amounts to actual malice, a defamation plaintiff must point to evidence that the defendant had real, subjective suspicions about the veracity of the statement in question. "There must be sufficient evidence to permit

dismissal for failure to plausibly plead actual malice); *Berisha*, 973 F.3d at 1312; *Klayman v. City Pages*, 650 F. App'x 744, 752 (11th Cir. 2016) (affirming summary judgment); *Levan v. Capital Cities/ABC, Inc.*, 190 F.3d 1230, 1244 (11th Cir. 1999) (vacating and remanding judgment on jury verdict for plaintiff because evidence was insufficient to establish that network and producer acted with actual malice in broadcasting report); *Meisler v. Gannett Co.*, 12 F.3d 1026, 1030 (11th Cir. 1994) (affirming summary judgment for defendant newspaper because defendants' actions were, at most, negligent, which is "not the appropriate standard for proving actual malice"); *Silvester v. Am. Broad. Cos.*, 839 F.2d 1491, 1498-99 (11th Cir. 1988). *Cf. Hunt v. Liberty Lobby*, 720 F.2d 631, 642-45 (11th Cir. 1983) (reversing verdict for plaintiff because of erroneous jury instruction concerning the actual malice standard).

the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication," *St. Amant v. Thompson*, 390 U.S. 727, 731, 88 S. Ct. 1323, 20 L. Ed. 2d 262 (1968), or that he acted with a "high degree of awareness of . . . probable falsity," *Garrison v. Louisiana*, 379 U.S. 64, 74, 85 S. Ct. 209, 13 L. Ed. 2d 125 (1964).

In public figure defamation cases, there is a "powerful interest in ensuring that free speech is not unduly burdened by the necessity of defending against expensive yet groundless litigation. Indeed, the actual malice standard was designed to allow publishers the 'breathing space' needed to ensure robust reporting on public figures and events." *Michel*, 816 F.3d at 702.

If Plaintiffs are public figures (*see* discussion below), then their negligence claims would also fail as a matter of law. [ECF Nos. 137-154; 175-194]. *See, e.g., Meisler v. Gannett Co.*, 12 F.3d 1026, 1030 (11th Cir. 1994), *cert. denied*, 512 U.S. 1222 (1994) (granting summary judgment where "[a]t best, the defendants' actions were negligent; negligence is not the appropriate standard for proving actual malice"); *Don King Prods., Inc. v. Walt Disney Co.*, 40 So. 3d 40, 43, 46 (Fla. 4th DCA 2010) (granting summary judgment for defendant and noting that "[a] public figure bringing a defamation action must prove more than mere negligence on the part of the publisher; he must prove that the publisher acted with actual malice").

## IV.   <u>ANALYSIS</u>

### <u>Are Any of the Scenes in the Film Defamatory?</u>

Before evaluating whether Plaintiffs are public figures or, if the answer is "yes," if Netflix acted with actual malice, we must *first* determine whether one or more of the 15 scenes pinpointed in the Complaint are defamatory. If none of them are, then there is no need to engage in the additional analysis. *See generally Lovingood*, 800 F. App'x at 848 (before determining the defamatory falsehood was made with actual malice, the Court "pause[d]" to identify "what, exactly, is the defamatory falsehood").

Netflix argues that *none* of the 15 scenes are defamatory. Although the Undersigned agrees with Netflix on *most* of the scenes, I cannot comfortably and conclusively determine now, as a matter of law, that *every* scene is not defamatory. I am *inclined* to side with Netflix on these few questionable paragraphs (and agree that none are defamatory). But it is more prudent to assume that these few scenes are defamatory. As we will soon see, though, this assumption is ultimately irrelevant because Plaintiffs are public figures who did not establish by clear and convincing evidence that Netflix acted with actual malice.

A substantial portion of the Complaint does not focus on Plaintiffs. Instead, it summarizes the historical background of the Cuban Revolution. *See* [ECF No. 1, ¶¶ 41-99]. The Complaint criticizes the Film as generally offending the Cuban exile community as a whole. For example, it alleges that: (1) the Film "romanticizes, or glorifies" the Cuban spies; (2) the Film "is an obvious attempt to rewrite and whitewash history in favor of the communist Cuban regime;" (3) the Film falsely portrays the

Cuban exile organizations as terrorists. *Id.* at ¶¶ 3-5. Similarly, Basulto claimed, in his deposition, that the "whole film" is "defamatory to the exile community to which I belong." [ECF No. 159-1, p. 140].

The Complaint asserts allegations about the specific scenes which are purportedly defamatory in one paragraph, divided into 15 subparts. [ECF No. 1, ¶ 107(a)-(o).]. As noted earlier, Plaintiffs did not themselves select these scenes for inclusion in the Complaint, and they had not reviewed the Complaint before it was shown to them at their depositions in this case.

**Paragraph 107(a)** alleges that the Film's depiction of Rene Gonzalez (a Cuban spy) describing Basulto as the "arch enemy of the Cuban revolution" is defamatory. It is not. To the contrary, it is true. Not only did Basulto testify that this description is true, but he is *proud* of it.

**Paragraph 107(b)** alleges that the Film's depiction of Basulto "describing himself as a man who was "[t]rained by the U.S. as a terrorist" is defamatory. Although Netflix points to newspaper articles and other publications which purport to quote Basulto with this language, he says he "does not remember" if he said it. And he says that his training sixty or more years ago does not make him a terrorist. He also explains that "after the 1960s, [he] decided to take a path of non-violence" and that this "decision was inspired by Martin Luther King Jr." [ECF No. 227, pp. 3-4].

63

To be sure, Basulto admitted (and admits to this day) that he fired a "cannon" at a Havana hotel in 1962 in an effort to shoot Russians -- an act which could fairly be described as terrorism, especially when Basulto conceded he was not trained as a sniper (which means that anyone at the hotel could have been killed or injured, regardless of whether he or she was Russian). However, that admission does not expressly concede that the United States *trained* him as a *terrorist*. In addition, it does not necessarily mean that Basulto *used* the training he received from the United States to fire the cannon at the hotel.

Basulto admits in his resume that the United States trained him, in the early 1960s, to be an *intelligence officer.* He also admits that he participated in the Bay of Pigs Invasion, which involved *violence*. His resume also says that he received training from the C.I.A. -- but it does not specify the *nature* of the training. He also admits to taking a counterinsurgency and special warfare course at the U.S. Army Special Warfare School at Ft. Bragg, North Carolina (but that is *different* from a course in **terrorism**). Likewise, his resume represents that he was sent (presumably by the United States) to Cuba "in an intelligence/insurgency mission as a radio operator . . . in support of the underground movement and the forthcoming Bay of Pigs invasion plan" (but this is not expressly *terrorism* training).

The scene at issue in the Film does not say that Basulto **was** a terrorist (in the early 1960s, during BTR's activities in the mid-1990s, or today). Instead, it alleges that

the Film showed Basulto "falsely **describing himself**" as a man who was "[**t]rained by the U.S. as a terrorist.**" (emphasis added).

This supposedly false allegation (about what Basulto supposedly said about himself) is not necessarily the same as a false allegation that Basulto himself **engaged** in actual terrorism, **was** a terrorist or **is** a terrorist. A key aspect of the allegation is that Basulto **described himself** as someone who *received* training from the U.S. as a terrorist. Netflix argues that this allegation is true and that the supposed quotes from articles (in which Basulto was interviewed) provide the necessary proof.

Basulto's briefing on this specific allegation has been imprecise. Rather than focus on whether he ever *described himself* in the manner at issue, Basulto's opposition memorandum focuses on whether he was a terrorist, and, if so, whether this renders him a terrorist for the rest of his life. In fact, Basulto's opposition memorandum includes the subheading "Basulto Is Not a Terrorist" (as opposed to "Basulto Never Publicly Conceded That He Was or Is a Terrorist" or "Basulto Never Described Himself as Someone the United States Trained as a Terrorist.") *See* [ECF No. 227, p. 2].

There is a distinction between a false statement accusing someone of being a terrorist, engaging in terrorist acts or merely receiving training to be a terrorist. Basulto's deposition testimony (i.e., that he "cannot remember" if he said the things the *Washington Post* said he said in its interview-based article) is hardly compelling or persuasive. However, because the Undersigned is evaluating a summary judgment

motion, I will not make a credibility determination about the veracity of Basulto's claim to not remember making the statement to the *Post* newspaper reporter.

In any event, Basulto's resume and his testimony about the resume and the activities listed on it could be construed as suggesting that the United States trained him in terrorist skills. But Netflix does not overtly and unequivocally say *that*.

However, Netflix argues that Plaintiffs have **abandoned** their claims concerning this scene (paragraph 107(b)) because their written opposition response makes no argument about this paragraph (and several others). There is authority affirming orders determining that claims are abandoned when not discussed in a summary judgment opposition. *See, e.g., Christian v. Cartersville City Sch. Bd. of Educ.*, 167 F. App'x 89, 93 n.1 (11th Cir. 2006) (affirming magistrate judge's decision that claim was abandoned where plaintiff failed to address it in her brief in opposition to summary judgment motion); *cf. Singh v. U.S. Att'y Gen.*, 561 F.3d 1275, 1278 (11th Cir. 2009) (explaining that "an appellant's brief must include an argument containing appellant's contentions and the reasons for them, with citations to the authorities and parts of the record on which the appellant relies," and that "simply stating that an issue exists, without further argument or discussion, constitutes abandonment of that issue and precludes our considering the issue on appeal" (internal quotation marks omitted)).

Although the Undersigned may well be entitled to deem this claim concerning this scene abandoned, it is surely less risky to evaluate the claim on the merits, rather

than relying on a theory of procedural default.[13] Concerning the merits question of whether the scene is defamatory, there are grounds to support a conclusion that the scene does *not* defame Plaintiffs because of the interpretation of the evidence described above.

In addition, it is questionable whether the alleged defamation is actually defamatory. Saying that the United States *trained* Basulto as a terrorist is not the same as alleging that he *used* that training to *become* a terrorist. Indeed, the statement that Basulto received training to be a terrorist might not cause him to be subjected to ridicule in the absence of a related allegation (i.e., that he engaged in terrorism after receiving the training). Given that the Complaint says that the *United States* trained Basulto as a terrorist and that the purported training was to become involved in the Bay of Pigs invasion of communist-led Cuba, it is not illogical to conclude that many, especially those in the Cuban exile community in Miami, would not deem that statement negatively.

---

[13]     If Plaintiffs pursue Objections to this Report and Recommendations, then Netflix could still sustain the ruling on an abandonment theory with the legal doctrine that a trial court can be affirmed if there is any reason to support its decision in the record, regardless of whether the lower court relied upon it. *Jaffke v. Dunham*, 352 U.S. 280, 281, 77 S. Ct. 307, 1 L. Ed. 2d 314 (1957) ("A successful party in the District Court may sustain its judgment on any ground that finds support in the record."); *Lucas v. W. W. Grainger, Inc.*, 257 F.3d 1249, 1256 (11th Cir. 2001) (appellate court "need not decide whether the district court properly resolved that issue if there is another basis for affirming its judgment" because affirmance may be based "'on any ground that finds support in the record'").

To the contrary, it could be deemed a *positive* description of Basulto in some quarters. [There is an allegation later in the Complaint that a character in the Film – Olga – says, in a quick comment, that Basulto *is* a terrorist. The Undersigned will assess that scene later in this Report and Recommendations, as it appears chronologically in the Complaint].

To summarize the evaluation of the scene at issue, it is highly likely that the statement at issue (that the United States trained Basulto as a terrorist) is not defamatory because: (1) it is true; (2) Basulto himself admitted it in a Washington Post interview; and (3) it does not subject Plaintiff to ridicule.

However, in an abundance of caution, the Undersigned will *assume* that the scene (in which Basulto acknowledges publicly that the United States trained him as a terrorist) is defamatory. This assumption will not turn out to be impactful because the end result -- Plaintiffs failed to establish actual malice by clear and convincing evidence -- renders the assumption entirely academic.

**Paragraph 107(c)** alleges that several constituent scenes "combined [to] paint the picture that Brothers to the Rescue and Mr. Basulto were funded by the criminal activities [of] Jorge Mas Canosa and CANF, and that Brothers to the Rescue are 'terrorists' who assist in 'operations carried on by mercenaries recruited in Central America.'" [ECF No. 159, ¶ 69]. To create the appearance of an alleged link in the Film between BTR and "terrorism," however, Plaintiffs rely on a scene where a

"representative for Cuba" states at a White House meeting that "the **CANF** is financing

terrorists and that the operations are carried on by mercenaries recruited in Central

America." *Id.* at ¶ 70 (emphasis added).

