# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

## CASE NO: 1:22-cv-21796-MORENO/GOODMAN

JOSE BASULTO, an individual, and
BROTHERS TO THE RESCUE, INC. a
Florida not-for-profit corporation,

      Plaintiffs,

v.

NETFLIX, INC., a Delaware corporation,
ORANGE STUDIOS, S.A., a French
anonymous society, OLIVIER
ASSAYAS, an individual, NOSTROMO
PICTURES, SL, a Spanish corporation,
US ONE COMERCIO E SERVICIOS DE
CRIACAO E PRODUCAO DE OBRAS
COM DIREITOS AUTORAIS, LTD, a
Brazilian limited company, CG CINEMA,
SASU, a French simplified joint stock
company, RODRIGO TEIXIEIRA, an
individual, CHARLES GILLIBERT, an
individual, and LOURENCO
SANT'ANNA, an individual,

      Defendants.

_____ /


## DEFENDANT NETFLIX'S RESPONSE TO PLAINTIFFS' OBJECTIONS TO THE REPORT AND RECOMMENDATION ON DEFENDANT NETFLIX'S SUMMARY JUDGMENT MOTION

## <u>PRELIMINARY STATEMENT</u>

Magistrate Judge Goodman's 132-page Report and Recommendation (the "Recommendation") is meticulous in its analysis of the relevant law and facts. The Recommendation follows multiple rounds of exhaustive briefing and a three-and-a-half hour oral argument. Judge Goodman gave Plaintiffs every benefit of the doubt and analyzed their claims, in detail, from every conceivable angle, and then properly granted Netflix's motion. Plaintiffs' Objections to Judge Goodman's rulings are baseless.

*First,* Judge Goodman found that none of the 15 scenes in *The Wasp Network* (the "Film") that Plaintiffs placed at issue is defamatory. Plaintiffs' Objections focus on only two of those scenes, arguing that Judge Goodman misconstrued them. Contrary to Plaintiffs' assertion, Judge Goodman correctly found that Plaintiffs offered unduly strained interpretations of both scenes about which, moreover, Plaintiffs could not meet their initial burden of proving are false.

*Second,* Judge Goodman found that, even if any of the Film's scenes were assumed, *arguendo,* to be defamatory, then Plaintiffs still cannot prevail because they are public figures who failed to offer clear and convincing evidence that Netflix acted with actual malice. While Plaintiffs contend that Judge Goodman misapplied the facts to find that they are both general and limited purpose public figures, Judge Goodman in fact correctly applied twelve uncontroverted facts that establish that Plaintiffs were, and remain today, public figures who voluntarily placed themselves into the controversy at issue. Judge Goodman also correctly rejected Plaintiffs' attempt to impute their idiosyncratic and malign inferences of random facts to Netflix, and correctly rejected Plaintiffs' contention that Netflix should have investigated the Film's content. The law is decidedly to the contrary.

*Third,* Plaintiffs additionally contend that, as supposed non-public figures, they had no burden to prove actual damages because they asserted claims for defamation *per se*. But Plaintiffs have not contested Judge Goodman's further observation that Netflix is a media defendant, which would require Plaintiffs to prove actual damages as a matter of law. It is uncontested that Plaintiffs have no such evidence. Nor are Plaintiffs correct that they may obtain injunctive relief in the absence of any showing of liability by Netflix.

Judge Goodman correctly, upon extremely well-reasoned and carefully articulated grounds, recommended that summary judgment be awarded to Netflix dismissing all of Plaintiffs' claims. The Recommendation should be adopted in full.

## RESPONSE TO OBJECTIONS

### I.   Plaintiffs' Objections Regarding The Allegedly Defamatory Scenes Are Baseless

Plaintiffs initially alleged that 15 scenes in the Film are defamatory.  (D.E. 1 at ¶¶ 107(a)-(o).)  As Judge Goodman correctly found, Plaintiffs abandoned their claims regarding six of those scenes by not making any arguments about them in opposition to Netflix's Motion for Summary Judgment.  (D.E. 269 at 66-67, 67 n.13, 89-90, 94; D.E. 1 at ¶¶ 107(a), (b), (k), (l), (m), and (o).)[1]  Judge Goodman then found that, in any event, 13 of the 15 scenes at issue are not defamatory.  (D.E. 269 at 62-63, 69-73, 84-89, 93-94, 129 n.29.)  Even regarding the two "questionable" scenes that Judge Goodman found to be closer calls, he ultimately "agree[d with Netflix] that none are defamatory," while also finding that, even if any such scenes were assumed *arguendo* to be defamatory, Plaintiffs' claims still failed on other grounds:  namely, because Plaintiffs failed to demonstrate any actual malice by Netflix with regard to any of the scenes (discussed further below).  (*Id.* at 62-63.)[2]