Plaintiffs testified that: (a) they have no evidence that such a meeting did not

actually occur, and (b) the Film's depiction of Cuba labeling CANF (or anyone) as a

"terrorist" is not defamatory to them. *Id.* at ¶¶ 71-72; *see also* [ECF No. 159-1, pp. 103-4

("Q. Is it your position that the movie's depiction of a representative of Cuba describing

CANF as affiliated with terrorists, is it your position that that scene somehow defames

you? A. No, no, absolutely not[.]"); ("Cuba views everybody that's against it, the

government, as terrorists.")]. Nor does this scene ever refer to Plaintiffs. *Id.* at ¶ 73.

Furthermore, Basulto testified that Jorge Mas Canosa, the president of CANF,

was also a legitimate businessman, which is confirmed by the public record. *Id.* at ¶ 74.

Indeed, the Court in *Martinez II* found that the same counsel representing Plaintiffs had

"mischaracteriz[ed] . . . [the portrayal] of Mas Canosa. Mas Canosa is portrayed in the

Film as a prominent, influential leader of the Cuban exile community and, in particular,

the Cuban American National Foundation." 2023 WL 2630337, at *4 n.2.

Plaintiffs also admit that CANF donated money to BTR. [ECF No. 228, ¶ 75]. The

Film's depiction of Mas Canosa donating to BTR and money being "no object" for him

does not defame Plaintiffs.

Moreover, a depiction of the Cuban government viewing **CANF** as supporting terrorism, even assuming that such a depiction was false, does ***not*** defame BTR ***or*** Basulto. *See Parekh v. CBS Corp.*, 820 F. App'x 827, 833 (11th Cir. 2020) (defamatory statement must be "of and concerning" the plaintiff).

**Paragraph 107(d)** alleges that the Film's depiction of Basulto saying, "'[w]e [i.e., BTR] are not just a humanitarian organization . . . [w]e're a militant organization," is defamatory. The scene's context shows that Basulto was referring to BTR unlawfully entering Cuban airspace in the past to drop pro-democracy propaganda. As discussed below, it is undisputed that BTR repeatedly did just that. *Id*. at ¶ 19.

So the question is: Does entering another country's airspace without permission to drop leaflets and/or propaganda constitute a "militant" act?

In support of its summary judgment motion, Netflix relies on a dictionary.com definition of "militant" as "aggressively active or combative in support of a cause"; "engaged in warfare;" or "fighting." [ECF No. 159-7].

In its deposition, BTR (through its corporate representative, Basulto's wife, Rita Maria Basulto, agreed that the Cuban Government would have been unhappy with BTR's dropping of leaflets. She described leaflet-dropping as a non-violent activity and non-aggressive. [ECF No. 159-6, p. 125]. BTR's representative explained that the dropping of leaflets over Cuba was "[a]ggressive in the sense that it could provoke people to do something, but not aggressive in the sense that it was going to hurt

anybody. Nobody was going to be hurt from a little paper falling on their heads." *Id*. at 128.

Dropping leaflets over Cuba after flying into its airspace without permission is certainly provocative, but it is likely also militant in the sense that it was "aggressively active" in "support of a cause." BTR's representative testified that the dropping of leaflets from BTR planes was done in furtherance of a cause: "freedom of Cuba." *Id*. at 126.

Under the substantial truth doctrine, a statement does not have to be perfectly accurate if the 'gist' or 'sting' of the statement is true." *Wentz*, 2019 WL 1716024, at *4.

Under the circumstances, even if I assume that Plaintiffs showed some degree of falsity, there is no genuine dispute that the scene is nonetheless "substantially true." *See, e.g., Wentz*, 2019 WL 1716024, at *5 (finding "the alleged defamatory content in this case is true, substantially true, or at least not provable as false" where "many of the alleged defamatory statements made by [the defendants] . . . are recitations of Wentz's own admitted actions and statements," and "although the Wentz Video includes a rap song implying Wentz is a liar, Wentz admitted to lying to Sandini during Wentz's deposition"); *Marder v. TEGNA Inc*., No. 19-81283-CIV-SMITH, 2020 WL 3496447, at *5 (S.D. Fla. June 29, 2020) (dismissing defamation claim concerning statement that plaintiff had been charged with crimes where plaintiff had, in fact, committed crimes for which he would later be charged); *Davis v. McKenzie*, No. 16-62499-CIV-

COHN/SELTZER, 2017 WL 8809359, at *12-14, *17-18 (S.D. Fla. Nov. 3, 2017), report and recommendation adopted, 2018 WL 1813897 (S.D. Fla. Jan. 19, 2018) (finding that PBS news reports about plaintiff's crimes were substantially true and that any falsehoods could have done only incremental damage to plaintiff's reputation).

Plaintiffs cannot legitimately challenge the fact that BTR planes invaded Cuban airspace knowing that Cuba would be upset, and dropped leaflets designed to induce Cubans to engage in regime change. Branding this activity as "militant" is true enough to not be defamatory. *See, e.g., Dunn v. Air Line Pilots Ass'n*, 193 F.3d 1185, 1193-94 (11th Cir. 1999) (granting summary judgment where description of pilots as "scabs" was not false where pilots admitted to crossing union picket lines and working during strike).

**Paragraph 107(e)** alleges that the Film's depiction of Basulto saying "[w]e don't respect safety rules or the laws of aeronautics" and laughing that such conduct is "illegal" is defamatory. But Basulto testified that BTR *did* violate U.S. and Cuban aviation laws and engaged in "extremely dangerous flying conduct." In addition, Basulto's pilot's license was suspended for operating an aircraft "recklessly." These scenes are true, and they are therefore not defamatory.

**Paragraph 107(f)** alleges that the Film defamatorily depicts BTR "as a lookout for terrorists" and as "aiding and abetting an illegal weapon smuggling mission" on a prior occasion. But the Undersigned has viewed the Film and paid close attention to the portions which supposedly support Plaintiffs' allegations here. The Film does not

clearly show what Plaintiffs contend. Plaintiffs' arguments require a huge leap in logic to conclude that vague scenes which do not clearly show events somehow implicate BTR in terrorism and weapons smuggling. To provide one specific illustration, the scene depicting three men on a boat does not show them holding guns, so it does not portray them as weapons smugglers.

Therefore, this paragraph does not concern defamatory material. But, even if it did, and as we will come to understand below, Plaintiffs did not establish actual malice by clear and convincing evidence for the scenes at issue in this paragraph (or any other paragraph, for that matter).

**Paragraph 107(g)** is a scene where Olga (who is living in Cuba while believing that her husband betrayed the Castro regime, to which she was loyal, by defecting to the United States) said she did not want her daughter to "live close to a terrorist like Jose Basulto." Plaintiffs contend that describing Basulto as a "terrorist" is defamatory.

But Netflix describes Olga's comment as merely an expression of her "opinion" about another character and is therefore not defamatory. At the hearing, Netflix noted that it was not arguing that calling a person a terrorist is *always* a protected, non-defamatory opinion. Instead, it explained that it was only contending that the circumstances here establish it as an opinion.

Our Supreme Court has imposed certain "culpability requirements" in order to "further ensure that debate on public issues remains 'uninhibited, robust and wide

open.'" *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 110 S. Ct. 2695, 2707 (1990) (quoting *New York Times Co.*, 376 U.S. at 270). Moreover, there is "protection for statements that cannot 'reasonably [be] interpreted as stating actual facts' about an individual." *Id*. at 2706. This protection "provides assurance that public debate will not suffer for lack of 'imaginative expression' or the 'rhetorical hyperbole' which has traditionally added much to the discourse of our Nation." *Id*. Consequently, the legal review of determinations concerning an opinion on a matter of public concern "will be made in a manner so as "not to 'constitute a forbidden intrusion of the field of free expression.'" *Id.*

The Undersigned required [ECF No. 240] the parties to provide supplemental legal authority on the issue of whether Olga's comment is a mere statement of opinion, and is therefore not actionable as a defamation claim.

In response, Netflix argued that "numerous courts have found that politically-charged descriptions like 'terrorist' are non-actionable opinions, including in the docudrama context." [ECF No. 243, p. 2]. It cited *LeBlanc v. Skinner*, 103 A.D.3d 202, 955 N.Y.S.2d 391 (2012) (accusation that the plaintiff was a "terrorist") and *Turner*, 879 F.3d at 1262 (calling the plaintiff "homophobic").

Netflix also asserted that "differing viewpoints related to controversial historical events are also protected opinions," *Id.,* citing *Partington v. Bugliosi*, 56 F.3d 1147, 1154 (9th Cir. 1995) (commentary on disputed facts of a controversial occurrence must be

protected else "the robust debate . . . that is a vital part of our democracy would be surely hampered"), especially where, as here, the alleged defamatory statement was uttered "during a fictionalized conversation, as part of [a] series that uses actors and actresses, music, and imagined dialogue to dramatize historical events," and *John E. Reid & Assocs., Inc. v. Netflix, Inc.*, No. 19 CV 6781, 2020 WL 1330657, at *7-8 (N.D. Ill. Mar. 23, 2020) (a prosecutor's comment that the Reid Technique, a specific interrogation technique, has been "universally rejected" is "the kind of loose, hyperbolic rhetoric that is a protected part of the nation's discourse").

Plaintiffs rely on cases in which the false accusation that the plaintiff was a terrorist or potential terrorist was deemed to not be an opinion because the fact of whether someone is a terrorist can be proven or disproven by the facts. *See TransUnion, LLC v. Ramirez*, 141 S. Ct. 2190, 2209 (2022) (The harm from being labeled a "potential" terrorist in a credit report is close enough to harm from being labeled a "terrorist," i.e., "the harm from a false and defamatory statement," to confer standing to sue a credit reporting agency for allegedly violating the Fair Credit Reporting Act); *Grokan v. Kokh, LLC,* 256 P.3d 1021, 1039 (Ok. App. 2011) ("Whether Grogan is, or is not, a terrorist can be established by the relevant facts. . . .[The statement] is not an opinion" for purposes of the fair comment privilege in a false light invasion of privacy claim); *Minerva Marine, Inc. v. Spiliotes*, No. 02-2517, 2005 WL 8175071 *6 (D.N.J. Apr. 4, 2005) ("'You are a terrorist' is actionable as it is an expression of fact rather than opinion.").

The cases cited by both sides do not cleanly and indisputably resolve the issue of whether Olga's brief comment in *The Wasp Network* docudrama is opinion or fact, as the discussion below about the cases will demonstrate.

Initially, as succinctly explained by our appellate court in *Turner*, 879 F.3d at 1262, "[t]rue statements, statements that are not readily capable of being proven false, and statements of pure opinion are protected from defamation actions by the First Amendment." *See also Keller v. Miami Herald Publ'g Co.*, 778 F.2d 711, 714–15, 717 (11th Cir. 1985) (applying Florida law); *Blake v. Giustibelli*, 182 So. 3d 881, 884 n.1 (Fla. 4th DCA 2016) ("Statements of pure opinion are not actionable."); *Anson v. Paxson Commc'ns Corp.*, 736 So. 2d 1209, 1211 (Fla. 4th DCA 1999); *Miami Child's World, Inc. v. Sunbeam Television Corp.*, 669 So. 2d 336, 336 (Fla. 3d DCA 1996).

More specifically, under Florida law, "statements of pure opinion cannot constitute actionable defamation. . . . 'Pure opinion occurs when the defendant makes a comment or opinion based on facts which are set forth in the article or which are otherwise known or available to the reader or listener as a member of the public.'" *Eastern Air Lines, Inc. v. Gellert*, 438 So. 2d 923 (Fla. 3d DCA 1983) (quoting *From v. Tallahassee Democrat, Inc.*, 400 So. 2d 52, 57 (Fla. 1st DCA 1981), [review denied, 412 So. 2d 465 (Fla. 1982)]) (citations omitted). *See also, Turner*, 879 F.3d at 1262 (citing *From*, 400 So. 2d at 57).

But mixed expression of opinion occurs when an opinion or comment is made

which is based upon facts regarding the plaintiff or his conduct that have not been stated in the publication or assumed to exist by the parties to the communication. *Id.* (citing *Stembridge v. Mintz*, 652 So. 2d 444, 446 (Fla. 3d DCA 1995)).

Whether the statement is one of fact or opinion and whether a statement of fact is susceptible to defamatory interpretation are questions of law for the court. *Keller*, 778 F.2d at 715; *Fortson v. Colangelo*, 434 F. Supp. 2d 1369, 1379 (S.D. Fla. 2006); *From*, 400 So. 2d at 56-57. When making this assessment, a court should construe statements in their totality, with attention given to any cautionary terms used by the publisher in qualifying the statement. *Turner*, 879 F.3d at 1263 (citing *Keller*, 778 F.2d at 717). It is also the court's function to determine "whether an expression of opinion is capable of bearing a defamatory meaning because it may reasonably be understood to imply the assertion of undisclosed facts that justify the expressed opinion about the plaintiff or his conduct." *Stembridge*, 652 So. 2d at 446 (quoting Restatement (Second) of Torts § 566, comment c).