Of the 13 scenes Judge Goodman found not to be defamatory, Plaintiffs object to only two, the scenes described at paragraphs 107(f) and 107(i) of Plaintiffs' Complaint.  (D.E. 270 at 3-4.)  Plaintiffs' objections to both scenes do not raise any genuine disputes for trial.

*First*, while Plaintiffs alleged in Paragraph 107(f) that the Film defamatorily depicts "Brothers to the Rescue … as a lookout for terrorists" and as "aiding and abetting an illegal weapon smuggling mission" on a particular occasion, Judge Goodman correctly found, and this Court can confirm upon its own review, that the scene is "vague" and that "Plaintiffs' arguments require a huge leap in logic" to conclude that BTR was "clearly" assisting weapons smuggling.  (D.E. 269 at 72-73.)  Plaintiffs do not contest Judge Goodman's (correct) finding that Plaintiffs bore the initial burden of proving that any of the scenes in dispute is, in fact, false.  (D.E. 269 at 50-51.)  Plaintiffs offered no evidence – such as flight logs, cockpit recordings or other evidence of pilot supervision – as to whether BTR's pilots ever engaged in such conduct, thereby failing entirely to meet their burden of proving the scene is false.  (D.E. 159 at ¶¶ 81-82.)

---

[1] Judge Goodman's *dictum* discussions of the abandoned scenes are irrelevant to this motion.

[2] Judge Goodman further noted the two scenes he assumed, *arguendo*, to be defamatory were among those that had been abandoned by Plaintiffs in their summary judgment briefing, which provides an alternate basis for their dismissal.  (D.E. 269 at 66-67, 90 & n.13.)

*Second*, Judge Goodman correctly found that Plaintiffs' allegations in Paragraph 107(i) that the Film depicts "[BTR] aiding a successful terrorist attack in Cuba," and Basulto "approving of the terrorist attack and as the leader and orchestrator of the terrorist attacks against Cuba," are belied by Plaintiffs' *admission* that this scene does not even depict a BTR plane, but "plainly depicts the attack as having been led and orchestrated by *another* anti-Castro organization, Movimiento Democracia, not by Basulto, who is depicted as asking Gonzalez what happened." (D.E. 269 at 87-88.)  This Court can readily confirm the correctness of Judge Goodman's findings for itself; Plaintiffs' assertions to the contrary are unduly strained and do not present any genuine issues for trial.[3]

## II.     Plaintiffs' Objections Regarding Their Public Figure Status Are Baseless

Judge Goodman's detailed "public figure" analysis is entirely correct.  (D.E. 269 at 95-102.)[4]  Judge Goodman correctly found that both Plaintiffs are general and limited purpose public figures.  (*Id.* at 96-100.)  Plaintiffs do not (and cannot) challenge any of the twelve facts on which Judge Goodman relied, which indisputably and squarely place them both within the public eye, both at the time of the events depicted in the Film and still today.  (*See id.*)

Plaintiffs' argument that the facts (a) do not sufficiently establish their "fame" and "notoriety" for purposes of the general purpose public figure analysis, and (b) do not sufficiently show that Plaintiffs "thrust" themselves "into a particular public controversy" for purposes of the limited purpose public figure analysis, is meritless.  *Berisha*, 973 F.3d at 1310 ("An individual may qualify as a public figure either generally – that is one with such fame and notoriety that he will be a public figure in any case – or for only 'limited' purposes, where the individual has thrust himself into a particular public controversy ….") (citing *Turner v. Wells*, 879 F.3d 1254, 1272

---

[3] Judge Goodman also correctly found that the Film is a docudrama, thus "underscor[ing] the practical point that 'viewers recognize docudramas as presenting dramatizations that may vary from historical fact even though they are based on true stories.'"  (D.E. 269 at 54-56.)  Plaintiffs do not contest this point by Judge Goodman.