In *Turner,* the former offensive line coach for the Miami Dolphins, James Turner, brought a defamation action against a law firm (and one of its partners), which issued a report to investigate allegations of bullying within the Dolphins organization. 879 F.3d at 1259-60. The Eleventh Circuit affirmed an order dismissing the lawsuit. Significantly, our appellate court held that the report's statement that Coach Turner participated in "homophobic taunting" of a Dolphins player "is an opinion and not

actionable in a defamation suit." *Id.* at 1264.

As analyzed by the Eleventh Circuit, the statement is the defendants' "subjective assessment of Turner's conduct and is not readily capable of being proven true or false." *Id.* **However**, the Court noted that the report outlined the many undisputed facts which the law firm relied upon in making the statement and also pointed out that the report expressly mentioned that "the opinions set forth in the findings and conclusions below and elsewhere in this [r]eport are our own." *Id.*

Netflix relies on *LeBlanc* for the proposition that "numerous courts have found that politically-charged descriptions like 'terrorist' are non-actionable opinions." [ECF No. 243, p. 2]. The appellate court held that the statement "Dave LeBlanc is a terrorist" constituted an expression of opinion and is therefore nonactionable; it also concluded that the statement, which appeared on an *internet blogpost,* as "likely to be perceived as 'rhetorical hyperbole, a vigorous epithet.'" 103 A.D. 3d at 213.

The assessment in *LeBlanc* helps Netflix's position. In the instant Film, Olga uttered the statement emotionally and impulsively, so a reasonable viewer may well have considered it to be a quick rant using an exaggerated critical comment, rather than an affirmative statement of alleged fact. An evaluation of the entire context demonstrates that Olga was under the impression that her husband abandoned her in Cuba; she was not aware at the time that her husband was a Cuban spy working for Castro's Communist regime in South Florida. On the other hand, the facts on which

this statement was supposedly based on were *not* discussed in the same scene.

Plaintiffs' cases on the issue are not particularly on-point or convincing. *Ramirez*, 141 S. Ct. at 2190, involves a claim brought under a federal statute, the Fair Credit Reporting Act, not under a common law defamation theory. In addition, the issue there was whether the plaintiff and the putative class had suffered an injury concrete enough to confer standing. Moreover, the comment at issue originated from a federal agency, the Office of Foreign Assets Control ("OFAC"), which maintained a list of suspected terrorists, drug traffickers and other serious criminals. The case did not involve a docudrama, nor did it involve created dialogue uttered in an emotional movie scene. Instead, the case involved an OFAC list of "specially designated nationals" who "threaten America's national security." *Id*. at 2201. That information is far-more factual than Olga's "terrorist" comment (which was actually uttered by well-known actress Penelope Cruz).

*Grogan*, 256 P.3d at 1021, concerned an invasion of privacy claim, not a defamation claim. Moreover, the court reversed a summary judgment in the defendant's favor because the material facts about the television reporter's comment about terrorism were disputed. The context (a television news report about a controversy at a school) is far different than the Film's context here. Although the case does mention the concept of "opinion" and indicated that the plaintiff's alleged terrorist status can be established by the relevant facts, the court's discussion of

opinion arose because it was determining whether the fair comment privilege protected the reporter's comment in the television broadcast – an issue not involved in the instant case.

*Minerva Marine, Inc. v. Spilotes*, No. 02-2517, 2005 WL 8175071 (D.N.J. Apr. 4, 2005) involves written statements which the defendant made in a letter to the Coast Guard. The court held that one statement (but not others) is an expression of fact, as opposed to an opinion. The court additionally held that the following comments were "just expressions of opinion" and therefore not actionable: that plaintiff "should not go unpunished," that it "may harbor other terrorists," and that this country cannot "allow companies like Minerva to do business with and operate freely in the United States." *Id*. at *6.

*Sirer v. Askoy*, No. 21-cv-22280, 2023 WL 3166453 (S.D. Fla. May 1, 2023) is a default judgment scenario in which neither defendant nor his attorney appeared at the evidentiary hearing. Moreover, the use of the term "terrorist" was far-more specific and detailed than Olga's single reference in a docudrama. Specifically, the defendant posted a video to his YouTube channel in which he falsely stated the plaintiff is a "member of the Fethullah Terrorist Organization ('FETÖ'), a group that has been designated as a terrorist organization in Turkey." *Id*. at *2. There was no discussion about whether the allegation was a protected opinion. To the contrary, the court described the YouTube video to be "dangerous" and broadcasting a falsehood which

"placed Plaintiff and his family at an increased risk of surveillance, arrest, and indefinite detainment when he was visiting Turkey." *Id*. at *10. Given the factual specificity of the falsehood, it would have been futile for the defendant, even if his counsel had been at the hearing, to challenge the statement as opinion.

Similarly, *Lustig v. Stone*, No. 15-20150, 2015 WL 13326350 (S.D. Fla. Aug. 18, 2015) also concerned an evidentiary hearing on damages after entry of a default against the defendant. Similar to the scenario in *Sirer,* no defense attorney appeared at the evidentiary hearing and there was no discussion about whether the word "terrorist" was protected opinion. Moreover, the allegation that the plaintiff, an attorney, was a "terrorist" was lost in the smorgasbord of other allegations which the defendant hurled against him. She accused him of: (1) "being an adult predator and like a child molester must be barred from contact with vulnerable adults"; (2) being engaged in "health insurance fraud [that] will soon be investigated"; (3) "extort[ing] over $400,000" from the plaintiff's mother; (4) "engag[ing] in a pattern and practice of abuse and embezzlement"; (5) "repeatedly fil[ing] fraudulent stated litigations"; (6) "engag[ing] in the 'human trafficking' of [the plaintiff's] mother"; (7) being a "diabolical fraudster"; (8) being a "thug attorney"; (8) being a "habitual liar"; and (9) engaging in "fraud, perjury, extortion and [other] felony crimes." *Id*. at *4. Given the mountain of incendiary allegations, the default status of the lawsuit and the complete lack of discussion about whether the "terrorist" allegation was a protected opinion,

this case is of no help to our analysis.

The Undersigned considers Olga's brief "terrorist" comment to be more akin to (1) the "terrorist" statement made in *LeBlanc* and (2) a statement (in a docudrama) falsely attributed to a prosecutor in the Netflix docudrama *When They See Us* (Harpo Films 2019). The prosecutor's comment, which she says she never actually said, was one of several remarks at issue in *Fairstein*, 553 F. Supp. 3d at 48 – a case worth discussing in some detail.

Linda Fairstein, the plaintiff, was a high-ranking prosecutor in the New York District Attorney's Office during the investigation and prosecution of five young men ("the Five") of color who were convicted of beating and raping a young woman in Central Park in 1989.

The five were exonerated in 2002, after the confession of a man whose DNA matched a sample found near the victim. The case, which is now known as the "Central Park Jogger" or the "Central Park Five" case, drew intense public interest. In 2019, 30 years after the brutal attack, Netflix released a four-part dramatization of the arrest and prosecution of the Five. It features high production values, a cast of famous actors, a popular music soundtrack and "atmospheric, hallucinatory sequences intended to reflect the characters' psychological states." *Id.* at 57. According to the trial judge's opinion on a motion to dismiss, the movie is "openly sympathetic to the Five" and depicts the Five as "innocent young men who are harmed by an unjust

prosecution and an unsympathetic and often brutal system bent on incarcerating the Five." *Id.*

The Court's opinion explains that Fairstein is portrayed as a "central villain" of the docudrama and as a "zealous, win-at-all-costs prosecutor." The Court concluded that "the average viewer would not perceive" the series "as a documentary and would instead understand it as a dramatization drawn from historical events." *Id.* at 59. The docudrama included a disclaimer in the closing credits of each episode, advising that "certain characters, incidents, locations, dialogue and names" are "fictionalized for the purposes of dramatization." *Id*. at 60.

Notwithstanding this disclaimer, which the complaint alleges is inconspicuous and appearing in small font late in the credit rolls, Fairstein's lawsuit asserts that defendants promoted and marketed *When They See Us* as a fact-based version of the events surrounding the Five. For example, advertising trailers described the series as "[t]he truth you haven't heard" and "based on the true story of the Central Park Five." *Id*. And a woman who wrote, directed and produced the movie was quoted in the complaint as referring to "the real story of The Central Park [Five]" and 100% real." *Id.*

*Fairstein* focused on many statements and events as being defamatory, but we will focus on only one here: referring (more than once) to the Five as "animals." The complaint alleges that Fairstein's comments were fabricated and that the dialogue portrays her as dehumanizing children of color by referring to them as "animals."

Recognizing that the Fairstein character's use of the word "animals" is in fact "derogatory and appears intended to discomfort the viewer," the court accepted her assertion that she never uttered those remarks and also held that the series' use of the word "animals" "is also protected as **privileged opinion**." *Id.* at 81 (emphasis added). The court held that "in the full context" of the series, "such language in a dramatized series drawn from historical events would not be understood by the average viewer as a faithful representation of Fairstein's actions and words." *Id.* Instead, the court reasoned, the average viewer would view it as "heightened and hyperbolic rhetoric that reflects the filmmakers' critique of the prosecution." *Id.*

Therefore, the court held, because the complaint does not plausibly allege a defamatory meaning to Fairstein's use of the word "animals," the complaint would be dismissed to the extent that it asserts defamation based on that scene." *Id.* at 82.[14]

We acknowledge, of course, that "terrorist" is different from "animals," and that the interpretation of "terrorist" may vary according to its place in a book, article or movie. Nonetheless, given that the Film is a documentary and that the Olga character

_____

[14]     As briefly noted earlier, *Fairstein* is not the only defamation lawsuit spawned by *When They See Us* and filed against Netflix. *John E. Reid and Assocs., Inc. v. Netflix,* involved the comment, made by a prosecutor character in the movie, that the "Reid Technique has been universally rejected." 2020 WL 1330657. In dismissing the complaint, the court there explained that "loose language," and "undefined slogans -- like saying something is 'unfair' or 'fascist' or calling someone a 'traitor' or accusing someone of blackmail -- do not necessarily amount to falsifications of fact." *Id.* at *7.

blurted out the remark in an emotional moment without knowing the full factual scenario concerning her husband, the Undersigned deems the scene (and the use of the word "terrorist") to be **not** defamatory. In other words, it is merely an emotional, dramatic, hyperbolic comment -- which is not actionable.

This assessment does not necessarily depend on the quick comment being officially categorized as an "opinion," as its nature does not suggest that a reasonable viewer would consider it to be an actual fact. As used by Olga in the docudrama, her reference to Basulto as a "terrorist" is merely hyperbolic rhetoric blurted out quickly and arising from an incorrect view of her husband's actual activities. In context, which is key, Olga's "terrorist" comment is akin to calling someone a "fascist" or a "traitor." The word is "neither precise nor readily understood." *Id.*; *John E. Reid & Assocs., Inc.*, 2020 WL 1330657 at *7. In addition, the Film makes it clear that Olga has a wildly incorrect understanding of what her husband was *actually* doing in South Florida, a scenario which would cause the average viewer to conclude that the emotional comment is not factual.

Thus, regardless of whether Olga's one-sentence comment is an opinion or a hyperbolic comment or a vague accusation hurled in a docudrama by a character spouting created dialogue in a conversation which may have never taken place in the first place, the allegation is not defamatory. *See, e.g., Trump v. Cable News Network, Inc.*, No. 22-61842, 2023 WL 4845589 (S.D. Fla. July 28, 2023) (granting with prejudice cable

news outlet's motion to dismiss former president's defamation claim based on the outlet's use of the phrase "the Big Lie" to describe his challenges to the legitimacy of the presidential election because the phrase is opinion, not factually false, and because the statement is not defamatory as a matter of law).

Still, the term "terrorist" is potentially inflammatory, so the Undersigned will assume, in an abundance of caution and solely for the purposes of our summary judgment motion analysis, that it is defamatory. That assumption will not yield a different result because, as we will soon discuss, Plaintiffs did not establish by clear and convincing evidence that Netflix published the assumed defamation with actual malice.

**Paragraph 107(h)** alleges that the Film falsely portrays BTR as being involved in drug smuggling. This allegation is not persuasive. The scene at issue shows that Gonzalez had left BTR and joined PUND and was flying a PUND plane at the time, not a BTR plane. BTR admitted that this scene does not depict a BTR plane. *See* [ECF No. 159, ¶ 92].