[4] Plaintiffs vacantly and wrongly assert (as they did to Judge Goodman) that Netflix had supposedly only argued for "general" public figure status and had not argued that Plaintiffs are "limited" public figures.  (D.E. 270 at 5; D.E. 227 at 12.)  Netflix expressly argued both, relying in particular on the limited public figure analysis in *Berisha v. Lawson*, 973 F.3d 1304, 1310 (11th Cir. 2020), *cert. denied*, 141 S. Ct. 2424 (2021).  (D.E. 237 at 2 n.2; D.E. 158 at 16-17.)  Judge Goodman correctly found that "Netflix argues that Plaintiffs are both general public figures and limited public figures," and he properly considered both public figure arguments.  (D.E. 269 at 96.)

(11th Cir. 2018)); *accord Jacoby v. Cable News Network, Inc.*, No. 21-12030, 2021 WL 5858569, at *3 (11th Cir. Dec. 10, 2021).

In concluding that Plaintiffs are general public figures, Judge Goodman correctly found numerous instances of Plaintiffs' fame and notoriety:  "Basulto admits that he is a public figure who people love" (D.E. 269 at 96); in 2021, two years after the Film's release (in 2019), Plaintiffs were publicly commemorated, and current members of Congress issued a press release concerning them  (*id.* at 97); in 2018, the City of South Miami honored Plaintiffs with a street-naming (*id.* at 99);  Basulto's BTR plane, "Seagull One," is publicly exhibited in a museum today, and Basulto's book, *Seagull One: The Amazing True Story of Brothers to the Rescue*, remains available for purchase (*id.* at 97-98).  None of these facts is disputed.  If modern-day street namings, ongoing commemorative events with current politicians, books, contemporary museum exhibitions, and countless press and media reports do not render people general purpose public figures, then nothing does.  While Plaintiffs assert that some of these facts make them only "historical" figures but not "public" figures (whatever that means), Plaintiffs do not contest Judge Goodman's (correct) finding that the passage of time does not alter a plaintiff's public figure status.  (*Id.* at 100-102 & n.19.)  *See also Brewer v. Memphis Publ'g Co., Inc.*, 626 F.2d 1238, 1257-58 (5th Cir. 1980), *reh'g denied*, 638 F.2d 247 (5th Cir. 1981), *and cert. denied*, 452 U.S. 962 (1981) (finding that general public figure status does not disappear with passage of time).[5]

And in finding that Plaintiffs are also limited public figures, Judge Goodman correctly found that Plaintiffs not only thrust themselves into the relevant public controversy, but "they

---

[5] Plaintiffs' reliance on *Straw v. Chase Revel, Inc.*, 813 F.2d 356, 361 (11th Cir. 1987), *cert. denied*, 484 U.S. 856 (1987), is misplaced.  The court in that case found that a private and generally unknown individual was not transformed into a public figure by dint of publishing a newsletter with a total circulation of 750 copies.  *Straw*, 813 F.2d at 361.  Those facts bear no resemblance to the widespread publicity surrounding Plaintiffs reflected in the twelve findings of undisputed fact found by Judge Goodman.  Plaintiffs' reliance on *Planned Parenthood Se., Inc. v. Strange*, 33 F. Supp. 3d 1381, 1384-85 (M.D. Ala. 2014), regarding the operation of Fed. R. Evid. 807 with respect to newspaper articles, is also misplaced (and desperate).  *Strange* involved a constitutional challenge to an Alabama statute, where legislative history was of particular relevance.  *Id.*  The court analyzed unique "hearsay rules [that] apply to the use of newspaper evidence in a bench trial <u>for the purpose of proving legislative intent</u>," finding that "even if" the articles were otherwise sufficiently trustworthy to be admissible under Rule 807, they could not be admitted to prove legislative history.  *Id.* (citations omitted) (emphasis supplied).  Legislative history is not at issue here, and Plaintiffs do not otherwise contest that Rule 807 is satisfied.

actually *created* the controversy by deciding to provide help to the rafters and to publicize those efforts." (D.E. 269 at 99.)  As Judge Goodman correctly found, "Basulto himself never turned down an interview request" and "participated in all television and radio programs he was invited to attend." (*Id.* at 97.)  "Basulto and BTR pursued and promoted their involvement in the public controversy by voluntarily participating in myriad interviews with the media about their activities." (*Id.* at 98.)  Likewise, "BTR admits that it easily attracted volunteers without needing any advertising because of its press coverage and prominence," and that its activities "'motivated the community' and that 'people just wanted to help.'" (*Id.*)  These facts are all uncontroverted and are not challenged by Plaintiffs in their Objections.