Basulto also admitted that the Film's depiction of Gonzalez stating that he did not always "follow the flight plan" when he was with BTR is substantially true because BTR pilots did, in fact, file false flight plans indicating missions to rescue rafters when, actually, the pilots intended to drop propaganda over Cuba. *See id*. At ¶ 19. Nor does the Film's depiction of Gonzalez stating that he did not always follow BTR's flight

plans suggest that he was smuggling drugs for BTR. That is a leap of logic. *See Rubinstein v. Ourian*, No. 20-21948-CIV, 2021 WL 4134753, at *5 (S.D. Fla. Sept. 10, 2021) (Moreno, J.) ("Counterclaimants say the general public would not understand what a 'stay' is and therefore, Dr. Ourian was defamed by implication. . . . If a viewer misinterprets the speaker's words when the speaker has done nothing to affirmatively cause that misinterpretation, the speaker cannot be faulted.").[15]

**Paragraph 107(i)** alleges that the Film defamatorily depicts "Brothers to the Rescue aiding a successful terrorist attack in Cuba," and Basulto "approving of the terrorist attack and as the leader and orchestrator of the terrorist attacks against Cuba." (But BTR again admitted that the scene does not depict a BTR plane.) [ECF No. 159, ¶ 95]. The allegation in paragraph 107(i) that "Rene [Gonzalez] is seen flying a Brother [sic] to the Rescue plane as cover and as a lookout for a speedboat transporting men holding machine guns" is an incorrect allegation, as BTR admitted during its deposition. *Id.* at ¶ 96.

To the contrary, the Film plainly depicts the attack as having been led and orchestrated by *another* anti-Castro organization, Movimiento Democracia, not by Basulto, who is depicted as asking Gonzalez what happened. (Film, 00:34:57 – 00:35:44)

_____

[15]     Plaintiffs note that Gonzalez later met with Basulto, as if that scene might suggest Gonzalez actually flew a drug smuggling mission for BTR. [ECF No. 227, p. 7]. To the contrary, that later scene is well *after* the PUND drug scene and in no way connects the PUND drug scene to BTR.

(Gonzalez: "The money's good, but it's too risky for me." PUND pilot: "Got any other offers?" Gonzalez: "Ramón Saul Sánchez reaching out to me. Movimiento Democracia needs good pilots."); (*Id.* at 00:42:02 – 00:42:07) (Basulto: "Back from a mission?" Gonzalez: "Don't you have your own sources?"); (*Id.* at 00:42:20 – 00:42:22) (Gonzalez: "The **Movimiento** may be proud, not me." (emphasis added)). Moreover, Basulto testified that BTR supported Movimiento operations; and that he (Basulto) did not judge whether the means used by any other exile group to effect regime change were appropriate or not. [ECF No. 159, ¶¶ 98-99].

Plaintiffs contend [ECF No. 227, p. 9] that the Film falsely portrays Basulto as "having inside knowledge of and approving the terrorist attack." Plaintiffs say the scene is false because "Basulto has never had any knowledge of any individuals shooting guns on a beach in Cuba in the 1990s and never had any conversation with anyone about such an event." But Plaintiffs' theory about how this scene should be interpreted is not sustainable, as the Film does not depict that. Instead, it shows Basulto *asking* Gonzalez for information about what happened. The scene is not defamatory; Plaintiffs have proffered an unconvincing theory about what the scene depicts.

**Paragraph 107(j)** alleges that the Film's depiction of Mas Canosa referring to Basulto as his "friend" during a wedding scene is defamatory because it implies that Basulto is "the ringleader and mastermind of criminal Cuban Exile groups" as well as

88

"a pawn of CANF" who "actively plans and coordinates terrorist attacks."[16] [ECF No. 159, ¶ 101 (Film, 00:46:04 – 00:46:44)]. As we discussed earlier in connection with paragraph 107(c), the Film's depiction of Mas Canosa is not defamatory as a matter of law. *See Martinez II*, 2023 WL 2630337, at *4 n.2. Nor is the Film's depiction of Mas Canosa and Basulto as having been friends defamatory because Basulto testified that he was in fact "a friend" of Mas Canosa, whom Basulto further described as "a Cuban patriot." *Id*. at ¶ 102. Basulto also acknowledged that he was at social events with Mas Canosa, and that he attended Mas Canosa's funeral in 1997. [ECF No. 159, ¶¶ 102-3].

These comments are not defamatory.

**Paragraph 107(k)** alleges that the Film defamatorily depicts Basulto as "endangering the pilots" who were shot down in 1992, and as further portraying the downed planes as "violating Cuban air space [sic] when they were shot down" when, in fact, they were "in international airspace[.]" *Id*.at ¶ 104 (Film, 01:13:37 – 00:16:50).

As a threshold matter, Plaintiffs have **abandoned** their claims concerning this scene because they make no argument concerning it in their opposition memorandum. [ECF No. 227]. *See Christian v. Cartersville City Sch. Bd. of Educ.*, 167 F. App'x at 93, n.1.

Nevertheless, as the Undersigned decided earlier in this ruling, I will address the merits of this abandoned claim in an abundance of caution.

---

[16]   This allegation appears illogical, as it contends that Basulto was both a "ringleader and mastermind" and a mere "pawn."

89

So, returning to the merits of Netflix's summary judgment motion on this scene, both Plaintiffs admitted that the Film does not depict the downed planes as having been in Cuban airspace at the time. [ECF No. 159, ¶ 105]. Basulto also admitted that the plane he piloted that day *did* cross into Cuban airspace. *Id*. at ¶ 106. The scene is not defamatory.

**Paragraph 107(l)** is another abandonment-of-claim scenario, as Plaintiffs did not discuss it in their memorandum. Following the procedure the Undersigned is using for the abandonment circumstance, the merits will be discussed anyway.

This allegation contends that the Film defamatorily depicts BTR and Basulto as "flying over the city of Havana and dropping leaflets from the window," and further alleges that such depiction of BTR and Basulto "illegally flying in Cuban airspace" is defamatory because it portrays "another justification for Cuba's shootdown of the planes." *Id*. at ¶ 107 (Film, 00:13:11 – 00:14:48). But Basulto **did** illegally fly into Cuban airspace on the day of the shootdown. *Id*. at ¶ 106. Both Plaintiffs further admitted that Basulto had illegally flown into Cuban airspace on multiple occasions in the past to drop pro-democracy leaflets, bumper stickers, and medallions, which had incited the Cuban government. *Id*. at ¶¶ 19, 108. So the scene is true and therefore not defamatory.

**Paragraph 107(m)** is another abandonment situation, but the Report and Recommendations will discuss it anyway in an abundance of caution. It alleges that Plaintiffs are defamatorily depicted in the Film "as being part of the criminal

enterprise composed of Cuban Exile groups" because of a scene where Roque gives an interview criticizing BTR and Basulto as "organizing terrorist actions in Cuba while pretending to give humanitarian aid." *Id*. ¶ at 109 (Film, at 01:18:40 – 01:19:40). But, as BTR itself admitted, Roque did, in fact, give such an interview on CNN. *Id*. at ¶ 110.

Plaintiffs have not alleged that the Film inaccurately depicts what Roque said on a CNN interview.

In addition, Netflix might arguably be protected by the fair and neutral reporting privileges. "Under Florida law, it is well settled that disinterested communications of matters of public concern are privileged, even if defamatory." *Barbuto v. Miami Herald Co.*, No. 21-cv-20608 , 2022 WL 123906, at *5 (S.D. Fla. Jan. 13, 2022), aff'd on other grounds, 2023 WL 3773707 (11th Cir. July 2, 2023) (citing *Corsi v. Newsmax Media, Inc.*, 519 F. Supp. 3d 1110, 1124 (S.D. Fla. 2021)). The neutral reporting privilege applies to "disinterested and neutral reporting by members of the media." *Id.* (citing *Ortega Trujillo v. Banco Cent. Del Ecuador*, 17 F. Supp. 2d 1334, 1338 (S.D. Fla. 1998)) (internal quotation marks omitted).

The neutral reporting privilege extends only to "disinterested and neutral reporting" by "**members of the media**." *Ortega*, 17 F. Supp. 2d at 1338 (emphasis added).

Whether the neutral reporting privilege provides protection is a legal determination that the Court can resolve by motion. *See generally Rendon v. Bloomberg,*

*L.P.*, 403 F. Supp. 3d 1269, 1276 (S.D. Fla. 2019). Netflix, an entertainment online streaming service which both produces and licenses content produced by others, including documentaries and docudramas, contends that it is a media defendant. If this perspective is legally correct (and Netflix is a "member of the media"), then it would be eligible for protection under the neutral reporting doctrine. Netflix has cited some authority to support its view that it is a media defendant. *See Nichols v. Moore*, 477 F.3d 396, 400 (6th Cir. 2007) (filmmaker was "media defendant"); *Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495, 502 (1952) (films are included in free press and free speech protections of First Amendment).

On the other hand, the scenario here does not fit cleanly into the typical neutral reporting doctrine. Netflix is not exactly "reporting" Roque's comments in *The Wasp Network*. It is not as if the Film has a newscaster saying, that "Roque provided an interview to a news program and said Plaintiffs were using humanitarian aid as a cover to engage in terrorism." Similarly, Netflix has not cited a case which squarely holds that Netflix or another streaming service broadcasting a docudrama is a media defendant (or a member of the media) for purposes of the neutral reporting privilege.

In addition, Netflix is not in the same role as the typical media defendant, which, for the Roque video-interview excerpt, would be the reporter or the network or news outfit employing the reporter. In reality, Cable News Network ("CNN") was the news entity which interviewed Roque, while the Film appears to be a dramatic

recreation, using a hard-to-discern fictional network similar to CNN which was interviewing Roque "live" in Havana.

Therefore, setting aside the abandonment-of-claim status (which would render the scene unavailable to Plaintiffs for purposes of opposing the summary judgment motion concerning this specific interview scene), recognizing that Roque did actually make the statement in a news interview he gave at the time, acknowledging that Netflix might also benefit from the neutral reporting doctrine, and noting that the specific statement is substantially negative (i.e., disguising terrorist activities under the umbrella of humanitarian aid), the Undersigned will *assume* that this brief scene is defamatory. But, as with the other assumptions mentioned in this ruling, the result does not change because Plaintiffs have not cleared the difficult-to-meet actual malice requirement for public figures.

**Paragraph 107(n)** is vague. It alleges only that "[t]here is also some narration" throughout the film. One portion of the narration says, "[d]uring the period, *The Wasp Network* was able to thwart 20 terrorist attacks, and seize a large quantity of explosives, weapons and cash." But there is nothing to link that allegation to BTR or Basulto. The cited portion of the Film (01:02:33 – 01:02:43) does not refer to BTR, though it does expressly mention (during a portion including the cited section)[17] *other* anti-Castro

---

[17]     (Film, 1:00:07 – 01:03:30).

93

groups.

In their depositions, Plaintiffs could not explain why the cited scene defames them, and they could not articulate what the paragraph meant. [ECF No. 159, ¶¶ 112-113]. This allegation is not defamatory because it is not of and about either Plaintiff.

**Paragraph 107(o)** is, once again, an abandonment situation, which means the Court will *still* evaluate it, in an abundance of caution. As with all the scenes which Plaintiffs abandoned, the Court *could* grant summary judgment on them in Netflix's favor without wrestling with the legal issues. *See Coal. For the Abolition of Marijuana Prohibition v. City of Atlanta*, 219 F.3d 1301, 1326 (11th Cir. 2000) (The Court saw "no reason for the district court to consider" the appellants' argument because it was abandoned.); *Five for Ent. S.A. v. Rodriguez*, No. 11-24142-CIV, 2013 WL 4433420, at *14 (S.D. Fla. Aug. 15, 2013) (finding the defendants entitled to summary judgment because the plaintiff abandoned its claims as pled).

This paragraph alleges that the Film's wedding scene presents "a defamatory image of Mr. Basulto being involved in a mafioso-like lifestyle paid for by cocaine and terrorist activities," because the scene portrays a nice wedding with a luxury bridal car, well-dressed guests, and the presence of press [ECF No. 159, ¶ 114 (Film, 00:43:51 – 00:48:34)]. But a sister court has already determined, in a related lawsuit, that this allegation is not defamatory. *See Martinez II*, 2023 WL 2630337, at *4, n.2 (rejecting as a "mischaracterization" the claim that this scene depicts "a lavish lifestyle funded by

criminal activity").

Are Plaintiffs Public Figures?

As noted above, whether Plaintiffs are public figures is a question of law for the Court. *Brewer v. Memphis Publ'g Co.*, 626 F.2d 1238, 1247 n.13 (5th Cir. 1980).

An individual may qualify as a public figure either generally – that is one with such fame and notoriety that he will be a public figure in *any* defamation case – or for only "limited" purposes, where the individual has thrust himself into a particular public controversy, and thus must prove actual malice in regard to certain issues. *Berisha*, 973 F.3d at 1310 (affirming trial court summary judgment ruling that plaintiff was a limited public figure) (citing *Turner*, 879 F.3d at 1272).