Plaintiffs' attempt to liken themselves to the plaintiff in *Wolston v. Reader's Digest Ass'n*, 443 U.S. 157, 167 (1979), is wholly unavailing.  Unlike Plaintiffs, the plaintiff in *Wolston* had neither sought press attention nor voluntarily thrust himself into a controversy over the espionage activities of the Soviet Union; he had simply failed to respond to a grand jury subpoena and then pled guilty to a contempt charge, and publicity followed his conduct without any further efforts by him.  *Id.*  Plaintiffs' numerous and wholly voluntary actions to both thrust themselves into and remain in the public eye stand in marked contrast.

Finally, Plaintiffs' claim that Netflix never identified a public controversy that could make Plaintiffs limited purpose public figures is specious.  The controversy that is depicted in the Film was *public*, and the Film's depiction of that controversy is self-evident.  As Judge Goodman correctly found, "the controversy was multi-factorial" and involved "the mass exodus of Cubans to Miami on rafts, BTR's efforts to provide food and water to the rafters with their aircraft and pilots, BTR's additional efforts to fly over Cuba and drop leaflets and the shootdown of the two BTR aircraft." (D.E. 269 at 99.)  Judge Goodman also correctly found that "Basulto and BTR were directly and significantly involved in the controversy …." (*Id.* at 99-100.)  Plaintiffs do not, and cannot, genuinely dispute these facts.[6]

---

[6] Plaintiffs argue that, if the Court were to find them to be private figures, then Netflix could be held liable for defamation *per se* without Plaintiffs having to prove any actual damages (it is uncontroverted that Plaintiffs have no evidence of any actual damages). (D.E. 270 at 9.)  Plaintiffs

### III.    Plaintiffs' Objection That They Offered Clear And Convincing, Triable Evidence Of Actual Malice By Netflix Is Baseless

As Judge Goodman correctly found, because Plaintiffs are public figures, they must establish, by clear and convincing evidence, that Netflix acted with actual malice with respect to any even arguably defamatory scenes.  (D.E. 269 at 102-122.)  Judge Goodman then correctly scrutinized the relevant law and record regarding the actual malice standard and found no clear and convincing showing by Plaintiffs.  (*Id.*)  Instead, as Judge Goodman properly concluded, Plaintiffs did no more than "cobble[] together a series of circumstances they deem to be suspicious and argue that these factors somehow establish actual malice.  They do not.  At most, they establish negligence." (*Id.* at 122.)

Judge Goodman correctly found that Plaintiffs could not possibly prove actual malice by Netflix because "Plaintiffs did not submit any evidence that anyone at Netflix ever doubted the accuracy of the Film or had any real awareness that any scene was problematic from an accuracy or defamation perspective." (*Id.* at 117.)  Judge Goodman also correctly concluded that there was no dispute that Netflix relied on the representations and warranties from the Film's producer that the Film contained no defamatory content, and did not have an obligation to conduct any independent research into the Film's accuracy before it was made available for streaming in June 2020.  (*Id.*)  Those uncontroverted facts are dispositive.  (*Id.* at 111.)  *E.g.*, *Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 688 (1989) ("[F]ailure to investigate before publishing, even when a reasonably prudent person would have done so, is not sufficient to establish reckless disregard."); *Lovingood v. Discovery Commc'ns, Inc.*, 800 F. App'x 840, 850 (11th Cir. 2020) (same), *cert. denied*, 140 S. Ct. 2808 (2020); *Klayman v. City Pages*, 650 F. App'x 744, 750-51 (11th Cir. 2016) ("[T]he defendants' failure to investigate and poor journalistic standards are insufficient to establish actual malice.").

---

are once more incorrect because, as Judge Goodman noted, Netflix is a media defendant.  (D.E. 269 at 110-111 (likening Netflix to Discovery Network as a "media defendant").)  It is long-established that a claim for defamation *per se* cannot be brought against a media defendant, and that proof of actual damages must still be shown.  *E.g.*, *Corsi v. Newsmax Media, Inc.*, 519 F. Supp. 3d 1110, 1119 (S.D. Fla. 2021) (noting Florida, following *Gertz v. Robert Welch Inc.*, 418 U.S. 323, 349 (1974), eliminated defamation *per se* actions against media defendants), *appeal dismissed in part*, Nos. 21-10480 & 22-107558, 2022 WL 3353776 (11th Cir. July 1, 2022), *and appeal dismissed in part*, Nos. 21-104808 & 22-10758, 2022 WL 3350519 (11th Cir. July 7, 2022) (citation omitted); *Edelstein v. WFTV, Inc.*, 798 So. 2d 797, 798 (Fla. 4th DCA 2001).