 General public figures are individuals who, "by reason of fame or notoriety in a community, will in *all* cases be required to prove actual malice." *Turner*, 879 F.3d at 1272 (emphasis added). Limited public figures, on the other hand, are "individuals who have thrust themselves forward in a particular public controversy and are therefore required to prove actual malice only in regard to *certain* issues. *Id.* (citing *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 94 S. Ct. 2997, 41 L. Ed. 2d 789 (1974) (emphasis added)).

If the existence of a public controversy is established, as it is here, then the court must apply a two-part test to determine if a specific individual is a limited public figure for the purpose of that controversy. First, the court must determine whether the

individual played a central role in the controversy. *Id.* at 1272-73 (citing *Gertz*, 418 U.S. at 347, 94 S. Ct. at 3010). Second, it must determine whether the alleged defamation was "germane to the individual's role in the controversy." *See also Long v. Cooper*, 848 F.2d 1202, 1204 (11th Cir. 1988) (internal citation and quotations omitted).

Two "fundamental" criteria help draw the line between public and private figures: (1) "public figures usually have greater access to the media which gives them a more realistic opportunity to counteract false statements than private individuals normally enjoy"; and, more importantly, (2) public figures typically "voluntarily expose themselves to increased risk of injury from defamatory falsehoods." *Berisha,* 973 F.3d at 1310 (citing *Silvester,* 839 F.2d at 1494) (internal quotation marks omitted) (affirming summary judgment in the defendants' favor in defamation lawsuit brought by limited public figures).

Netflix argues that Plaintiffs are both general public figures and limited public figures. The Undersigned concludes that Plaintiffs are *both* types of public figures.

First, although it is not necessarily binding or issue-dispositive, the Undersigned deems it significant that Basulto admits that he is a public figure who people love. In fact, he is so well loved, even today, that people still offer to buy him meals at restaurants, approximately 25 years after the two BTR planes were shot down.

Second, Basulto and BTR were the subjects of substantial news coverage about their activities dropping supplies to rafters and dropping leaflets over Cuba. In fact,

Basulto was named one of the twenty-five most interesting people of the year by a well-established national magazine in 1995. And Basulto was designated as one of the most-trusted persons in Miami. Basulto collaborated with an author for a book about him and BTR, and the book explained that "*The Miami Herald* and its Spanish counterpart, *El Nuevo Herald*, **saturated** the community with articles on Brothers to the Rescue." [ECF No. 159-3, p. 24 of the book (emphasis supplied)].

Third, BTR and Basulto were the subject of even more media coverage and prominence after the shootdown of two of its planes by the Cuban air force. In fact, Netflix's summary judgment motion attached myriad news articles about Basulto and BTR as exhibits. By way of illustration only, Netflix submitted a New Yorker magazine article which explained that BTR's missions "had made Basulto **a Miami media star**." [ECF No. 159-5, p. 31 (emphasis added)].

Fourth, according to the testimony of BTR's representative, Basulto himself never turned down an interview request. Indeed, the representative explained that Basulto participated in all the television and radio programs he was invited to attend.

Fifth, a BTR plane is exhibited in a museum.

Sixth, the 25th anniversary of the shootdown of the two BTR planes was publicly commemorated in 2021 with memorials attended by Basulto, U.S. Senator Marco Rubio, and three members of Congress, who released a joint statement. An NBC News article about the event noted that Basulto went to lay flowers at Opa-locka Airport "and to

speak about the tragedy." [ECF No. 161-13].

Seventh, BTR admits that it easily attracted volunteers without needing any advertising because of its press coverage and prominence. BTR's representative testified that BTR's activities "motivated the community" and that "people just wanted to help."

Eighth, Basulto testified as a witness at the criminal prosecution against what is known in Miami as "The Cuban Spy Trial" in 2001 and was prominently featured in extensive news coverage about the trial.

Ninth, Basulto and BTR were the subject of significant public attention during their efforts to help rafters who left Cuba and following the death of the BTR pilots in the shootdown by Cuban jets.

Tenth, in addition, Basulto and BTR pursued and promoted their involvement in the public controversy by voluntarily participating in myriad interviews with the media about their activities. *See generally Michel*, 816 F.3d at 702 ("no question" that rapper and philanthropist Prakazrel ("Pras") Michel was a public figure). To provide another example of his purposeful coordination with the media, Basulto arranged to have media representatives on board all BTR planes during a July 13, 1995 mission to fly to a spot six miles from the Cuban coast. [ECF No. 195-3, p. 183 of *Seagull One* (described in the next paragraph)].

Eleventh, Basulto collaborated with author Lily Prellezo in writing and publishing the book *Seagull One, The Amazing True Story of Brothers To The Rescue*, which

was published in 2010. It is still available for purchase.[18]

Twelfth, the City of South Miami and the Miami-Dade County Commission passed resolutions honoring Basulto and BTR's work by naming a street (S.W. 76th Street) "Jose Basulto Street." A January 2018 ceremony to install the sign was attended by the Mayor of South Miami and several city commissioners. So Basulto was *still* in the news years after the BTR rescue flights and the shootdown of the two planes.

For purposes of the limited public figure analysis, the Undersigned concludes that the controversy was multi-factorial: the massive exodus of Cubans to Miami on rafts, BTR's efforts to provide food and water to the rafters with their aircraft and pilots, BTR's additional efforts to fly over Cuba and drop leaflets and the shootdown of the two BTR aircraft.

Basulto and BTR were directly and significantly involved in the controversy. Indeed, they actually *created* the controversy by deciding to provide help to the rafters and to publicize those efforts. Their involvement increased when they violated Cuban airspace in order to drop leaflets.

And, finally (for purposes of the limited public figure analysis), the alleged

---

[18]     *See* https://www.amazon.com/Seagull-One-Amazing-Brothers-Rescue (last visited September 3, 2023). The Amazon internet description of the book lists Basulto as a "contributor," as well as working "in collaboration with" the author. It explains that "the group's tactics were sometimes controversial, including protests against both the Cuban and U.S. governments, yet the organization manages to save over 4,200 people they would seldom, if ever, meet."

defamation was surely *germane* to Plaintiffs' participation in the controversy. According to the Complaint, Plaintiffs' efforts to help rafters and to provide information to Cubans by dropping leaflets from the planes were aided by terrorists who obtained funding with drug trafficking proceeds. The allegations directly relate to their voluntary participation in the public controversy.

The passage of time does not alter an individual's public-figure status with respect to that particular public controversy. *See Friedgood v. Peters Pub. Co.*, 521 So. 2d 236, 241-42 (Fla. 4th DCA 1988) (plaintiff's public figure status did not go stale despite the passage of time because "once a person becomes a public figure in connection with a particular controversy, that person remains a public figure thereafter for purposes of later commentary or treatment of that controversy," including "later historical or dramatic treatment of the same events"); accord *Street v. Nat'l Broad. Co.*, 645 F.2d 1227, 1235-36 (6th Cir. 1981) (same, despite passage of forty years); *Brewer,* 626 F.2d at 1257 (same, despite retreat to private life several years before the publication); *Seale v. Gramercy Pictures*, 964 F. Supp. 918, 922-23 (E.D. Pa. 1997) (same, thirty years after the event); *Contemp. Mission, Inc. v. New York Times Co.*, 842 F.2d 612, 619-20 (2d Cir. 1988) (same, collecting cases, and rejecting the "but-I've-returned-to-private-life" argument). *See also Meeropol v. Nizer*, 560 F.2d 1061, 1066 (2d Cir. 1977), cert. denied, 434 U.S. 1013 (1978) (the children of Julius and Ethel Rosenberg were found to be general public figures because they were "cast into the limelight" during the Rosenberg trial, and the

court assumed, *sub silentio*, that the children's status as public figures continued some 20 years after the trial for the purpose of a libel action based upon a book published in 1973 containing commentary on the Rosenberg trial).[19] Therefore, Plaintiffs are both

_____

[19]     Plaintiffs rely on *Wolston v. Reader's Digest Ass'n, Inc.*, 443 U.S. 157 (1979), where the Supreme Court left unanswered the question of "whether or when an individual who was once a public figure may lose that status by the passage of time." *Id.* at n.7. However, Justice Blackmun's concurrence concluded that the plaintiff was not a public figure due to "the lapse of 16 years." *Id.* at 170-71. The passage of time may diminish the defamed party's "access to the means of counterargument," i.e., access to the media. *Id.*

But "concurring opinions written by a single appellate-level jurist are not considered binding upon the lower courts and have almost no dispositive impact upon the law on which they speak." Ryan Moore, *I Concur! Do I Matter?: Developing A Framework for Determining the Precedential Influence of Concurring Opinions*, 84 Temple L. Rev. 743, 743 Spring (2012). *Cf. Maryland v. Wilson,* 519 U.S. 408, 412-13 (1997) (language in a concurrence is not "binding precedent").

And Plaintiffs have not called our attention to any binding case law which holds that a public figure loses that status through the passage of time. The law is to the contrary. *See generally Shoen v Shoen*, 292 P.3d 1224, n.5 (Col. Ct. Appeals, Div. V) ("Circuit courts addressing the issue, however, have concluded that "once a person becomes a public figure in connection with a particular controversy, that person remains a public figure thereafter for purposes of later commentary or treatment of that controversy."). *See also Partington v. Bugliosi*, 56 F.3d 1147, 1152 n. 8 (9th Cir. 1995) ("it appears that every court of appeals [addressing the temporal element of public figure status] has concluded that the passage of time does not alter an individual's status as a limited purpose public figure"); *accord Milsap v. Journal/Sentinel, Inc.*, 100 F.3d 1265, 1269–70 (7th Cir. 1996) (concluding that the founder of a 1960s newspaper was a public figure for purposes of defamation action based on editorial column published **25 years later** and concluding that "a person who injects himself into public controversy assumes the risk of negative public comment on his role in the controversy, both contemporaneously and **into the future**" (emphasis added)).

Moreover, Justice Blackmun's non-binding concurrent opinion took the position

general and limited public figures.

<u>Did Netflix Act With "Actual Malice?"</u>

Evaluating whether Netflix acted with actual malice requires an evaluation of the circumstances, which, in this scenario, involves a movie entertainment company which did not create the film and contends that it could safely rely on the producer's representations and warranties (without doing any of its own investigation of the Film's factual accuracy). There are not many cases involving this type of circumstance, but there are two cases which are substantially similar: *Lovingood*, 800 F. App'x at 840 and *Colborn v Netflix, Inc.*, No. 19-cv-0484-BHL, 2023 WL 2482620 (E.D. Wisc. Mar. 10, 2023). The Undersigned will discuss both cases in detail, starting with the appellate decision (i.e., *Lovingood,* from our own Eleventh Circuit).

<u>Lovingood</u>

This lawsuit involves a made-for-television movie about the space shuttle *Challenger*, which broke apart 73 seconds after it launched in January 1986, killing all seven astronauts on board. A presidential commission was convened to investigate the

---

that the passage of time will often be "relevant" to determining a plaintiff's access to the means of counter argument. But we would reach the same conclusion *even if* the passage of time was a relevant factor, as Basulto and BTR have hardly disappeared into anonymity since they stopped flying planes to pick up rafters and to drop leaflets over Cuba. To the contrary, they remain in the public eye, as evidenced by the naming of a street after Basulto, the book about Plaintiffs' activities (which the public can still easily purchase on the internet) and the commemoration which attracted national politicians.

cause of the disaster. More than 25 years later, the British Broadcasting Corporation ("BBC"), Discovery Communications, Inc. ("Discovery") and the Open University co-produced a film entitled *The Challenger Disaster*.

Although that film uses some historical video footage, most of the film involves actors portraying the people and events involved in the *Challenger i*nvestigation, and the film is shot in a dramatic, rather than documentary, style. So the production seems to be more of a docudrama, rather than a documentary. Similar to the Film at issue here, the made-for-television movie was based in part on a book.

The BBC broadcast the movie in the United Kingdom on March 2013. Similar to the parties in the instant case, a licensing agreement was involved. Specifically, Discovery had a master agreement with the BBC that granted Discovery the option to co-produce and rebroadcast BBC programming in the United States, though the BBC would retain final artistic and editorial control over the programming. Discovery had **contributed 40% of the production cost** of the movie and received the license to rebroadcast the movie in the United States. It rebroadcast the film in the United States, very slightly modified, on the Discovery Channel and the Science Channel on November 16, 2013.

Similar to the Film at issue here, the movie opens with the title card: "This is a true story." The opening then adds, "[s]ome scenes have been created for dramatic purposes." The plaintiff, Judson Lovingood, Ph.D., was the deputy manager of the

space shuttle projects office at NASA's Marshall Space Flight Center in 1986. In the movie, he appears in one short scene near the end. In that scene, Lovingood and two other NASA managers testify in the commission's televised hearing.

As it turned out, Lovingood's testimony scene is a fictionalization. Although he did in fact testify twice before the commission, the movie did not depict *that* actual testimony. His actual testimony about discrepancies in failure probabilities at NASA appeared, instead, on an appendix to the commission's final report.