Plaintiffs are flatly incorrect that Netflix *should have* investigated, and *should have* made the same leaps of inference that Plaintiffs make and connected a number of scattered dots to arrive at the same picture Plaintiffs have chosen to draw. (D.E. 270 at 9-16.) Plaintiffs could not possibly demonstrate "clear and convincing evidence" of actual malice by Netflix based upon Plaintiffs' various inferences; nor could Plaintiffs establish that Netflix had any duty to investigate the Film's content. *See, e.g.*, *Tobinick v. Novella*, 108 F. Supp. 3d 1299, 1309 (S.D. Fla. 2015), *aff'd*, 848 F.3d 935 (11th Cir. 2017) (cited by Plaintiffs and explaining that, to be "clear and convincing," evidence of actual malice "must be sufficiently strong to command the unhesitating assent of every reasonable mind").

In particular, Judge Goodman correctly rejected Plaintiffs' assertion that Netflix should have investigated because Cuba was "the source of the Film's content." (D.E. 269 at 118.) Plaintiffs offered *no* evidence – let alone clear and convincing evidence – that Cuba was the source of any content in the Film, let alone the source of defamatory content concerning Plaintiffs specifically. (*Id.*) *See, e.g.*, *Parekh v. CBS Corp.*, 820 F. App'x 827, 833 (11th Cir. 2020) (defamatory content must be "of and concerning" the plaintiff specifically). As Judge Goodman found: "The mere fact that Cuba permitted the Film to be filmed in Cuba hardly means that Castro's Communist Government was the source of the Film's content, nor does it mean that it influenced the Film to the point where it injected defamatory information or modified the script to include defamatory information." (D.E. 269 at 118.) Plaintiffs' own inferences to the contrary do not create any triable disputes of fact. Plaintiffs' Objections to the Recommendation based upon their self-serving *inferences*, rather than *evidence*, are meritless. (Judge Goodman's detailed handling and rejection of all of Plaintiffs' legally irrelevant inferences was also correct. (*Id.* at 118-122.))[7]

Plaintiffs' further contention that Netflix could not reasonably rely on the warranty of non-defamation from the Film's producer because the warranty was not specific to Plaintiffs is entirely

---

[7] Plaintiffs point to so-called "circumstantial evidence" as supporting their numerous inferences. These are red-herrings. Plaintiffs speculate, for example, that an email in which the Film's director vaguely stated the crew was "spied on" must be evidence that Cuba was "ensur[ing] that the Film … portrayed Plaintiffs as terrorists." (D.E. 270 at 14.) No triable issue is raised by such rhetoric. As Judge Goodman found, "Plaintiffs have not pinpointed to any specific comment or scene which is defamatory and which arose from that Government's involvement." (D.E. 269 at 118.)

unsupported and incorrect. (D.E. 270 at 16.) As Judge Goodman correctly found, the warranty at issue was like the warranty at issue in *Lovingood*, which absolved the media defendant in that case, Discovery Network, from having to conduct fact-checking *notwithstanding* that Discovery's corporate deponent testified that Discovery "retained 'some' responsibility for fact-checking the movie" (the record in this case is uncontroverted that Netflix retained no responsibility for fact-checking the Film). (D.E. 269 at 107-108, 111, 117 n.20 (analyzing similar warranty in *Greene v. Paramount Pictures Corp.*, 340 F. Supp. 3d 161, 171-72 (E.D.N.Y. 2018), *aff'd*, 813 F. App'x 728 (2d Cir. 2020), which also made it impossible for the plaintiff to "'establish that [the] [d]efendants "in fact entertained serious doubts as to the truth of [the] publication.'"").)[8]