Lovingood filed his lawsuit against Discovery, the Science Channel, the Discovery Channel, BBC Films, the Open University and the screenwriter (and several unnamed defendants), alleging defamation and invasion of privacy-false light, stemming from his negative portrayal in the movie. Several defendants were dismissed and Discovery eventually moved for summary judgment. The district court granted summary judgment against both of Lovingood's claims and dismissed his complaint with prejudice. Concerning the defamation claim, the district court found that Lovingood was a public official, and that he failed to show that Discovery acted with actual malice – the same standard used for public figures.

The Eleventh Circuit affirmed the conclusion that Lovingood is a public official for purposes of the lawsuit. Lovingood challenged the public official designation, but the appellate court pointed out that there was "contemporary press coverage" of the *Challenger* investigation and that the "record contains many **news articles** from the

1980s in which Lovingood was **quoted by local and national media** as an authoritative source about the space shuttle program." 800 F. App'x at 846 (emphasis supplied).

Moreover, the *Lovingood* Court noted that he "has continued to give retrospective interviews about *Challenger* and appeared in two separate television documentaries about the disaster.

Lovingood urged the Court to create an exception to the well-established *New York Times* standard for situations involving the fictionalization of sworn testimony. Specifically, he wanted the Court to hold that the "actual malice" standard is inapplicable in the context of depictions of perjury. The *Lovingood* Court refused.

Referencing *Masson*, 501 U.S. at 516 (which it described as "declining to create an exception for inaccurate quotations), *Lovingood*, 800 F. App'x at 847, the *Lovingood* Court held that "our 'actual malice' inquiry must take into account how a reasonable viewer would understand the contents of the scene." *Id.*

The appellate court acknowledged that "there is some dispute about how this film's genre should be formally characterized." *Id.*

It noted that Discovery's corporate representative described it as a docudrama or a historical drama but distanced himself from a Science Channel press release label of "fictional drama." Discovery emphasized the last of the three title cards displayed in the first minute of the movie: "Some scenes have been created for dramatic purposes." Lovingood, by contrast, focused on the first of the title cards, which said, "[t]his is a true

story."

The *Lovingood* Court reasoned that "the perspective of the reasonable viewer encompasses more than a one- or two-word label; it looks to the film itself." *Id.*

But, as summarized by our appellate court, "the overall format, tone, and direction of the film" is "most telling." Therefore, the Court explained, a reasonable viewer "would understand within the first two minutes that he is not watching a documentary film that consists mainly of historical footage and interviews with the historical figures." Instead, the Court outlined, that reasonable viewer would "recognize the parts of the film that do use historical footage and understand that they are meant to depict literal history, and he would understand that most of the film uses actors to portray historical events with **some amount of artistic license**." *Id*. (emphasis added).

In addition, the Eleventh Circuit held, the reasonable viewer would "also understand that condensing the entire *Challenger* investigation into a 90-minute dramatic film required the **selective editing** of real history not only for time but also for clarity, flow and emotional impact." *Id.* (emphasis added).

According to the *Lovingood* Court, the "most important[]" factor to consider when evaluating how a reasonable viewer would understand the movie is that the viewer "would understand that the film presents the *Challenger* story not as a disinterested, objective narrative but through a single critical perspective – that of an

involved witness (the author) who is sympathetically portrayed by a recognizable actor and who appears in nearly every scene." *Id.* The Court found that a reasonable viewer "would understand the film as generally **not** purporting to present verbatim dialogue from the pages of history." *Id.* (emphasis added).

Significantly, the Court held, when determining if Discovery acted with actual malice, "the mere fact that the film contains altered historical dialogue is *not*, in itself, evidence that Discovery made statements with knowledge they were false for purposes of the *New York Times* standard." *Id.* at 848 (emphasis supplied).

The Court *assumed* that Lovingood adequately alleged that Discovery republished a defamatory statement about him. As a result of this assumption, Lovingood had to show that Discovery acted with "actual malice" – and the court easily concluded that the record contained "no evidence at all" that Discovery knew that the lines spoken by the Lovingood character in the film were false. *Id.* at 849.

Nevertheless, Lovingood argued that Discovery acted with reckless disregard for whether the statements about him were false, insisting that Discovery's executive director should have read the hearing transcripts and the author's book "more closely" and "should have been more aggressive in the pursuit of the BBC's research notes." *Id.* at 849.

The *Lovingood* Court acknowledged that the record contains "some discrepancies" about what Discovery subjectively believed its responsibility was for

fact-checking the script of the movie. Similar to Netflix's position in our case, Discovery's corporate representative repeatedly asserted that the BBC had sole responsibility for fact-checking and avoiding defamation because it actually produced the movie. The Court also pointed out that the master agreement included a no-defamation *warranty.*

However, Discovery's executive producer testified that, although he mainly relied on the BBC to get the facts right, his job "was to make sure that they were doing it." But he admitted that he personally had only skimmed the book on which the movie was partly based. Noting that the record in a summary judgment posture required that the record be viewed in the light most favorable to the plaintiff, the *Lovingood* Court assumed for purposes of analysis that Discovery retained "some" responsibility for fact-checking the movie. *Id.* at 850.

Nevertheless, the appellate court held that the standard for reckless disregard is "still higher" than Lovingood's view of what type of fact-checking Discovery should have reasonably done. *Id.* at 850.

For purposes of determining whether Plaintiffs in the instant have established actual malice by Netflix, the following two holdings from *Lovingood* inform the analysis:

1. **"[F]ailure to investigate** before publishing, even when a reasonably prudent person would have done so, is **not sufficient** to establish reckless disregard." *Id.* (quoting *Harte-Hanks Comm'ns, Inc. v. Connaughton,* 491 U.S. 657, 688, 109 S. Ct. 2678,

105 L. Ed. 2d 562 (1989) (emphasis supplied)).

2.  Because actual malice is not an objective standard, arguments about what a reasonable producer should have done will not avail. Rather, to show reckless disregard that amounts to actual malice, a defamation plaintiff must point to evidence that the defendant had **real, subjective suspicions** about the veracity of the statement in question. "There must be sufficient evidence to permit the conclusion that the defendant in fact **entertained serious doubts** as to the truth of his publication," *St. Amant v. Thompson*, 390 U.S. 727, 731, 88 S. Ct. 1323, 20 L. Ed. 2d 262 (1968), or that he acted with a "**high degree of awareness of . . . probable falsity,**" *Garrison v. Louisiana*, 379 U.S. 64, 74, 85 S. Ct. 209, 13 L. Ed. 2d 125 (1964) (emphasis supplied).

Framed by these principles, our appellate court emphasized that Lovingood had not identified any evidence showing that anyone at Discovery had "actual doubts about the scene or real awareness that the scene might be problematic." *Id*. at 850. The Discovery employee who had "even a modicum of responsibility for the content of the film" testified that he "had absolutely no reason to believe they did not do their job . . . I had no reason to – to suspect that they weren't doing their job." *Id.*

The *Lovingood* Court also rejected Lovingood's alternative argument that Discovery should be liable because it was willfully blind to the falseness of the scene. The Court noted that neither the U.S. Supreme Court nor our Circuit has ever applied the willful blindness doctrine to a civil defamation claim. Moreover, the Court noted

that Lovingood had not presented any evidence that Discovery acted with willful blindness, which requires "an even higher standard than recklessness." Thus, if Lovingood could not point to evidence of recklessness as actual malice, then he necessarily cannot establish willful blindness, the appellate court held.

Based on this analysis, the Eleventh Circuit held that Discovery was "entitled to the protection of the First Amendment" and affirmed the district court's grant of summary judgment in Discovery's favor.

Applied to the Netflix summary judgment motion at issue before us, the takeaways from *Lovingood* are:

1. If a media company like Discovery, which contributed 40% of the production cost, can obtain First Amendment protection based on a scene the Court assumed to be defamatory, then a company like Netflix, which did not contribute *any* of the financing, can enjoy similar Constitutional protection.

2. The existence of news articles and media coverage can be factored into the decision of whether Plaintiffs like Basulto and BTR are public figures.

3. A reasonable viewer would understand that *The Wasp Network* is not meant to depict literal history, as it uses precious little actual historical footage and, instead, uses actors to portray events.

4. Likewise, a reasonable viewer would understand the Film as generally not purporting to present verbatim dialogue from history. Because the Film is a docudrama,

110

not a documentary, virtually all of the dialogue was *created* by either the author of the book, the director of the movie, or screenwriters. Therefore, any reasonable viewer would acknowledge that some, if not many, of the conversations depicted in the Film may not have actually happened at all (or that the conversations, assuming they even occurred, did not contain the specific language depicted in the Film's scenes).

5.  Relying on a warranty of accuracy and/or no defamation from Orange, the Film's producer, is not unreasonable, especially when Netflix has a history of licensing other films from Orange and considers it to be reliable.

6.  Netflix's failure to investigate the accuracy of the scenes from *The Wasp Network* does not generate recklessness for purposes of the *New York Times* standard for public figure plaintiffs.

7.  Plaintiffs did not produce any evidence that anyone at Netflix entertained serious doubts about the Film's accuracy.

8.  If a media defendant like Discovery can obtain summary judgment on the actual malice standard when its executive producer believed he had some responsibility to check the facts by ensuring that the producer was doing what it was supposed to do, then Netflix is capable of also obtaining summary judgment here, where there has been no evidence of any Netflix official who thought the company had *any* investigative duties.

*Colborn*

This lawsuit involves the Netflix-released ten-part docuseries *Making a Murderer* (Synthesis Films 2015), which led to a defamation lawsuit filed by a small-town police sergeant (Andrew Colborn), who was portrayed in an unflattering way in the series about a murder prosecution against Steven Avery. A special prosecutor charged Avery with homicide in November 2005. Weeks later, two graduate film students traveled to Manitowoc, Wisconsin and began work on a project which would ultimately evolve into *Making a Murderer,* which Netflix released approximately ten years later, in December 2015. The series focused on the trial, which began in February 2007.

Avery's defense attorneys argued that police officers, including Colborn, had planted evidence to ensure conviction of a man they had already deemed guilty. At trial, one of Avery's lawyers cross-examined Colborn, challenged his motives and tried to paint his conduct as unscrupulous. Colborn repeatedly denied any wrongdoing. The jury returned with a guilty verdict on the charges of intentional homicide and felon in possession of a firearm, and the trial judge sentenced Avery to life in prison without the possibility of parole.

The two graduate students spent the next several years editing footage and mapping out the first few episodes of their project. By July 2013, they had independently shot 90% of the series and produced rough cuts of the first three episodes. One year later, impressed with the work, Netflix licensed the series. Netflix

112

appointed four employees to **oversee the project**. This team provided **feedback and suggestions**, though the two former film students retained responsibility for editing the cuts. According to the Netflix team of four, none of them reviewed the raw footage of the trial or depositions.

In the final version of the series, Colborn's three-hour trial testimony is reduced to **ten minutes**, spread across several episodes. Dramatic musical flourishes are linked to particular moments. Out-of-sequence responses are stitched together to give the appearance of a seamless examination. The episodes also feature the two defense lawyers, who give out-of-court interviews in which they repeat their theory that Manitowoc law enforcement officials (like Colborn) planted evidence.

Colborn's lawsuit pursued two types of claims: his primary theory was defamation, but he also alleged intentional infliction of emotional distress.

Colborn had seen only an hour of *Making a Murderer.* Because he was a public official, the First Amendment (as interpreted by the Supreme Court) required him to establish, through clear and convincing evidence, that Netflix published the series with actual malice.

The trial court flagged several legal principles which also apply to the claim which Basulto and BTR are pursuing:

      1. Concerning Colborn's theory that, in the course of condensing the trial footage, the defendants deliberately altered Colborn's words to make him appear more

contemptible, the court there explained that "of course, some alteration is necessary" because "no documentary is 'true' in the strictest sense of the words; they all abbreviate, edit and emphasize." 2023 WL 2482620, at *6.

2.  To protect journalists, as well as other voices shouting into the marketplace of ideas, minor inaccuracies are forgiven "so long as 'the substance, the gist, the sting, of the libelous charge be justified.'" *Id.* (quoting *Masson*, 501 U.S. at 517).

3.  "Put another way, [a] statement is not considered false unless it 'would have a different effect on the mind of the reader from that which the pleaded truth would have produced.'" *Id.* (quoting Robert D. Sack, *Libel, Slander, and Related Problems* 138 (1st ed. 1980).

The court concluded that *Making a Murderer* was "not always so evenhanded in its presentation" and held that "a fair-minded jury could conclude that *Making a Murderer* not-so-subtlety nudges viewers toward the conclusion that Colborn did, in fact, plant evidence to frame Steven Avery." Therefore, the court noted, Netflix and the other Defendants were not entitled to summary judgment on the question of *falsity*. They were, however, entitled to summary judgment because Colborn could not show *actual malice.*

The court's discussion later focused on whether Netflix acted with actual malice and pointed out that Colborn had no evidence that Netflix knew that any statements were in fact false. The court highlighted the fact that no one on Netflix's creative team

ever spoke to anyone depicted in *Making a Murderer* and never even watched the raw trial footage, relying instead solely on the cuts the producers provided.