## IV.    **Plaintiffs' Objection That They Were Entitled To An Injunction Is Baseless**

Judge Goodman correctly found that "because Plaintiffs failed to establish actual malice, … they [are] not entitled to *any* remedy – including injunctive relief." (D.E. 269 at 126.) This conclusion is indisputable. In the absence of liability, Plaintiffs are not entitled to any remedy. *E.g.*, *Berisha*, 973 F.3d at 1310, 1312 ("Because of the expressive freedom guaranteed by the First Amendment," a public figure plaintiff "cannot prevail" in a defamation suit "unless he shows, by clear and convincing evidence, that the defendants acted with actual malice"); *Counterman v. Colorado*, 143 S. Ct. 2106, 2115 (2023) ("[A] public figure cannot recover for the injury [a defamatory] statement causes unless the speaker acted with 'knowledge that it was false or with reckless disregard of whether it was false or not.'") (quoting *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 280 (1964)); *Medina v. City of Hialeah*, No. 02-20957-CIV, 2003 WL 1562281, at *2-3 (S.D. Fla. Mar. 24, 2003) (Moreno, J.) (granting summary judgment dismissal of defamation claim and,

---

[8] Plaintiffs' cited cases are all distinguishable. In *Tobinick*, 108 F. Supp. 3d at 1310-11, the court *dismissed* the plaintiff's defamation claim finding the defendant did not need to fact-check a reputable source. In *Biro v. Condé Nast*, 807 F.3d 541, 546 (2d Cir. 2015), *cert. denied*, 578 U.S. 976 (2016), the court affirmed *dismissal* of a defamation suit despite the plaintiff's allegation that the defendant relied on anonymous and biased sources. *Harte-Hanks Communications, Inc. v. Connaughton*, 109 S. Ct. 2678, 2696 (1989), *Curtis Publishing Co. v. Butts*, 388 U.S. 130 (1967), and *Cape Publications, Inc. v. Adams*, 336 So.2d 1197 (Fla. 4th DCA 1976), are all distinguishable because the publishers in each of those cases knew prior to publication that their sources were unreliable. (D.E. 269 at 119 (correctly distinguishing cases on such grounds).) No similar evidence exists here. As Judge Goodman also correctly found, the actual malice inquiry under Florida's single-publication rule focuses only on the publisher's knowledge prior to initial publication, not on any facts or notice that may exist after such publication. (*Id.* at 122 n.21.)

*sub silentio*, request for injunctive relief included therein because plaintiff failed to establish actual malice); *OAO Alfa Bank v. Ctr. for Pub. Integrity*, 387 F. Supp. 2d 20, 56 (D.D.C. 2005) (same).

Plaintiffs protest that injunctions against speech should be possible.  (D.E. 270 at 17.) Perhaps.  But not in the absence of any basis to impose liability, as Judge Goodman properly ruled.[9]

### **CONCLUSION**

For the reasons set forth above, Netflix respectfully requests that the Court adopt Magistrate Judge Goodman's Report and Recommendation in full, enter summary judgment in Netflix's favor in all respects, dismiss all of Plaintiffs' claims with prejudice, and award Netflix such other and further relief as deemed just and proper.

Dated: October 18, 2023                           Respectfully submitted,

**PRYOR CASHMAN LLP**
255 Alhambra Circle, 8th Floor
Miami, Florida 33134
Telephone: (786) 582-3010
*s/ James G. Sammataro*
James G. Sammataro (Florida Bar No. 520292)
Tom J. Ferber (admitted *pro hac vice*)
William L. Charron (admitted *pro hac vice*)
Felicity S. Kohn (admitted *pro hac vice*)
jsammataro@pryorcashman.com
tferber@pryorcashman.com
wcharron@pryorcashman.com
fkohn@pryorcashman.com

*Attorneys for Netflix, Inc.*

---

[9] In *dictum*, Judge Goodman observed that "it is an open constitutional question whether permanent injunctions against prospective speech are ever permissible under the First Amendment," and that "[c]ourts typically refuse to grant permanent injunctions regarding speech in any circumstance, even where liability for defamation has been found."  (D.E. 269 at 126-27 (citations omitted).)  Where there is no genuine dispute of material fact in this case that Netflix did not act with actual malice and cannot be liable for defamation as a matter of law, there is no need for this Court to further consider such issues.

<u>**CERTIFICATE OF SERVICE**</u>

**I HEREBY CERTIFY** that on October 18, 2023, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will send Notices of Electronic Filing to all counsel of record.

*s/ James G. Sammataro*

James G. Sammataro