Significantly (because it relates to a theory being advanced here by Basulto and BTR), Colborn argued that Netflix assumed the risk of a defamation lawsuit when it published *Making a Murderer* "**without a thorough factcheck**." But the *Colborn* Court rejected that theory as a misstatement of the law because "a publisher is 'under **no obligation to check** [a producer's] facts at all, unless something **blatant** puts them on notice that [the producer] was reckless about the truth." *Id.* at *19 (quoting *Saenz v. Playboy Enterprises, Inc.,* 841 F.2d 1309, 1319 (7th Cir. 1988) (quoting *St. Amant,* 390 U.S. at 731-32)).

The court held that Colborn had not established actual malice even though the series may not have been to his liking, noting that "[i]f media could portray us only at our best, we would be a country of antiseptic caricatures, and less intelligent for it." *Id.* at *19.

Relying on *Hustler Magazine, Inc. v. Falwell,* 485 U.S. 46, 57 (1988) (holding that the actual malice standard is needed for an intentional infliction of emotional distress claim by reason of publication because the standard "is necessary to give adequate 'breathing space' to the freedoms protected by the First Amendment"), the *Colborn* Court held that Colborn's claim for intentional infliction of emotional distress also failed because, as a public figure, he did not establish the requisite actual malice.

Applying the lessons articulated in *Colborn to* the instant case yields the following conclusions:

1. If Netflix could obtain summary judgment because a defamation plaintiff failed to establish actual malice when Netflix employees *oversaw* the project and made *suggestions* to help shape the look and feel of the series, then Netflix should be able to obtain a similar summary judgment ruling when it had **absolutely no involvement** with the creative process of making the movie.

2. If Netflix could obtain summary judgment on the actual malice issue when the employees it assigned to oversee the project never reviewed the raw footage of the relevant video (i.e., the trial and the depositions), then it should be able to likewise obtain a favorable summary judgment ruling when it did no investigation into the accuracy of the Film because it was relying on the producer's warranty.

3. If Netflix could obtain summary judgment when a trial court judge held that the series was not always evenhanded in its presentation, then it should be able to obtain a similar summary judgment ruling when the trial court (i.e., the Undersigned) made no such conclusion.

4. If Netflix was able to obtain summary judgment in its favor when the trial court concluded that it did not need to check the producer's facts even though the trial judge also concluded that a jury could conclude that the series not-so-subtlety nudged viewers into believing that Colborn planted evidence to frame Avery, then it should be

able to obtain a summary judgment here, where there is no similar finding.[20]

There is no dispute that Netflix did not conduct any independent research into the Film's accuracy before it was initially made available for streaming in June 2020. Plaintiffs have not submitted any legal authority to advance the theory that Netflix meets the actual malice standard merely because it relied on the warranty of the Film's producer, Orange. To the contrary, the record establishes that Netflix had licensed other movies from Orange before and had no reason to doubt Orange's reliability or the soundness of the warranties.

Likewise, Plaintiffs did not submit any evidence that anyone at Netflix ever doubted the accuracy of the Film or had any real awareness that any scene was problematic from an accuracy or defamation perspective.

And Plaintiffs have not established that Netflix's failure to investigate meets the actual malice standard, as the law is to the contrary. *See, e.g., Klayman v. City Pages,* 650 F. App'x at 750-51 ("[d]efendants' failure to investigate and poor journalistic standards are

---

[20]     *See also Greene v. Paramount Pictures Corp.,* 340 F. Supp. 3d 161, 171-72 (E.D.N.Y. 2018), *aff'd,* 813 F. App'x 728 (2d Cir. 2020). The court affirmed the award of summary judgment to all defendants, including the film's publisher, on actual malice grounds, crediting the publisher's declaration that it "acted solely as the [m]ovie's distributor and did not produce or develop its screenplay," and that it **relied on the producer's "represent[ations] and warrant[ies]** to Paramount that the [m]ovie would comply with libel and slander laws." *Greene,* 340 F. Supp. 3d at 171-72 (emphasis supplied). The court found that, where the distributor relied on the producer's representations and warranties of no defamatory content, the plaintiff could not "establish that [the] [d]efendants 'in fact entertained serious doubts as to the truth of [the] publication.'" *Id.*

insufficient to establish actual malice") (affirming summary judgment for defendant news companies and reporters). Furthermore, a mere refusal to correct a publication also "falls short" of meeting the actual malice burden. *Id.*

The mere fact that Cuba permitted the Film to be filmed in Cuba hardly means that Castro's Communist Government was the source of the Film's content, nor does it mean that it influenced the Film to the point where it injected defamatory information or modified the script to include defamatory information. Even if the Cuban Government played some role in the Film's content, which Plaintiffs have assuredly not established, Plaintiffs have not pinpointed to any specific comment or scene which is defamatory and which arose from that Government's involvement.

Plaintiffs emphasize that Cuban pilots were provided with cameras to assist in the filming, but how does *that* establish that the pilots (or the Cuban Government) somehow influenced the Film to include scenes defamatory to Plaintiffs? The answer is obvious: it does not. Moreover, Plaintiffs have not alleged that the in-flight film from cameras used by the Cuban pilots actually made it into the Film, nor have they alleged that any such filming (assuming it even made it into the Film) is defamatory.

Likewise, the Cuban Government's approval of the script does not mean that it was also the *source* of information for the Film's content. Plaintiffs have not established that any specific scene or snippet of dialogue came from the Cuban Government. And

the director explained in interviews that the Cuban Government did not influence the script.

But, for the sake of discussion, let's *assume* that the Cuban Government's role in the Film should have somehow put Netflix on notice that some type of additional due diligence into the Film's accuracy was needed and that Netflix overlooked its duty to probe further. That circumstance would *still* not be sufficient to demonstrate actual malice, because a negligent lapse and careless failure to follow up does not meet the standard of "in fact entertain[ing] serious doubts as to the truth of [its] publication." *Berisha*, 973 F.3d at 1312 (quotation and citations omitted). Indeed, even an "extreme departure from professional [publishing] standards" does not necessarily rise to the level of actual malice. *Harte-Hanks*, 491 U.S. at 665.

Plaintiffs argue that they and the Cuban Government were in a feud and that this somehow generated grounds compelling Netflix to not rely solely on Orange's warranty but to actually probe on its own the facts depicted in the Orange-produced Film. But the Cuban Government was not the source of information for the Film. *Cape Publ'ns, Inc. v. Adams,* 336 So. 2d 1197, 1199-200 (Fla. 4th DCA 1976), cited by Plaintiffs, is inapposite. Actual malice was found in that case because the author of the article was told *before* publication that a *source of information* was in a feud with, and had *provided false information* about, the plaintiff. No similar facts exist here. The letter was sent after the Film was published on Netflix's streaming platform, not before. And there is no record

evidence that the Cuban Government was the source of information for the Film. The Undersigned does not find that authority applicable or convincing.

Plaintiffs have not introduced any evidence to demonstrate that Netflix entertained serious doubts about the factual accuracy of the events portrayed in the Film. For example, the following types of hypothetical statements from Netflix employees (such as those often found in emails in other defamation lawsuits) were **not** submitted as evidence by Plaintiffs: "I think that scene is not true," "We need to look into that comment -- it seems to be false," "That scene makes me nervous because it does not sound true," "That dialogue can't possibly be true, so we should get rid of it," "That guy sounds out of his mind when he says that, so we should either eliminate it or research it," or "Let's check that scene out with Orange – it appears very dicey."

Plaintiffs' other strategies of trying to demonstrate actual malice by clear and convincing evidence are similarly unconvincing. Their speculation about why Netflix did not make an industry decision to pursue an award for the Film in the United States does not constitute evidence of "serious doubts" about possible defamatory content concerning Plaintiffs. Similarly, the fact that the author of the book on which the Film was based was supposedly a friend of Castro's is, at most, circumstantial evidence which "cannot substitute for" the lack of direct evidence amounting to "purposeful avoidance of the truth." *Blankenship v. NBC Universal, LLC,* 60 F.4th 744, 764 (4th Cir.

2023) (citing *Harte-Hanks*, 491 U.S. at 692 and affirming summary judgment for defendant media organizations and news reporters).

Plaintiffs argue that Netflix "published the Film with actual malice because it knew that the Film was made by an unreliable source, the [c]ommunist Cuban government" and that Netflix's *Cuba Libre* documentary "shows that the Cuban Government censors speech and does not permit freedom of the press or freedom of speech." [ECF No. 227, p. 14]. But, as already noted, the Film was not "made" by the Cuban Government. Yes, the Cuban Government *allowed* the Film to be made in Cuba after reviewing the script, but that hardly means that it "made" the film. Netflix's decision to previously air the *Cuba Libre* documentary does not establish by clear and convincing evidence that it knew that any specific portion of the Film was defamatory.

First, different teams at Netflix worked on the two projects. And second, even if the team working on the Film knew about the *Cuba Libre* project (and its theme that Cuba did not permit free speech), that would not establish actual malice. It might establish *negligence* (i.e., the Film's staffers should have investigated further because Cuba allowed the Film to be made there), but that is not actual malice. *See, e.g., Lovingood*, 800 F. App'x at 850 (standard for reckless disregard is higher than a "failure

to investigate before publishing even when a reasonably prudent person would have done so is not sufficient to establish reckless disregard").[21]

At bottom, Plaintiffs have cobbled together a series of circumstances they deem to be suspicious and argue that these factors somehow establish actual malice. They do not. At most, they establish negligence. So Netflix might not win a journalism or filmmaking award for exemplary fact-checking of a docudrama made by others, but it is also entitled to summary judgment here on the defamation claims (including the conspiracy to defame claims).[22]

---

[21]    Netflix's failure to amend the Film after receiving a pre-suit (but post-publication) notice letter from counsel does not establish actual malice either. *Klayman,* 650 F. App'x at 751 (defendant's refusal to correct publication or conduct investigation after receiving demand letter was insufficient -- "falls short" -- to show actual malice); *Fairfax v. CBS Corp.*, 2 F.4th 286, 295 (4th Cir. 2021) (same, and holding that refusal to correct or retract is not probative of media defendant's state of mind at the time of publication) (quoting *Horne v. WTVR, LLC,* 893 F.3d 201, 211 (4th Cir. 2018)); *Mount Juneau Enters., Inc. v. Juneau Empire*, 891 P.2d 829, 840 (Alaska 1995) (same); *Pippen v. NBCUniversal Media, LLC*, 734 F.3d 610, 614 (7th Cir. 2013), *cert. denied*, 573 U.S. 917 (2014) ("[T]he fact that [plaintiff] alerted the defendants by email after publication that he had not entered bankruptcy does not help him establish actual malice at the time of publication.").

In addition, Basulto's pre-suit notice did not suggest the warranty was incorrect. It had several errors and it failed to identify specific scenes or to offer any specific facts. *See* [ECF No. 237, p. 5 n.7].

[22]    Because Plaintiffs have no claim for defamation, their "Conspiracy to Defame" claims should also be dismissed. *See, e.g., Thomas v. Patton,* No. 162005CA003777XXXXMA, 2005 WL 3048033, at *4 (Fla. 4th Cir. Ct. Oct. 21, 2005), *aff'd and remanded*, 939 So. 2d 139 (Fla. 1st DCA 2006) ("Without a defamation, there can be no conspiracy to defame."); *Pierson v. Orlando Reg'l Healthcare Sys., Inc.*, No. 6:08-CV-466-Orl-28GJK, 2010 WL 1408391, at *24 (M.D. Fla. Apr. 6, 2010), aff'd, 451 F. App'x 862

<u>Intentional Infliction of Emotional Distress</u>

Basulto abandoned this claim, as he did not discuss it in his Opposition to Netflix's summary judgment motion, which contained an *entire* named subsection on intentional infliction of emotional distress ("IIED"). It may well be that Basulto[23] decided to abandon his claim because he did not submit any evidence showing any manifestation of these types of injuries. For example, he conceded that he has never seen a doctor for any type of Film-generated ailment. But, regardless of the reason for the abandonment, Basulto ignored this section of Netflix's summary judgment motion. Nevertheless, despite the procedural abandonment, the Undersigned will briefly assess it on the merits anyway.

To state an IIED claim, a plaintiff must allege conduct "so outrageous in character, and so extreme in degree," that it is considered "atrocious and utterly intolerable in a civilized community." *Paylan v. Devage*, No. 8:15-CV-1366-T-36AEP, 2019 WL 9667696, at *9-11 (M.D. Fla. Mar. 12, 2019), *aff'd sub nom. Paylan v. Dirks*, 847 F. App'x 595 (11th Cir. 2021). "Whether a claim pleads conduct sufficiently outrageous to support a claim of IIED is a question of law . . . and is measured by an objective standard; the subjective response of the person who allegedly suffered emotional distress does not

_____

(11th Cir. 2012) (same).

[23]    BTR did not assert an IIED claim.

control." *Piccolo v. Piccolo*, No. 15-CV-62463, 2016 WL 9526494, at *3 (S.D. Fla. May 6, 2016).

Moreover, "[a] plaintiff cannot transform a defamation action into a claim for intentional infliction of emotional distress simply by characterizing the alleged defamatory statements as 'outrageous.'" *Rubinson*, 474 F. Supp. 3d at 1278 (citing *Fridovich v. Fridovich*, 598 So. 2d 65, 70 (Fla. 1992)). Basulto must instead offer evidence that Netflix engaged in "atrocious and utterly intolerable" as well as uncivilized conduct. Basulto has no such evidence; Netflix's reliance on the representation and warranty from Orange was not atrocious and utterly intolerable. [ECF No. 159, ¶ 56]. He has not done so, and Netflix is entitled to summary judgment on the IIED claim.[24]

<u>Injunctive Relief</u>

Although Plaintiffs did not raise this argument in their briefing submitted in opposition to Netflix's summary judgment motion, they informally (and quickly)

---

[24]     Given the ruling here, there is no need to also assess Netflix's alternate argument that it is entitled to summary judgment on Basulto's IIED claim because he did not submit any evidence of damages. *See cf. Ratlieff v. City of Fort Lauderdale, Fla.*, No. 22-CV-61029-RAR, 2023 WL 3750581, at *16 (S.D. Fla. June 1, 2023)("Ultimately, Ratlieff has failed to establish [in his motion to dismiss] that the City is liable under a final policymaker theory, and the Court need not reach the parties' additional arguments, including whether these decisions were a moving force behind any constitutional violations."); *Lambert v. Seminole Cnty. Sch. Bd.*, No. 6:15-CV-78-ORL-18DAB, 2016 WL 9453806, at *2 (M.D. Fla. Jan. 21, 2016) (finding that because the plaintiff's cause of action is unavailable against the defendant, who could not be found liable, there was no need to address the parties' additional arguments).

suggested, at the hearing, that the Court could still award injunctive relief (i.e., prohibiting further showing of the Film, requiring the deletion of certain allegedly defamatory scenes and the removal of the reference to the Film being "based on true events"). Given this last-minute development, the Undersigned required additional briefing on the issue of injunctive relief. [ECF No. 263]. The Order directed the parties to assume that the Court were to conclude that Plaintiffs are public figures, that at least one of the scenes was defamatory, and that Netflix did not act with the requisite "actual malice." *Id*. Plaintiffs and Netflix submitted the required memoranda [ECF Nos. 266; 267].

The Undersigned rejects Plaintiffs' theory.

First, relief likely cannot be provided in a defamation lawsuit filed by a public figure without Plaintiff establishing actual malice. *Berisha*, 973 F.3d at 1310. In the absence of actual malice, questions of falsity, substantial truth, and defamatory content become moot. *See, e.g., id.* at 1312 (explaining that a public figure plaintiff "cannot prevail" in defamation suit "unless he shows, by clear and convincing evidence, that the defendants acted with actual malice"); *Counterman v. Colorado*, 143 S. Ct. 2106, 2115 (2023) ("[A] public figure cannot recover for the injury [a defamatory] statement causes unless the speaker acted with 'knowledge that it was false or with reckless disregard of whether it was false or not.'") (quoting *New York Times Co.*, 376 U.S. at 280).

Therefore, if Plaintiffs failed to establish actual malice, then they would not be entitled to *any* remedy -- including injunctive relief. *See Medina v. City of Hialeah*, No. 02-20957-CIV, 2003 WL 1562281, at *2-3 (S.D. Fla. Mar. 24, 2003) (Moreno, J.) (granting summary judgment dismissal of defamation claim and, *sub silentio*, request for injunctive relief included therein because the plaintiff failed to establish actual malice);[25] *OAO Alfa Bank v. Ctr. for Pub. Integrity*, 387 F. Supp. 2d 20, 56 (D.D.C. 2005) (same).[26]

Second, it is an open constitutional question whether permanent injunctions against prospective speech are **ever** permissible under the First Amendment. "As a

---

[25] The day after granting the City's summary judgment motion, Judge Moreno entered a final judgment in its favor (and against Plaintiff). [ECF No. 46, Case No. 02-cv-20957]. The amended complaint, filed by a terminated police officer, sought a permanent injunction to restrain the City from disseminating information to third parties that the plaintiff was terminated from employment with the City because he engaged in illegal conduct or committed a crime.

[26] The court granted the summary judgment motion filed by defendants, a public interest organization and its reporters, because plaintiffs, two Russian businessmen and their companies (who were deemed limited public figures), did not establish actual malice. *OAO Alfa Bank*, 387 F. Supp. 2d at 56. The court entered the summary judgment on all of plaintiffs' claims **even though** it also concluded that: (1) it could not say that defendants or the article are without fault; (2) defendants likely should have researched certain points more carefully before leveling allegations as serious as drug trafficking and organized crime connections; (3) the defendants' sources lack of information on certain points should have given defendants pause; (4) defendants could have painted a fuller portrait of the backdrop for the reader; and (5) defendants' suggestion that further research was not pursued because of deadline pressure and a desire to beat their competitors to a breaking story "is no excuse for less than thorough reporting." *Id.* The court held that "these lapses in ethics and judgment amount at most to negligence or bad journalism, not actual malice." *Id.*

general matter, the First Amendment forbids the government, including the Judicial Branch, 'from dictating what we see or read or speak or hear.'" *Sindi v. El-Moslimany*, 896 F.3d 1, 30 (1st Cir. 2018) (dissolving permanent injunction against speech adjudicated to be defamatory and published with actual malice) (quoting *Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 245 (2002)).

Indeed, some courts have suggested that the remedy "is per se unconstitutional," while others leave open the possibility that under some circumstances an injunction following trial could be permissible. *Id.*

Courts typically refuse to grant permanent injunctions regarding speech in any circumstance**, even where liability for defamation has been found**. *See Tory v. Cochran*, 544 U.S. 734, 737-38 (2005) (dissolving permanent injunction as overbroad); *Sindi*, 896 F.3d at 30 (same); *see also Grayson v. No Labels, Inc.*, No. 6:20-CV-1824, 2023 WL 2919911 at *5 (M.D. Fla. Jan. 17, 2023), report and recommendation adopted, No. 6:20-CV-1824-PGB-LHP, 2023 WL 2706733 (M.D. Fla. Mar. 30, 2023) ("[E]ven if [the] [p]laintiff had prevailed on his claims, he would not have been able to obtain any equitable, injunctive relief[.]"); *United Sanitation Servs. of Hillsborough, Inc., v. City of Tampa*, 302 So. 2d 435, 439 (Fla. 2d DCA 1974) (even if a defamation had in fact taken place, "there would be no basis for a failure to follow the well-established rule that equity will not enjoin either an actual or a threatened defamation").

Plaintiffs cited some case law authority for the notion that injunctive relief is available once there has been a determination -- by either a judge or jury -- that the speech is, in fact, false and defamatory. *Deligdish v. Bender*, No. 6:23-cv-417, 2023 WL 5016547, at *12 (M.D. Fla. Aug. 7, 2023) (citing *Ward v. Triple Canopy, Inc.*, 2017 WL 3149431, at *5 (M.D. Fla. 2017); *In re Conservatorship of Turner*, No. 2013-01665, 2014 WL 1901115, at *19 (Tenn. App. Mar. 19, 2014) (discussing the purported development of "a modern, superseding rule" that, once a trial court or a jury has made a final determination that speech is defamatory, the speech determined to be false may be enjoined"); *McCarthy v. Fuller*, 810 F.3d 456, 464 (7th Cir. 2015) (explaining, in a concurring opinion, about "an emerging modern trend, however, acknowledges the general rule but allows for the possibility of narrowly tailored permanent injunctive relief as a remedy for defamation as long as the injunction prohibits only the repetition of the specific statements found at trial to be false and defamatory");[27] *Hill v. Petrotech Resources Corp.*, 325 S.W.3d 302, 308 (Ky. 2010) ("The recognition that false, defamatory speech is unprotected by the First Amendment has resulted in the development of a modern, superseding rule concerning the enjoining of defamatory speech. Under the

---

[27]      Plaintiffs' memorandum did not mention that the quoted language was from a concurring opinion, nor did it mention that the appellate court vacated the injunction because it was vague, overbroad, open-ended and not supported by the jury's verdict. In addition, that case did not involve public figures and the actual malice standard.

modern rule, once a judge or jury has made a final determination that the speech at issue is defamatory, the speech determined to be false may be enjoined.").[28]

Plaintiffs have not called our attention to any binding law adopting the so-called modern view that an injunction against speech determined to be defamatory may be entered if narrowly crafted. But even if we were to join the courts who Plaintiffs say follow the purported modern rule, the Undersigned is not prepared to do so here because: (1) there has been no determination that the statements are false and defamatory,[29] and (2) I am reluctant to create new legal principles under Florida law based on non-binding opinions.

## V.    **CONCLUSION**

Some people, like the city and county commissioners who honored Basulto by naming a street after him because of his BTR activities, view Plaintiffs as heroes. Others, like the Chicago Tribune editorial board, who described BTR as "an exile group [which] went looking for trouble by violating Cuba's sovereign airspace to drop leaflets and by playing hide-and-seek with Cuban jets along its periphery" [ECF No. 161-3], have a

---

[28]     Plaintiffs' memorandum did not point out that the court dissolved the trial court's injunction because there had not been an adjudication that the speech alleged to be false and defamatory was, in fact, false.

[29]     *Assuming* for the sake of argument in a written ruling that a statement is defamatory is not the same as **adjudicating** a statement to be defamatory for purposes of entering a prior restraint concerning the Film.

less-complimentary perspective of Plaintiffs.

Perspectives about Plaintiffs are not uniform. They are deemed both heroes and provocateurs -- and in myriad other ways along the spectrum. So it is hardly surprising that a docudrama movie about them would generate mixed reactions. The reactions of Film viewers are often powerful. Some may consider the Film offensive. So be it. That does not make the Film defamatory to Plaintiffs. Neither do allegations that the Film "glorifies" the Cuban spies portrayed in it and "maligns the Cuban exile community in general." [ECF No. 1, ¶¶ 3-4, 13, 103, 105].

The United States Constitution protects the freedom of speech which protects artistic expression like the Film. *See Fed'n of Turkish-Am. Societies v. Am. Broad. Cos.*, 620 F. Supp. 56, 59 (S.D.N.Y. 1985) (granting summary judgment on claims by Turkish-American groups that the film *Midnight Express* was offensive towards Turkish culture and explaining that plaintiffs "must recall that one of the freedoms which, by their exodus they have obtained for themselves and their children, is that very freedom of speech which . . . entitles the defendants to summary judgment dismissing this complaint.").[30]

Because Plaintiffs are public figures and because they did not establish by clear

---

[30]    The Court explained that "[i]t is perhaps an understatement to say that 'Midnight Express' portrays certain Turkish law enforcement and governmental authorities in an unflattering light." 820 F. Supp. at 57.

and convincing evidence that Netflix acted with actual malice, the Undersigned **respectfully recommends** that Judge Moreno **grant** Netflix's motion and enter summary judgment in Netflix's favor in all respects. *See New York Times Co.*, 376 U.S. at 270 (discussing the "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic and sometimes unpleasantly sharp attacks"); *see also St. Amant*, 390 U.S. at 732 ("[t]o insure the ascertainment and publication of the truth about public affairs, it is essential that the First Amendment protect some erroneous publications as well as true ones"). This ruling also recommends that all other pending motions be denied as moot.

## VI.   OBJECTIONS

The parties will have fourteen (14) days from the date of being served with a copy of this Report and Recommendations within which to file written objections, if any, with United States District Judge Federico A. Moreno. Each party may file a response to the other party's objection within fourteen (14) days of the objection. Failure to file objections timely shall bar the parties from a *de novo* determination by the District Judge of an issue covered in the Report and shall bar the parties from attacking on appeal unobjected-to factual and legal conclusions contained in this Report except upon grounds of plain error if necessary in the interest of justice. *See* 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140, 149 (1985); *Henley v. Johnson*, 885 F.2d 790, 794 (11th Cir.

1989); 11th Cir. R. 3-1 (2016).

      **RESPECTFULLY RECOMMENDED**, in Chambers, in Miami, Florida, on

September 20, 2023.

Jonathan Goodman
UNITED STATES MAGISTRATE JUDGE

**Copies furnished to:**
The Honorable Federico A. Moreno
All Counsel of Record